**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF**
**OKLAHOMA**

(1) IRA LEE WILKINS,                            )
                                                )
                                                )
On behalf of themselves and all others          )
similarly situated,                             )
                                                )
                     Plaintiffs,                )
                                                )
v.                                              )
                                                )
                                                )          Case No.   17-cv-00606-CVE-JFJ
(1) ABERDEEN ENTERPRIZES II, INC.,)
     AN OKLAHOMA CORPORATION    )                          (Complaint –Class Action)
                                                )
                                                )          JURY DEMAND
And                                             )
                                                )
(2)  THE OKLAHOMA                               )
      SHERIFFS' ASSOCIATION,                    )
      AN OKLAHOMA NOT FOR                        )
      PROFIT CORPORATION                         )
                                                )
And                                             )
                                                )
      PARTICIPATING COUNTY                       )
      SHERIFFS OF OKLAHOMA:                      )
                                                )
(3)  JASON RITCHIE, SHERIFF OF                   )
      ADAIR COUNTY, HIS OFFICIAL                 )
      AND INDIVIDUAL CAPACITY                    )
                                                )
(4)  RICK WALLACE, SHERIFF OF                    )
      ALFALFA COUNTY, HIS OFFICIAL               )
      AND INDIVIDUAL CAPACITY                    )
                                                )
(5) TONY HEAD, SHERIFF OF                        )
      ATOKA COUNTY, HIS OFFICIAL                 )
      AND INDIVIDUAL CAPACITY                    )
                                                )
(6) RUBEN PARKER, SHERIFF OF                     )
      BEAVER COUNTY, HIS OFFICIAL                )
      AND INDIVIDUAL CAPACITY        )

1

(7) DEREK MANNING, SHERIFF OF
BECKHAM COUNTY, HIS OFFICIAL
AND INDIVIDUAL CAPACITY

(8) TONY ALMAGUER, SHERIFF OF
BLAINE COUNTY, HIS OFFICIAL
AND INDIVIDUAL CAPACITY

(9) JOHNNY CHRISTIAN, SHERIFF OF
BRYAN COUNTY, HIS OFFICIAL
AND INDIVIDUAL CAPACITY

(10)LENNIS MILLER, SHERIFF OF
CADDO COUNTY, HIS OFFICIAL
AND INDIVIDUAL CAPACITY

(11)CHRIS WEST, SHERIFF OF
CANADIAN COUNTY, HIS OFFICIAL
AND INDIVIDUAL CAPACITY

(12)CHRIS BRYANT, SHERIFF OF
CARTER COUNTY, HIS OFFICIAL
AND INDIVIDUAL CAPACITY

(13)NORMAN FISHER, SHERIFF OF
CHEROKEE COUNTY, HIS OFFICIAL
AND INDIVIDUAL CAPACITY

(14)TERRY PARK, SHERIFF OF
CHOCTAW COUNTY, HIS OFFICIAL
AND INDIVIDUAL CAPACITY

(15) LEON APPLE, SHERIFF OF
CIMARRON COUNTY, HIS OFFICIAL
AND INDIVIDUAL CAPACITY

(16) JOE LESTER, SHERIFF OF
CLEVELAND COUNTY, HIS OFFICIAL
AND INDIVIDUAL CAPACITY

(17) BRYAN JUMP, SHERIFF OF
COAL COUNTY, HIS OFFICIAL
AND INDIVIDUAL CAPACITY

(18) KENNY STRADLEY, SHERIFF OF

2

COMANCHE COUNTY, HIS OFFICIAL          )
AND INDIVIDUAL CAPACITY                )
                                       )
(19) KENT SIMPSON, SHERIFF OF          )
COTTON COUNTY, HIS OFFICIAL            )
AND INDIVIDUAL CAPACITY                )
                                       )
(20) HEATH WINFREY, SHERIFF OF         )
CRAIG COUNTY, HIS OFFICIAL             )
AND INDIVIDUAL CAPACITY                )
                                       )
(21) BRET BOWLING, SHERIFF OF          )
CREEK COUNTY, HIS OFFICIAL             )
AND INDIVIDUAL CAPACITY                )
                                       )
(22) KENNETH TIDWELL, SHERIFF OF)
CUSTER COUNTY, HIS OFFICIAL            )
AND INDIVIDUAL CAPACITY                )
                                       )
(23) HARLAN MOORE, SHERIFF OF          )
DELAWARE COUNTY, HIS OFFICIAL          )
AND INDIVIDUAL CAPACITY                )
                                       )
(24) CLAY SANDER, SHERIFF OF           )
DEWEY COUNTY, HIS OFFICIAL             )
AND INDIVIDUAL CAPACITY                )
                                       )
(25) SHANE BOOTH, SHERIFF OF           )
ELLIS COUNTY, HIS OFFICIAL             )
AND INDIVIDUAL CAPACITY                )
                                       )
(26)JERRY NILES, SHERIFF OF            )
GARFIELD COUNTY, HIS OFFICIAL          )
AND INDIVIDUAL CAPACITY                )
                                       )
(27) LARRY RHODES, SHERIFF OF          )
GARVIN COUNTY, HIS OFFICIAL            )
AND INDIVIDUAL CAPACITY                )
                                       )
(28) JIM WEIR, SHERIFF OF              )
GRADY COUNTY, HIS OFFICIAL             )
AND INDVIDUAL CAPACITY                 )
                                       )
(29) SCOTT STERLING, SHERIFF OF        )
GRANT COUTNY, HIS OFFICIAL             )
AND INDVIDUAL CAPACITY                 )

3

)
(30) DEVIN HUCKABAY, SHERIFF OF )
GREER COUNTY, HIS OFFICIAL )
AND INDIVIDUAL CAPACITY )
)
(31) JOE JOHNSON, SHERIFF OF )
HARMON COUNTY, HIS OFFICIAL )
AND INDIVIDUAL CAPACITY )
)
(32) TRA SNIDER, SHERIFF OF )
HARPER COUNTY, HIS OFFICIAL )
AND INDVIDUAL CAPACITY )
)
(33) TIM TURNER, SHERIFF OF )
HASKELL COUNTY, HIS OFFICIAL )
AND INDIVDUAL CAPACITY )
)
(34) MARCIA MAXWELL, SHERIFF OF )
HUGHES COUNTY, HER OFFICIAL )
AND INDIVIDUAL CAPACITY )
)
(35) ROGER LEVICK, SHERIFF OF )
JACKSON COUNTY, HIS OFFICIAL )
AND INDIVIDUAL CAPACITY )
)
(36) JEREMIE WILSON, SHERIFF OF )
JEFFERSON COUNTY, HIS OFFICIAL )
AND INDIVIDUAL CAPACITY )
)
(37) JON SMITH, SHERIFF OF )
JOHNSTON COUNTY, HIS OFFICIAL )
AND INDIVIDUAL CAPACITY )
)
(38) STEVE KELLEY, SHERIFF OF )
KAY COUNTY, HIS OFFICIAL )
AND INDIVIDUAL CAPACITY )
)
(39) DENNIS BANTHER, SHERIFF OF )
KINGFISHER COUNTY, HIS OFFICIAL )
AND INDIVDIUAL CAPACITY )
)
(40) JEFF SMITH, SHERIFF OF )
KIOWA COUNTY, HIS OFFICIAL )
AND INDIVIDUAL CAPACITY )
)
(41) JESSE JAMES, SHERIFF OF )

4

LATIMER COUNTY, HIS OFFICIAL            )
AND INDIVIDUAL CAPACITY                 )
                                        )
(42) ROB SEALE, SHERIFF OF              )
LeFLORE COUNTY, HIS OFFICIAL            )
AND INDIVDUAL CAPACITY                  )
                                        )
(43) CHARLES DOUGHERTY, SHERIFF )
 OF LINCOLN COUNTY, HIS OFFICIAL   )
AND INDIVIDUAL CAPACITY                 )
                                        )
(44) DAMON DEVEREAUX, SHERIFF      )
 OF LOGAN COUNTY, HIS OFFICIAL     )
AND INDIVDUAL CAPACITY                  )
                                        )
(45) MARTY GRISHAM, SHERIFF OF      )
LOVE COUNTY, HIS OFFICIAL               )
AND INDIVIDUAL CAPACITY                 )
                                        )
(46) STEVE RANDOLPH, SHERIFF OF    )
MAJOR COUNTY, HIS OFFICIAL              )
AND INDIVIDUAL CAPACITY                 )
                                        )
(47) DANNY CRYER, SHERIFF OF           )
MARSHALL COUNTY, HIS OFFICIAL      )
AND INDIVIDUAL CAPACITY                 )
                                        )
(48) MIKE REED, SHERIFF OF              )
MAYES COUNTY, HIS OFFICIAL              )
AND INDIVIDUAL CAPACITY                 )
                                        )
(49) DON HEWETT, SHERIFF OF            )
McCLAIN COUNTY, HIS OFFICIAL        )
AND INDIVIDUAL CAPACITY                 )
                                        )
(50) KEVIN CLARDY, SHERIFF OF         )
McCURTAIN COUNTY, HIS OFFICIAL    )
AND INDIVIDUAL CAPACITY                 )
                                        )
(51) KEVIN LEDBETTER, SHERIFF OF  )
MCINTOSH COUNTY, HIS OFFICIAL      )
AND INDIVDUAL CAPACITY                  )
                                        )
(52) DARRIN RODGERS, SHERIFF OF    )
MURRAY COUNTY, HIS OFFICIAL          )
AND INDIVIDUAL CAPACITY                 )

5

)
(53) ROB FRAZIER, SHERIFF OF            )
MUSKOGEE COUNTY, HIS OFFICIAL           )
AND INDIVIDUAL CAPACITY                 )
                                        )
(54) CHARLES HANGER, SHERIFF OF         )
NOBLE COUNTY, HIS OFFICIAL              )
AND INDIVIDUAL CAPACITY                 )
                                        )
(55) SANDY HADLEY, SHERIFF OF           )
NOWATA COUNTY, HER OFFICIAL             )
AND INDIVIDUAL CAPACITY                 )
                                        )
(56) STEVEN WORLEY, SHERIFF OF          )
OKFUSKEE COUNTY, HIS OFFICIAL           )
AND INDIVIDUAL CAPACITY                 )
                                        )
(57) P.D. TAYLOR, SHERIFF OF            )
OKLAHOMA COUNTY, HIS OFFICIAL           )
AND INDIVIDUAL CAPACITY                 )
                                        )
(58) EDDY RICE, SHERIFF OF              )
OKMULGEE COUNTY, HIS OFFICIAL           )
AND INDIVIDUAL CAPACITY                 )
                                        )
(59) EDDIE VIRDEN, SHERIFF OF           )
OSAGE COUNTY, HIS OFFICIAL              )
AND INDIVIDUAL CAPACITY                 )
                                        )
(60) JEREMY FLOYD, SHERIFF OF           )
OTTAWA COUNTY, HIS OFFICIAL             )
AND INDIVIDUAL CAPACITY                 )
                                        )
(61) MIKE WATERS, SHERIFF OF            )
PAWNEE COUNTY, HIS OFFICIAL             )
AND INDIVIDUAL CAPACITY                 )
                                        )
(62) R.B. HAUF, SHERIFF OF              )
PAYNE COUNTY, HIS OFFICIAL              )
AND INDIVIDUAL CAPACITY                 )
                                        )
(63) CHRIS MORRIS, SHERIFF OF           )
PITTSBURG COUNTY, HIS OFFICIAL          )
AND INDIVIDUAL CAPACITY                 )
                                        )
(64) JOHN CHRISTIAN, SHERIFF OF         )

PONTOTOC COUNTY, HIS OFFICIAL          )
AND INDIVIDUAL CAPACITY                )
                                       )
(65) MIKE BOOTH, SHERIFF OF            )
POTTAWATOMIE COUNTY, HIS               )
OFFICIAL AND INDIVIDUAL CAPACITY)
                                       )
(66) B.J. HEDGECOCK, SHERIFF OF        )
PUSHMATAHA COUNTY, HIS OFFICIAL)
AND INDIVIDUAL CAPACITY                )
                                       )
(67) DARREN ATHA, SHERIFF OF           )
ROGER MILLS COUNTY, HIS OFFICIAL )
AND INDIVIDUAL CAPACITY                )
                                       )
(68) SCOTT WALTON, SHERIFF OF          )
ROGERS COUNTY, HIS OFFICIAL            )
AND INDIVIDUAL CAPACITY                )
                                       )
(69) SHANNON SMITH, SHERIFF OF         )
SEMINOLE COUNTY, HIS OFFICIAL          )
AND INDIVIDUAL CAPACITY                )
                                       )
(70) LARRY LANE, SHERIFF OF            )
SEQUOYAH COUNTY, HIS OFFICIAL          )
AND INDIVIDUAL CAPACITY                )
                                       )
(71) WAYNE McKINNEY, SHERIFF OF  )
STEPHENS COUNTY, HIS OFFICIAL          )
AND INDIVIDUAL CAPACITY                )
                                       )
(72) MATT BOLEY, SHERIFF OF            )
TEXAS COUNTY, HIS OFFICIAL             )
AND INDIVIDUAL CAPACITY                )
                                       )
(73) BOBBY WHITTINGTON, SHERIFF )
OF TILLMAN COUNTY, HIS OFFICIAL   )
AND INDIVIDUAL CAPACITY                )
                                       )
(74) VIC REGALADO, SHERIFF OF          )
TULSA COUNTY, HIS OFFICIAL             )
AND INDIVIDUAL CAPACITY                )
                                       )
(75) CHRIS ELLIOT, SHERIFF OF          )
WAGONER COUNTY, HIS OFFICIAL           )
AND INDIVIDUAL CAPACITY                )

|  | ) |
| (76) RICK SILVER, SHERIFF OF | ) |
| WASHINGTON COUNTY, HIS OFFICIAL | ) |
| AND INDIVIDUAL CAPACITY | ) |
|  | ) |
| (77) ROGER REEVE, SHERIFF OF | ) |
| WASHITA COUNTY, HIS OFFICIAL | ) |
| AND INDIVIDUAL CAPACITY | ) |
|  | ) |
| (78) RUDY BRIGGS, JR, SHERIFF OF | ) |
| WOODS COUNTY, HIS OFFICIAL | ) |
| AND INDIVIDUAL CAPACITY | ) |
|  | ) |
| (79) KEVIN MITCHELL, SHERIFF OF | ) |
| WOODWARD COUNTY, HIS OFFICIAL | ) |
| AND INDIVIDUAL CAPACITY | ) |
|  | ) |
|  | ) |
| Defendants | ) |

## Class Action Complaint

### Introduction

This lawsuit is about constitutional violations and corruption in the collections of fines and costs, imposed on indigent defendants in criminal cases, by Aberdeen Enterprizes (sic) II (hereafter known as "Aberdeen") through a contract with The Oklahoma Sheriffs' Association (hereafter known as "Sheriffs' Association") as the administrative agent of certain, participating County Sheriffs of Oklahoma, listed above. The Plaintiffs in this case are all people living in poverty, found to be indigent by the Courts of Oklahoma Counties, who were assigned a Public Defender or counsel through the Oklahoma Indigent Defense System at the time of sentencing, who were later issued warrants and/or incarcerated for failure to pay criminal court fines and costs. These plaintiffs are victims of an extortion scheme in which the Defendants have conspired to extract as much money as possible

from indigent people through a pattern of illegal and unconscionable behavior.

The crux of this scheme is a conspiracy by a private company, Aberdeen, to collect the court debts in criminal cases by extorting[1] money from these impoverished individuals, through a cycle of intimidation, warrants and incarceration.  This scheme is carried out with the aid of the Sheriffs' Association, which contracts with Aberdeen for this egregious practice, and who has received millions of dollars in kickbacks from funds collected.

These plaintiffs have no ability to pay court costs. When they fall behind on payments, the amount they owe is increased, without notice, by 30% and sent to Aberdeen, who collects the 30% for itself and the Sheriffs' Association. Aberdeen acts as a debt collector for the Sheriffs' Association and the Counties.  Aberdeen's intimidation, through repeated and continuous threats to arrest and imprison indigent and often disabled individuals, is enforced by the Counties, who also assess and collect its own additional and substantial fees and surcharges. Counties have ceded the proper authority of the judges to Aberdeen because it is Aberdeen who requests that warrants be issued and recalled, with no hearing to determine ability to pay, as required by law.

As a result of this extortion enterprise, the Plaintiffs and tens of thousands of others similarly situated[2] have  lost housing, lost jobs, lost cars, undergone humiliating physical intrusions on their bodies in jails,  suffered medical injuries, sacrificed food and clothing for their vulnerable children, and/or diverted their low-income physical and mental disability checks—all in order to pay a  private company "fines, costs, and fees" incurred in criminal

---

[1] Extortion is defined as "the obtaining of property from another with his consent, induced by a wrongful use of force or fear, or under color of official right." 21 Oklahoma Statute §1481

[2] It is estimated that approximately 75% of all indigent defendants sentenced by the court receive a Failure to Pay warrant issued. In Tulsa County alone, 80% of all felonies are filed are filed against indigent people.

court which have already declared them to be indigent. They have languished year after year on recurring terms of debt collection under constant threats to their physical and emotional well-being, and they have been repeatedly jailed because of their poverty.   This cycle of ever-increasing debts, threats, and imprisonment has left the Plaintiffs and thousands of people like them in Cities and Counties across Oklahoma trapped in a culture of fear and panic.[3]

This civil rights action is brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the United States Constitution pursuant to 42 U.S.C. § 1983, and Oklahoma law to stop the Defendants from continuing to operate a racketeering enterprise that is extorting money from some of the most impoverished people in Oklahoma Counties under constant threat of jail and to prevent the Defendants from misusing the fines and costs imposed on the poor as a process for profit.

The treatment of Ira Lee Wilkins and each of the other Plaintiff class members, reveals systemic illegality perpetrated as a matter of ongoing design, policy, and practice by Aberdeen Enterprises and their conspirators, the Sherffs' Associaton, in each of the named Sheriffs of the counties in Oklahoma. By and through their attorneys and on behalf of themselves and all others similarly situated, the Plaintiffs seek in this civil rights action the vindication of their fundamental rights, compensation for the violations that they suffered, punitive damages to punish the Defendants and to deter similar misconduct in the future, and injunctive relief assuring that their rights will not be violated again. Debtors prisons have no place in our society.

---

[3] "[T]he percentage of families living in poverty in Oklahoma increased in 2016, even as the national poverty rate declined to its lowest point since 2008. In 2016, almost one out of six Oklahomans (16.3 percent) were making less than the poverty line ($24,230 a year for a family of four) before taxes. About 9,500 more Oklahomans had incomes below the poverty line in 2016 than in 2015. Oklahoma's poverty rate increased even as the poverty rate for the United States as a whole fell to 14.0 percent. These national improvements widened the gap between Oklahoma and the U.S. as a whole. Oklahoma's poverty rate in 2016 was 9th highest out of all 50 states." Perry, Gene. "New Census Data shows Oklahoma fell further behind the U.S. on poverty and uninsured rate in 2016,"  Healthcare, Poverty & Opportunity, Oklahoma Policy Institute, September 14, 2017.

## Nature of the Action[4]

1.      Aberdeen Enterprizes II and The Oklahoma Sheriffs Association entered into a contractual agreement, *see* Exhibit 1 ("The Agreement"), to hand control of the collection of court fines and costs from the County Courts Cost Administrator to the private, for-profit company. Pursuant to the specific terms of the Agreement, Aberdeen must earn its profit solely and directly from the people that it collects from, by operating a "user funded" model in which plaintiffs are ordered to pay, under threat of arrest and revocation of their probation, a variety of fees and surcharges to Aberdeen, as well as their court costs. According to the agreement, the Sherriff's Association will pay Aberdeen nothing, and Aberdeen will make no profit unless it is able to get money from the indigent people from whom it extorts.[5]

2.      This agreement creates an unethical and illegal alliance: a supposedly neutral collections agency who a) has a direct financial stake in every decision and outcome in any indigent individual's criminal case, and b) can request for warrants to be issued and recalled without being held accountable for an individual's ability to pay, hardship incurred, or suffering caused by limited resources going to Aberdeen rather than to the family of those affected by this abuse. This specific contractual arrangement violates the basic notions of due process, neutrality, and fairness as those concepts have been understood throughout American legal history.

3.      When defendants fail to pay, the case is sent to Aberdeen, and the amount the impoverished person owes is increased by 30%.

4.      At sentencing, plaintiffs are not given notice about this 30% increase in fines and costs that might be owed if they cannot pay.

---

[4] Plaintiffs make the allegations in this Complaint based on personal knowledge as to matter in which they have had personal involvement and on information and belief as to all other matters.
[5] "Agreement for Collection" between Oklahoma Sheriffs' Association and Aberdeen Enterprizes II, dated January 1, 2010 and most recently renewed December 16, 2016. At p. 3

5.      Indigent plaintiffs are repeatedly threatened by Aberdeen and told that failure to pay  them will result in a warrant (a warrant for which they will be charged an additional $80).

6.      The Plaintiffs were not given notice that if a warrant is issued for failure to pay, the Plaintiffs' driver's licenses will be suspended.

7.      The indigent plaintiffs, rather than be assigned community service hours or some other non-pecuniary punishment, are required to pay hundreds and often thousands of dollars in fines and costs as a part of their sentence. If they fail to pay, a warrant is issued, the total debt is increased by 30%, and the case is sent to Aberdeen, who contacts the indigent person and tells them they can have the warrant recalled in exchange for money up front and a payment schedule – the amount which is determined by the company, not the courts. This schedule is enforced through threats, warrants, and incarceration.

8.      Aberdeen is given the discretion to pay itself first from the 30% of the money increased on the debt. The amount originally owed is set by the court at sentencing, and is collected by Aberdeen until the entire debt, including the increase is paid. For example, if a plaintiff is assessed $1000 in fines and costs, Aberdeen threatens him or her with warrants and jail until $1300 is collected from the impoverished person. Therefore, Aberdeen routinely extorts money through the arrest and incarceration of indigent Oklahoma residents *who have already paid enough money to cover the entirety of their original court debts*.

9.      These proceedings are initiated and conducted without any inquiry into a probationer's ability to pay—even though the clear majority of Aberdeen's probationers are indigent—and they result in the imposition of further costs, fees, and surcharges, thus

trapping probationers in a cycle of debts, arrest, jail, and more debts.

10.     In addition to the 30% markup in costs owed by indigent named plaintiffs, and in addition to the $80 "warrant fee," the contractual arrangement provides that, "Aberdeen may offer to a debtor of a Warrant the opportunity to pay his/her Debt by electronic means by check or credit card, when receiving payments. The charges associated with the convenience of paying by electronic means is a convenience that, if the debtor uses that procedure, the charge for such processing shall be chargeable to the debtor with notice, and shall be in compliance with applicable law."[6] Therefore, the poor pay for a 30% mark up on the actual debt imposed, $80 for a warrant to be issued when they cannot pay, and then they pay a "convenience fee" for actually paying Aberdeen in a manner that is convenient to both the payer and Aberdeen. When the plaintiffs simply cannot pay, Aberdeen tells them warrants will be issued.

11.     Aberdeen and the Sheriffs' Association have conspired to make good on these threats by jailing probationers who do not pay in order to create an environment of desperation that has made each of them millions of dollars from this illegal scheme.

12.     The Plaintiffs seek declaratory, injunctive, compensatory, and punitive relief for themselves and all others similarly situated.

**Jurisdiction and Venue**

13.     This is a civil rights action arising under 42 U.S.C. § 1983, 18 U.S.C. § 1964(c) (RICO), and 28 U.S.C. § 2201, et seq., and the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. The Court has supplemental jurisdiction over the state law causes of action asserted in this Complaint pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same

---

[6] "Agreement," at 4

case or controversy as the federal law claims.

14.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## Parties

15.     Plaintiff Ira Wilkins is an indigent resident of Tulsa, currently in the custody of the Oklahoma Department of Corrections.   Mr. Wilkins was represented by a Public Defender when he plead in Tulsa County District County on April 6, 2015. A Bench warrant for Failure to Pay was issued on March 23, 2016 and sent to Aberdeen for collections. From June 6, 2016 to June 17, 2016, he was in custody of Tulsa County Jail and was assigned a Public Defender. Currently, he is incarcerated in the Department of Corrections. Aberdeen has requested that a warrant be issued, and a warrant  was issued, out of Wagner County, Oklahoma. He has been cleared for release if were not for the warrant for failure to pay. Counsel has recordings between the family of Mr. Wilkins and Aberdeen. They explain he is in custody and has zero income. Aberdeen explicitly states that there is no recourse for showing he is unable to pay.

16.     Defendant Aberdeen Enterprizes II is an Oklahoma corporation registered to do business in Oklahoma. According to their own materials, "°What does Aberdeen do? We collect unpaid court costs and fines for the counties and municipalities in Oklahoma °What is the most important thing we do? We request the recall of failure to pay warrants"[7] Aberdeen sends letters and makes numerous phone calls to plaintiffs threatening them with warrants if they fail to make payments.  Aberdeen collects over a million dollars a month from people who are destitute and face the illegal and unconscionable choice of going to jail or going without basic necessities for themselves

---

[7] Exhibit 2. Aberdeen Enterprizes, "Two Things You Need to Know!"

and their families.

17.     Defendants 1-77 are the Sheriffs who comprise the Sherriff's Association, who contract with Aberdeen to extort money from the poor. In 2015 alone, the Sherriff's Association made over $829,075 from its contract with Aberdeen.[8]

• The end of year assets from 2009, before they received the kickbacks from the extortion scheme, was $52,755. The end of year assets from 2015, after 5 years of collection, was $2,717,449 for this "non-profit."

• During the same time period, "Advertising and promotion" has increased from $189 to $91,292. Travel expenses have increased from $1,129 to $11,745. "Conferences" have increased from $34,070 to $103,720. "Public Relations" has increased from $0 to $36,585 (in addition to the enormous increase advertising).

18.     The Sheriffs' Association is also a lobbying organization.

19.     The Sheriffs are responsible for operating the County jails, so they receive money for jailing inmates when the indigent cannot pay and warrants are issued.  In nearly every county in Oklahoma, people who are living in poverty have to pay the jail for the "privilege" of being forced to stay in jail for being too poor to bond out. These fees are added to the impoverished person's fines and costs, adding to Aberdeen and the Sheriffs' Associations profits. In addition, some of the costs that every defendant must pay goes to the Sheriffs - just not to the Sheriffs Association. The "Sheriff's Service Fee on Arrests" is $5 for every count changed. The "Sheriff's Service Fee for Court House Security" is $10 for every count charged. This is per count, not per defendant.

---

[8] IRS 990 doc

## Factual Background

### The Debt Collection Scheme in Oklahoma

20.     The treatment of the Plaintiffs was caused by and is representative of the policies and practices employed by the Sheriffs' Association and Aberdeen to collect debts from the fines, costs, fees, and surcharges on criminal cases across the state of Oklahoma.

21.     The experiences of the named Plaintiffs have been corroborated through written policy documents and interviews with people who have been subjected to Aberdeen's threats and extortion scheme. Many of the current and former probationers break down crying when they recount the basic necessities of life that they and their families have had to forego under threat of being arrested for not being able to pay Aberdeen what they demanded. When they are jailed for lack of payment at the request of Aberdeen they are forced to endure deplorable conditions and physical and verbal abuse at the County jails.

### The Agreement for Collection Between the Sheriffs' Association and Aberdeen

22.     The Agreement for Collection is "by and between The Oklahoma Sheriffs' Association ("Association"), in its capacity as administrative agent of certain, participating County Sheriffs of Oklahoma[9] (the "County Sheriffs"), and Aberdeen Enterprises II, Inc., an Oklahoma corporation ("Aberdeen") for the collection of fines, penalties and assessments of certain "Warrants"…issued by the County Sheriffs in the State of Oklahoma."[10]

23.     The Agreement gives Aberdeen "in effect" with the Administrative Director of the Courts, "an Agreement Regarding Use of the Oklahoma Court Information System of Private Collections Vendor (OCIS Agreement,) for access to certain district court case

---

[9] Defendants 1-77
[10] Agreement, at 1

management and accounting functions on OCIS." This gives Aberdeen access to certain district court case management and accounting functions on OCIS."[11]

24.     The Agreement ostensibly limits Aberdeen's conduct, and, at the same time, links the contract to the County Clerks, requiring that Aberdeen shall "use its best efforts of collect any Debts associated with any Warrants referred to Aberdeen hereunder solely utilizing means which are legal, necessary and proper. Aberdeen shall not harass or exert undue pressure on delinquent debtors or employ any procedure that would cast discredit upon the Association, the County Clerks(s), or otherwise subject the Association, the County Sheriff(s) and/or such Court Clerk(s) to public disapproval; and (ii) comply with all applicable federal, state, and local laws and regulation with regard to collection practices and procedures."

A.     The Sherriff's Association must have known Aberdeen had no intention of limiting their collection activities to those which are "legal, necessary and proper" because using warrants and jail to enforce debt collections is illegal, and Aberdeen's own promotional materials state they will take the funds that people on social security receive, which is illegal. Furthermore, Aberdeen has no capability to determine if the warrant is issued because of a refusal to pay or an inability to pay, which is also illegal.

B.     Oklahoma statutes provide instructions for those who cannot or will not pay fines and costs. "…. if the defendant shall **refuse to pay** the fine, fees or costs, the payment of such fees and costs, in addition to the payment of the fine assessed, shall be enforced by imprisonment until the same shall be satisfied at a rate of Twenty-five Dollars ($25.00) per day of such fees and costs, or fine, or both, or shall be satisfied at a rate of Fifty Dollars ($50.00)

---

[11] Id., at 3

per day of such fees and costs, or fine, or both, should the defendant perform useful labor. **If the defendant is without means to pay** the fine, fees or costs, the total amount owed shall be entered upon the judgment docket and thereupon **the same remedies shall be available for the enforcement of said judgment as are available to any other judgment creditor**.[12]

    **C.**   In essence, this statute allows a judge to issue a bench warrant for Failure to Appear at an asset hearing after the debtor has been personally served. This process outlined by statute differs in important ways from the manner in which warrants are issued for Failure to Pay. First, there is personal service for the defendant to appear. Even if we assume that personal service occurs at the Rule 8 Hearing during sentencing when a judge orders the defendant to report to the Cost Administrator, warrants have been issued long after the defendants appear at Cost Administration. That is, for criminal defendants, warrants were issued Failure to Pay, but for civil debtors, the warrants were issued for Failure to Appear.[13] We are unaware of any statue which allows civil remedy, as required by 28 O.S. §101, "available for the enforcement of said judgment as are available to any other judgment creditor," that includes repeated incarceration for lack of payment.

    25.   The Oklahoma Court of Criminal Appeals Rules also provide for the circumstances under which defendants might be incarcerated for Failure to Pay. Rule 8.2 states

---

[12] Title 28 O.S. §101.
[13] See "BENCH WARRANT ISSUED FAILED TO PAY BY ORDER OF THE HONORABLE COST. ADMIN. JUDGE (GENERAL)," attached.

that "[i]f the defendant, by judicial finding, is financially able but refuses or neglects to pay the fine and/or costs in accordance with the court order, he/she may be immediately confined. *See* Section 983(A) of Title 22."

26.     There has been no proper hearing by our district court judges before the warrant is issued to determine if the failure to pay is the result of unwillingness or inability; furthermore, even after incarceration, most defendants do not see a judge to make a determination. They are simply released if they come up with the cash bond or are held and then released to Cost Administration or Aberdeen if they cannot make a cash bond. The statutes and court rules assume that the defendants' financial situation is taken into account, when in practice, the court doesn't hear the defendants' financial situation even after they have been placed into custody.

27.     The Agreement states that Aberdeen may charge a convenience fee if the plaintiff pays by electronic check or credit card. This means that in addition to the 30% mark up over what fines and costs are owed as part of the case, there is an additional cost for the manner in which it is paid.[14]

28.     Funds extorted by Aberdeen are dispersed to the respective Counties on the 15th day of the month. Further dispersements are given to the Court Clerk of the County that has issued a Warrant. That Court Clerk will then pay Aberdeen "30% of the original fines before the administrative fees were added or 23.0769% of the total monies received or 20% of the original fines before the administrative fees were added, or 16%.67 whichever is less as determined by the assignment date of the case for collection."[15]

29.     Aberdeen also distributes an unknown percentage back to the Sheriff's

---

[14] Agreement, at 4
[15] Id.

Association. This percentage has been redacted from the contract, but in 2015 alone, the "Warrant Collection Program" gave the Sheriffs' Association $829,075. That is 67.8% of their total funds for the year. That money bulk of the money from the poor was spent on "Compensation of current officers, directors, trustees, and key employees" ($70,354)[16], "Other salaries and wages" ($111,100), "Advertising and promotion" ($91,292), "Office Expenses" ($63,796), "Public Relations" ($36,585) and "Conferences, conventions, and meetings" ($103,720)[17]. The balance of the non-profit as of 2015 was $2,717,449.[18] The statutory provision which makes this possible states that "The administrative cost reflected in subsection A of this section, when collected, shall be distributed to the association administering the provisions of the contract, a portion of which may be used **to compensate the contractor**." However, it's not clear that the Sheriff's Association has *any* actual expenses associated with the collection of these costs. Certainly, there is nothing on the 990 IRS Form which indicates expenses for collection that would approach what they are taking in.

30.    After Aberdeen collects $1,000,000, in gross revenue, then a new distribution scheme goes into effect with the Sheriffs' Association getting an unknown (redacted) percentage of the 30% of revenue Aberdeen adds to the cost to the poor, and Aberdeen retains the balance as its fee for collection of the accounts.[19]

31.    The distribution of partial payments by the poor on pay plans with Aberdeen are divided with 76.9231% to the Court Clerk's offices and "23.0769% of the payment or 16.67% whichever is less as determined by the assignment date of the case for collection to Aberdeen

---

[16] This is the salary of Ray McNair, Executive Director of the Sheriff's Association.
[17] The Sheriffs' Association also claims it made $85,820 from "Conferences and Seminars" during the same year.
[18] Oklahoma Sheriffs' Association IRS Form 990 (2015)
[19] Agreement, at 5-6

until the full amount is paid."[20]

32.    Aberdeen shall cease collection of any debts upon the filing of this lawsuit.

        A.    "Aberdeen shall not represent Association, any County Sheriff's office and/or any Court Clerk's office in any matter other than the collection of an account referred hereunder. **If and when an account referred to Aberdeen by the Association, a County Sheriff and/or Court Clerk hereunder become involved in litigation, Aberdeen shall immediately suspend collection activity and/or return any account at no charge, upon the request of Association, such County Sheriff's office, and/or Court Clerk's office**. In no event shall Aberdeen seek to collect on any account which becomes involved in litigation including without limitation, bankruptcy.[21]

        B.    Because this lawsuit includes all Sheriffs in Sheriff's Association, all collection must immediately cease and/or Aberdeen must return any account at not charge, under the terms of the contract.

33.    The Sheriff's Association turned over private information on the plaintiffs to Aberdeen: "Association will provide to Aberdeen any debtor information that would be available to Association for purposes of collecting the warrant."[22]

34.    The Agreement requires that Aberdeen hold the Sheriff's Association harmless:

- "It is hereby acknowledged and agreed by the Parties that Association, its Board members, officers, County Sheriffs and Court Clerks shall have no liability for any acts or omissions by Aberdeen, its officers, agents and/or employees, connection with its performance or failure to perform its duties and obligations under this Agreement. Rather, notwithstanding anything to the contrary, Aberdeen shall indemnify, defend, and forever hold

---

[20] Id. At 6
[21] Id. At 7
[22] Id. At 7-8

harmless Association, its Board members, officers and directors, the County Sheriffs, the State of Oklahoma, the Oklahoma District Court, the Administrative Office of the Courts and their officials, agents and employees from and against any and all claims, damages, liabilities, costs and expenses (including reasonable attorneys' fees) (collectively "Claims") arising out of any breach of any of Aberdeen's warranties, representations and duties and/or obligations pursuant to this Agreement including, without limitation, any acts or omissions on the part of Aberdeen and/or any officer(s), agent(s), and/or employees(s) of Aberdeen in connection with its performance under the terms of this Agreement. Upon receipt by Aberdeen of written notice of any claim for which such indemnity applies, Aberdeen shall immediately undertake the defense of any such claim or action and permit Association to participate, in Association's sole discretion."[23]

**The Defendants' Contract and the "User Funded Model"**

35.     Aberdeen and the Sheriffs' Association, with the knowledge of the Counties, agreed to enter into an arrangement in which the parties would operate an "offender-funded" or "user-funded" model in which all its revenues would be extracted from the people that it supervised. The Sheriffs' Association agreed to enter into the arrangement implementing this model because Aberdeen promised them that its methods would not only produce a profit for the Sheriffs' Association but would also result in coercing probationers to pay a larger amount of the County's court debts. The two parties entered into the Contract that is still in effect. *See* Exhibit 1.

36.     This Contract removes discretion from the judge. No mechanism is in place for the judge to review the ability of the plaintiff to pay, as required by the law. Aberdeen is able to request that a warrant be issued or recalled for Failure to Pay, and it is Aberdeen who has had contact with the impoverish plaintiff. The judge issuing the warrant has forfeited his or her role to a private company, and the company collects money that is used to pay the judge

---

[23] Id. At 9

and the judge's retirement.

37.     In sum, he Contract unlawfully delegates to Aberdeen employees critical decisions in

the collection of fines and costs, including who has the ability to pay, how to pay, when to

pay, and how much to pay. The contract unlawfully increases what criminal defendants owe by

30%, it kickbacks money to the Sheriffs' Association, and it undermines the proper authority of

the courts to the courts' financial profit. The contract does all of the above at the expense of the

people with the least power, who can least afford it, and moves money to officials in power,

who already live well above the poverty level.


**How People Are Assigned Aberdeen – Tulsa County Example[24]**

38.     The methods of ending up on Aberdeen's collection list do not differ significantly from

        county to county. Tulsa County is used as an example for brevity.

39.     After people have been incarcerated for 6 days without bonding out of jail, they are given

        a Pauper's Affidavit by an official with the Sheriff's office. Then, the judge makes a

        finding of indigency, and poor defendants are assigned a public defender or other

        appointed counsel.[25]  Approximately 2-3 weeks later, if charged with a misdemeanor, or

        one month later, if they are charged with a felony, plaintiffs get an opportunity to plea –

        often to probation and the fastest way out of jail for the poor.

40.     Those who plead are given a Rule 8 Form to sign which includes fines and fees. They

---

[24] In April 2017, Tulsa County Court change part of the manner in which is collected fines and costs by creating a "Cost Docket." After years of holding indigent people in custody for 10 days for no other reason than failure to pay with no hearing, no lawyer, and no reduction in what defendants owe, Tulsa now holds people jails people for 1 day and then gives them a court date through an employee of the sheriff at the jail. No restitution was given to those who had already been harmed. No changes were made so that indigent people could receive community service hours or some other alternative to costs. None of the 20,000 outstanding warrants issued illegally were recalled. None of the issues addressed in this lawsuit were cured by Tulsa County with the Cost Docket.
[25] In counties other than Tulsa and Oklahoma, who have a public defender system, counsel from the Oklahoma Indigent Defense System is appointed, and defendants are charged for their services, the costs of which are added to the fines and costs eventually collected by Aberdeen.

will have been in custody that entire time between arrest and sentencing – often losing jobs, housing, and any meager possessions they may have had.

41.     The fines are assessed by the judged. But the "costs" associated with each charge are unknown to the judge, the plaintiff, and the public defender. The judge makes a "finding" that the plaintiffs have the ability to pay despite never asking the plaintiffs whether they are able to pay, if they are on social security or other public assistance, whether they have dependents or pay child support, or in some other way would suffer financial hardships. These costs are often over $200 per count.

42.     Judges are given other options on the Rule 8 Form: The Rule 8 Form gives the Court the ability to choose a) to have found the defendant has the ability to pay and that the defendant agrees to pay by installment and ordered to report immediately to the Cost Administrator;[26] b) find that they are not able to pay and ordered to perform community service hours in lieu of the fines and costs, or,27 c) find that the defendant cannot pay and suspend the fines and costs.28 Any option other than a finding of "able to pay" is essentially a fiction. As explained, *infra*, an honest, true finding of ability to pay is what is required under the Equal Protection clause of the Oklahoma and United States Constitutions.

43.     When people are not able to pay[29] a warrant is issued. No hearing is held to determine if the person has the ability to pay but refuses, or simply does not have the means to pay. In fact, even when it is blatantly obvious that people are destitute, debt is referred to

---

[26] Such an order is impossible for the defendant to follow because nearly all indigent defendants are in custody and will not be released until long after the courthouse is closed.

[27] It is estimated by Public Defenders that fewer than 1% of indigent defendants are given work hours instead of fines and costs.

[28] Suspension of fines and costs is rarer than work hours in lieu of fines and costs.

[29] Data for 2007 suggests that 74% of Public Defender clients were issued a warrant for failure to pay

Aberdeen and the debtors are imprisoned.

    **A.**   For example, in a Tulsa County case styled as CF-16-52, the plaintiff was charged with Larceny from a Retailer and Trespassing. His total bond was $1500, so he was unable to provide $150 to a bondsman. He was arrested New Years Eve 2016, and spent 8 days in jail before filling out a Pauper's Affidavit. According to his Pauper's Affidavit, he is on social security disability, has a total income of $750 per month, and owns no property. The plaintiff was appointed a public defender on January 7, 2017. January 28, 2016, he pleaded guilty to a reduced charge of two misdemeanors, and was assessed $425 in fines and fees on the Rule 8 form. He was also assessed $385 in *hidden* costs that include, among others, two charges for $83 each on "court costs on misdemeanor," two charges of $15 each for "DA Council Prosecution Assessment for Misdemeanor," two charges of $10 each for "Sheriff's Service Fee for Court House Security," two charges of $5 each for "Sheriff's Service fee on Arrests," and two charges of $7 each for "Court Clerk Administrative Fee on Collections."

    **B.**  On May 31, 2016, a warrant was issued for Failure to Pay, the case was sent to Aberdeen for collections, and a cash bond was set for $897 that he would have to pay in order to be released[30]. This is more money than he makes in an entire month. On June 7, 2016, the plaintiff was in custody for Failure to Pay. He never saw a judge or was appointed counsel. The minute reads that his "Court Cost Hearing Date" would be set for June 16, 2016. "Prior to the court cost hearing the defendant may at any time pay a total cash payment of

---

[30] The plaintiff had other cases in which he was unable to pay the fines and costs.

($500.00), be released and order to report immediately to cost administration for information pertaining to Aberdeen Enterprises or call Aberdeen to set up payment arrangements on the remaining balance. **2nd Aberdeen**"[31]

**C.** Plaintiff was given a letter to sign, not by the court or an attorney, but by a sheriff's officer at the jail acknowledging his "debt" to Aberdeen.[32] On the line for "address" this plaintiff wrote "415 W. Archer, Tulsa, OK." That address is the Day Center, one of the best known homeless shelters in Tulsa. On this one occasion, for this one plaintiff, a man spent 10 days in jail[33], costing tax payers approximately $600 to incarcerate him, because he could not afford $500 cash to give to Aberdeen. He was finally released on June 16, 2017. Aberdeen continues to try to collect his debt.

44.     The plaintiff in the example above was not an isolated case. According the Vera Report, a study of the calendar year 2016 inmate population in the Tulsa County Jail, 1,163 people were booked into the jail for the top charge of Failure to Pay fines and costs. The average length of stay was 5 days. At $60 per day, Tulsans paid approximately $348,900 to incarcerate the poor for non-payment of fines in 2016 alone.  At 1,163 persons booked into jail, Failure to Pay was the fourth top charge in admissions in 2016, after Possession of Controlled Drug (1,326 persons booked), Public Intoxication (1,267 persons booked), DUI First Offense (1,262 persons booked). The fifth top charge for admissions in 2016 was first offense Domestic Assault and Battery with 655 persons booked.[34] Currently,

---

[31] Emphasis in original.
[32] From the form letter: "You will be released today and you are to call Aberdeen Enterprises (sic) II at 918.794.0810 or report to their office at 4143 e. 31st. Street, Tulsa, OK 74135 within 48 hours upon release. If you fail to call or report to Aberdeen Enterprises II, a bench warrant will be issued for your arrest. A warrant fee of $80 will be added to each case."
[33] Having previously spent 28 days in jail because he could not afford to bond out before plea.
[34] "Report to Tulsa County Stakeholders on Jail Reduction Strategies," Vera Center on Sentencing + Corrections.

there are over 20,000 active warrants for Failure to Pay just in Tulsa County.

45.    In counties other than Tulsa and Oklahoma, where impoverished clients are assigned attorneys from the Oklahoma Indigent Defense System, 67% of cases filed are against indigent people.[35]

46.    In every county, warrants are issued for Failure to Pay without a hearing to determine ability to pay, and the debt increased by 30% is given over to Aberdeen. Plaintiffs could pay the Cost Administrator directly, even after the debt is sent to Aberdeen, but Aberdeen conspires to mislead the Plaintiffs. According to their own materials, "If the defendant contacts the court clerk's office, they can be easily redirected to our 1-800 number so a case manager can handle any of the defendant's needs…"[36] In guidelines for their employees collecting debts, Aberdeen writes, "You are to *NEVER* refer any defendant to call the court clerks."[37]

47.    Aberdeen states in its promotional materials that they make no exception for plaintiffs who are so indigent that they receive social security disability or other forms of public assistance. "Typically, we will put persons on disability or SSI on a minimum payment schedule of approximately $50 per month."[38] A single person receives $735 per month in disability. That is $8820 per year, or 27% below the federal poverty level standard.

**<u>Collection by threat</u>**

48.    Aberdeen relies on warrants and threats of warrants to collect debt from the poor. According to Aberdeen's own training materials, as discussed *supra*, Aberdeen considers the most important thing they do is not the collection of money owed to the

---

August 2017
[35] OIDS 2016 Annual Report.
[36] Exhibit 3, "Collection Process" Aberdeen Enterprizes
[37] Exhibit 4, "General Collection Rules/Guidelines for working cases" Aberdeen Enterprizes Emphasis in original.
[38] Exhibit 5, "Collection Process" Aberdeen Enterprizes

court, but to "request the recall of failure to pay warrants." "°What does Aberdeen do? We collect unpaid court costs and fines for the counties and municipalities in Oklahoma °What is the most important thing we do? We request the recall of failure to pay warrants"[39]

49. Aberdeen claims the County and Sheriffs' Association can expect "full collection after locating and contacting a defendant in: 60 days for cases of $400 or less; 120 days for cases of $401-800; and cases of $801 + being resolved based on the ability of the defendant to pay over time."[40]

50. Aberdeen's policy is to "Establish a 40% first payment to recall the warrant on cases where the balance is over $500, followed by a reasonable monthly payments until the debt is resolved." On a plea for a misdemeanor Driving Under the Influence charge, fines and costs typically are approximately $1300 for indigent plaintiffs. Adding the 30% mark up for being with Aberdeen, the plaintiff owes $1690. Therefore, Aberdeen demands $664 up front from people in poverty in order to ask for the warrant to be recalled.

51. Aberdeen contacts plaintiffs by phone and letter. Aberdeen's first letters to plaintiffs ends with "Please contact us to make arrangements and avoid the service of any bench warrant"[41] Aberdeen's second letter to plaintiffs states, "If you contact us, I will discuss options with you that can allow you to make monthly payments on your balance and have your bench warrants(s) recalled."[42] Aberdeen's third letter to plaintiffs states, "You have previously entered into a payment plan agreement that

---

[39] Exhibit 2. Aberdeen Enterprizes, "Two Things You Need to Know!"
[40] Exhibit 5, "Collection Process" Aberdeen Enterprizes
[41] "Sample – 1st Notice / First Letter" Aberdeen Enterprises
[42] Exhibit 4 "2nd Notice / Second Letter" Aberdeen Enterprises

covers a specific account or accounts that is now in default. We are required to report this default to the courts, which could result in the issuance of a bench warrant for your arrest and will increase the costs that you will owe." These letters are sent in addition to the numerous phone calls made to plaintiffs threatening them with warrants if they fail to make payments.  They collect over a million dollars a month.

52.    When a plaintiff calls Aberdeen after receiving a letter, the case managers are told to say the following: "Thank you for calling Aberdeen Enterprizes this is Greg how can I help you?—One the letter you received there will be an account ID in the upper right hand corner, please share that with me.—**Mr. Smith you have a balance of $2612.75 and a failure to pay warrant for court costs and fines with Osage County. Do you have the ability to pay this balance in full today?** –If you are not able to pay the balance in full, we can set up a payment plan of $1000 down and monthly payments of $125. We also accept payments online and over with phone with your credit or debit care. **Upon receiving your down payment, we will send a request to have the FTP warrant recalled** and make the county aware of your payment plan. We will set up a reminder call three days before your payment is due to help ensure that you stay current with your payments. How would you like to make the down payment?"[43]

53.    There is no pretense of the interaction being other than month for warrant recall. No attempt is made at determining ability to pay or suggesting alternatives such as going to the judge or court clerk. This is simply extortion.

54.    For outbound calls, used when Aberdeen has been given telephone contact information. "Hello this is Greg from Aberdeen. I am calling for Mr. Terry Smith. Is Mr. Smith

---

[43] Exhibit 6, "Call Flow" Aberdeen Enterprizes

available?—Mr. Smith, we handle unpaid court cost that has bad a FTP warrant issued on the case and we are calling you in regards to an issue with Osage County. Our records show there is an outstanding balance of $680 for unpaid court cost**. Are you able to pay this in full today? – Okay, we can also set up a payment place with a down payment of $250 and $125 monthly until the balance is paid in full. –Mr. Smith because you are on SSI disability of $770 a month and receive no other income, we can come down to $150 down and set you on month payments of $50. We take that payment over the phone with a debit or credit card. –Yes sir, we can set that first payment for the 3rd of the month when your check is deposited, but just remember you will have a warrant until the down payment is made.** If you have any problems as the months go by, please give us a call so that we can try to assist you in any way that we can. Mr. Smith, if you will send a copy of your awards letter we will put it in your file for future reference."[44]

55.   As explained, *supra*, people on disability are already living 27% below the federal poverty line, and Aberdeen is asking for nearly 20% of the plaintiff's month income to release the warrant and then $50 per month thereafter. These people are indigent by any standards. They were found to be paupers by the court in in order to get counsel appointed. They fall below they federal poverty guidelines. They were referred to the collection agency in the first place because they missed a payment or signing up with the Cost Administrator.

56.   When a plaintiff has fallen behind on payments to Aberdeen and proactively calls to avoid a warrant, this is what they are told: "Thank you for calling Aberdeen Enterprizes this is Greg how can I help you? –On that letter you received there is an

---

[44] Id.

account ID number in the upper right hand corner could you share that number with me? ---After reviewing your account I see that we sent you that letter in regards to your account going delinquent 60 days. **When an account is 60 days delinquent, the county could reissue a FTP warrant. We want to get you back on track and get this account current before that happens. You are $200 past due, are you able to pay that today?** – if you are able to make a regular payment for this month and half of what you are behind, you can do the same next month to get caught up. When you are current, we can go back to the $100 per month. As always we can process your payment via Visa, Master Card, cash, or money order. Thank you for getting back to us about this matter, we look forward to helping you get this issue resolved."

57. There is no part of the interaction in which Aberdeen employees asks about ability to pay or suggests that the person see a judge. The interactions are a closed loop between Aberdeen, the Sheriffs' Association, law enforcement who makes the arrest, and the pauper at their mercy.

58. When Aberdeen learns that the impoverished plaintiff has children, this fact does not mitigate the debt, but rather is exploited. Aberdeen case managers are told to say, "**I understand that is a lot to come up with at once. What do you do for a living? Is it just you on your own? Like I said I want to help you get this resolved. I would not want you to get pick up on this warrant and not be there for your kids.**"[45]

59. Under "Negotiation" Aberdeen counters legitimate reasons why people cannot pay. "Listen to any objections (Can't get a job, on fixed income, etc.) Overcome the objections (Job list, special arrangements for people on SSI, etc.) I understand it is tough out there, but we do offer a job list that could give you some leads on maybe a

---

[45] Id.

better job that does hire people with a criminal record. With your situation I can definitely work with you and I can get that down payment down to half that and set you up for $___ down and then lower that month payment to $___ a month."[46]

60.     Aberdeen admits that plaintiffs may either pay "the client" (Court Cost Administrator for each county) or Aberdeen but they "believe that recovery is significantly higher if Aberdeen processes the payments exclusively. Client recovery requires the defendant to be proactive in a way that will reduce the likelihood of full recovery. Aberdeen has found that creating a relationship, completing an initial payment, and consistent contact with the defendant generates greater recovery with less reliance on the defendant." In other words, they discourage people coming in the Cost Administrator to pay fines and costs, which is the function of the Cost Administrator. Instead, they imply they can get more money from the impoverished person through regularly contacting them with threats of warrants.

61.     Under "General Guidelines for Warrant Recalls"

• "We do not recall warrants, the county does. We send a request to have the warrant recalled."

However, the county is extremely responsive. "It takes anywhere from 1 hour to 72 hours for the county to get the warrant recalled."

• "Any time that we take a payment on a case with a failure to pay warrant, we are required to send a request to have the warrant recalled. You must also make sure that the case is put into the correct status code when the first payment is made."

There is no oversight from the courts or the Sheriffs' Association that the case is

---

[46] Id.

put in correctly or warrants are issued or recalled by mistake.

- "We can only get Failure to Pay warrants recalled. (Failure to Appear in some exceptions).

    Again, this is done without court oversight.

62.    According to numerous plaintiffs, if Aberdeen wants $500 down, for example, they will refuse to take $100, even if that is all the plaintiff can afford.

**Collateral Consequences**

63.    According to the Plaintiffs, they cannot receive food stamps if there is a warrant for Failure to Pay.

64.    Housing assistance for the mentally ill is unavailable until a Failure to Pay warrant is lifted.

65.    One's driver's license is suspended when a plaintiff is unable to pay fines and costs.

66.    Warrants have a huge adverse impact on one's ability to get a job. Most employers will not hire a person who has a warrant issued for his or her arrest.

**Warrants for Failure to Pay**

67.     The cash bond amount for the warrant issued is generally the entire amount owed. For example, for putative class member, Montell Fisher, a "BENCH WARRANT ISSUED FAILED TO PAY BY ORDER OF THE HONORABLE COST ADMIN. JUDGE (GENERAL)" The total bond amount is $3160.99, which is the amount owed both to the court and to Aberdeen, combined. Also noted on the warrant, "Comment: Attention: BOOKING DEPT – DEFT MAY BE RELEASED UPON A CASH PAYMENT IN FULL OR SET FOR THE COST DOCKET."

68.    There is no indication of when this "cost docket" might take place, and no authority for

33

demanding the entire balance up front in cash from an indigent plaintiff without a hearing.

**No policy to give plaintiffs a way to ask for a hearing**

69.     The Rules of the OCCA are clear: "If the defendant fails to make an installment payment when due, he/she must be given an opportunity to be heard as to the refusal or neglect to pay the installment when due. If no satisfactory explanation is given at the hearing on failure to pay, the defendant may then be incarcerated. If a defendant has the ability to pay but due to exigent circumstances or misfortune fails to make payment of a particular installment when due, he/she may be given further opportunity to satisfy the fine and/or costs, at the discretion of the court, to be governed by the facts and circumstances of each particular case."[47] No policy is in place across the counties for the plaintiffs to have an opportunity to be heard.

70.     The clients could, in theory, file a *pro se* motion to get a Rule 8 Hearing. Forms could be made available at the Cost Administrator's desk in order to do just that. Even when a request for a Rule 8 Hearing is made by an attorney, there is no guarantee that a hearing will be granted.[48] Instead, the protocol is for the indigent defendants to be found able to pay without questions that would cast light on whether that is a proper assessment, and then provide no relief from warrants other than payment or jail. This cycle is repeated, and when the debt is sent to Aberdeen for collection (with the ability to have warrants for Failure to Pay issued), the amount the pauper's owe is automatically increased by one-third.

---

[47] OCCA Rule 8.4.
[48] *See Motion for Relief of Fines and Costs* filed September 29, 2015 in Tulsa County cases CF-2014-5582, CF-15-601, CF-14-306, CF-14-3249, CF-15-423, September 30, 2015 in cases CF-12-3706, CF-13-3247, CF-14-2560, CF-11-4166, CF-11-3211, October 1, 2015 in CF-13-3882 which were never considered or set for hearing.

**Law Regarding Incarceration for Failure to Pay**

71.     The Department of Justice has issued warnings regarding the collection of fines and

costs. Our system is essentially the same as the one in Ferguson Missouri which

received so much negative attention for funding their justice system on the backs of the

poor. More recently, DOJ sent a "Dear Colleague" letter to city and state judges across

the nation warning them that a defendant cannot be jailed simply because that person

cannot pay fines and costs. The DOJ states, "To help judicial actors protect individuals'

right and avoid unnecessary harm, we discuss below a set of basic constitutional

principles relevant to the enforcement of fines and fees. These Principles, grounded in

the rights to due process and equal protection, require the following:

**(A) Courts must not incarcerate a person for nonpayment of fines or fees**

**without first conducting an indigency determination and establishing**

**that the failure to pay was willful;**

There are tens of thousands of indigent Oklahomans with Failure to Pay

warrants outstanding that are subject to illegal detention.

**(B) Courts must consider alternatives to incarceration for indigent**

**defendants unable to pay fines and fees;**

Neither the Oklahoma Counties, the Sheriffs' Association, nor Aberdeen have

a policy that allows for alternatives to payment. The Rule 8 Forms that give

such alternative are a fiction. Judges do not inquire about indigency and

automatically give every defendant "standard" fines and costs without benefit

of alternatives.

**(C) Courts must not condition access to a judicial hearing on the**

prepayment of fines or fees;

If plaintiffs fail to pay what Aberdeen requires, a warrant is issued.

**(D) Courts must provide meaningful notice and, in appropriate cases, counsel, when enforcing fines and fees;**

No notice is given when warrants are issued.

**(E) Courts must not use arrest warrants or license suspensions as a means of coercing the payment of court debt when individuals have not been afforded constitutionally adequate procedural protections;**

Warrants and license suspensions are the only enforcement mechanism for collecting debt from indigent defendants. To make matters worse, Judges, Counties, Public Defenders, Cost Administrators, the Sheriffs' Association, and Aberdeen all have conflict of interest as the collection of fines and costs directly benefit their retirement fund.

**(F) Courts must not employ bail or bond practices that cause indigent defendants to remain incarcerated solely because they cannot afford to pay for their release; and**

The bond practices in Oklahoma Counties violate this guideline every day.

**(G) Courts must safeguard against unconstitutional practices by court staff and private contractors.**

Aberdeen and the Sheriffs' Association operate with little to no oversight from the courts.

### *Ballard* and Equal Protection

72.     In *Ballard v. State*, the Oklahoma Court of Criminal Appeals found that the imposition

36

of fines and costs did not unfairly discriminate against indigent defendants because judges had alternatives to financial penalties:

> The Legislature also inserted a provision in the statute providing that if a defendant "is without means" to pay the fine, fees or costs, these fines, fees or costs shall be entered on the judgment docket, putting the court in the same position as any other judgment creditor. Id**. It is this provision—providing for penalties for a willful refusal to pay, but providing for alternate remedies if a defendant is unable to pay—that enables the assessment to withstand a constitutional challenge by an indigent on equal protection grounds. If a defendant cannot pay the assessment because he is without means to do so, he is not thrown into prison or otherwise punished.**[49]

73. The Rule 8 Form used in some counties such as Tulsa, provides judges the option to waive the fines and costs or assign work hours instead – giving the Court the ability to withstand constitutional challenge. However, that protection from Constitutional challenge is in jeopardy if the options are, in practice, fiction. Judges rarely, if ever, assign indigent plaintiffs work hours instead of fines and costs. Aberdeen has no ability to offer alternatives nor incentive to recommend those alternatives to the court over a request for a warrant.  Furthermore, while the form makes clear that the defendants will be incarcerated for failure to pay, no information is given to direct the defendant to seek another Rule 8 hearing to petition for relief from fines and costs. Many of these indigent clients live in poverty, nearly always lack a complete education, and frequently suffer from mental illness and addiction. They cannot, because of their poverty, hire an attorney to petition the court for relief. The Public Defender's Office is not notified when a client is incarcerated on a failure to pay warrant or when a warrant is issued. Whatever findings are made concerning ability to pay are being made at sentencing,

---

[49] *State v. Ballard*, 1994 OK CR 6, 868 P.2d 738, 741.

making the issue ripe at that time, and continuing to be ripe as the collection process continues.

**Before incarceration, a hearing must be held to determine if the defendant refuses to pay or is unable to pay**

74.    Oklahoma statutes provide instructions for those who cannot or will not pay fines and costs.

> …. if the defendant shall **refuse to pay** the fine, fees or costs, the payment of such fees and costs, in addition to the payment of the fine assessed, shall be enforced by imprisonment until the same shall be satisfied at a rate of Twenty-five Dollars ($25.00) per day of such fees and costs, or fine, or both, or shall be satisfied at a rate of Fifty Dollars ($50.00) per day of such fees and costs, or fine, or both, should the defendant perform useful labor. **If the defendant is without means to pay** the fine, fees or costs, the total amount owed shall be entered upon the judgment docket and thereupon the same remedies shall be available for the enforcement of said judgment as are available to any other judgment creditor.[50]

75.    The statute is clear that defendants who refuse to pay must be incarcerated and given $25 or $50 a day toward fines and costs. This is not the current practice. For at least the past year, warrants have been issued without the defendants having been notified. A cash bond is set at $500 in every case. In the past, when they were arrested and booked, many stayed in custody for up to 14 days without seeing a lawyer or a judge. They were not brought in for a hearing to determine if the failure to pay was the result of refusal or inability to pay – they were simply incarcerated, and they received no credit toward what they owed.

76.     For example, the defendant in Tulsa County cases CM-13-342, CM-10-4540, CM-08-

---

[50] Title 28 O.S. §101.

6094, and CM-08-3521 was in custody from December 30, 2016 to January 5, 2017 on solely for Failure to Pay.  He was released a week early because our office began to pay attention to the jail blotter looking for cases like these; such cases were not hard to find. The original minute for Mr. Harmon's case read: COURT COST HEARING SET FOR 1/12/17. EXECUTION BOND ON CASE(S): CM-08-3521/CM-10-4540/.CM-08-6094/CM-2013-342. PRIOR TO THE COURT COST HEARING THE DEFENDANT MAY AT ANY TIME PAY A TOTAL CASH PAYMENT OF ($500.00), BE RELEASED AND ORDERED TO REPORT IMMEDIATELY TO COST ADMINISTRATION FOR INFORMATION PERTAINING TO ABERDEEN ENTERPRIZES II OR CALL ABERDEEN ENTERPRIZES II TO SET UP PAYMENT ARRANGEMENTS ON THE REMAINING BALANCE. **2ND ABERDEEN**" In other words, he had been in custody since December 30, 2016 and the judge set his "cost hearing" for 13 days later on January 12.

77. This "cost hearing" did not take place. Defendants were set for a hearing that never happened; they were simply released and told to call Aberdeen collection agency.

78. This case is instructive in another manner – the court's policy of issuing warrants without knowing if the failure to pay was because of inability to pay or refusal to pay. . On October 2, 2013, the following minute was entered: "MILLER, ANTHONY: BENCH WARRANT ISSUED FOR FAILURE TO PAY A CASH PAYMENT OF $386.80.  **DID NOT PAY ABERDEEN, 2ND BENCH WARRANT ISSUED, DO NOT RELEASE**" Therefore, whomever is reading the minute is specifically warned not to release the defendant even though there is no indication that a finding was made, pursuant to 28 O.S. §101, that his failure to pay was a refusal rather than an inability.

The "Do not release" order is not an aberration; rather, it appears to be a long standing policy.

79.   The second portion of 28 O.S. §101 instructs the court of what to do if the defendant is without means to pay the fine, fees or costs. "[T]he total amount owed shall be entered upon the judgment docket and thereupon the same remedies shall be available for the enforcement of said judgment as are available to any other judgment creditor." On the face of the statute, the debt should be forwarded to small claims, and the debtor might find himself with bad credit, but not incarcerated for Failure to Pay.  One statute allows for a bench warrant and incarceration for a civil debt - Title 12 O.S. §842 (A), regarding asset hearings:

> At any time after a final judgment, order, or decree is filed, on application of the judgment creditor, a judge of the court in which the final judgment, order, or decree was rendered shall order the judgment debtor to appear before the judge, or a referee appointed by the judge, at a time and place specified in the order, to answer concerning the judgment debtor's property. The judge may, by order, enjoin the judgment debtor from alienating, concealing, or encumbering any of the judgment debtor's nonexempt property pending the hearing and further order of the court. Upon the judgment debtor's disclosure of any nonexempt property, proceedings as provided by law may be had for the application of the property to the satisfaction of the judgment. **If the judgment debtor is personally served with an order to appear pursuant to this section, the judge issuing the order may authorize the issuance of either a contempt citation or a bench warrant for the judgment debtor's failure to comply with the order. If the judgment debtor is served by other than personal service, the judge may authorize the issuance of a contempt citation for the judgment debtor's failure to comply with the order**.

80.    In essence, this statute allows a judge to issue a bench warrant for Failure to Appear at an asset hearing after the debtor has been personally served. This process outlined by statute differs in important ways from the manner in which warrants are issued for Failure to Pay. First, there is personal service for the defendant to appear. Even if we assume that personal service occurs at the Rule 8 Hearing during sentencing when a judge orders the defendant to report to the Cost Administrator, warrants have been issued long after the defendants appear at Cost Administration. That is, for criminal defendants, warrants were issued Failure to Pay, but for civil debtors, the warrants were issued for Failure to Appear.[51] We are unaware of any statue which allows civil remedy, as required by 28 O.S. §101, "available for the enforcement of said judgment as are available to any other judgment creditor," that includes repeated incarceration for lack of payment.

81.    The Oklahoma Court of Criminal Appeals Rules also provide for the circumstances under which defendants might be incarcerated for Failure to Pay. Rule 8.2 states that "[i]f the defendant, by judicial finding, is financially able but refuses or neglects to pay the fine and/or costs in accordance with the court order, he/she may be immediately confined. *See* Section 983(A) of Title 22." In the past,, there has been no proper hearing by our district court judges before the warrant is issued to determine if the failure to pay is the result of unwillingness or inability; furthermore, even after incarceration, defendants do not see a judge to make a determination. They are simply released if they come up with the cash bond or are held and then released to Cost Administration or Aberdeen if they cannot make a cash bond. The statutes and court rules assume that the

---

[51] See "BENCH WARRANT ISSUED FAILED TO PAY BY ORDER OF THE HONORABLE COST. ADMIN. JUDGE (GENERAL)," attached.

defendants' financial situation is taken into account, when in practice, the court doesn't

hear the defendants' financial situation even after they have been placed into custody.

**Collecting fines and costs from people on public assistance is illegal.**

82.    As stated, supra, Aberdeen advertises to the Sheriffs' Assocation and the Counties that

they will collect from people on a fixed income from Social Security. This is illegal.

Under the Social Security Act, 42 U.S.C §407(a) "none of the moneys paid" as part of a

social security benefit "shall be subject to the execution, levy, attachment, garnishment,

or other legal process, or to the operation of any bankruptcy or insolvency law."   In

Philpott v. Essex County Welfare Board, 409 U.S. 413, 93 S. Ct. 590, 34 L. Ed 2nd 608

(1973), the Supreme Court found that funds from social security were protected from

claims from state governments. Id. at 417. Oklahoma has not made a specific ruling

regarding the protection of social security moneys from payment of criminal fines, fees

and costs.  However, based on this Supreme Court ruling, many other courts have held

that states cannot order individuals to pay legal financial obligations, such as fines, fees

and costs, from social security benefits.  See In re Lampart, 306 Mich. App. 226. 856

N.W. 2d 192 (2014); State v. Eaton, 323 Mont. 287, 99 P.3d 661 (2004).  These courts

have ruled that legal financial obligations, such as criminal fines, fees and costs, count

as "other legal process" under 42 U.S.C. §407(a). Additionally, the Supreme Court in

Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler, 537 U.S.

371, 385, 123 S. Ct. 107, 154 L.Ed. 2d 972 (2003), explained that "other legal process"

is a process where "some judicial or quasi-judicial mechanism, though not necessarily

an elaborate one, by which control over property passes from one person to another in

order to discharge or secure discharge of an allegedly existing or anticipate liability."  In

this case, the Court has ordered Ms. Bailey to pay $40 per month to the district attorney and a monthly amount to the Tulsa County cost administrator out of her monthly social security payment.  That order meets the Supreme Court's definition of "other legal process."

## Class Action Allegations

83.   Plaintiffs bring this Class action on behalf of themselves and all others similarly situated, for the purpose of asserting the claims alleged in this Complaint on a common basis.

84.   A class action is a superior means, and the only practicable means, by which Plaintiffs and unknown Class members can challenge the Defendants' unlawful debt-collection scheme.

85.   This action is brought and may properly be maintained as a Class action pursuant to Rule 23(a)(1)-(4), Rule 23(b)(2), and Rule 23(b)(3) of the Federal Rules of Civil Procedure.

86.   This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

87.   Plaintiffs propose the following class for which they seek declaratory, injunctive, and monetary damages: The Plaintiffs in this case are all people living in poverty, found to be indigent by the Courts of Oklahoma Counties, who were assigned a Public Defender or counsel through the Oklahoma Indigent Defense System throughout the term of their case, who are victims of an extortion scheme in which the Defendants have conspired to extract as much money as possible, from indigent defendants through a pattern of illegal and shocking behavior.

**Numerosity.  Fed. R. Civ. P. 23(a)(1)**

43

88. Over the past several months and years, the Counties, Sheriffs' Association and Aberdeen have required and currently requires thousands of people to pay court fines and costs, plus a 30% mark up and extra fees for warrants, directly to Aberdeen. Pursuant to the Defendants' policy and practice, all of these people are currently being threatened with arrest and jailing if they do not make the payments in the amount or frequency demanded by the Defendants.

89. The names, case numbers, probation documents, dates of imprisonment, financial receipts, and relevant records of the class members are in the possession of the Defendants and are easily ascertainable.

90. The Defendants have followed and continue to follow materially the same policies, practices, and procedures with respect to all of the Class members.

91. Those who still owe debt payments or who will incur such debts will be subjected to the same ongoing policies and practices absent the relief sought in this Complaint.

**Commonality.  Fed. R. Civ. P. 23(a)(2).**

92. The relief sought is common to all members of the Class, and common questions of law and fact exist as to all members of the Class. The Plaintiffs seek relief concerning whether the Defendants' policies, practices, and procedures violated their rights and relief requiring that those policies, practices and procedures be changed to protect their rights in the future.

93. Among the most important, but not the only, common questions of fact are:

   A. Whether Aberdeen Enterprizes and the Sheriffs' Association contracted for the provision of probation services;

B.  Factual determinations concerning how Aberdeen and the Sheriffs' Association earns its profit and what fees it charges pursuant to the contractual arrangement;

C.  All of the facts surrounding how the County, Aberdeen and the Sheriffs' Association operate the collection system pursuant to the Contract, including who is placed on a warrant request list; how people are placed on payment plans and with Aberdeen; what conditions are imposed by Aberdeen.; what policies and practices are in place for plaintiffs under Aberdeen's supervision; what policies and practices are in place for determining ability to pay; what policies and practices, if any, are used to determine indigency; what policies and practices are used to initiate requests for warrants; what policies and practices are in place  for collecting money; and how and under what circumstances Rule 8 hearings are conducted.

94.   Among the most important common question of law are:

A.  Whether as a matter of federal law, a County can choose to abandon the traditional methods of collection of fines and costs contract to employ a private company, with a substantial kick back to the Sheriffs' Association, with all of the same duties and powers but who has a personal financial conflict of interest in the management and outcome of every case through a "user funded model";

B.  Whether a contract creating a debt collector with such a personal financial stake is void;

C.  Whether a government can place people on onerous payment plans that involve extra fees and serious intrusions on liberty based on wealth status;

45

D.  Whether a government and a private company, working together, can circumvent state debt-collection protections by imposing onerous actions that no private creditor could lawfully impose;

E.  Whether it is lawful to issue and execute arrest warrants based solely on non-payment, especially in the case of people known or adjudged in advance to be indigent;

F.  Whether it is lawful to detain a person after arrest because the person cannot afford to pay a preset money bond without any inquiry into ability to pay or any other findings;

G.  Whether it is lawful to use legal process concerning the imposition and collection of fines and costs for criminal cases with the ulterior motive to earn profit.

95.  These common legal and factual questions arise from one central scheme and set of policies and practices: the Defendants' enormously profitable contractual relationship governing their collection practices. The Defendants operate this scheme openly and in materially the same manner every day. The material components of the scheme do not vary from Class member to Class member, and the resolution of these legal and factual issues will determine whether all of the members of the class are entitled to the relief that they seek.

**Typicality.  Fed. R. Civ. P. 23(a)(3).**

96.  The named Plaintiffs' claims are typical of the claims of the members of the Class, and they have the same interests in this case as all other members of the Class that they represent. Each of them suffered injuries from the failure of the Defendants

to comply with the basic constitutional and statutory provisions detailed below. The answer to whether the Defendants' scheme of policies and practices is unlawful in the ways alleged will determine the claims of the named Plaintiffs and every other Class member.

97.   If the named Plaintiffs succeed in their claims that the Defendants' policies and practices concerning debt collection through misdemeanor probation for fines, fees, costs, and surcharges violate the law in the ways alleged in each claim of the Complaint, then that ruling will likewise benefit every other member of the Class.

**Adequacy.  Fed. R. Civ. P. 23(a)(4).**

98.   The named Plaintiffs are adequate representatives of the Class because they are members of the Class and because their interests coincide with, and are not antagonistic to, those of the Class. There are no known conflicts of interest among Class members, all of whom have a similar interest in vindicating the constitutional and statutory rights to which they are entitled.

99.   Plaintiffs are represented by attorneys from Smolen, Smolen & Roytman, PLLC and J Webb Law Firm, PLLC who have experience in litigating complex civil rights matters in federal court and extensive knowledge of both the details of the Defendants' scheme and the relevant constitutional and statutory law.

100.  Counsel's efforts have so far included extensive investigation over a period of months, including numerous interviews with witnesses, plaintiffs and their families, attorneys practicing in counties across Oklahoma, community members, experts in the functioning of Oklahoma criminal courts, and national experts in debt collection and constitutional law.

101.   Counsel have also observed and participated in numerous courtroom hearings in Oklahoma Counties in order to compile a detailed understanding of state law and practices as they relate to federal constitutional requirements. Counsel has studied the way that these systems function in other cities and counties in order to investigate the wide array of options in practice for municipalities.

102.   As a result, counsel has devoted enormous time and resources to becoming intimately familiar with the Defendants'' scheme and with all of the relevant state and federal laws and procedures that can and should govern it. Counsel has also developed relationships with man of the individuals and families most victimized by the Defendants' practices.

103.   The interests of the members of the Class will be fairly and adequately protected by the Plaintiffs and their attorneys.

**Rule 23(b)(2)**

104.   Class action status is appropriate because the Defendants, through the policies, practices, and procedures that make up its debt-collection scheme, have acted and/or refused to act on grounds generally applicable to the Class. Thus, a declaration that people in the Class are entitled, as a matter of federal law, to a neutral collector without a financial conflict of interest in their case would benefit every member of the proposed Class. The same applies to legal rulings on the other claims, including: that the Contract is void; that the arrangement and the Defendants' policies violate the Equal Protection Clause by imposing onerous debt conditions based on wealth status and by imposing debt-collection methods far more onerous than any private creditor could lawfully impose; that the scheme to issue arrest warrants based solely on non-payment violates the Fourth Amendment and procedural due

48

process; that Aberdeen and the Sheriffs' Association abuses process by commandeering specific legal processes for the ulterior motive of earning profit; that it is unlawful to detain a person after arrest because the person cannot afford to pay a preset money bond without any inquiry into ability to pay or any other findings; and that the policy, pattern, and practice of threats to jail people for nonpayment without informing them of their rights or inquiring into their ability to pay constitutes an extortion enterprise in blatant violation of racketeering laws.

105. Injunctive relief compelling the Defendants to comply with these constitutional and statutory requirements will similarly protect each member of the Class from being subjected to the Defendants' unlawful policies and practices with respect to the debts that they still owe and protect those who will incur such debts in the future from the same unconstitutional conduct. Therefore, declaratory and injunctive relief with respect to the Class as a whole is appropriate.

**Rule 23(b)(3)**

106. Class treatment under Rule 23(b)(3) is also appropriate because the common questions of law and fact overwhelmingly predominate in this case. This case turns, for every named Plaintiff, as well as for the members of the Class, on what the Defendants' policies and practices are and on whether those policies are lawful.

107. The common questions of law and fact listed above are dispositive questions in the case of every member of the Class. The question of liability can therefore be determined on a class-wide basis. Class-wide treatment of liability is a far superior method of determining the content and legality of the Defendants' policies and practices than individual suits by tens of thousands of indigent people owing court

fines. To the extent that individual damages will vary, they will vary depending in large part on the amount of time that a person was subjected to the unlawful scheme and the amount of money extorted from them. Determining damages for individual Class members can thus typically be handled in a ministerial fashion based on easily verifiable records in the Defendants' possession. If need be, individual hearings on Class- member specific damages based on special circumstances and particular hardships endured as a result of Defendants' extortion scheme can be held after Class-wide liability is determined—a method far more efficient than the wholesale litigation of thousands of individual lawsuits.

108.   The Plaintiffs seek the following relief and hereby demand a jury trial in this cause for all matters so appropriate.

### Claims for Relief

### Count One:  Racketeer Influenced and Corrupt Organizations Act.
### 18  U.S.C. § 1962 (c) and (d)

109.   The Plaintiffs incorporate by reference the allegations in paragraphs 1-95.

110.   The Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68 ("RICO"), are brought against the Aberdeen Enterprizes, the Sheriffs' Assocation, and not the individual Oklahoma counties.

111.   The Plaintiffs are "persons" with standing to sue within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

112.   Defendants Aberdeen Enterprizes II and the Sheriffs' Assocation are "RICO persons" within the meaning of 18 U.S.C. § 1961(3) because it is an entity

capable of holding a legal or beneficial interest in property.

113. Each of the Defendants are a "RICO person" within the meaning of 18 U.S.C. § 1963(1) because they are capable of holding a legal or beneficial interest in property.

### A.  The RICO Enterprise

114. The Sheriffs' Association, together with Aberdeen and the other unnamed conspirators, constitute an association-in-fact, and therefore an enterprise within the meaning of 18 U.S.C. § 1961(4). This RICO Enterprise is an ongoing business relationship with the common purpose of maximizing the collection of court fines, costs, and fees by Aberdeen without consideration of the probationer's ability to pay.

115. The RICO Enterprise is engaged in interstate commerce because its activities and transactions relating to the collection of money, and the movement of the profit received by Defendant Aberdeen Enterprizes II pursuant to this operation, frequently requires movement and communications across state lines. Aberdeen's case managers also use the electronic communications and the United States mail to communicate with indigent plaintiffs, including using those means to transmit threats of incarceration for nonpayment.

116. The members of the RICO Enterprise function as a continuing unit.

117. The Defendants have violated 18 U.S.C. § 1962(c) because they are associated with an enterprise that is engaged in, or the activities of which affect, interstate commerce and have, directly or indirectly, conducted or participated in the conduct of an enterprise's affairs through a pattern of racketeering activity.

118. The Defendants have violated 18 U.S.C. § 1962(d) because they have conspired with

each other to violate 18 U.S.C. § 1962(c).

119.   Specifically, the Defendants conducted or participated in and conspired to conduct the affairs of the RICO Enterprise by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

      a. Extortion in violation of the Hobbs Act, 18 U.S.C. § 1951;

      b. Extortion in violation of Title 21 Oklahoma Statute § 1481;

      c. Extortion Induced by Threats in violation of Title 21 Oklahoma Statute § 1482 and

      d. Extortion in violation of the Travel Act, 18 U.S.C. § 1952.

**B.  Predicate Acts**

120.   The Plaintiffs incorporate by reference the previously described extortion allegations.

121.   The Defendants have, on their own and in conspiracy with the other participants in the RICO Enterprise, obtained by threat the various fines and costs associated with criminal cases, with intent to deprive indigent persons of this money.

122.   The Defendants, individually and in conspiracy with the other participants in the RICO Enterprise, threatened and continue to threaten Plaintiffs that if they do not agree to pay money to Aberdeen, they: (a) will have a warrant issued (b) will be arrested; (c) will face testimony by Aberdeen against them regarding non-payment, but without revealing the reasons for non-payment (including an inability to pay); (d) will be charged additional fees; and (e) will be sent to jail.

123.   These threats are inherently wrongful because they are motivated out of a desire to extort, because they are premised on deception concerning the facts and in knowing violation of the legal rights of the victims, and because they are demanded

pursuant to an unlawful contract.

124. Because of these unlawful threats, the Plaintiffs paid the fees demanded by Aberdeen.

### i. Extortion in violation of the Hobbs Act, 18 U.S.C. § 1951

125. The Plaintiffs incorporate by reference the previously described extortion allegations.

126. The Defendants have, individually and in conspiracy with the other participants in the RICO Enterprise, obtained fees from Plaintiffs with their consent, which consent has been induced by the wrongful use of fear in violation of 18 U.S.C. § 1951 (Hobbs Act).

127. The proceeds of Defendants' extortionate activities were used in commerce, and therefore affected commerce or the movement of any article or commodity in commerce, as these terms are understood by 18 U.S.C. § 1951(a).

**Extortion in Violation of the Travel Act**

128. The Plaintiffs incorporate by reference the previously described extortion allegations.

129. The Defendants have, individually and in conspiracy with the other participants in the RICO Enterprise, obtained by threat fees from Plaintiffs, with intent to deprive them of this money and the enjoyment of their state and federal rights, in violation of 18 U.S.C. § 1952 (Travel Act) and Oklahoma law.

130. The Defendants have traveled in interstate commerce, and have used the mail and facilities in interstate commerce to distribute the proceeds of the extortionate scheme and to communicate with each other and with their victims concerning the operation of the scheme. in violation of 18 U.S.C. § 1952(a)(1). The Defendants have

traveled in interstate commerce, and have used the mail and facilities in interstate commerce to  otherwise promote, manage, establish, carry on, and facilitate the promotion, management,  establishment, or carrying on, of an extortionate scheme, in violation of 18 U.S.C. § 1952(a)(3).

**Pattern of Racketeering Activity**

131.   The Private Probation Defendants and the other participants in the RICO Enterprise have engaged in the racketeering activity described in this Complaint repeatedly since at least 2010 and continuing through the present with respect to thousands of indigent persons in Oklahoma Counties. These racketeering acts are part of the enterprise's regular way of doing business.

132.   The racketeering acts of the Defendants and the other participants in the RICO enterprise have a similar purpose: to maximize the collection of court  fines, costs, and fees by Aberdeen Enterprizes II without consideration of the individual's ability to pay and without informing probationers of their legal rights.

133.   The racketeering acts of the Defendants and the other participants in the RICO Enterprise have yielded similar results and caused similar injuries to the  Plaintiffs: the Plaintiffs have, inter alia, all been subjected to fees paid to Defendant Aberdeen as  a result of their unlawful conduct. Moreover, the Plaintiffs have  all also been subjected to threats of physical confinement and actual physical confinement as well as relinquishing their federal and state rights through onerous and unlawful conditions.

134.   As set forth in the preceding paragraphs, the racketeering acts have similar participants:  Aberdeen and the Sheriffs' Association Defendants, County officials,

and the other participants in the RICO Enterprise.

135. As set forth in the preceding paragraphs, Defendants and the other participants in the RICO Enterprise, through the RICO Enterprise, directed their racketeering activities at similar victims: the named Plaintiffs specifically, and more generally all Oklahoma criminal defendants who were appointed counsel due to indigency, and whose cases were sent to Aberdeen Enterprizes for collection.

136. As set forth in the preceding paragraphs, the racketeering acts of Defendants and the other participants in the RICO Enterprise have similar methods of commission, namely: extorting the named Plaintiffs and, more generally, all indigent Oklahoma criminal defendants who cannot afford to pay their entire court debts on the date they are adjudicated or assigned, into paying Aberdeen Enterprizes.

**C. Injury**

137. As a direct and proximate result of Defendants' and the other participants in the RICO Enterprise's willful, knowing, and intentional acts discussed in this Complaint, the Plaintiffs have suffered injuries to their property. Plaintiffs have all been subjected to fees and surcharges paid to Defendant Aberdeen and the Sheriffs' Association and they have been forced to continue paying these fees even when they cannot afford to do so without sacrificing the basic necessities of life, resulting in economic harm to themselves and their families.

138. The Plaintiffs are entitled to an award of damages in an amount to be determined at trial, including treble damages and attorneys' fees and costs associated with this action.

**Count two: Defendants' Use of a Private Actor With a Personal Financial Stake in the Outcome of Judicial Proceedings As a Supposedly Neutral Collection Agency Violates Plaintiffs' Due Process Rights.**

139.   The Plaintiffs incorporate by reference the allegations in paragraphs 1-126 above.

140.   The Due Process Clause of the Fourteenth Amendment prohibits neutral judicial officials and neutral civil and criminal law enforcement actors from having a personal financial interest in the cases prosecuted and decided by them in our legal system. The County has contracted with a private, for-profit corporation to perform a traditional court function— fine and cost collection—and, critically, made the resolution of the Plaintiffs' cases contingent on the demands, advice, recommendations, discretionary decisions, enforcement actions, testimony, and representations of this private entity.

141.   In contrast to the traditional and longstanding role of the cost administrator, Aberdeen has a direct financial stake in every decision that they make regarding case supervision, enforcement, and revocation. Aberdeen has a personal financial interest to conduct its role as a court cost collector in a way that maximizes its personal profit and not as a neutral public court officer.

142.   Because this non-neutral actor profits significantly from the decisions about what fines and costs are levied, what conditions to require, what information to provide indigent criminal defendants about their rights and obligations, how to enforce those conditions, what testimony to provide, and what sanction to recommend, there is a clear risk that those financial interests will affect its judgment when it makes in those decisions. There is also overwhelming evidence that these financial interests have and continue to have an impact on every decision of Aberdeen's employees.  Because this private entity has a significant personal financial interest in how these cases are managed and resolved, unlike a traditional neutral judicial actor, prosecuting

authority, or probation department, the Defendants' policies and practices violate the longstanding due process restrictions against such self-interested financial arrangements in American courts of justice.

143.    Under the Defendants' scheme, Aberdeen can not only decide whether to initiate warrant requests, but it can also influence what conditions are imposed.[52] It can then make rules and determine whether and when to petition for warrants based on the perceived violation of those rules or other conditions. It also controls when and how much the indigent is required to pay, and what information is provided to or withheld from them concerning their legal rights. Then, Aberdeen serves as the main witness or, as often happens, Aberdeens's allegations are treated as evidence at any Cost Hearing that will likely results in incarceration for failure to pay.

**Count Three: The Contract Between Aberdeen and the Sheriffs' Association Is Void and Unenforceable Under Oklahoma Law.**

144.    The Plaintiffs incorporate by reference the allegations in paragraphs 1-131 above.

145.    The Plaintiffs seek declaratory and injunctive relief voiding the Contract between Defendants Aberdeen, the Sheriff's Association, and the Counties of Oklahoma contrary to Oklahoma law.

146.    The Contract between Aberdeen and the Sheriffs' Association, the terms and provisions of which are set forth above, and included as Exhibit 1, is harmful to the public and is in conflict with federal and state law. As set forth more fully herein, and incorporated by reference above, the Contract between Aberdeen and the Sheriffs' Association violates the U.S. Constitution, the parallel protections of the Oklahoma Constitution, as well as Oklahoma's laws and judicial opinions. To take only

---

[52] Warrants issued for a certain bond amount given to the County by Aberdeen.

several of the many examples discussed in this Complaint, the Contract unconstitutionally and unconscionably establishes a private actor with a personal financial stake in the outcome of each case as a supposedly neutral state debt collector mandates that particular actions be taken and particular amounts charged in particular judicial cases, and requires that nonpayment of costs and fees be made a "violation."

147. The Plaintiffs are intended third-party beneficiaries to the Contract between Aberdeen and the Sheriffs' Association in that the Contract specifically contemplates the provision of private services to residents of Oklahoma Counties served by their elected Sheriffs, such as the Plaintiffs. Specifically, the Contract between Aberdeen and the Sheriffs' Association provides for a monopoly on cost collection services in Oklahoma Counties and ensures that all residents placed on Aberdeen's client list (including the Plaintiffs) will be serviced by Aberdeen.

148. Accordingly, because the Contract between Aberdeen and the Sheriffs' Association prescribes for private debt collection services to be conducted through a "user funded model" and in a manner inconsistent with the U.S. Constitution, the parallel protections of the Oklahoma Constitution, and Oklahoma's laws and judicial opinions, the Plaintiffs are forced, and were specifically intended to, suffer the unlawful terms of the Contract.

**Count Four: Defendants' Use of Jail, Threats of Jail, and an Onerous System to Collect Debts Owed to the County Violates Equal Protection Because It Imposes Unduly Harsh and Punitive Restrictions On Debtors Whose Creditor Is the Government Compared To Those Who Owe Money to Private Creditors.**

149. Plaintiffs incorporate by reference the allegations in paragraphs 1-136 above.

150. The United States Supreme Court has held that, when governments seek to recoup

court costs from indigent defendants, they may not take advantage of their position to impose unduly restrictive methods of collection solely because the debt is owed to the government and not to a private creditor. Not only does the County place indigent people on standardized and overly onerous fines and costs lasting years, when the cases of wealthier people would be closed or unsupervised, but by imposing imprisonment, repeated threats of imprisonment, onerous liberty-restricting economic conditions, revoked or withheld drivers' licenses, extra fees and surcharges, and other restrictions on Plaintiffs, the County, Aberdeen, and the Sheriffs' Association take advantage of its control over the machinery of the County jail, prosecutorial, court, and police systems to deny debtors the statutory protections that every other Oklahoma debtor may invoke against a private creditor. The Defendants deprive the Plaintiffs of these protections even though Oklahoma law explicitly states that the debts owed to the Defendants are subject to Oklahoma's law on civil judgments.

151. Many people like the Plaintiffs owing money to the County have to borrow money, ration public benefits, convert federal means tested disability checks into money orders for Aberdeen, and go further into debt in order to pay off the County because other non-government creditors are not permitted to jail them, threaten to jail them, or compel their repeated arrest and court appearances for years for non-payment of debt. This coercive policy and practice constitutes invidious discrimination and violates the fundamental principles of equal protection of the laws.

**Count Five: Defendants' Policy and Practice of Placing People Who Owe Debts to the County on Onerous Probation Supervision Based Solely on Their Wealth Status Violates the Fourteenth Amendment.**

152.    The Plaintiffs incorporate by reference the allegations in paragraphs 1-139 above.

153.    The Defendants' policy and practice is to use Aberdeen's debt collection for those people who cannot afford to pay the court judgment in full. If the person can pay, the person pays and they are not supervised by Aberdeen. If the person is too poor to pay, the County and Sheriffs' Association has a policy and practice of turning the debt over to Aberdeen for collection,  including forcing the person to abide by conditions agreed upon by Aberdeen, the Sheriffs' Association, and the County that seriously restrict the person's liberty  and that purport to subject the person to punishment in jail if those conditions  (including payment of extra fees to Aberdeen) are violated. The same is true throughout the duration of the collection process, which can last for decades after the case is closed; this results in of hounding of the poor for years more than those who are wealthy, faced with the same charges, but able to pay. This policy and practice of altering punishment based solely on wealth status violates fundamental principles of Due Process and Equal Protection.

**Count Six: Defendants' Policy and Practice of Issuing and Executing Arrest Warrants Solely Based on Nonpayment of Monetary Debts Violates the Fourth and Fourteenth Amendments.**

154.    Plaintiffs incorporate by reference the allegations in paragraphs 1-141 above.

155.    The Defendants' policy and practice is to seek, issue, and execute arrest warrants against those who have not paid their debt from Oklahoma criminal cases. These warrants are sought, issued, and served without any inquiry into the person's ability to pay even when the Defendants have prior knowledge that the person is impoverished and unable to pay the debts or possesses other valid defenses (including against people who the Court itself has found indigent and who Aberdeen has actual

knowledge of indigence). These warrants are regularly sought, issued, and served without any finding of probable cause that the person has committed the elements of any offense or violation and, indeed, with actual knowledge that no willful violation has occurred. The warrants therefore are procured based on the reckless and knowingly false premise that a violation has occurred.     Indeed, the warrants are procured notwithstanding Oklahoma law that a person cannot have incarcerated for the nonpayment of court costs without a finding of ability to pay.

156.   The Defendants choose to pursue warrants instead of issuing summons even when they have spoken to people on the phone or in person and have the opportunity to notify them to appear in court, thus allowing Aberdeen to deprive Plaintiffs of their liberty for nonpayment prior to any meaningful pre-deprivation process (and thereby to levy additional fees and costs). Moreover, the many of the Counties' policies and practices are to unreasonably delay presentment for judicial proceedings days or weeks for no legitimate reason. These practices violate the Fourth and Fourteenth Amendments and result in a deprivation of fundamental liberty without adequate due process.

**Count Seven: Defendants Violate Plaintiffs' Rights By Jailing Them Solely Because They Cannot Afford A Preset Money Payment Prior to a Court Appearance.**

157.   Plaintiffs incorporate by reference the allegations in paragraphs 1-144 above.

158.   The Fourteenth Amendment's due process and equal protection clauses have long prohibited keeping a person in jail because of the person's inability to make a monetary payment. Defendants violate Plaintiffs' rights by placing and keeping them in jail pursuant to arrest warrants sought and obtained by Aberdeen Enterprizes for allegedly failing to pay on a schedule that Aberdeen controls. Plaintiffs cannot afford to pay the amount of money bond preset by the arrest warrant without any inquiry into

their indigence and ability to pay, any pre-deprivation process, any assessment of alternatives to detention, or any inquiry into whether the Plaintiffs are a danger to the community  or a risk of flight.

### Count Eight: Abuse of Process

159.   Plaintiffs incorporate by reference the allegations in paragraphs 1-149 above.

160.   The Defendants abused the legal process to seek arrest warrants with an ulterior motive to collect additional fees.

161.   When indigent plaintiffs are unable to pay what Aberdeen demands, Aberdeen alerts the Court and secures warrants for the arrest of indigent person. Moreover, Aberdeen. then participates through written documents, testimony, and informal ex parte conversations with County prosecutors and judges to secure warrants. Aberdeen engages in all of these activities with the ulterior motive of securing the additional court costs and fees that come as a matter of County policy and practice with each failure to pay. Aberdeen also engages in an abuse of process throughout its cost collection by using the order to collect not to do justice and assist indigent plaintiffs, but for the ulterior motive of making profit by setting fees and using the threat of incarceration for non-payment order to extort money.

### Request for Relief

WHEREFORE, the Plaintiffs demand a jury trial for all issues so appropriate and request  that this Court issue the following relief:

a.  A declaratory judgment that subjecting the Plaintiffs to the Defendants' conduct as alleged in the Counts listed above is unlawful;

b.  An order and judgment preliminarily and permanently enjoining the Defendants from enforcing the above-described unconstitutional and illegal policies and practices against  the Plaintiffs and the Class of similarly situated people on whose behalf they are bringing  suit;

c.  A judgment compensating the Plaintiffs and the Class of similarly situated individuals

for the damages that they suffered as a result of the Defendants' unconstitutional and unlawful conduct;

d.  A judgment granting the treble and punitive damages authorized by statute based on the Defendants' willful and egregious violations of the law;

e.      An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 18 U.S.C. § 1964, and any other relief this Court deems just and proper.

Respectfully,

/s/ Daniel E. Smolen
Daniel Smolen, OBA #19943
Donald E. Smolen, II, OBA #19944
Robert M. Blakemore, OBA #18656
Smolen Smolen & Roytman
701 South Cincinnati Avenue
Tulsa, OK 74119
Phone: (918) 585-2667
Fax: (918) 585-2669

Respectfully,

/s/ Jill E. Webb
Jill Webb, OBA #21402
J Webb Law Firm PLLC
PO Box 1234
Tulsa, OK 74101
Phone: (918) 346-5664
Jill.Webb@gmail.com

***Attorneys for Plaintiff***

## AGREEMENT FOR COLLECTION

This Agreement for Collection (the "Agreement") is being entered into by and between The Oklahoma Sheriffs' Association ("Association"), in its capacity as administrative agent of certain, participating County Sheriffs of Oklahoma (the "County Sheriffs""), and Aberdeen Enterprises II, Inc., an Oklahoma corporation ("Aberdeen"), for the collection of fines, penalties and assessments of certain "Warrants" (as defined below) issued by the County Sheriffs in the State of Oklahoma. Association and Aberdeen may each be referenced hereunder as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, pursuant to 19 O.S. §§ 514.4 and 514.5, (effective November 1, 2010), County Sheriffs may enter into a private contract for the purpose of requiring the contractor to attempt to locate and notify persons of any, (I) outstanding misdemeanor failure-to-pay warrants issued or relating to any proceeding pursuant to the State and Municipal Traffic Bail Bond Procedure Act, (ii) outstanding misdemeanor failure-to-pay warrants issued that allows a defendant to resolve the matter by payment in lieu of a personal appearance in court, and/or (iii) failure-to-pay warrant issued in a criminal case (collectively "Warrants"), and to collect any fines, penalties and assessments (collectively "Debt") associated with any such Warrants which remain unpaid and uncollected; and

WHEREAS, in accordance with 19 O.S. §§ 514.4, certain County Sheriffs have elected to assign their right to contract for the collection of any such Warrants to the Association; and

WHEREAS, Aberdeen is in the business of collecting the debts associated with such Warrants in the State of Oklahoma; and

WHEREAS, the Parties are entering into this Agreement for Aberdeen to provide certain collection services to Association, in Association's capacity as administrative agent for those certain, participating County Sheriffs, in connection with certain Warrants issued by those participating County Sheriffs and referred to Aberdeen for collection hereunder;

NOW, THEREFORE, in consideration for the mutual promises, agreements and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree to the following terms and conditions:

## TERMS AND CONDITIONS



1.    **Term and Termination**.

    (a)    <u>Term</u>. Unless otherwise earlier terminated in accordance with the terms of this Agreement, the term of this Agreement ("<u>Term</u>") shall commence on the date last signed by the Party below ("the <u>Effective Date</u>") and shall expire on **December 31, 2014** (the "<u>Termination Date</u>"). This Agreement shall automatically terminate on the Termination Date, unless both Parties otherwise agree to extend the Term in writing via an amendment to this Agreement prior to such Termination Date. Otherwise, upon the Termination Date of this Agreement, neither Party shall have any further obligation under this Agreement, except as otherwise set forth in Section 14 (<u>Survivability</u>).

    (b)    <u>Termination</u>.

        (1)    The Sheriffs' Association may terminate this contract due to non-renewal, unavailability of funds or for neglect as determined by the Sheriffs' Association which shall include, but not necessarily be limited to, failure to provide required periodic statements, failure to provide required standards of service, failure to provide quality and frequency of service, and failure to act consistently with the spirit of the applicable debt collection provisions of the FDCPA and FCRA under the Federal guidelines for collections and the corresponding State guidelines.  This may include any cessation or diminution of service including but not limited to failure to maintain adequate personnel, whether arising from labor disputes, or otherwise, any substantial change in ownership or proprietorship of Aberdeen which in the opinion of the Sheriffs' Association is not in its best interest, or failure to comply with the terms of this contract.

        (2)    Notwithstanding any other provision of this Agreement either Party may terminate this Agreement by giving the other Party written notice, if the other Party has materially breached its representations, warranties, duties and/or obligations hereunder, and such breach is not cured within thirty (30) days after receipt of such written notice.

        (3)    In addition, notwithstanding anything to the contrary, Association shall have the right to terminate this Agreement, (I) if Aberdeen has filed a petition in bankruptcy, is insolvent, or has sought relief under any law related to Aberdeen's financial condition or its ability to meet its payment obligations; (ii) if any involuntary petition in bankruptcy has been filed against Aberdeen, or any relief under any such law has been sought by any creditor(s) of Aberdeen, unless such involuntary petition is dismissed, or such relief is denied, within thirty (30) days after it has been filed or sought;

and/or (iii) at any time during the Term, in Association's sole discretion, upon sixty (60) days advance written notice to Aberdeen.

(4)    Upon expiration or termination of this Agreement, Aberdeen shall immediately discontinue collection action, and all referrals which have not been collected and all monies due but which have not yet been paid shall be transmitted by Aberdeen to Association within ten (10) business days following such expiration or termination date, along with a detailed report setting forth the current status of each referral being returned. Any monies received by Aberdeen on behalf of the Association after the expiration or termination date of this Agreement shall be immediately forwarded to Association, and shall not be subject to any collection fee(s).

2.    **Aberdeen's Roles and Responsibilities.**

(a)    <u>Accounts.</u>    Aberdeen shall only accept accounts placed under this Agreement by the Association, and referred by a County Sheriff's or Oklahoma Court Clerk's office ("Court Clerk(s)") to Aberdeen for collection, in such County Sheriff or Court Clerk's sole discretion. Upon request by a County Sheriff or Court Clerk, Aberdeen shall immediately return to such County Sheriff or Court Clerk any account(s) referred to Aberdeen in error at no charge to such County Sheriff or Court Clerk.

(b)    <u>OCIS Agreement and Access.</u>

(1)    Aberdeen hereby acknowledges and agrees that pursuant to 20 O.S. § 1315, the Oklahoma Supreme Court, by and through the office of the Administrative Director of the Courts ("AOC"), maintains the court information system designated as the "Oklahoma Court Information System" ("OCIS"), which is utilized by the court clerks and judges of certain district courts of this state for case management and accounting purposes, including processing payments of court fees, penalties, and assessments. Aberdeen further acknowledges and agrees that on and after the Effective Date of this Agreement and throughout the Term of this Agreement, including any Agreement renewals, Aberdeen shall have in effect with the AOC an Agreement Regarding Use of the Oklahoma Court Information System by Private Collections Vendor ("<u>OCIS Agreement</u>"), for access to certain district court case management and accounting functions on OCIS, subject to the terms and conditions imposed by the AOC regarding system use and access as provided for under such separate OCIS Agreement, and subject to the Rules for Management of the Oklahoma Court

Page 3 of 16

Information System, 20 O.S. Chap. 18, App. 2, and the Rules for Using the Oklahoma Court Information System, 20 O.S. Chap. 19, App. 3.

(2)     If the County Sheriff or Court Clerk referring a Warrant to Aberdeen hereunder is in a county that utilizes the OCIS system, the account shall be processed through OCIS. If the county is not a county which utilizes the OCIS system, accounts may be furnished to Aberdeen by way of paper, tape, or electronic media, as determined by the referring County Sheriff or Court Clerk, in such County Sheriff's or Court Clerk's sole discretion.

(c)     At all times throughout the Term of this Agreement, Aberdeen shall, (I) use its best efforts to collect any Debts associated with any Warrants referred to Aberdeen hereunder, solely utilizing means which are legal, necessary and proper. Aberdeen shall not harass or exert undue pressure on delinquent debtors or employ any procedure that would cast discredit upon the Association, the County Sheriff(s) and/or the Court Clerk(s), or otherwise subject the Association, the County Sheriff(s) and/or such Court Clerk(s) to public disapproval; and (ii) comply with all applicable federal, state, and local laws and regulations with regard to collection practices and procedures.

(d)     Aberdeen may offer to a debtor of a Warrant the opportunity to pay his/her Debt by electronic means by check or credit card, when receiving payments. The charges associated with the convenience of paying by electronic means is a convenience that, if the debtor uses that procedure, the charge for such processing shall be chargeable to the debtor with notice, and shall be in compliance with applicable law.

(e)     Trust Account/Payments.

(1)     Aberdeen shall accept accounts placed by the Sheriffs' Association from the various County Court Clerks under the terms of this agreement and will use its best efforts to collect said accounts utilizing means legal, necessary and proper. Aberdeen agrees that any and all information provided by or through each County Sheriff's Office and Court Clerk's Office or any other state agency shall remain confidential in all respects. The placement of accounts by each County Sheriff's Office and Court Clerk's Office to Aberdeen shall be at the sole discretion of each County Sheriff's Office and Court Clerk's Office. Accounts may be furnished on paper, tape, and electronic media or through OSCN access to Aberdeen.

Page 4 of 16

(2)    Aberdeen agrees to return to each County Sheriff's Office and/or Court Clerk's Office at no charge accounts referred in error.

(3)    Aberdeen shall deposit all funds collected by Aberdeen hereunder in a trust account and shall be disbursed to the respective Counties on the 15th and last day of the month, plus 5 days for check processing.  The disbursement will detail the name of the debtor, the account the payment was applied, the date of the payment, the amount of the payment and the pro-rata division of the funds between the parties, if appropriate.  Further disbursements will be made under the following terms:

    (A)    To each Court Clerk of the County that has issued a Warrant referred to Aberdeen for collection hereunder, the total amount collected on the original filings, penalties and an administration fee and itemized by a Trust Statement.

    (B)    It is understood and agreed that each Court Clerk of the County that has issued a warrant and collected the funds plus the administrative cost shall then, in turn, pay Association, or its designated representative or assignee, in this case Aberdeen, 30% of the original fines before the administrative fees were added or 23.0769% of the total monies received or 20% of the original fines before the administrative fees were added, or 16.67% whichever is less as determined by the assignment date of the case for collection.

    (C)    Aberdeen, within fifteen (15) days of the receipt of any funds from the Court Clerk of the County that has issued a warrant and paid funds to the Association or Aberdeen pursuant to 19 O.S. § 514.5 (A) and (B), shall distribute to Association ▮▮▮ of that amount, less any adjustments made by the Court subject to the terms below.

    (D)    Notwithstanding anything to the contrary, including, without limitation, in Sections (B) & (C) above, if and when the Aberdeen Fees for collection of the Debts associated with the Warrants referred to, and collected by, Aberdeen under this Agreement equal or exceed $1,000,000.00 (one million dollars) in gross revenue aggregate, then the distributions

Page 5 of  16

provided for in Section (C) shall have no further force and effect throughout the remainder of the Term of the contract. In lieu, the following distributions shall apply with respect to any and all Debts collected by Aberdeen hereunder:

(i) To Association directly, ▓▓▓▓▓▓▓▓▓▓▓▓ of the thirty percent (30%) as provided for under Title 19 O.S. § 514.5 (A).

(j) Aberdeen shall retain the balance as its fee for collection of the accounts.

(4) The distribution calculations on partial payments or payments under a payment plan shall be consistent with a division on each payment of 76.9231% of the fine, penalty, administrative fee to the Court Clerk's offices and 23.0769% of the payment or 16.67% whichever is less as determined by the assignment date of the case for collection to Aberdeen until the full amount is paid.

(5) It is expressly understood and agreed that Aberdeen shall not be entitled to retain any portion of an overpayment and shall not be entitled to a collection fee for any overpayment or for "credit for time served". Any amount received by Aberdeen that is in excess of that which is due and payable by a debtor shall constitute an "overpayment" and shall be returned to the debtor. In any case where Aberdeen determines an overpayment has been made by any debtor, Aberdeen shall immediately notify Association in writing, provide Association a full accounting relative to such overpayment, and shall promptly return such overpayment to the debtor (and provide Association with documentation evidencing the return of such overpayment).

(f) Upon expiration or termination of this Agreement, Aberdeen shall immediately, (i) discontinue collection action, and (ii) deliver to Association all Information (as defined in Section 14 below) which Aberdeen obtained by virtue of this Agreement and/or relating to Aberdeen's performance hereunder, whether in tangible or intangible form, or (iii) if directed by Association, in Association's sole discretion, destroy all such Information in accordance with applicable law and prevailing industry standards within ten (10) days of Association's request, and provide written certification to

Page 6 of 16

Association of the complete and permanent destruction of such Information. All referrals uncompleted and all monies due but not yet paid by Aberdeen to the applicable Court Clerk's office, shall be transmitted to such County Court Clerk's office within ten (10) business days following such expiration or termination date, and shall not be subject to a collection fee, and shall include a written summary by Aberdeen of the current status of each referred account being returned.

(g)    Aberdeen shall not represent Association, any County Sheriff's office and/or any Court Clerk's office in any matter other than the collection of an account referred hereunder. If and when an account referred to Aberdeen by the Association, a County Sheriff and/or Court Clerk hereunder becomes involved in litigation, Aberdeen shall immediately suspend collection activity and/or return any account at no charge, upon the request of Association, such County Sheriff's office, and/or Court Clerk's office. In no event shall Aberdeen seek to collect on any account which becomes involved in litigation including without limitation, bankruptcy.

(h)    Collection Activity Reports.

(1)    Monthly Reports. No later than the Fifteenth (15th) day and Twentieth (20th) day of each calendar month during the Term, Aberdeen shall provide Association the following information with respect to each county that has been referred by Association, a copy of each check from the trust account paid to the county. At the time of payment to the Association a copy of all checks paid by the county of which the distribution of payments to Aberdeen and the Association are made up.

(2)    Bi-Monthly Reports. No later than the 1st and 15th of each calendar month during the Term, Aberdeen shall provide each County Clerk's Office the information set forth in section 2 (e) (3) above relative to each account which has been referred by Association, a County Sheriff's office and/or Court Clerk's office for collection and which relates to such county.

(3)    Annual Report. No later than October 31st of each calendar year, Aberdeen shall provide an annual summary report to Association.

3.    **Roles and Responsibilities of Association.**

(a)    Upon request by Aberdeen, Association will provide to Aberdeen any debtor information that would be available to Association for purposes of

Page 7 of 16

collecting the warrant, based upon information obtained through the collective efforts of each County Sheriff's office and Court Clerk's office. Aberdeen agrees that any and all information provided by or through Association, a County Sheriff's office and a Court Clerk's office or any other state agency shall remain confidential in all respects and shall be treated as "Information" under Section 14 below.

(b)     Association shall assist Aberdeen in obtaining a monthly report from each Court Clerk for an Oklahoma County that has issued a Warrant which has been referred to Aberdeen for collection hereunder.

**4.     Representations and Warranties.**   Aberdeen hereby represents and warrants that: (i) it is a corporation duly organized, validly existing and in good standing under the laws of the State of Oklahoma; (ii) it has the requisite power and authority to enter into this Agreement and to fully perform its obligations hereunder; (iii) the individual executing this Agreement has the authority to do so; (iv) it has not made nor will it make any contractual or other commitment which will or may prevent, impair or hinder its full performance of this Agreement; (v) it shall comply in spirit with all federal, state, and local laws, rules and regulations, including, without limitation, the applicable debt collection provisions of the FDCPA and FCRA under the Federal guidelines for collections and the corresponding State guidelines and all applicable privacy laws; (vi) it shall not knowingly use the rights granted to it hereunder for any unlawful purpose; (vii) it shall be responsible for obtaining all required permits, licenses, and bonding to comply with pertinent regulations; municipal, county, state and federal laws and shall be liability for all applicable taxes; (viii) it has not, and shall not at any time during the Term, provide services to the State of Oklahoma of a similar nature for a non-uniform rate as set forth in this Agreement.

**5.     Records and Audit Rights.**   Aberdeen agrees to keep and maintain accurate books and records with respect to its performance under this Agreement. During the Term and for two (2) years thereafter, Association, the State Auditor and Inspector, and any other state agency have the right to conduct an audit of such books and records that are reasonably necessary to verify Aberdeen's compliance with the terms of this Agreement. Any such audit shall be conducted during Aberdeen's regular business hours at Aberdeen's principal place of business in the State of Oklahoma. If with respect to any audit there is a shortfall for the period audited between the amounts payable to Association and the amounts actually paid, Aberdeen shall promptly pay all outstanding payments to Association, and in addition to any such payments due, shall pay interest on such overdue amount at a rate of one and one-half percent (1½ %) per month, and shall pay for the reasonable costs and expenses of Association, the State Auditor and Inspector, and/or any other state agency associated with performing such audit.

**6.     Indemnity, Limitation of Liability and Disclaimer of Warranties.**

Page 8 of  16

(a)     It is hereby acknowledged and agreed by the Parties that Association, its Board members, officers, County Sheriffs and Court Clerks shall have no liability for any acts or omissions by Aberdeen, its officers, agents and/or employees, connection with its performance or failure to perform its duties and obligations under this Agreement. Rather, notwithstanding anything to the contrary, Aberdeen shall indemnify, defend, and forever hold harmless Association, its Board members, officers and directors, the County Sheriffs, the State of Oklahoma, the Oklahoma District Courts, the Administrative Office of the Courts and their officials, agents and employees from and against any and all claims, damages, liabilities, costs and expenses (including reasonable attorneys' fees) (collectively "Claims") arising out of any breach of any of Aberdeen's warranties, representations and duties and/or obligations pursuant to this Agreement including, without limitation, any acts or omissions on the part of Aberdeen and/or any officer(s), agent(s), and/or employee(s) of Aberdeen in connection with its performance under the terms of this Agreement. Upon receipt by Aberdeen of written notice of any Claim for which such indemnity applies, Aberdeen shall immediately undertake the defense of any such claim or action and permit Association to participate, in Association's sole discretion.

(b)     LIMITATION OF LIABILITY. NOTWITHSTANDING ANYTHING TO THE CONTRARY, IN NO EVENT SHALL ASSOCIATION, ITS OFFICERS, DIRECTORS OR BOARD MEMBERS BE LIABLE TO ABERDEEN FOR ANY INCIDENTAL, SPECIAL, CONSEQUENTIAL, PUNITIVE OR SIMILAR DAMAGES (INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS OR REVENUES, OR DAMAGES TO OR LOSS OF PERSONAL PROPERTY), HOWEVER CAUSED, BASED ON ANY THEORY OF LIABILITY.

(c)     DISCLAIMER OF WARRANTIES. ASSOCIATION MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO, ANY WARRANTY AS TO MERCHANTABILITY OR FITNESS FOR INTENDED OR PARTICULAR PURPOSE WITH RESPECT TO ITS OBLIGATIONS, SERVICES AND/OR REPORTS PROVIDED HEREUNDER.

7.     **Insurance**.

(a)     With respect to Aberdeen's performance under this Agreement, and in addition to Aberdeen's obligation to indemnify, Aberdeen shall at its sole cost and expense:

(1)     maintain the insurance coverages and limits required by this Section 7 and any additional insurance and/or bonds required by law: (A) at

Page 9 of 16

all times during the term of this Agreement and until completion of all work associated with this Agreement, whichever is later; and (B) with respect to any coverage maintained in a "claims-made" policy, for two (2) years following the term of this Agreement or completion of all work associated with this Agreement, whichever is later. If a "claims-made" policy is maintained, the retroactive date must precede the commencement of work under this Agreement;

(2)     procure the required insurance from an insurance company eligible to do business in Oklahoma and having and maintaining a Financial Strength Rating of "A-" or better and a Financial Size Category of "VII", or better, as rated in the A.M. Best Key Rating Guide for Property and Casualty Insurance Companies, except that, in the case of Workers' Compensation insurance, Aberdeen may procure insurance from the Oklahoma State Insurance Fund; and

(3)     deliver to Association certificates of insurance stating the types of insurance and policy limits. Aberdeen shall provide or will endeavor to have the issuing insurance company provide at least thirty (30) days advance written notice of cancellation, non-renewal, or reduction in coverage, terms, or limits to Association. Aberdeen shall deliver such certificates: (A) prior to execution of this Agreement and prior to commencement of any work hereunder; (B) prior to expiration of any insurance policy required in this Section 7; and (C) for any coverage maintained on a "claims-made" policy, for two (2) years following the term of this Agreement or completion of all work associated with this Agreement, whichever is later.

(b)     The Parties agree:

(1)     the failure of Association to demand such certificate of insurance or failure of Association to identify a deficiency will not be construed as a waiver of Aberdeen's obligation to maintain the insurance required under this Agreement;

(2)     that the insurance required under this Agreement does not represent that coverage and limits will necessarily be adequate to protect Aberdeen, nor shall it be deemed as a limitation on Aberdeen's liability to Association under this Agreement;

(3)     Aberdeen may meet the required insurance coverages and limits with any combination of primary and Umbrella/Excess liability insurance; and

(4)      Aberdeen is responsible for any deductible or self-insured retention.

(c) The insurance coverage required by this Section includes:

(1)      **Workers' Compensation** insurance with benefits afforded under the laws of the State of Oklahoma and **Employers Liability** insurance with limits of at least:

· $500,000 for Bodily Injury – each accident

· $500,000 for Bodily Injury by disease – policy limits

· $500,000 for Bodily Injury by disease – each employee

To the fullest extent allowable by Law, the policy must include a waiver of subrogation in favor of Association.

(2)      **Commercial General Liability** insurance written on Insurance Services Office (ISO) Form CG 00 01 12 04 or a substitute form providing equivalent coverage, covering liability arising from premises, operations, personal injury, products/completed operations, and liability assumed under an insured contract (including the tort liability of another assumed in a business contract) with limits of at least:

· $2,000,000 General Aggregate limit

· $1,000,000 each occurrence limit for all bodily injury or property damage incurred in any one (1) occurrence

· $1,000,000 each occurrence limit for Personal Injury and Advertising Injury

The **Commercial General Liability** insurance policy must: (A) include the Oklahoma Sheriffs' Association and its Board of Directors, Executive Director and Officers as an Additional Insured(s), and Aberdeen shall provide a copy of the Additional Insured endorsement to Association. A copy of the Additional Insured endorsement must be provided within 30 days of execution of this Agreement.

**8.      Governing Law.**   Notwithstanding anything to the contrary, the obligations of Association and Aberdeen under this Agreement are subject to all applicable federal, state and local laws, rules and regulations, and this Agreement and all matters or issues collateral thereto shall be governed by, and construed in accordance with, the laws of the State of Oklahoma (without giving effect to the laws, rules or principles of the State of Oklahoma regarding conflicts of laws).

Page 11 of 16

9.      **Conflict with State or Federal Law.**   It is hereby acknowledged and agreed by the Parties that the Association, the County Sheriffs, and the Court Clerks are charged with and remain uniquely responsible for upholding the state and federal constitutions and other state and federal laws. Therefore, notwithstanding anything to the contrary, nothing in this Agreement shall be construed to require the Association, any County Sheriff(s) and/or any Court Clerk(s) to perform, direct, authorize, or participate in any act that causes any of them, individually or as an organization, to violate those laws or the rights of the citizens or consumers under those laws. Any provision or part of this Agreement that conflicts with the requirements of any applicable state or federal law, as amended from time to time, shall be void and unenforceable.

10.     **Intellectual Property Rights.**   Notwithstanding anything to the contrary, nothing contained herein shall act as a transfer to Aberdeen of ownership of any intellectual property rights in any of the materials, creations, inventions, writings, discoveries, programs, developments or innovations that are created or conceived for use by Association, any County Sheriff(s) and/or Court Clerk(s) during and/or otherwise related to Aberdeen's performance hereunder, and/or any Information (as defined in Section 14 below) disclosed or otherwise made available to Aberdeen in connection with this Agreement and/or its performance hereunder.

11.     **Assignment.**   Aberdeen shall have no right to assign this Agreement, and/or to subcontract, or otherwise delegate any of Aberdeen's rights, obligations and/or duties hereunder.

12.     **Force Majeure.**   Other than as set forth in this paragraph, neither Party shall have any rights or liabilities against the other Party hereto for the non-operation of facilities, equipment, or software or the non-furnishing of the Service(s) or any part thereof, by reason of an act of God, labor dispute, fire, weather condition, breakdown of facilities, legal enactment, governmental order or regulation, or any other cause (excluding financial inability) beyond a Party's reasonable control ("Force Majeure"). The affected Party will give prompt notice to the other Party when a Force Majeure has occurred.

13.     **Notices.**   All notices required hereunder shall be in writing and shall be delivered by hand, certified mail, return receipt requested, telecopy or facsimile, or by express courier or overnight delivery adequate postage prepaid to the respective addresses for each Party set forth below, as such notice contacts may be modified from time to time in accordance with this Section.

      If to Association:
      Oklahoma Sheriff's Association
      6531 N. Classen Blvd., #A
      Oklahoma City, OK 73116-7307

Attn: Ken McNair
Facsimile: (405) 286-3265

With a copy to:
Christopher J. Collins, Esq.
Collins, Zorn & Wagner, P.C.
429 N.E. 50th Street, Second Floor
Oklahoma City, OK 73105
Facsimile: (405) 524-2078

If to Aberdeen:
Aberdeen Enterprises II, Inc.
4143 E. 31st Street
Tulsa, Oklahoma 74135
Attention: Renita Shofner
Facsimile: (918) 794-0800

Notices shall be deemed given: if by hand delivery on the next business day following delivery; if by mail, on the earlier to occur of actual receipt or on the fifth calendar day following mailing if sent in accordance with this Section; if by facsimile on the date set forth on the confirmation produced by the sending facsimile machine; if by express courier or overnight delivery service, on the next business day following delivery of the notice or report to such service with instructions for overnight delivery.

**14.    Security and Confidentiality.**   Aberdeen and its employees, officers, attorneys, auditors, consultants and agents ("Aberdeen Representatives") have maintained and will maintain in confidence the terms and conditions of this Agreement, as well as all data, summaries, reports or information of all kinds, whether oral or written, acquired from or from the files of, or devised or developed by Association, a County Sheriff's office and/or a Court Clerk's office and/or otherwise disclosed by Association, a County Sheriff's office and/or a Court Clerk's office to Aberdeen and/or any Aberdeen Representative(s) in connection with Aberdeen's performance hereunder (collectively the "Information"), and have not and will not reveal the same to any third party, except: (I) at the written direction or consent of Association; (ii) to the extent necessary to comply with applicable law, rule or regulation of a governmental agency, or a valid order of a court of competent jurisdiction, in which event Aberdeen shall so notify Association as promptly as practicable (and, prior to making any disclosure) and shall in all cases seek confidential treatment and redaction to the greatest extent possible of such information; and (iii) as part of its normal reporting or review procedure to its attorneys or auditors, provided such attorneys and/or auditors agree to be bound by the provisions of this Section. In no event shall Aberdeen, directly or indirectly, publish, disseminate, or otherwise disclose, deliver or make available any Information to any third party, and shall limit the disclose of the Information to only those Aberdeen Representatives with a need to know to perform under this Agreement. Aberdeen hereby acknowledges and agrees that Aberdeen and the Aberdeen Representatives

Page 13 of 16

may use Information including, without limitation, Information concerning individual debtors only for such reasonable and lawful means to effect collections hereunder, and for no other reason whatsoever. Aberdeen shall develop, implement, maintain and use appropriate administrative, technical and physical security measures which may include but not be limited to encryption techniques and firewalls, to preserve the confidentiality and integrity of all Information. If any Information made available to Aberdeen hereunder is stolen, lost, or in any way compromised, transgressed, trespassed, hacked, copied, damaged, or improperly disclosed, Aberdeen shall immediately notify Association and at Aberdeen's sole expense, cooperate with Association in its efforts to assess the loss, recover or reconstruct the Information, and to identify, investigate and prosecute those responsible.

**15.     Survivability.**   The Parties' obligations under this Agreement which by their nature are intended to continue beyond the termination or expiration of this Agreement shall survive the termination or expiration of this Agreement. Without limiting the general applicability of the foregoing, the following sections are specifically agreed by the Parties to continue beyond the termination or expiration of this Agreement: the Recitals, Sections 1, 2 and Sections 4 through 21.

**16.     Severability.**   Every provision of this Agreement is intended to be severable. If any term or provision of this Agreement shall be held to be invalid, illegal or unenforceable for any reason, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of the remainder of this Agreement.

**17.     Relationship.**   Neither Party shall be, or hold itself out as, the agent of the other Party under this Agreement. Nothing contained herein shall be deemed to create, and the Parties do not intend to create, any relationship of partners or joint venturers, and neither Party is authorized to or shall act toward third parties or the public in any manner which would indicate any such relationship. Aberdeen shall, at all times throughout the Term of this Agreement, act and perform its collection duties hereunder as an independent contractor. It is expressly understood and agreed that Association shall not exercise any control over the methods by which Aberdeen and/or any officer(s), agent(s), and/or employee(s) of Aberdeen, shall perform Aberdeen's work and functions. In addition, it is expressly acknowledged and agreed that Aberdeen shall solely be responsible for all costs, travel expenses, insurance and any and all other costs and expenses incurred by Aberdeen and/or Aberdeen Representatives in connection with, or otherwise incidental to, Aberdeen's performance under this Agreement. Under no circumstances shall this Agreement be construed or interpreted as an exclusive dealing agreement by either Party. Nothing in this Agreement shall be construed as to restrict Association from entering into any agreement with any other party, even if similar to or competitive with the transactions contemplated hereunder.

**18.     No Third Party Beneficiaries.**   This Agreement is for the sole benefit of the Parties, and their permitted assignees who are parties to this contract and nothing

Page 14 of 16

herein expressed or implied shall create or be construed to create any third party beneficiary rights hereunder. This Agreement shall not provide any non-party with any remedy, claim, cause of action or other right.

**19.**   **No Presumption.**   The Parties acknowledge and confirm that each of their respective attorneys has participated in the review and revision of this Agreement and that each Party has had the benefit of its independent legal counsel's advice with respect to the terms and provisions hereof and its rights and obligations hereunder. Each Party stipulates and agrees that the rule of construction to the effect that any ambiguities are to be or may be resolved against the drafting Party shall not be employed in the interpretation of this Agreement to favor any Party against another and that no Party shall have the benefit of any legal presumption or the detriment of any burden of proof by reason of any ambiguity or uncertain meaning contained in this Agreement.

**20.**   **Non-Recourse.**   Notwithstanding anything to the contrary in this Agreement, it is expressly understood and agreed by the Parties that each and every representation, undertaking and agreement made in this Agreement on the part of the Association was not made nor intended to be made as a personal representation, undertaking or agreement on the part of any individual, incorporator, stockholder, director, officer or partner, past, present or future, of the Association, any County Sheriff(s), and/or any Court Clerk(s), all of which recourse, whether in common law, in equity, by statute or otherwise, is hereby forever waived and released.

**21.**   **Scope of Agreement, Waiver and Amendment**.   This Agreement constitutes the entire agreement and understanding between the Parties with respect to the subject matter hereof and supersedes all prior and/or contemporaneous, express or implied, written or oral, agreements, representations and conditions between the Parties with respect thereto. No provision of this Agreement shall be deemed waived or amended by either Party unless such waiver or amendment is reduced to writing and signed by the Party against whom such waiver or amendment is sought to be enforced. This Agreement may only be amended by a writing signed by both Parties.

The Parties hereto have executed this Agreement as of the date(s) set forth below.

**The Oklahoma Sheriffs' Association**

By: _____

Printed Name: _____

Title: _____

Page 15 of  16

Date: _____

**Aberdeen Enterprises II, Inc.**
By: _____
Printed Name: _____
Title: President
Date: _____

## COLLECTION CONTRACT EXTENTED

This agreement is made between Oklahoma Sheriff's Association, (OSA), party of the first part and Aberdeen Enterprizes II, Inc., an Oklahoma Corporation (Aberdeen), party of the second part for the collection of outstanding obligations due various county courts of which OSA is the administrative agent.

### RECITALS

1. That the party of the first part is the administrative agent for uncollected obligations that are due and owing to the county courts and have been unable to collect them in the ordinary course of business which remain unpaid.

2. That Aberdeen is in the business of converting these types into collected funds.

3. That the parties have entered into an agreement under the following terms and conditions to collect these obligations for and on behalf of the county courts represented by the party of the first part.

4. That the parties wish to extend the agreement beyond its present terms as follows:

### TERMS

The parties to this agreement hereby agree to extend the collection agreement heretofore commenced on this 1st day of January, 2010, with a one year extension, and again extended from December 31st, 2011 for a term of three (3) years to commence on January 1st, 2012 to December 31, 2014, and again extended from December 31st, 2016 between The Oklahoma Sheriff's Association and Aberdeen Enterprizes II, Inc., for the collection of court cost and fines that are unpaid and assigned for collection.

That said agreement shall be extended for a term of three (3) years to commence on January 1st, 2017. That all terms under the original agreement shall remain in full force and effect, except the terms of all preceding agreements referenced therein except this extension agreement.

In Witness Whereof, the parties hereto have hereto set their hands on this ____16____ day of December, 2016.

Oklahoma Sheriff's Association

*Ray McNair*                    Dated ___12/16/16___

Aberdeen Enterprizes II, Inc.

*Kristi K. Ziegler*            Dated ___12/15/16___

# Aberdeen Enterprizes II

## Collection Process

Aberdeen does an individual deep skip trace to obtain a current address and/or telephone number within 5 days of case assignment. Letters are then sent, offering a solution to the issue of outstanding fines. The defendant can either resolve their fines fully by any number of our various accepted payment options or they can contact us to receive a case manager. Their case manager will answer any questions regarding their outstanding debt to the court and aid them in fulfilling their obligation. Case managers will also follow up on any letters that are not quickly responded to, either by phone, if available, or a more in-depth skip trace to correctly locate and identify each defendant.

If the defendant contacts the court clerk's office, they can be easily redirected to our 1-800 number so a case manager can handle any of the defendant's needs, saving the court clerk valuable time. Even if the defendant is arrested, Aberdeen can set up a payment plan or accept payments based on the rules of the court. The sheriff or police can then release the defendant from jail, reducing costs and court appearances before the Judge.

Aberdeen enters all case information into our Debtmaster Professional system. Debtmaster creates an individual case file for each defendant that is highly secure and tied to the court's case file number to ensure accuracy of information. Debtmaster will track all information for each defendant including contact information, contacts made via telephone and letter, payment plan, payments received, and account activity by case managers. All information in Debtmaster is secure and backed-up daily.

Aberdeen expects full collection after locating and contacting a defendant in:

- 60 days for cases of $400 or less
- 120 days for cases of $401 - $800
- cases of $801+ being resolved based on the ability of the defendant to pay over time

Typically, we will put persons on disability or SSI on a minimum payment schedule of approximately $50 per month. Collection for incarcerated defendants may be delayed until their release. We locate and track incarcerated individuals until released.

Our case managers will follow the guidelines outlined by each client in the customized collection plan created with Aberdeen, but often plans include these general practices:

- Collect full balances under $500, with some exceptions
- Establish a 40% first payment to recall the warrant on cases where the balance is over $500, followed by reasonable monthly payments until the debt is resolved
- Provide a voice mail reminder 3 days prior to each payment's due date
- Contact the debtor by phone to seek resolution, if payment becomes past due

www.aberdeen-2.com          1.800.945.1301          rds@aberdeenenterprizes2.com



PLAINTIFF'S
EXHIBIT
2



**Tulsa County**

| Year | Amount |
|------|--------|
| 2009 | $2,383,055 |
| 2010 | $2,811,607 |
| 2011 | $2,987,534 |
| 2012 | $3,664,358 |
| 2013 | $4,126,360 |
| 2014 | $4,017,617 |
| 2015 | $3,217,401 |
| 2016 | $3,264,587 |
| 2017 | $493,716 |

Sample – Broken Promise / Third Letter

 Aberdeen
Enterprizes II

TST
1081

2121 Nowhere Street
Tulsa, OK 74105

Account ID:  1081

Monday, March 06, 2017

John Q Sample
4143 E 31st Street
Apt 31
Tulsa, OK 74135

Dear John Q Sample,

You have previously entered into a payment plan agreement that covers a specific account or accounts that is now in default.  We are required to report this default to the courts, which could result in the issuance of a bench warrant for your arrest and will increase the cost that you will owe.

Before we make our report, this letter is to encourage you to bring your account current and maintain the payment agreement to avoid these results.  If you have an acceptable reason for the default we may, in some cases, provide a solution that will be helpful.  Please call your account manager today at 918-794-0810 or if outside the Tulsa calling area call 1-800-945-1305.

Be advised that the account or accounts included in your payment plan may or may not be all the accounts in your name.

Sincerely,

Collections Manager

Sample – 1ˢᵗ Notice / First Letter

 Aberdeen
Enterprizes II

2121 Nowhere Street
TST          Tulsa, OK 74105
1081

Acct ID:  1081
Balance: $1,218.00

Monday, March 06, 2017

John Q Sample
4143 E 31ˢᵗ Street
Apt 31
Tulsa, OK 74135

Dear John Q Sample:

This letter serves as NOTICE that the below referenced account(s) have an outstanding balance as to those cases. Unless otherwise advised, bench warrant(s) have been issued for Failure to Pay.  Aberdeen Enterprizes II, Inc. is here to assist you with arrangements regarding your outstanding fines, penalties, and court costs. If you have made payment arrangements already, this notice may mean that additional obligations have been assigned to Aberdeen Enterprizes II, Inc. and will need to be resolved as a bench warrant is in effect.   Our company can only assist you if you contact us. Our purpose is to keep you in good standing with the court.

You may pay by making a personal appearance OR you may contact Aberdeen Enterprizes II at 918-794-0810 or at 1-800-945-1305 to pay or make a payment plan.  We accept payments by money order, debit or credit card or cash. You may pay by phone, in person, on-line at www.okwarrants.com or through the mail.  Payments made on-line over the phone will have a convenience fee.

If you so choose, your attorney may contact us regarding the payment of the balance due.

Please contact us to make arrangements and avoid the service of any bench warrant.

Aberdeen Enterprizes II, Inc
918-794-0810

Citation No.:                              789102          $652.20
Citation No.:                              123456          $565.80

Sample – Follow-Up / Second Letter

 Aberdeen
Enterprizes II

TST
1081

2121 Nowhere Street
Tulsa, OK 74105

Acct ID:  1081
Balance:  $1,218.00

Monday, March 06, 2017

John Q Sample
4143 E 31st Street
Apt 31
Tulsa, OK 74135

Dear John Q Sample:

 Aberdeen Enterprizes II, Inc. has attempted to contact you about your outstanding court cost.  The courts have listed the cases below with us for resolution, because of the past due balance status, these cases could have bench warrants issued for failure to pay.

If you contact us, I will discuss options with you that can allow you to make monthly payments on your balance and have your bench warrants(s) recalled.  You may contact Aberdeen Enterprizes II at 918-794-0810 or at 1-800-945-1305 to pay or make a payment plan.  We accept payments by money order, debit or credit card or cash.  You may pay by phone, in person, on-line at www.okwarrants.com or through the mail.  Payments made on-line or over the phone will have a convenience fee.

If you so choose, your attorney may contact us regarding the payment of the balance due at 1-800-945-1302.

Please contact us to make arrangements and allow us to assist you in this matter.

Aberdeen Enterprizes II, Inc
918-794-0810 or
1-800-945-1305

| Citation No.: | 789102 | $652.20 |
| Citation No.: | 123456 | $565.80 |

## Call Flow

### Inbound Letter:

Thank you for calling Aberdeen Enterprizes this is Greg how can I help you? ---On the letter you received there will be an account Id in the upper right hand corner, please share that with me. --- Mr. Smith you have a balance of $2,612.75 and a failure to pay warrant for court costs and fines with Osage County. Do you have the ability to pay this balance in full today? ---If you are not able to pay the balance in full, we can set up a payment plan of $1,000 down and monthly payments of $125. You can pay your down payment in our office via Visa, Master Card, Money Order or cash. We also accept payments online and over the phone with your credit or debit card.  Upon receiving your down payment, we will send a request to have the FTP warrant recalled and make the county aware of your payment plan.  We will set up a reminder call three days before your payment is due to help ensure that you stay current with your payments. How would you like to make the down payment?

### Outbound Call:

Hello this is Greg from Aberdeen. I am calling for Mr. Terry Smith. Is Mr. Smith available? ---Mr. Smith, we handle unpaid court cost that has had a FTP warrant issued on the case and we are calling you in regards to an issue with Osage County. Our records show there is an outstanding balance of $680 for unpaid court cost. Are you able to pay this in full today? ---Okay, we can also set up a payment plan with a down payment of $250 and $125 monthly until the balance is paid in full. ---Mr. Smith because you are on SSI disability of $770 a month and receive no other income, we can come down to $150 down and set you on monthly payments of $50. We can take that payment over the phone with a debit or credit card. ---Yes sir, we can set that first payment for the 3rd of the month when your check is deposited but just remember you will have the warrant until the down payment is made. If you have any problems as the months go by, please give us a call so that we can try to assist you in any way that we can. Mr. Smith, if you will send a copy of your awards letter we will put it in your file for future reference.

### Delinquent Call:

Thank you for calling Aberdeen Enterprizes this is Greg how can I help you? ---On that letter you received there is an account ID number in the upper right hand corner could you share that number with me? --- After reviewing your account I see that we sent you that letter in regards to your account going delinquent 60 days. When an account is 60 days delinquent, the county could reissue a FTP warrant. We want to get you back on track and get this account current before that happens. You are $200 past due, are you able to pay that today? ---If you are able to make a regular payment for this month and half of what you are behind, you can do the same next month to get caught up. When you are current, we can go back to the $100 per month. As always we can process your payment via Visa, Master Card, cash, or money order. Thank you for getting back to us about this matter, we look forward to helping you get this issue resolved.

36

# Call Flow

**Open**
- Identify yourself and company
- Ask for the defendant
  - Verify the defendant (DOB, last 4 of SSN, etc.)
- State purpose of the call (what is it we do)
- Start building rapport

- Hi this is _____ from Aberdeen.
- I'm calling for _____.
  - Mr. _____ I just want to make sure I have the right guy is your DOB __/__/__?
- Great, I am calling in regards to outstanding court cost in _____ County.
- I want to help you get this resolved.



**Facts**
- State the amount due
- Ask for full balance
- What do you do for a living
  - Who do you support or who supports you
- Continue building rapport with inserting facts given

- The total due is $_____.
- The best way to handle this is paying the balance in full.
- I understand that is a lot to come up with at once. What do you do for a living?
  - Is it just you on your own?
- Like I said I want to help your get this resolved. I would not want you to get picked up on this warrant and not be there for your kids.



**Negotiation**
- Start at the top of our guidelines
- Listen to any objections
  - (Can't get a job, on fixed income, etc.)
- Overcome the objections
  - (Job list, special arrangements for people on SSI, etc.)
- Weigh all the facts and staying within our guidelines make a payment arrangement that can be successful.

- To get this warrant resolved you would need a down payment and monthly payments set. With this amount you would typically need around $___ down and $___ a month.
- I understand it is tough out there, but we do offer a job list that could give you some leads on maybe a better job that does hire people with a criminal record.
- With your situation I can definitely work with you and I can get that down payment down to half that and set you up for $___ down and then lower that monthly payment to $___ a month.



**Close**
- Assume the close
- Update account information
  - (Phone, address, etc.)
- Summarize the arrangement
- Continue building rapport while ending the call

- When can you pay the initial $___?
- Great, let me update your information. Is this the best number to reach you for reminder calls, and what is the best address to mail you a letter?
- Okay, I have you set up for $___ on the __th and then $100 on the __th thereafter.
- If something comes up I want to try to help you so stay in touch with me. Otherwise I will talk to you on the __th.

# Aberdeen Enterprizes II

## Payment Options

While either the client or Aberdeen can accept the entirety of payments, we believe that recovery is significantly higher if Aberdeen processes the payments exclusively. Client recovery requires the defendant to be proactive in a way that will reduce the likelihood of full recovery. Aberdeen has found that creating a relationship, completing an initial payment, and consistent contact with the defendant generates greater recovery with less reliance on the defendant.

Aberdeen is fully equipped to process all payments and provides the defendant with a variety of payment options to better enable the completion of the payment plan. Aberdeen accepts:

- Mail-in Payments (money order, cashier's check, certified check)
- Credit Card/Debit Card (via phone or secure payment website)
- Online Payment
- Check over the Phone

Aberdeen will provide the court with printed literature for defendants that may come to the court in person. This will direct the defendant to our 1-800 number and website to set up a payment plan or to make payments directly.

Aberdeen also provides a hybrid payment option. This allows defendants to pay through Aberdeen or in person at the court. To facilitate the exchange of information, Aberdeen offers real-time access to payments made in our office via the client portal, as well as bi-weekly disbursement updates via the Trust Statement. Court staff can use the client portal to locate payment information for each defendant including any payment plan agreements they have made with Aberdeen. Clients can upload a list of payments taken at their location via the same secure portal.

# Two Things You Need to Know!

- What does Aberdeen do?
  - ➤ We collect unpaid court cost and fines for the counties and municipalities in Oklahoma

- What is the most important thing we do?
  - ➤ We request the recall of failure to pay warrants.

3

## General Collection Rules/Guidelines for working cases

- Collections should be your main focus when at your desk. No cell phones, magazines or any other distractions.
- Update contact information on every call. This includes phone number, address, employer information, and any other file information for defendant.
- Read notes and review court dockets before discussing case.
- Failure to pay warrants are the only warrants that we can help resolve (Failure to Appear in some exceptions). Although, you should make the defendant aware of any other warrants may have. If there is a Failure to Pay warrant, make sure to follow recall procedures
- Check work list to verify case manager. If case work list belongs to 001, MGT, CL1, or STF (in most cases) then the case is open and you may request it. If the case belongs to another collector please transfer call to case manager if they are available. If the case manager is not available, work the case as if it were yours and when done email the case manager to review.
- Review the court docket on every case in either OSCN or ODCR. Also check to see if defendant has more cases that can possibly be sent over to Aberdeen for collections.
- If defendant has another case there are a few things that you need to look for. If the defendant has a payment plan with the county we will have to wait until the payment plan has expired with the county. There has to be a failure to pay warrant issued to get case sent over to Aberdeen. We have to make the defendant aware that the balance will increase 30 percent. If you believe the case can be transferred to Aberdeen bring the case to management to verify if can be sent or not.
- Always start with requesting the balance. If not able to pay the balance offer 40% - 10% down and $120-$75 per month. If the defendant is on social security/disability, we can set them at $50 monthly.
- Document every conversation you have with defendant clearly and concisely in the activity notes. Make sure you place case into correct status code.
- Each county a defendant has requires its own down payment and monthly payment. The defendant can resolve one county at a time if they wish but when down payment is made to recall a warrant then monthly payments will be need to be paid. **Cases with multiple counties must have a warning reflecting how the money is to be applied.**
- Before saving a case, make sure that the contact information is up to date, make sure the case is in the correct status code, and make sure that you have documented conversation in the activity history. Take the time to re-read your notes before saving and add anything that needs to be clarified, so that it will be clear to anyone who reads it. If there has been an arrangement set up make sure that the PPA, VBC, and reminder calls are set up correctly.
- It is important to remember that we work for elected officials and Aberdeen wants to prevent any unnecessary complaints made to the counties. It is ok to be firm but it is equally important to be fair as well. If a conversation appears to be going in the wrong direction, transfer the call to management.
- Arrangements with defendants are to be made over the phone, NOT in the office in person. If a defendant comes into the office to discuss a case, the defendant is to be handled by management. It is important to let the defendants know that they are not going to be able to talk to case managers when they come to the office.

7

## Guidelines for Court Clerk Calls

- Occasionally a phone call is received on the case manager side from County Court Clerks or other staff. These calls must be transferred to management (GMY, RDS, JDS) to take care of. Many or all of these calls are regarding updates or changes to specific county policies and procedures and need to be dealt with by management.
- If for whatever reason someone from management is not immediately available, take a name and number and let them know someone will be returning their call soon.
- You are to **NEVER** refer any defendant to call the court clerks.

## General Collections Guidelines for Working Other Case Managers Cases

- Always determine if the case manager is available before transferring or handling the phone call.
- Do not transfer the call blindly or if the case manager is on the phone.
- If a defendant is calling in to make a scheduled payment, TAKE the payment. Make sure that you note the case, make sure status code is correct and send an email to recall if necessary as well as an email to the case manager. Make sure the promised payment window is up to date.
- If the case manager is not available, work the case as if it were yours.
- Check to see if there are any notes in the Warning field.
- If the case manager has not set up any arrangements, follow our standard guidelines in negotiations to set up arrangements.
- Any contact with the defendant should be documented and an email needs to be sent to the case manager.
- Any issue regarding how a case manager has handled a case will be brought to management not to the case manager.
- REMEMBER: Treat each other the way you would like to be treated.

## General Guidelines for Reassigning Cases

- Team work is essential to our success.
- You have to have the case complete; updated phone number, good address, complete notes, correct status code, VBC and PPA set up.
- Cases are ONLY re-assigned by management.
- Spanish speaking cases are to be sent to the Spanish collector. If a defendant does not speak English the case is to be moved to the Spanish collector through management.
- If you personally know a defendant, report this to management and have the case moved out of your name if necessary so there are no conflicts of interest.

8

## General Guidelines for Warrant Recalls

- We do not recall warrants, the county does. We send a request to have the warrant recalled.
- Any time that we take a payment on a case with a failure to pay warrant, we are required to send a request to have the warrant recalled. You must also make sure that the case is put into the correct status code when the first payment is made, (FPR = 121).
- It takes anywhere from 1 hour to 72 hours for the county to get the warrant recalled.
- If a defendant is in custody when taking a down payment, it is very important to find out the county or municipal jail the defendant is being held. That information must be included in your email request.
- When sending the email to recall a warrant make sure you include the Account ID number, how much was paid, county or municipality being held, how was paid and a request for a recall. If in custody, send a recall /release. (i.e. "55555 needs warrant recalled, not in custody, pd 500 dwn and 125 monthly" or "55555 needs warrant recalled/release, dft is in Tulsa co on hold for Rogers, paid 500 dwn and 125 monthly")
- Some counties have their own specific rules for recalls and that information can be found in the exceptions to the standard operating procedures.
- We can only get Failure to Pay warrants recalled. (Failure to Appear in some exceptions)

## Guidelines for Requesting a Reissue

- Certain criteria must be met to request a reissue;
- No payment for at least 60 days. (Some exceptions) Tulsa County is an exception, 120 with no payment
- After 60 days of non-payment the case can be moved into the 123 status code by management and a 123W letter must be sent. You do not have to move case into 123 after 60 days. Request for reissue is only done after we have exhausted all options to reestablish a new payment agreement.
- Once the request for reissue is sent case should be continued to be worked and the defendant needs to negotiate another payment plan.
- Some counties have different guidelines and can be viewed in the exceptions to standard operating procedures.

## Attendance Guidelines

- If you are going to be late or absent, you must call the office (918-794-0810) and talk to management. If you are not able to reach anyone, leave a message including reason and a phone number where you can be contacted.
- For full attendance policy refer to the Aberdeen handbook.

## Aberdeen's Policy about Dealing with Others

- Employees are not to make false statements or threats in any conversation or interaction with a debtor.
- Employees are prohibited from exaggerating personal/ company authority in resolving account discrepancies including, but not limited to, refusal to pay situations.
- Advising any Aberdeen account on legal matters is strictly forbidden.
- Professional behavior at all times when dealing with defendants.
- Every employee shall treat every other employee and management with respect.  The criterion of treatment of others is, treat others the way you want to be treated.

By signing this statement below, I _____ agree to above policy and understand that violation of this policy are grounds for disciplinary act of dismissal for cause.

_____
SIGNATURE

## Office Hours

Prompt arrival is required of all Aberdeen employees.  Office hours begin and phone lines open at 8:00 AM and close at 5:30 pm.  Administrative staff and collectors are expected to be in place to take payments and/or incoming calls at that time.  All employees are allowed two breaks not to exceed 15 minutes as well as a 60 minute lunch. Repeated violations are subject to review.

_____
SIGNATURE

10

# Client Portal

Aberdeen provides access to case information by way of an internet based client portal system. This secure online resource provides valuable, real-time information to the court staff. This information includes:

- **First Payment Received** - This lists the first payments received by Aberdeen and notifies the court that any warrants for failure to pay/ contempt citation may be recalled.

- **Payment in Full** - This lists balances paid in full and notifies the courts that any warrant for failure to pay/ contempt citation may be recalled.

- **Closed Accounts** – This lists the cases that should be re-called from Aberdeen without a balance reduction due to the case being assigned in error or the defendant being deceased.

- **Payment Agreements** – This is a comprehensive list of all defendants making payment arrangements during the given time frame.

- **Broken Promises** – Aberdeen's has a due process notice requirement, taking about 45-60 days to attempt to cure a defendant's failure to pay. Broken Promises lists defendants that fail to make payments under a payment plan even after a due process notice. This notifies the court a failure to pay bench warrant/contempt citation is requested.



Client Access Portal  -- Release Canidate 1.30

**Overview of Recent Activity**

| | |
|---|---|
| rds | Beginning Date |
| Tulsa County Court Clerk | 5/14/2013 |
| Logout | |
| 1003 | |
| Update my Client ID | |

Ending Date
5/15/2013

Printable Daily Status Report

Preview Trust Statement

Overview of Recent Activity

Search by Reference Number

Search by Name

Change your Password

Manage Users

Password

Manage Users

### First Payment Received - Please Recall

| Reference Number | Debtor Name | Status Date | Balance Remaining |
|---|---|---|---|
| TR-2011-5185 | Fransisco Vergara-sanchez | May 14 2013 | $450.45 |
| TR-2011-5187 | Fransisco Vergara-sanchez | May 14 2013 | $391.95 |
| TR-2012-4293 | Michael David Campbell | May 14 2013 | $950.95 |
| TR-2011-4347 | DONYA PATRICIA CRAYTON | May 15 2013 | $305.50 |
| CF-2009-4219 | ROSE MARIE ATCHISON | May 15 2013 | $575.25 |

1 2 3

### Case Paid in Full (check for recall of warrant)

| Reference Number | Debtor Name | Status Date | Balance Remaining |
|---|---|---|---|
| TR-2001-2156 | CASEY BRIAN GRAVIL | May 14 2013 | $0.00 |
| TR-2012-5159 | KEVIN LEE HAWKINS | May 14 2013 | $0.00 |
| CM-2009-3720 | TIMOTHY J WARNER | May 14 2013 | $0.00 |
| TR-2011-3520 | JEFFREY FISHER | May 14 2013 | $0.00 |

1 2

### Closed Accounts (Unsuccessful - Funds NOT Received)

| Reference Number | Debtor Name | Status Date | Balance Remaining |
|---|---|---|---|
| CF-2004-3072 | ERICKA LADAWN WILLIAMS | May 14 2013 | $0.00 |

### Payment Agreements (Payments Recleved)

| Reference Number | Debtor Name | Status Date | Balance Remaining |
|---|---|---|---|
| CF-2000-5649 | CARL WAYNE EDELMAN | | $1,176.80 |

# Client Portal Con't

- **Defendant Refuses to Pay** – Although very rare, this is a list of defendants who refuse to pay or make payment arrangements. Our information will show our last address for possible enforcement of a failure to pay warrant/contempt citation.

- **List of All Active Accounts** – This is a comprehensive list showing case number, name of defendant, statement and balance remaining of all active cases.

- **Newly Listed Account** – This list shows newly listed cases by case number, name of defendant, state, date and balance remaining of assigned cases.

| | | | |
|---|---|---|---|
| | FOGLEMAN | 2013 | |
| CF-1992-3160 | LARRY GOUDEAU SR | May 14 2013 | $1,853.80 |
| TR-1990-17687 | LARRY GOUDEAU SR | May 14 2013 | $1,912.40 |

1 2 3 4 5 6 7 8

**Broken Promises (Failure to Pay on Payment Agreements)**

| Reference Number | Debtor Name | Status Date | Balance Remaining |
|---|---|---|---|
| CM-2006-3394 | JERRY OTIS ROBINSON | May 14 2013 | $707.48 |
| CF-2000-2211 | WILLIAM T ALBERTY | May 14 2013 | $2,042.44 |
| CF-2009-1719 | LARRY DWAYNE EMBRY | May 14 2013 | $2,735.20 |
| CM-2001-70 | LARRY DWAYNE EMBRY | May 14 2013 | $926.90 |
| TR-1999-12450 | CHRISTOPHER SCOTT TURNER | May 14 2013 | $1,257.60 |

1 2 3 4 5 6 7 8 9

**Debtor Refuses to Pay**

No accounts were found to match the specified criteria.

**Active Accounts**

| Reference Number | Debtor Name | Status Date | Balance Remaining |
|---|---|---|---|
| CF-2005-4319 | JOHNNY FOX | May 14 2013 | $1,835.08 |
| CF-2006-231 | JOHNNY FOX | May 14 2013 | $1,655.08 |
| CM-2002-4954 | JOHNNY FOX | May 14 2013 | $1,433.68 |
| CF-2002-2621 | JOHNNY FOX | May 14 2013 | $2,621.23 |
| CM-2005-1658 | JAMES DICKEY | May 14 2013 | $1,584.24 |

1 2 3 4 5 6 7 8 9 10 ...

**Newly Listed Accounts**

| Reference Number | Debtor Name | Status Date | Balance Remaining |
|---|---|---|---|
| CF-1999-1854 | RICHARD DWAYNE BLALOCK | May 14 2013 | $1,099.34 |
| CM-2011-2146 | SEAN MICHAEL O'HIGGINS | May 14 2013 | $417.95 |
| TR-1999-11335 | PEDRO RIVERA | May 14 2013 | $702.00 |
| CF-2011-3779 | MICHELLE LYNN ROSENCUTTER | May 14 2013 | $3,185.65 |
| TR-2011-5410 | RODNEY LEE RUSHING | May 14 2013 | $736.45 |

1 2 3 4 5

Copyright 2009 Aberdeen Enterprizes II, Inc.          This site was designed with FireFox in mind.

www.aberdeen-2.com          1.800.945.1301          rds@aberdeenenterprizes2.com

# Client Portal Con't

Aberdeen's Client Portal also allows your office to search for a defendant by name or case number. The searches will provide such vital case information as the full name, case number and status, current balance, driver's license numbers, state of issuance, and current address. It will also state the date and amount of next payment due.



Client Access Portal  ·· Release Canidate 1.30

**Debtor Overview**

rds
Tulsa County Court Clerk
Logout

1003
Update my Client ID

Printable Daily
Status Report

Preview Trust
Statement

Overview of
Recent Activity

Search by
Reference Number

Search by
Name

Change your
Password

Manage Users

The debtor has a scheduled payment of $100.00 due on or before Jun 13 2013.

| | |
|---|---|
| Reference Number | CF–2000–5649 |
| Debtor Name | CARL WAYNE FOGLEMAN |
| Debt Description | |
| Account Comments | |
| Status Code | 122 |
| Status Date | May 14 2013 |
| Status | Pay Plan – Keeping Promises |
| Current Balance | 1176.8 |
| Driver's License State | OK |
| Driver's License Number | 081831439 |
| Address Line 1 | 2758 S 136TH EAST AVE |
| Address Line 2 | TULSA, OK 74134 |
| Address Line 3 | |

1 2 3 4 5 6 7 8

Copyright 2009 Aberdeen Enterprizes II, Inc.                    This site was designed with FireFox in mind.

www.aberdeen-2.com            1.800.945.1301            rds@aberdeenenterprizes2.com

# Collection Process Con't



# Remit Collections to the Court

Aberdeen will send a Trust Statement to the court every two weeks that details the amounts collected, case information, and case balances. The Trust Statement provided to the client will detail all of the funds collected and those funds due Aberdeen. Each month, Aberdeen will remit 100% of all funds collected to the client. To assist with proper accounting practices, the client will receive all funds collected and then remit Aberdeen's fees on a monthly basis.

Aberdeen Enterprizes II, Inc.
4143 E 31st Street
Tulsa, OK  74135
Phone:  918-794-0810
Fax:    918-747-7339

**Aberdeen Enterprizes II**

City of , OK
City of Anywhere,OK  COURT CLERK
121 Main Street
Anywhere, OK  78610

**Historical Trust Statement**
09/16/2012 to 09/30/2012
Client: 1131

Payments Received:

| Pmt Date | Debtor Name | Debt ID | Clt Ref No | Rate Plan | Pmt Code | Amount Paid Us | Amount Paid Clt | Amount Due Us | Amount Due Clt | Balance on 09-30-2012 |
|---|---|---|---|---|---|---|---|---|---|---|
| 9/21/2012 | ALLEN, LINDA ARLETTA | 47963 | CF-2009-00316 | OK | DRC | 0.00 | 50.00 | 11.54 | (11.54) | 325.85 |
| 9/27/2012 | ANASTASIO, JOSHUA | 119715 | CM-2004-00116 | OK | CCD | 1,479.45 | 0.00 | 341.41 | 1,138.04 | 0.00 |
| 9/27/2012 | ANASTASIO, JOSHUA | 119715 | CM-2007-00411 | OK | CCD | 520.55 | 0.00 | 120.13 | 400.42 | 1,766.27 |
| 9/25/2012 | ANDERSON, SHANE LEE | 128526 | CF-2010-00350C | OK | CSH | 100.00 | 0.00 | 23.08 | 76.92 | 1,711.95 |
| 9/21/2012 | BARNETT, JUSTIN | 105105 | CF-2009-00216 | OK | CCD | 98.00 | 0.00 | 22.62 | 75.38 | 2,489.10 |
| 9/20/2012 | BEARD, BEAU JACOB | 143318 | CF-2005-00139 | OK | CCD | 50.00 | 0.00 | 11.54 | 38.46 | 4,341.10 |
| 9/19/2012 | BEARPAW, MICHAEL WAYNE | 44068 | CM-2010-00584 | OK | DRC | 0.00 | 100.00 | 23.08 | (23.08) | 4,084.10 |
| 9/24/2012 | BLEVINS, CHARLES WAYNE | 60706 | CM-2010-00051 | OK | DRC | 0.00 | 12.50 | 2.88 | (2.88) | 1,040.10 |
| 9/27/2012 | BLOSSOM, JOHN A. | 105153 | CF-2004-00296 | OK | DRC | 0.00 | 100.00 | 23.08 | (23.08) | 833.19 |
| 9/25/2012 | BRANDON, CRYSTAL | 114780 | CF-2007-00179 | OK | MO | 125.00 | 0.00 | 28.85 | 96.15 | 4,485.80 |
| 9/18/2012 | BRANDON, RITCHIE ALLAN | 128577 | CF-2010-00241 | OK | MO | 75.00 | 0.00 | 17.31 | 57.69 | 5,291.63 |
| 9/17/2012 | BREWER, CHAD | 128581 | CF-2005-00195 | OK | CCD | 125.00 | 0.00 | 28.85 | 96.15 | 1,346.22 |
| 9/28/2012 | BRITTON, BYRON | 114619 | TR-1998-01116 | OK | CCD | 202.80 | 0.00 | 46.80 | 156.00 | 0.00 |
| 9/17/2012 | BROCK, JOYCE | 105197 | CM-2007-00497 | OK | DRC | 0.00 | 356.45 | 82.26 | (82.26) | 0.00 |
| 9/27/2012 | BROWN, JOHN C. | 42737 | CF-1996-00104 | OK | DRC | 0.00 | 100.00 | 23.08 | (23.08) | 3,144.36 |
| 9/20/2012 | BROWN, KEVIN WAYNE | 128585 | TR-2011-00003 | OK | MO | 105.80 | 0.00 | 24.42 | 81.38 | 0.00 |
| 9/28/2012 | BUDDER, TRAVIS DEAN | 105215 | CM-2009-00164 | OK | CCD | 50.00 | 0.00 | 11.54 | 38.46 | 955.55 |
| 9/28/2012 | CANADA, LASONDA | 70545 | CM-2010-00606 | OK | CCD | 600.00 | 0.00 | 138.46 | 461.54 | 418.55 |
| 9/20/2012 | CARTER-COCHRAN, AMIE | 11544 | CM-2006-00451 | OK | CSH | 25.00 | 0.00 | 5.77 | 19.23 | 1,479.11 |
| 9/21/2012 | CHILDERS, RHONDA KAY | 147925 | CM-2009-00732 | OK | DRC | 0.00 | 60.00 | 13.85 | (13.85) | 44.35 |
| 9/19/2012 | CHILDERS, RHONDA KAY | 147925 | CM-2009-00732 | OK | DRC | 0.00 | 90.00 | 20.77 | (20.77) | 44.35 |
| 9/24/2012 | COLE, ROBERT C. | 122700 | TRC-2007-02042 | OK | CCD | 75.00 | 0.00 | 17.31 | 57.69 | 364.80 |
| 9/21/2012 | COPPIN, DONNIE M. | 105330 | CF-2008-00224 | OK | DRC | 209.00 | 0.00 | 48.23 | 160.77 | 2,781.64 |
| 9/27/2012 | CUMMINGS, MATHEW E. | 157048 | TR-1999-01490 | OK | DRC | 0.00 | 205.00 | 47.31 | (47.31) | 45.25 |
| 9/28/2012 | DORSEY, GABRIEL STEPHEN | 128669 | CF-2010-00096A | OK | CCD | 100.00 | 0.00 | 23.08 | 76.92 | 2,759.65 |
| 9/27/2012 | EDWARDS, RORY MICHAEL | 153088 | CM-2010-00183 | OK | DRC | 0.00 | 50.00 | 11.54 | (11.54) | 0.00 |
| 9/21/2012 | EDWARDS, RORY MICHAEL | 153088 | CM-2010-00183 | OK | DRC | 0.00 | 50.00 | 11.54 | (11.54) | 2,518.60 |
| 9/24/2012 | EVANKOVICH, ASHLEY MARIE | 122139 | CF-2010-00119C | OK | CCD | 100.00 | 0.00 | 23.08 | 76.92 | 6,085.40 |
| 9/28/2012 | EVANKOVICH, ASHLEY MARIE | 122139 | CF-2010-00119C | OK | CCD | 100.00 | 0.00 | 23.08 | 76.92 | 6,085.40 |
| 9/19/2012 | FARRIS, MELODY GAYLE | 147931 | CF-2010-00130 | OK | MO | 100.00 | 0.00 | 23.08 | 76.92 | 5,613.10 |
| 9/21/2012 | FIELDS, CHRISTOPHOR D. | 117083 | CM-2010-00285 | OK | DRC | 0.00 | 100.00 | 23.08 | (23.08) | 5,613.10 |
| 9/24/2012 | GONZALES, MANUEL | 40948 | CF-2010-00251A | OK | DRC | 0.00 | 700.00 | 161.54 | (161.54) | 5,557.75 |
| 9/24/2012 | GONZALIS, KEITH DARREN | 105568 | CM-2010-00372 | OK | CCD | 100.00 | 0.00 | 23.08 | 76.92 | 1,581.15 |

www.aberdeen-2.com          1.800.945.1301          rds@aberdeenenterprizes2.com

# Remit Collections to the Court Con't

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 9/27/2012 | JUSTICE, CALVIN LAMAR | 128789 | TRC-2006-02421 | OK | DRC | 0.00 | 465.92 | 107.52 | (107.52) | 251.00 |
| 9/20/2012 | KIMBROUGH, CODY JAMES | 164537 | TR-2011-01637 | OK | CCD | 122.30 | 0.00 | 28.22 | 94.08 | 6,256.10 |
| 9/21/2012 | KNIGHT, BOBBIE JO | 105802 | CM-2006-00814 | OK | DRC | 0.00 | 50.00 | 11.54 | (11.54) | 0.00 |
| 9/17/2012 | LASTER, JACKIE M. | 76473 | CF-2009-00389 | OK | CCD | 50.00 | 0.00 | 11.54 | 38.46 | 0.00 |
| 9/18/2012 | LEWIS, JOHN CHRISTOPHER | 122166 | CF-2001-00435 | OK | CCD | 125.00 | 0.00 | 28.85 | 96.15 | 0.00 |
| 9/18/2012 | LITTLEDAVE, LEONARD J. | 105845 | CM-2009-00505 | OK | DRC | 0.00 | 50.00 | 11.54 | (11.54) | 2,025.52 |
| 9/18/2012 | LLYOD, JIMMIE | 122169 | CM-2010-00592 | OK | MO | 100.00 | 0.00 | 23.08 | 76.92 | 537.30 |
| 9/17/2012 | LONG, JOHN WILLIAM | 128818 | CF-2005-00102 | OK | CCD | 100.00 | 0.00 | 23.08 | 76.92 | 1,339.34 |
| 9/28/2012 | MCFARLAND, DALE L. | 176348 | CM-2011-00656 | OK | DRC | 0.00 | 10.00 | 2.31 | (2.31) | 860.15 |
| 9/18/2012 | MILLS, JUSTIN E. | 128846 | CM-2010-00490 | OK | DRC | 0.00 | 35.75 | 8.25 | (8.25) | 628.80 |
| 9/24/2012 | MORRIS, JAMI BETH | 87098 | CF-2009-00311 | OK | CCD | 400.00 | 0.00 | 92.31 | 307.69 | 2,017.06 |
| 9/26/2012 | NEVEL, DEBORAH A. | 176350 | CF-2010-00251B | OK | CSH | 642.20 | 0.00 | 148.20 | 494.00 | 0.00 |
| 9/27/2012 | PENA, LETA | 106104 | CM-2005-00348 | OK | DRC | 0.00 | 194.00 | 44.77 | (44.77) | 1,673.70 |
| 9/19/2012 | PHILLIPS, JOHN JAY | 163465 | CF-2011-000378 | OK | MO | 125.00 | 0.00 | 28.85 | 96.15 | 200.42 |
| 9/28/2012 | ROBERTS, MICKEY LEE | 106219 | CF-2004-00051 | OK | CCD | 125.00 | 0.00 | 28.85 | 96.15 | 4,008.30 |
| 9/18/2012 | SERAGE, MATTHEW CARL | 106306 | CF-2006-00099A | OK | MO | 125.00 | 0.00 | 28.85 | 96.15 | 1,026.76 |
| 9/17/2012 | SMALL, CAROLYN R | 42039 | CM-2009-00199 | OK | CSH | 25.00 | 0.00 | 5.77 | 19.23 | 6,098.44 |
| 9/24/2012 | SMITH, LESTER LEROY | 173560 | CF-2010-002003 | OK | DRC | 0.00 | 1,200.00 | 276.92 | (276.92) | 910.79 |
| 9/25/2012 | SOLIER, JULIA (JULIE) | 106363 | CM-2000-00696 | OK | CCD | 500.00 | 0.00 | 115.38 | 384.62 | 151.35 |
| 9/27/2012 | STANLEY, JAMES CHRISTIAN | 174858 | TR-2011-01582 | OK | DRC | 0.00 | 99.50 | 22.96 | (22.96) | 2,603.10 |
| 9/17/2012 | TANNER, SANTO CARL | 106426 | CF-2008-00252 | OK | CCD | 125.00 | 0.00 | 28.85 | 96.15 | 1,799.05 |
| 9/21/2012 | TEAGUE, PAMELA MARIE | 128994 | CM-2009-00436 | OK | DRC | 0.00 | 100.00 | 23.08 | (23.08) | 7,385.30 |
| 9/18/2012 | THOMAS, HENRY LEE | 106452 | CM-2006-00333 | OK | CCD | 129.56 | 0.00 | 29.90 | 99.66 | 8,317.18 |
| 9/21/2012 | THOMPSON, CHARLES A | 84696 | CM-2008-00655 | OK | CSH | 50.00 | 0.00 | 11.54 | 38.46 | 76.44 |
| 9/18/2012 | WHITE, MARY ANITA | 129045 | CF-2010-00242 | OK | CCD | 100.00 | 0.00 | 23.08 | 76.92 | 3,438.85 |
| 9/18/2012 | WILLIAMS, TERRINA D. | 163484 | TR-1995-00786 | OK | DRC | 0.00 | 135.26 | 31.21 | (31.21) | 0.00 |
| | | | | | | 7,808.66 | 6,308.30 | 3,257.88 | 4,550.78 | |

**(69 Payments)**

| | |
|---|---|
| Credit Amoun | $7,808.66 |
| Remit Amoun | $3,257.88 |

All financial data, including Trust Statements and payment information, is backed up and maintained indefinitely. Clients will have access to historical data, at their request, for audit purposes. As our Trust Statement and Client Portal show, we are diligent in maintaining a correct balance for all of our cases. When sending you the gross amount of fees, fines, restitution and any other amounts collected (including the admin fee) the balance will be correct and up-to-date.

Aberdeen Enterprizes II

**An Introduction to Aberdeen's
Court Cost Recovery Program**

4143 East 31st Street
Tulsa, Oklahoma 74135
Rob Shofner
918.794.0833
1.800.945.1301 ext. 833



# Aberdeen Enterprizes II

## About Aberdeen

Established in 2006, Aberdeen Enterprizes II, Inc. ("Aberdeen") has developed a highly successful process for court cost recovery, which provides solutions for courts and defendants alike.

Our mission at Aberdeen is to provide ways to resolve outstanding warrants, increase court recovery and reduce court costs, all with a personal approach. We believe debtors can fully satisfy their court debts by receiving respect, customized payment plans and direction to needed community resources. We believe that counties and municipalities deserve a solution that generates additional revenue, while costing zero in collection expense and reducing court and jail costs.

Aberdeen offers a variety of benefits that will increase revenue, decrease costs, and allow defendants to fulfill their obligations in a respectful manner. Aberdeen works exclusively with courts at the state, county, and municipal levels. This focus allows us to better understand the needs, workload, processes, and relationships inherent in the court system.

Aberdeen differs from other agencies by believing the defendant deserves our respect. We believe that our job is not to be a problem for the defendant, but rather an aid in resolving their court debts. Aberdeen understands that most defendants want to take care of their obligations to the court, but may be experiencing difficult financial circumstances or other hardships. We strive to build a relationship with each defendant in order to understand their situation and help them build a plan to pay their court debts in a manner that works for everyone. Aberdeen's case managers encourage defendants to pay their fines and fees in full, but also understand the need to arrange payment plans that fit within the defendant's capabilities. Our case managers are dedicated to maintaining the relationship with a defendant through payoff, thus ensuring they have fulfilled their obligations to the court.

Aberdeen has earned the loyalty of our clients due to their confidence in our process, staff, and the results obtained. We are ready to create and implement your customized court cost recovery program. We look forward to serving you.

Aberdeen Enterprizes II, Inc. is an Equal Opportunity Employer.

# Aberdeen Enterprizes II

## Mission Statement

Our mission at Aberdeen Enterprizes II is to provide ways to resolve outstanding warrants and court cost with a personal approach. We, at Aberdeen, strive to not only assist debtors with customizing payment plans that help solve their issues with our Clients, but also directing them to Community resources that help satisfy their debts. All this while costing Zero in collection expense to our Clients and reducing extra jail and court cost for the Counties and Municipalities that Aberdeen serves.

# Aberdeen Enterprizes II

## Advantages of Aberdeen

Aberdeen's process creates an income stream for the court, rather than a "get what you can" approach to collections. Our experience with court cost administration teaches us that upon locating and contacting a defendant, the chance of completing full collections is very high. We think in terms of full recovery over time, based upon the size of the obligation and the defendant's ability to pay. Presently our income stream for the state of Oklahoma is over a million dollars per month and growing.

Aberdeen is dedicated to keeping the court clear of uncollectable cases. We identify deceased defendants to close files and recall failure to pay bench warrants. We also locate and track incarcerated defendants until their release. Aberdeen identifies true hardship cases and notifies the court. We identify the unemployed, persons on fixed incomes, and social security disability recipients to set up payment plans within their means. Our success is based upon understanding the defendant's abilities to pay and aiding them in resolving their debt fully.

Aberdeen is also dedicated to full recovery of older cases. Although the age of a case is a definite variable, we have found that it does not determine the collection results. Aberdeen has successfully collected outstanding fines and court cost on 20 year old cases, as well as more recent ones.

The benefits to the court of using Aberdeen for court cost recovery include:

- Significantly increasing the revenue going to the general and operations fund, permitting a budget increase for all offices
- Recovering payable traffic citations and ordinance violations that have gone uncollected
- Recovering court-ordered fines and costs that have been unpaid by defendants
- Recovering restitution
- Recovering outstanding parking tickets
- Sharing updated contact information for defendants
- Identifying deceased defendants and recalling warrants
- Identifying disabled defendants and creating a payment plan that fits their financial abilities
- Referring defendants with records to employers that hire persons with records
- Fewer defendants jailed for failure to pay fines
- Less hours in custody to manage arrested defendants
- Reducing liability for medical expenses while in custody