**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **CARLY GRAFF, et. al.** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 4:17-CV-606-CVE-JFJ** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ABERDEEN ENTERPRIZES II, INC., et al.;** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>NAMED PLAINTIFFS CARLY GRAFF AND RANDY FRAZIER'S MOTION FOR A
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND
MEMORANDUM IN SUPPORT THEREOF</u>**

February 1, 2018

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ......................................................................................... i

**INTRODUCTION** ....................................................................................................... 1

**STANDARD OF REVIEW** ......................................................................................... 3

**STATEMENT OF FACTS** .......................................................................................... 3

**ARGUMENT** .............................................................................................................. 5

I.       **Plaintiffs Are Likely to Succeed on the Merits of Their Claims that
Arresting and Jailing Debtors Solely Because They Cannot Make Payments
Is Unconstitutional** ......................................................................................... 5

    A. **Defendants Violate Equal Protection and Due Process by Seeking and
Enforcing Arrest Warrants For Nonpayment Without Any
Pre-Deprivation Process** .......................................................................... 5

        1.  **Arrests for Nonpayment Violate Due Process and Equal Protection** .................... 5

        2.  **Arrests for Nonpayment Violate the Fourth Amendment** ..................................... 11

    B. **Defendants Violate Due Process and Equal Protection
When They Confine Debtors After Arrest If the Debtors Cannot Make Cash
Payments** ................................................................................................. 16

II.     **Absent an Injunction, Ms. Graff and Mr. Frazier Will Suffer
Irreparable Harm, the Requested Relief Will Not Harm Defendants,
and the Issuance of an Injunction Will Serve the Public Interest** ............... 21

III.    **The Court Should Use Its Discretion Not to Require the Posting
of Security** ...................................................................................................... 24

**CONCLUSION** .......................................................................................................... 25

## **TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Addington v. Texas*, 441 U.S. 418 (1979) ....................................................................................8

*Alabama v. White*, 496 U.S. 411 (1981) ....................................................................................14

*Alkire v. Irving*, 330 F.3d 802 (6th Cir. 2003) ..................................................................... 7, 10

*Awad v. Ziriax*, 670 F.3d 1111 (10th Cir. 2012)......................................................................23

*Barnard v. State*, 119 P.3d 203 (Okla. Crim. App. 2005) ...............................................15

*Barker v. Wingo*, 407 U.S. 514 (1972) ....................................................................................22

*Bass v. Richardson*, 338 F. Supp. 478 (S.D.N.Y. 1971)........................................................25

*Bearden v. Georgia*, 461 U.S. 660 (1983) ........................................................................ *passim*

*Brinegar v. United States*, 338 U.S. 160 (1949) .....................................................................13

*Burke v. Glanz*, No. 11-CV-720-JED-PJC (N.D. Okla. Nov. 17, 2011) .......................................22

*Cate v. Oldham*, 707 F.2d 1176 (10th Cir. 1983) ...................................................................23

*City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084 (5th Cir. 1981)................25

*Cobb v. Green*, 574 F. Supp. 256 (W.D. Mich. 1983)...............................................................21

*Connecticut v. Doehr*, 501 U.S. 1 (1991) ................................................................................10

*Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461 (10th Cir. 1987)......................24

*De Luna v. Hidalgo County, Tex.*, 853 F. Supp. 2d 623 (S.D. Tex. 2012) ..................................20

*District of Columbia v. Wesby*, No. 15-1485, 2018 U.S. LEXIS 760 (U.S. Jan. 22, 2018) ..........14

*Doe v. Angelina County*, 733 F. Supp. 245 (E.D. Tex. 1990) .......................................................7

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 125 (10th Cir. 2004) ..........3

*Dow v. Baird*, 389 F.2d 882 (10th Cir. 1968) .........................................................................12

*Foucha v. Louisiana*, 504 U.S. 71 (1992)...............................................................................7, 8

*Franks v. Delaware*, 438 U.S. 154 (1978)...............................................................................13

*Frazier v. Jordan*, 457 F.2d 726 (5th Cir. 1972) ...................................................................8, 20

*Fuentes v. Shevin*, 407 U.S. 67 (1975)................................................................................10, 20

*G & V Lounge v. Michigan Liquor Control Comm.*, 23 F.3d 1071 (6th Cir. 1994) ......................23

*Giovani Carandola v. Bason*, 303 F.3d 507 (4th Cir. 2002) ....................................................23

*Groh v. Ramirez*, 540 U.S. 551 (2004) ...................................................................................11

*Hall v. Furlong*, 77 F.3d 361 (10th Cir. 1996) ..........................................................................6

*Harte v. Bd. of Commissioners of Cty. of Johnson, Kansas*, 864 F.3d 1154
 (10th Cir. 2017)...........................................................................................................13

*Henton v. Albuqerque Hous. Auth.*, 2013 U.S. Dist. LEXIS 186219 (D.N.M. 2013) ..................25

*Illinois v. Gates*, 462 U.S. 213 (1983) ..............................................................................14, 15

*Johnson v. Bd. of Police Comm'rs*, 351 F. Supp. 2d 929 (E.D. Mo. 2004)..................................25

*Jones v. City of Clanton*, No. 215CV34-MHT, 2015 WL 5387219
 (M.D. Ala. Sept. 14, 2015)...........................................................................................18

*Kerns v. Bader*, 663 F.3d 1173 (10th Cir. 2011) ..................................................................... 13

*Lake v. Speziale*, 580 F. Supp. 1318 (D. Conn. 1984)..............................................................21

*Landry v. Hoepfner*, 840 F.2d 1201 (5th Cir. 1988) ............................................................6, 16

*M.L.B. v. S.L.J.*, 519 U.S. 102 (1996)........................................................................................6

*Mathews v. Eldridge*, 424 U.S. 319 (1976)............................................................................8, 9

*Mapp v. Ohio*, 367 U.S. 643 (1961).........................................................................................11

*Mitchell et al. v. City of Montgomery*, 14-cv-186-MEF, Doc. 18 (2014)....................................25

*ODonnell v. Harris County*, 251 F.Supp.3d 1052 (S.D. Tex. 2017) .................................... *passim*

*ODonnell v. Harris County*, 260 F. Supp. 3d 810 (S.D. Tex. 2017) ............................................22

*Pugh v. Rainwater*, 572 F.2d 1053 (5th Cir. 1978) (en banc)............................................6, 16, 17

*Rodriguez v. Providence Cmty. Corr., Inc*., 155 F. Supp. 3d 758
    (M.D. Tenn. 2015) ...............................................................................17, 21, 23, 24

*SEC v. Bankers Alliance Corp*., 1995 WL 317586 (D.D.C.1995)...........................................21

*Shapiro v. Thompson*, 394 U.S. 618 (1969)..............................................................................20

*State v. Ballard*, 868 P.2d 738 (Okla. Crim. App. 1994)...............................................................3

*Tate v. Short*, 401 U.S. 395 (1971) ...................................................................................6, 16

*Thompson v. Moss Point*, No. 1:15-cv-00182-LG-RHW, 2015 WL 10322003
    (S.D. Miss. Nov. 16, 2015) ............................................................................18

*Turner v. Rogers*, 564 U.S. 431 (2011) ...........................................................9, 10, 20

*United States v. Argueta-Mejia*, 615 F. App'x 485 (10th Cir. 2015) .............................................14

*United States v. Bogel*, 855 F.2d 707 (11th Cir. 1988)..........................................................21

*United States v. Deters*, 143 F.3d 577 (10th Cir. 1998).............................................................8

*United States v. Grose*, 687 F.2d 1298 (10th Cir. 1982) (en banc) ...........................................7, 16

*United States v. Joseph*, 730 F.3d 336 (3d Cir. 2013) ............................................................14

*United States v. Kennedy*, 131 F.3d 1371 (10th Cir. 1997) ....................................................13

*United States v. Ortiz-Hernandez*, 427 F.3d 567 (9th Cir. 2005) ...........................................13

*United States v. Payan*, 992 F.2d 1387 (5th Cir. 1993) ............................................6, 16

*United States v. Salerno*, 481 U.S. 739 (1987) ......................................................................7

*United States v. Schell*, 692 F.2d 672 (10th Cir. 1982) ............................................................9

*United States v. Valenzuela*, 365 F.3d 892 (10th Cir. 2004) ..................................................13

*United States v. Ventresca,* 380 U.S. 102 (1965)....................................................................11

*Walker v. City of Calhoun, Georgia*, No. 4:15-CV-0170-HLM, 2016 WL 361612
 (N.D. Ga. Jan. 28, 2016)........................................................................21, 25

*Wanatee v. Ault*, 120 F. Supp. 2d 784 (N.D. Iowa 2000) ......................................................21

*Washington v. Harper*, 494 U.S. 210 (1990)..............................................................6, 16, 17

*Wayne Chem. v. Columbus Agency Serv. Corp.*, 567 F.2d 692 (7th Cir. 1977) ...........................24

*Williams v. Alexander, Ark.*, 772 F.3d 1307 (8th Cir. 2014) ..................................................14

*Williams v. Illinois*, 399 U.S. 235 (1970) .....................................................................6, 7, 16

*Winnebago Tribe v. Stovall*, 341 F.3d 1202 (10th Cir. 2003)...................................................24

*Wong Sun v. United States*, 371 U.S. 471 (1963) .................................................................13

*Youngberg v. Romeo*, 457 U.S. 307 (1982) ...................................................................7, 8

*Zadvydas v. Davis*, 533 U.S. 678 (2001) .....................................................................21

## Constitutions, Statutes, and Rules

Fed. R. Civ. P. 65...............................................................................................24, 25

Okla. Stat. tit. 21, § 565 .......................................................................................15

Okla. Stat. tit. 22, § 983 ..............................................................................2, 9, 14, 15

Okla Stat. tit. 28, § 101 ............................................................................................3

Okla. Ct. Crim. App. Rule 8.4 ...........................................................................3, 10, 15

U.S. Const. amend. IV ...........................................................................................11, 12

iv

**<u>Other Authorities</u>**

11A Wright & Miller § 2954 ..........................................................................................25

Andrew Cohen, *An Oklahoma Horror Story: The last six days of Elliott Earl Williams*,
  The Marshall Project, Jan. 23, 2017 ................................................................22

DOJ, National Institute of Corrections, *Fundamentals of Bail: A Resource Guide*
  *for Pretrial Practitioners and a Framework for America Pretrial*
  *Reform* (September 2014) ...................................................................................23

International Association of Chiefs of Police, Resolution (October 2014),
  121st Annual Congress ..........................................................................................23

Ram Subramanian *et al.*, Vera Institute of Justice, *Incarceration's Front Door:*
  *The Misuse of Jails in America*, (Feb. 2015) .....................................................22

*Sheriff's Office struggles to repay millions owed to county*, The Frontier,
  Jan. 19, 2016 .......................................................................................................23

Vera Institute of Justice, *The Price of Jails: Measuring the Taxpayer Cost of*
  *Local Incarceration* (May 2015) .......................................................................23

## INTRODUCTION

Named Plaintiffs Randy Frazier and Carly Graff face imminent unlawful arrest solely because they are unable to make payments on debts owed from previous court cases in Tulsa County (Mr. Frazier) and Rogers County (Ms. Graff). If the Sheriffs of Tulsa County or Rogers County arrest them, they will be kept in a jail cell prior to any court appearance unless they can make a predetermined cash debt payment, without any inquiry into their ability to pay. In Tulsa County, the cash payment required for release is $250, and in Rogers County, it is the total amount of court debt Ms. Graff owes. Upon arrest, if Ms. Graff or Mr. Frazier could come up with the cash demanded, which would be applied toward their debts, they would be released immediately. Because they cannot afford the amounts required, they will remain in jail. Because this scheme flagrantly violates Plaintiffs' constitutional rights, they seek a temporary restraining order and preliminary injunction to protect them against imminent irreparable harm.

This case challenges a systemic extortion scheme in Tulsa and Rogers Counties (and throughout Oklahoma) in which indigent people subject to monetary debts for previously adjudicated traffic and criminal offenses are threatened with arrest for nonpayment, arrested, confined in jail, assessed further fees and surcharges based on their unlawful arrest, and then threatened again. Defendants in this case seek, issue, and execute arrest warrants for failure to pay court debts with no inquiry into ability to pay. One Defendant, private for-profit company, controls and profits off of the collection of court debts by setting payment amounts and then threatening and seeking arrest if and when impoverished people are unable to meet the company's demands.

Plaintiffs challenge numerous policies and practices that have trapped impoverished individuals in Oklahoma in repeated cycles of debt, poverty, arrest, jailing, and more debt. This Motion, however, is limited to Counts 2, 3, and 4 of the Complaint, which challenge the

constitutionality of the following policies of Tulsa and Rogers Counties: to arrest and jail court debtors for nonpayment without any pre-deprivation inquiry into their ability to pay or findings that the nonpayment is willful (Count 2); to seek and execute arrest warrants for nonpayment that are not supported by oath or affirmation, do not establish probable cause, and contain material omissions (Count 3); and to keep arrested debtors in jail until court appearance unless they make a cash payment toward their debt (Count 4) (a minimum of $250 in Tulsa County and a pre-set amount based on the total debt owed in Rogers County).

Plaintiff Carly Graff has an outstanding debt-collection arrest warrant for nonpayment and faces imminent arrest in Rogers County.   Upon arrest, the Rogers County Sheriff will require her to pay the total amount of court debt that she owes to be released.  Because she cannot afford to pay $435.83 in exchange for her freedom, the Sheriff will detain her until the next arraignment docket date after her arrest.[1]   Plaintiff Randy Frazier has outstanding debt-collection arrest warrants for nonpayment and faces imminent arrest.   Upon arrest, the Tulsa County Sheriff will require him to pay $250 to be released.  Because he cannot afford to purchase his freedom, the Sheriff will detain him until the Tuesday or Friday morning following his arrest, at which point he will be released without paying any money.

The Named Plaintiffs seek a temporary restraining order prohibiting their imminent arrest and confinement for nonpayment unless Defendants in Tulsa and Rogers Counties make the substantive findings and provide the legal procedures required by due process, including conducting an inquiry into their ability to pay and making findings on the record that they have the ability to pay but are willfully refusing to do so.  Exactly this process is already required by Oklahoma law: Okla. Stat. tit. 22, § 983(A) (requiring "notice and hearing that the defendant is

---

[1] Arraignment dockets occur in Rogers County every Monday, Tuesday, Thursday, and Friday, except holidays.

financially able but refuses or neglects to pay" before a person may be jailed for nonpayment of court debt) and Okla. Ct. Crim. App. Rule 8.4 (stating that if a defendant misses a payment, "he/she must be given an opportunity to be heard as to the refusal or neglect to pay the installment when due"), which Defendants routinely ignore as a matter of policy and practice.

## STANDARD OF REVIEW

A motion for temporary restraining order or preliminary injunction is warranted if the movant can demonstrate that "(1) [she] will suffer irreparable harm if the injunction is not granted, (2) [the] threatened injury outweighs the harm caused to the opposing party as a result of the injunction, (3) the injunction is not adverse to the public interest, and (4) [the movant] has a substantial likelihood of success on the merits of the case." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 125, 1260 (10th Cir. 2004). "[A] showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction. . . ." *Id.* Ms. Graff and Mr. Frazier satisfy each of these requirements.

## STATEMENT OF FACTS

Ms. Graff and Mr. Frazier owe debts that originally arose from fees, fines, and costs relating to previously adjudicated traffic and criminal cases. Ex. 1 at ¶3, Ex. 2 at ¶7. Defendants have since added more surcharges as part of Defendants' debt-collection process, including a 30-percent penalty surcharge associated with outsourcing debt-collection to Aberdeen Enterprizes II, Inc. ("Aberdeen, Inc."). Ex. 5 at ¶9. Under Oklahoma law, these "court debts" can be collected in the same manner as any other civil judgment debt. *See State v. Ballard*, 868 P.2d 738, 741 (Okla. Crim. App. 1994) ("[I]f a defendant 'is without means' to pay the fine, fees, or costs, these fines, fees or costs shall be entered on the judgment docket, putting the court in the same position as any other judgment creditor." (quoting Okla Stat. tit. 28, § 101)). As described in the Complaint, the

entire debt-collection process is pervaded by unlawful threats of arrest, illegal jailing, and financial conflicts of interest in every relevant decision, including what payment amounts to require, when to require payment, whether to offer alternatives, whether and when to seek arrest, whether and when to provide notice or legal process, and whether and when to let arrested debtors out of jail.

Carly Graff is the mother of two daughters, ages 6 and 10. Ex. 1 at ¶6. She survives on food stamps and her partner's income, which is minimal, especially in the winter. *Id.* at ¶¶6-8. She received traffic tickets in Rogers County last spring, Ex. 3, which she could not afford to pay. *Id.* at ¶3.. Aberdeen, Inc. has informed her by mail that there is a warrant for her arrest for nonpayment of court debts. *Id.* at ¶ 4; Ex. 4; Ex. 7. This warrant was not issued on the basis of sworn statements, and there was no allegation or finding that her nonpayment was willful. Ex. 5 at ¶11-12. Ms. Graff struggles to pay for food, clothing, medicine, and electricity. Ex. 1 at ¶8. She cannot afford groceries and is about to fall behind on her rent and electricity bills. *Id.* at ¶9. She is terrified that she will be arrested. *Id.* at ¶10. If she is arrested, she will be required to pay $435.83, which is the full amount she owes, to be released. *Id.* at ¶4. Because she cannot afford the money, she will be arrested and kept in jail. Ex. 5 at ¶¶ 17-18.

Randy Frazier survives on social security disability payments and is a military veteran. Ex. 2 at ¶¶3, 5. He owes court debts in Tulsa County. *Id.* at ¶7. Mr. Frazier's debts were transferred to Aberdeen, Inc. Ex. 6; Ex. 5 at ¶¶ 8-9. The company has called him repeatedly to demand payments and informed Mr. Frazier that an arrest warrant was issued because he has not paid. Ex. 2 at ¶7. The company told him and his wife that he would have to pay $250 to have the warrant recalled. Ex. 2 at ¶8. He and his wife have told Aberdeen, Inc. that he cannot afford $250, but Aberdeen, Inc. refuses to accept a smaller payment to recall the arrest warrant. *Id.* at ¶¶8-9. The arrest warrants were not issued on the basis of sworn statements. Ex. 5 at ¶¶14. When it sought

4

the warrant, Aberdeen, Inc. omitted the fact that Mr. Frazier had told the company he could not afford to pay the debt.  Ex. 2 at ⁋⁋9-10.   If Mr. Frazier is arrested, he will have to pay $250 to be released.  Ex. 5 at ⁋20.  He cannot afford that amount of money.  Ex. 2 at ⁋17.

## ARGUMENT

I.     **Plaintiffs Are Likely to Succeed on the Merits of Their Claims that Arresting and Jailing Debtors Solely Because They Cannot Make Payments Is Unconstitutional**

   A.   **Defendants Violate Equal Protection and Due Process by Seeking and Enforcing Arrest Warrants For Nonpayment Without Any Pre-Deprivation Process**

Aberdeen, Inc., the Tulsa Clerk, the Tulsa Cost Administrator, and the Rogers Clerk have a policy of seeking, and the Tulsa County Sheriff and Rogers County Sheriff have a policy of enforcing, arrest warrants for debtors who are too poor to pay their court debts.  These arrest warrants and the ensuing arrests for nonpayment violate Plaintiffs' rights to due process and equal protection because they result in the deprivation of the fundamental right to bodily liberty without the substantive findings or procedural protections that must precede arrest and jailing for nonpayment.  Defendants' policy of seeking and enforcing arrest warrants for nonpayment also violates the Fourth Amendment because none of the applications for arrest warrants are based on oath or affirmation, material facts are omitted from the application, and there is no probable cause that the nonpayment was willful.

   1.   **Arrests for Nonpayment Violate Due Process and Equal Protection**

The Fourteenth Amendment to the U.S. Constitution guarantees that all persons are entitled to the equal protection of the laws and that no person may be deprived of life, liberty, or property without due process of law.  Together, due process and equal protection principles provide a right against wealth-based detention.  *See Bearden v. Georgia*, 461 U.S. 660, 666 (1983) (explaining that "[d]ue process and equal protection principles converge" in evaluating wealth-based

5

detention); *M.L.B. v. S.L.J.*, 519 U.S. 102, 120 (1996) (explaining that wealth-based detention cases "reflect both equal protection and due process concerns").

Defendants thus violate both substantive and procedural rights when they automatically arrest and jail Plaintiffs for nonpayment of court debts. *See Washington v. Harper*, 494 U.S. 210, 220 (1990) (explaining the line between substantive and procedural constitutional rights).[2]

As a substantive matter, the Equal Protection and Due Process Clauses prohibit arresting and jailing a person solely because she cannot afford to pay an amount of money. *See Williams v. Illinois*, 399 U.S. 235, 240-41 (1970) (holding that imprisonment resulting "directly from an involuntary nonpayment of a fine or court costs" is "an impermissible discrimination that rests on ability to pay"); *Tate v. Short*, 401 U.S. 395, 398 (1971) (holding that subjecting a person to "imprisonment solely because of his indigency" violates the Fourteenth Amendment); *Bearden*, 461 U.S. at 665, 667-68 (prohibiting the government from "impos[ing] a fine as a sentence and then automatically convert[ing] it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full," and holding that, "if the State determines a fine or restitution to be the appropriate and adequate penalty for the crime, it may not thereafter imprison a person solely because he lacked the resources to pay it").[3]   To deprive someone of her core bodily liberty based on her inability to pay is "contrary to the fundamental fairness required by the Fourteenth

---

[2] Substantive constitutional claims "involve[] a definition of the protected constitutional interest, as well as identification of the conditions under which competing state interests might outweigh it," and procedural-due-process claims "concern[] the minimum procedures required by the Constitution for determining that the individual's liberty interest actually is outweighed in a particular instance." *Harper*, 494 U.S. at 220.

[3] *See also, e.g.*, *Hall v. Furlong*, 77 F.3d 361, 364 (10th Cir. 1996) ("[T]he Equal Protection Clause mandates the grant of full credit toward the maximum term of Mr. Hall's sentence for the time he spent incarcerated prior to sentencing due to his indigency."); *Landry v. Hoepfner*, 840 F.2d 1201, 1216 n.30 (5th Cir. 1988) ("Nor generally can nonpayment result in *any* imprisonment where it is *bona fide* merely the result of financial inability." (citing *Bearden*)); *United States v. Payan*, 992 F.2d 1387, 1396 (5th Cir. 1993) ("Nothing in the language of the *Bearden* opinion prevents its application to any given enforcement mechanism."); *Pugh v. Rainwater*, 572 F.2d 1053, 1056 (5th Cir. 1978) (en banc) ("At the outset we accept the principle that imprisonment solely because of indigent status is invidious discrimination and not constitutionally permissible.").

Amendment." *Bearden*, 461 U.S. at 672-73; *United States v. Grose*, 687 F.2d 1298, 1301 (10th Cir. 1982) (en banc) (holding that it is unconstitutional to jail a person for inability to pay a fine).[4]

As a result, when a court contemplates whether to arrest or jail someone for nonpayment, it "must inquire into the reasons for failure to pay" to determine whether the nonpayment is willful. *Bearden*, 461 U.S. at 672.  Unless a court finds that failure to be willful, it must consider alternatives to imprisonment and, even in the probation context, can resort to incarceration only "if alternate measures are not adequate to meet the State's interests in punishment and deterrence." *Id.*  The Supreme Court has repeatedly required courts to consider alternatives to arrest and incarceration as the tools for enforcing court-imposed debts, even when, unlike here, payment is a condition of the completion of a criminal sentence.  *See e.g.*, *Williams*, 399 U.S. at 244-45 n. 21-22 (noting installment plans, work orders, and garnishment are available alternatives to incarceration for collecting payment, and any "further burden" these requirements place on States in the administration of criminal justice is outweighed by "constitutional imperatives").

In sum, as a substantive matter, the "fundamental" right to bodily liberty is infringed by arresting or jailing a person for missing debt payments. *See Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.") (citing *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982)); *United States v. Salerno*, 481 U.S. 739, 755 (1987) (holding that the right to liberty prior to or absent a criminal conviction is "fundamental"). Accordingly, the government cannot jail Plaintiffs unless no alternative to jailing them could serve a compelling government

---

[4] *See also Alkire v. Irving*, 330 F.3d 802, 810, 818 (6th Cir. 2003) (holding that it is unconstitutional to issue a bench warrant and imprison a person for nonpayment without an inquiry and findings as to whether the nonpayment was willful); *Doe v. Angelina County*, 733 F. Supp. 245, 254 (E.D. Tex. 1990) (holding that, because an "important liberty interest is implicated when the state determines to incarcerate a person for failure to pay a fine," and because of "the likelihood of unconstitutional conduct in the absence of process," the Constitution "clearly requires the institution of some form of pre-incarceration legal process for determining the reasons for a party's failure to pay a fine.").

interest. *See, e.g., Frazier v. Jordan*, 457 F.2d 726, 728 (5th Cir. 1972) (striking down a fine-collection scheme in which "[t]hose with means avoid imprisonment [while] the indigent cannot escape imprisonment" because it was not narrowly tailored to serve a compelling interest). In Tulsa and Rogers Counties, no official ever conducts the rigorous inquiry or makes the substantive findings the Fourteenth Amendment requires prior to depriving a person of bodily liberty.

As a procedural matter, the Supreme Court's decision in *Mathews v. Eldridge,* 424 U.S. 319 (1976), sets forth a three-part balancing test to determine what process is due prior to depriving someone of a liberty or property interest. The court examines: 1) the nature of the private right at stake; 2) the risk of erroneous deprivation given the procedures currently being employed and the probable value of additional safeguards; and 3) the government's interest in avoiding additional procedural safeguards. *Id.* at 335. Here, the private right at stake is one of the most fundamental liberty interests that exists—the right to be free from bodily restraint and confinement in a jail cell. *See, e.g.*, *Foucha*, 504 U.S. at 80; *Youngberg,* 457 U.S. at 316; *United States v. Deters*, 143 F.3d 577, 582-83 (10th Cir. 1998). Moreover, the risk of erroneous deprivation without inquiry into ability to pay is enormous. Because nonpayment can be punished with physical confinement only if it is willful, jailing people prior to inquiring into their ability to pay (especially given that large numbers of traffic and criminal debtors are indigent) is highly likely to result in the wrongful deprivation of fundamental liberty.

Finally, the harm to the government of issuing a summons and holding a hearing on whether nonpayment was willful prior to depriving a person of her liberty is non-existent. To the contrary, the government benefits from accurate fact-finding and a reduction in wasted resources spent on incarcerating those who cannot pay. *Cf. Addington v. Texas*, 441 U.S. 418, 426 (1979) ("[I]t is at least unclear to what extent, if any, the state's interests are furthered" by using a standard

8

of proof that increases the risk that people will be erroneously committed); *United States v. Schell*, 692 F.2d 672, 684 (10th Cir. 1982) (explaining that the government has an interest in avoiding erroneous liberty deprivations) (McKay, J., concurring in part and dissenting in part).  And, as noted, any purported interest in a local government or private company jailing people without these basic protections is significantly diminished when state law has determined that those protections are required to protect the State's interests. Okla. Stat. tit. 22, § 983(A).  Moreover, in both Tulsa and Rogers Counties, a post-deprivation hearing will be held, and in Tulsa, the arrestee will be released following that hearing no matter what.  Ex. 5 at ¶¶16-19.  Given these policies and practices, the County incurs no legitimate burdens whatsoever by complying with the Constitution.

Indeed, the Supreme Court has applied these principles to this context and already explained the minimum procedural safeguards required before the government may arrest or jail a person for nonpayment.  In *Turner v. Rogers*, 564 U.S. 431, 447–48 (2011), the Court, after applying the balancing test articulated in *Mathews,* 424 U.S. at 335, described the steps that must be followed if a government attempts to jail a person for nonpayment.  *Turner* held that South Carolina's incarceration of a man for unpaid child support payments was unconstitutional because the court had imprisoned him without an inquiry into ability to pay.  *Id*. at 449.  Whether in the context of the probation revocation proceeding in *Bearden*, the child-support contempt proceedings in *Turner*, or the debt-collection proceedings here, the government must provide certain basic protections before jailing a person for nonpayment:

> Those safeguards include (1) notice to the defendant that his "ability to pay" is a critical issue in the . . .  proceeding; (2) the use of a form (or the equivalent) to elicit relevant financial information; (3) an opportunity at the hearing for the defendant to respond to statements and questions about his financial status, (e.g., those triggered by his responses on the form); and (4) an express finding by the court that the defendant has the ability to pay.

*Id*. at 447–48.  Turner's confinement was unconstitutional because the court did not provide the notice, opportunity to be heard, inquiry into ability to pay, or "express finding[s]" essential to "fundamental fairness." *Id*. at 448.

*Turner*'s holding reaffirms a longstanding legal principle that the Supreme Court has repeatedly upheld across its procedural due process jurisprudence: absent "extraordinary situations," a person must be given a meaningful opportunity to be heard *prior* to a deprivation of liberty or property.  *Fuentes v. Shevin*, 407 U.S. 67, 90-92 (1975) (holding that postponement of notice and a hearing is justified only in "truly unusual" situations, and only when "directly necessary" to advance important interests, when there is a "special need for very prompt action," and if specific standards are "narrowly drawn"  to limit the deprivation); *Connecticut v. Doehr*, 501 U.S. 1, 15 (1991) (holding that due process is offended when a delayed hearing "would not cure the temporary deprivation that an earlier hearing might have prevented"). It is thus unconstitutional to arrest someone solely on the basis of nonpayment.  *See Alkire*, 330 F.3d at 810, 818.  The government's interest in collecting old court debt — and Aberdeen, Inc.'s interest in generating profit through the debt-collection process — do not create an exigency that could possibly justify departure from decades of settled law requiring safeguards against the erroneous deprivation of a person's liberty.  *See Turner*, 564 U.S. at 447–48; *Bearden*, 461 U.S. at 666.[5]

Defendants violate these fundamental principles every day as a matter of policy and practice. When a debtor does not make a payment, Aberdeen, Inc. or the Defendant Court Clerks and Cost Administrator automatically seek arrest warrants solely based on nonpayment without any inquiry into ability to pay, and the Tulsa County Sheriff and Rogers County Sheriff arrest

---

[5] These fundamental principles have also been enshrined in Oklahoma court rules.  For example, Rule 8.4 of the Rules of the Court of Criminal Appeals provides: "If the defendant fails to make an installment payment when due, he/she must be given an opportunity to be heard as to the refusal or neglect to pay the installment when due. If no satisfactory explanation is given at the hearing on failure to pay, the defendant may then be incarcerated."

debtors and confine them in the Tulsa County or Rogers County jail pursuant to those arrest warrants.  The Tulsa and Rogers County Sheriffs conduct no inquiry into ability to pay prior to arresting and jailing debtors.  At no point in this process do Defendants provide an opportunity to be heard or consideration of ability to pay and alternatives to incarceration, and there are no findings concerning willfulness.  The result is that impoverished court debtors are jailed without any of the longstanding protections required by federal law.  Plaintiffs are overwhelmingly likely to prevail on the merits of their due process and equal protection claim.

## 2.  Arrests for Nonpayment Violate the Fourth Amendment

This Court need go no further to conclude that Plaintiffs are likely to prevail.  Nevertheless, Defendants' conduct also violates the Fourth Amendment because they seek, issue, and execute arrest warrants even though the factual allegations underlying them are not sworn; the warrant applications omit material facts as a matter of policy; and there is no probable cause that the alleged nonpayment was willful.

As an initial matter, Defendants' arrest warrants are invalid because they are not "supported by a sworn affidavit."  *Groh v. Ramirez*, 540 U.S. 551, 557 (2004).  The Fourth Amendment provides that "no warrant shall issue except on probable cause, supported by Oath or affirmation."  U.S. Const. amend. IV; *Mapp v. Ohio*, 367 U.S. 643 (1961) (affirming the applicability of the Fourth Amendment to the states).  "Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police."  *United States v. Ventresca*, 380 U.S. 102, 109 (1965).  In Tulsa County and Rogers County, Defendants seek, issue, and execute arrest warrants for nonpayment, although no one has ever sworn to the veracity of the factual allegations in the warrant application.  Ex. 5 at ¶¶12, 14.  Although the processes for seeking and issuing arrest warrants in Tulsa and Rogers

Counties are informal and opaque, one thing is clear: warrants are sought, issued, and executed automatically when an Aberdeen, Inc. employee or employee in the Cost Administrator or Clerk of Court's Office simply asserts—not under oath or affirmation—that a debtor has not made sufficient payments. *Id.* There is thus no basis on which a neutral magistrate could determine that probable cause for an arrest exists.

The requirement of a sworn statement of fact is "not to be cavalierly brushed aside as an empty formality." *Dow v. Baird*, 389 F.2d 882, 884 (10th Cir. 1968) (finding an affidavit that was signed but not sworn under oath "clearly and obviously invalid"). Rather, the oath-or-affirmation requirement reflects the fact that to arrest someone — to take her away from her children, her family, her friends, and her daily life; to subject her to the probing searches of her body that accompany an arrest; to require her to answer the personal questions that are part of the booking process; and to expose her to the violence and disease that afflict our local jails — is a grave infringement on a person's dignity, liberty, and autonomy. The Founders emphasized the importance of this solemn undertaking by requiring that those seeking to deprive bodily liberty attest to the basis for their request under oath. U.S. Const. amend. IV. Defendants' policies of seeking, issuing, and executing arrest warrants without any person ever complying with this simple requirement reflects the indifference with which Defendants treat Plaintiffs' constitutional rights. It also ensures that the private company — which decides in its discretion when and how much money a debtor must pay to avoid arrest — operates without any transparency or accountability. The Constitution prohibits the Defendants' policy of seeking arrest warrants without sworn statements. This defect alone renders the arrest warrants invalid under the Fourth Amendment.

Although the Court need not reach these issues to conclude that Plaintiffs are likely to succeed, the arrest warrants suffer from at least two additional deficiencies. First, in seeking debt-

collection arrest warrants for Mr. Frazier, Aberdeen, Inc. knowingly omitted the material fact that Mr. Frazier's nonpayment was due to his poverty and not willful refusal to pay.  Ex. 2 at ¶9.  In fact, when Aberdeen, Inc. employees, or employees of the Tulsa Clerk, Tulsa Cost Administrator, or Rogers Clerk seek debt-collection arrest warrants, they omit the debtor's reasons for nonpayment as a matter of policy and practice.  Ex. 5 at ¶15.  "[L]aw-enforcement officers must not 'disregard facts tending to dissipate probable cause'" *Harte v. Bd. of Commissioners of Cty. of Johnson, Kansas*, 864 F.3d 1154, 1182 (10th Cir. 2017) (quoting *United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005)); *see also United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997) ("[T]he standards of deliberate falsehood and reckless disregard set forth in *Franks v. Delaware*, 438 U.S. 154 (1978) apply to material omissions, as well as affirmative falsehoods.").  But, consistent with the Defendants' policies and practices to never include evidence of inability to pay in arrest warrant applications, the arrest warrants were sought without informing the issuing magistrate of these facts.  These knowing material omissions render the warrants invalid.

Second, the warrants are invalid under the Fourth Amendment for yet another reason: there is no probable cause that the nonpayment was willful.  No warrant may issue unless there is probable cause for an offense.  "Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004); *see also Wong Sun v. United States*, 371 U.S. 471 (1963).  Mere nonpayment is insufficient to establish probable cause for an arrest when jailing can only be predicated on *willful* nonpayment. *Brinegar v. United States*, 338 U.S. 160, 175 (1949); *Kerns v. Bader*, 663 F.3d 1173,

1188 (10th Cir. 2011) (stating that probable cause requires "more than a bare suspicion").[6] Nevertheless, when a person does not make a payment, Defendants seek, issue, and execute an arrest warrant *automatically*, without an individualized inquiry into the person's reasons for nonpayment and thus without any information relevant to whether the nonpayment was willful, the key element without which nonpayment cannot be punished.[7]

Moreover, Defendants know that, in a large number of cases, nonpayment reflects poverty. When determining probable cause, "the whole picture" of Defendants' debt-collection efforts must be taken into account. *See Alabama v. White*, 496 U.S. 411, 417 (1981). The "probabilities [of this] particular factual context[]," in which the many court debtors are indigent, lean heavily against the reasonableness of automatically assuming willfulness whenever a debtor misses a payment. *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Overwhelmingly, the people whose debts are transferred to Aberdeen, Inc. are those individuals who were unable to pay the entire amount of their debts after sentencing. Those debts, which were already beyond the debtors' means to pay, were then increased by 30 percent upon referral to Aberdeen, Inc. A vast majority of these people were previously found indigent for the purpose of their underlying case. In this context,

---

[6] The Tenth Circuit has held that it is not plain error to find that probable cause requires evidence of every element of an offense. In *United States v. Argueta-Mejia*, 615 Fed. Appx. 485 (10th Cir. 2015), the Court acknowledged a circuit split on the issue and that the Tenth Circuit "lack[ed] precedential decisions" on the necessity of probable cause for each element of a criminal offense, and ultimately held that "the district court did not commit a clear or obvious error in failing to find probable cause without at least some evidence" of each element. *Id.* at 490. *See also Williams v. Alexander, Ark.*, 772 F.3d 1307, 1312 (8th Cir. 2014) ("For probable cause to exist, there must be probable cause for all elements of the crime."); *United States v. Joseph*, 730 F.3d 336, 342 (3d Cir. 2013) ("To make an arrest based on probable cause, the arresting officer must have probable cause for each element of the offense."). Additionally, in a recent U.S. Supreme Court decision, the Court overturned a ruling of the D.C. Circuit by conducting a factual analysis of the evidence supporting each element of the offense, and did not overturn the Circuit Court's legal determination that some proof of each element is required. *See District of Columbia v. Wesby*, No. 15-1485, 2018 U.S. LEXIS 760 (U.S. Jan. 22, 2018). Perhaps most importantly, in this unique context, where the willfulness of a nonpayment is essentially the *only* relevant element that could render the conduct criminalized, it is even more obvious that there must be some evidence of that essential element justify probable cause that a crime has been committed.

[7] It is not a separate crime to not pay court debt, but a debtor can be incarcerated when the nonpayment is willful. Okla. Stat. tit 22, § 983. Oklahoma courts have analogized this to contempt. *See infra* note 8.

Defendants have strong reason to believe that those who have been previously unable to pay court debts suffer from financial hardship.

Oklahoma law explicitly adopts basic principles of reasonableness in the context of arrests for nonpayment. The arrest warrants issued by Defendants are issued under Okla. Stat. tit. 22, § 983(A), which states: "Any defendant found guilty of an offense in any court of this state may be imprisoned for nonpayment of the fine, cost, fee, or assessment when the trial court finds after notice and hearing that the defendant is financially able but refuses or neglects to pay the fine, cost, fee, or assessment." On the statute's face, a prerequisite for imprisonment is that the defendant is "financially able but refuses or neglects to pay."[8] Additionally, Rule 8.4 of the Rules of the Court of Criminal Appeals provides: "If the defendant fails to make an installment payment when due, he/she must be given an opportunity to be heard as to the refusal or neglect to pay the installment when due. If no satisfactory explanation is given at the hearing on failure to pay, the defendant may then be incarcerated." The courts of Tulsa County and Rogers County do not follow the process that state law expressly requires, and these state law requirements are necessary in this context to protect against an erroneous deprivation of liberty due to poverty.

---

[8] Defendants do not consider any information beyond an informally alleged nonpayment of an unspecified amount of money the debt collectors have themselves told the person to pay by a certain date. They therefore seek, issue, and execute arrest warrants without "a substantial basis for determining the existence of probable cause" of any particular crime. *Gates*, 462 U.S. at 239.

For at least some purposes, detention under Title 22 § 983 is "akin to being detained for indirect contempt of court." *Barnard v. State*, 119 P.3d 203, 204 n. 2 (Okla. Crim. App. 2005). It is therefore useful to compare the arrest under § 983 to arrest based on contempt. A necessary element of contempt under Oklahoma law is that the violation of a court order be "willful." Okla. Stat. tit. 21 § 565 ("Indirect contempts of court shall consist of willful disobedience of any process or order lawfully issued or made by court; resistance willfully offered by any person to the execution of a lawful order or process of a court."). Before issuing an arrest warrant for that offense, Defendants must put forth some evidence establishing probable cause that the individual willfully violated a court order (i.e. that the nonpayment was willful). Moreover, because Cost Administrators and Aberdeen, Inc. have authority to set payment plans, grant extensions, and issue and recall warrants for partial payment, it is entirely unclear what court order a debtor supposedly would have violated by missing a payment determined by the debt collectors. Is it an instruction of the Cost Administrator? Exceeding a deadline that an Aberdeen, Inc. employee allowed over the phone? (As discussed below, no one can know the answer to these questions because there are no facts entered by oath or affidavit supporting the issuance of the automatic warrants.)

Plaintiffs are likely to succeed on the merits of their claims that Defendants violate their rights when they seek, issue, and execute arrest warrants based solely on nonpayment.

**B. Defendants Violate Due Process and Equal Protection When They Confine Debtors After Arrest If the Debtors Cannot Make Cash Payments.**

After arrest, debtors in Tulsa County are told by the Sheriff that they are free to leave the County jail, but only if they pay $250 in cash toward their debts. Ex. 5 at ¶20.  Debtors in Rogers County are told by the Sheriff that they will remain in jail unless they pay an amount of cash that is based on the total amount of court debt they owe.  *Id.* at ¶17.   These amounts are not a "bond" or "bail" designed to ensure appearance at a future court date; amounts the debtor pays are never returned.  *Id.* at ¶¶19, 21.  If a debtor cannot pay this quasi-ransom, the debtor, if detained in Tulsa County, is confined until at least the next "cost docket" court date, which takes place on Tuesdays and Fridays, *id.* at 20, or, if detained in Rogers County, is held until the next business day other than Wednesday, when debtors are brought to court, *id.* at 17. The Tulsa and Rogers County Sheriffs' policy of depriving debtors of their fundamental right to bodily liberty if they cannot make a cash debt payment is clearly unconstitutional.

Again, Plaintiffs' constitutional claim has "both substantive and procedural aspects." *Harper*, 494 U.S. at 220.  Substantively, the Supreme Court has held that equal protection and due process prohibit keeping a person in jail solely because she cannot afford to make a monetary payment. *Williams*, 399 U.S. at 240-41 (1970); *Tate*, 401 U.S. at 398 (1971); *Bearden*, 461 U.S. at 665, 667-68 (1983);[9] *Grose*, 687 F.2d at 1301; *Pugh*, 572 F.2d at 1056 ("At the outset we accept the principle that imprisonment solely because of indigent status is invidious discrimination and not constitutionally permissible.").   Procedurally, the government must provide safeguards to

---

[9] *See also Landry*, 840 F.2d at 1216 n.30 ("Nor generally can nonpayment result in *any* imprisonment where it is *bona fide* merely the result of financial inability." (citing *Bearden*)); *Payan*, 992 F.2d at 1396 ("Nothing in the language of the *Bearden* opinion prevents its application to any given enforcement mechanism.").

ensure that any substantive finding that incarceration is necessary to achieve a compelling government interest is sufficiently rigorous to guard against the erroneous deprivation of the substantive right.  *Harper*, 494 U.S. at 228.

It is well-established that requiring a predetermined payment for a person's release from jail, without an inquiry into ability to pay or consideration of non-financial alternatives, violates both due process and equal protection.  In *Pugh*, 572 F.2d at 1057, the Fifth Circuit explained that, when the government conditions the defendant's release upon payment of a secured money bond of a fixed amount without "meaningful consideration of other possible alternatives," it violates both the due process and equal protection requirements of the Fourteenth Amendment.  *Id.* at 1057.

*Pugh's* conclusion has been widely followed by other federal courts, and it has been applied in situations nearly identical to those presented in this case.  For example, in *Rodriguez v. Providence Cmty. Corr., Inc.*, 155 F. Supp. 3d 758 (M.D. Tenn. 2015) (Sharp, C.J.)*,* probationers assigned to a private company for the collection of court debts were arrested on warrants that included predetermined secured money bond amounts.  *Id.* at 762.[10]  Upon arrest, if the person could not afford immediately to purchase her release, she was kept in jail for days or weeks without any inquiry into her ability to pay or consideration of non-financial alternatives.  *Id.* at 766. Thus, like the Plaintiffs in this case, while each was determined in advance to be eligible for immediate release, each was prevented from being released only if she could not make the required predetermined payment.  *Rodriguez* reached the "constitutionally mandated conclusion" that the government cannot subject probationers to predetermined money bonds to secure release pending formal revocation hearings without individualized consideration of ability to pay and alternatives.

---

[10] After the federal district court for the Middle District of Tennessee granted a classwide preliminary injunction on similar claims, the private probation company and Rutherford County Tennessee agreed to a $14.3 million settlement, which has been preliminarily approved by the court.  *Rodriguez v. Providence Cmty. Corr., Inc.*, Case No. 15-1048, Dkt. 197 (M.D. Tenn. Jan. 2, 2018).

*Id*. at 768-69.  The court issued a classwide preliminary injunction to protect class members from detention on pre-set money bonds pursuant to arrest warrants sought by the private company.  *Id.*

Most recently, in *ODonnell v. Harris County*, 251 F.Supp.3d 1052 (S.D. Tex. 2017), the court preliminarily enjoined on due-process and equal-protection grounds Harris County officials from detaining misdemeanor pretrial arrestees who are otherwise eligible for release but cannot pay a predetermined money bond. *Id.* at 1060.  Harris County judges required preset secured bonds without considering alternate means of ensuring defendants' presence at subsequent proceedings. *Id.* at 1087.  The court concluded that due process and equal protection prohibit the government from jailing people because of their inability to pay a money bond without procedural safeguards, including a hearing before a judge who must make findings concerning the defendant's ability to pay and available alternatives. *Id.* at 1124.  Without such individualized determinations of the necessity of incarceration, Harris County's money bond practices "effectively function[ed] as detention orders only against the indigent." *Id.* at 1111.

Courts throughout the country have consistently reached the same conclusion even when, unlike here, people are arrested and jailed for committing criminal offenses. *See, e.g.*, *Jones v. City of Clanton*, No. 215CV34-MHT, 2015 WL 5387219, at *2 (M.D. Ala. Sept. 14, 2015) (declaring that the "use of a secured bail schedule to detain a person after arrest, without an individualized hearing regarding the person's indigence and the need for bail or alternatives to bail, violates the Due Process Clause of the Fourteenth Amendment"); *Thompson v. Moss Point*, No. 1:15-cv-00182-LG-RHW, 2015 WL 10322003, at *1 (S.D. Miss. Nov. 16, 2015) (declaring that predetermined secured bail amounts applied to indigent defendants violate the Fourteenth Amendment's Equal Protection Clause).

The violations in this case are more flagrant than in any of these other federal cases. Here, debtors are arrested not for committing any crime, but because they have not made a payment on a debt being collected by a private company. Once jailed, debtors can be released if they pay a $250 or other substantial pre-set "bond." Ex. 5 at ¶ 20. But, as noted, this "bond" is not a bond as that term has been understood for centuries of American law: it is not returned upon appearance at some future proceeding. Instead, it is a cash payment applied to outstanding debt. *Id.* at ¶21. Indeed, as a matter of policy and practice, Tulsa debtors are always released the Tuesday or Friday following their arrest, whichever is sooner. *Id.* at ¶20. Thus, because Tulsa debtors are released for free anyway after up to three or four days in custody, any conceivable state interest present in the other federal cases of requiring a financial condition to incentivize future appearance evaporates. Similarly, in Rogers, the cash payment is never treated as a monetary bail that is returned on appearance. *Id.* at ¶19. Even worse, in Rogers, when a person cannot pay the pre-set cash payment, she is not released at the subsequent hearing. *Id.* at ¶18. Instead, the cash amount is reduced to $100. *Id.* Rogers debtors who cannot afford to pay the $100 are then kept in custody until they "sit out" the $100 cash payment at $25 per day or until they pay. *Id.* As with the original payment demand, if the $100 is paid, it is applied to the debt without any further proceedings. *Id.* at ¶17. Defendants' scheme is a brazen strategy to use the threat of several days in jail to coerce payments they know the debtor cannot afford.

This "pay or stay" scheme has been rejected by courts for decades. In *Frazier*, for example, a court imposed a sentence requiring indigent defendants to serve alternative sentences of a $17 fine or 13 days in jail for each of two violations of municipal ordinances. The indigent defendants could not pay, and sought release because the sentences violated their constitutional rights. The Fifth Circuit applied strict scrutiny to hold that these sentences violated equal protection and due

process because the alternative jail term was not "necessary to promote a compelling government interest." 457 F.2d at 728 (quoting *Shapiro v. Thompson*, 394 U.S. 618, 634 (1969)). The court found that there were "far less onerous alternatives" that would satisfy the "state's interest in collecting its fine revenue." *Id.* at 728; *see id.* at 729-30 (reviewing adequate alternatives available to the state); *see also De Luna v. Hidalgo County, Tex.*, 853 F. Supp. 2d 623, 647-48 (S.D. Tex. 2012) (holding that, before a person can be jailed for nonpayment, the government must provide procedures for determining "whether the person is indigent and has made a good faith effort to discharge the fines, and whether alternatives to incarceration are available").

The only conceivable justification for Tulsa and Rogers Counties' practice (other than unlawfully coercing cash debt payments) would be that the several days in custody is some means of determining true indigence. But any assertion that 72 to 96 hours of wealth-based detention is a method of verifying indigence (i.e., only the truly indigent would suffer detention rather than expend the funds necessary to secure release) is contrary to *Bearden*, to procedural due process cases like *Turner* and *Fuentes*, and to Oklahoma statutory rules codifying these constitutional requirements. Those cases and laws all require *pre-deprivation* process for determining ability to pay, and they require a meaningful opportunity to exchange evidence that can support findings on the record in adversarial legal proceedings. And the suggestion that "pay-or-stay" detention could be used as a test of indigence was explicitly rejected by *Frazier*, which prohibited using jailing "to coerce defendants with marginal or concealable assets to use those assets." 457 F.2d at 728.

There can thus be no serious dispute that Defendants' practice of keeping people in jail for days due to failure to pay a predetermined cash payment with no inquiry into ability to pay or consideration of alternatives is unconstitutional. Plaintiffs are likely to succeed on the merits.

**II.    Absent an Injunction, Ms. Graff and Mr. Frazier Will Suffer Irreparable Harm, the Requested Relief Will Not Harm Defendants, and the Issuance of an Injunction Will Serve the Public Interest.**

Without intervention from this Court, Ms. Graff and Mr. Frazier face an imminent risk of suffering the serious and irreparable harm of being unlawfully jailed on warrants for nonpayment. Arresting and then imprisoning a human being in a jail cell in violation of her constitutional rights is an irreparable harm to her body and her mind.   "Freedom from imprisonment — from government custody, detention, or other forms of physical restraint — lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).  Even one additional night in jail is a harm to a person that cannot be later undone.  *See, e.g.*, *United States v. Bogle*, 855 F.2d 707, 710–711 (11th Cir. 1988) (holding that the "unnecessary deprivation of liberty clearly constitutes irreparable harm"); *ODonnell*, 251 F. Supp. 3d at 1157 ("[T]he plaintiffs' injury [illegal pretrial detention] is irreparable."); *Rodriguez*, 155 F. Supp. 3d at 771 (finding irreparable harm when the defendants "jail[ed] [Plaintiffs] on secured money bonds without an indigency inquiry"); *Walker v. City of Calhoun*, No. 4:15-CV-0170-HLM, 2016 WL 361612, at *44 (N.D. Ga. Jan. 28, 2016) (holding that detention due to inability to pay "constitutes irreparable harm").[11]

In addition to the loss of physical liberty, which has a special status in the American constitutional order as an irreparable harm, the related consequences of even brief periods in jail for nonpayment are frequently devastating.  After several days in jail, low-income debtors can lose their jobs, lose their housing and shelter, are cut off from their children and families, are deprived

---

[11]  *Wanatee v. Ault*, 120 F.Supp.2d 784, 789 (N.D. Iowa 2000) ("[U]nconstitutional incarceration generally constitutes irreparable harm to the person in such custody."); *see also SEC v. Bankers Alliance Corp.*, 1995 WL 317586, *3 (D.D.C.1995); *Lake v. Speziale*, 580 F. Supp. 1318, 1335 (D. Conn. 1984); *Cobb v. Green*, 574 F.Supp. 256, 262 (W.D. Mich. 1983).  Each jailing also carries with it numerous other indignities for each Class member, including intrusive body searches and cramped, crowded, and unsanitary living conditions.

of vital mental health and medical treatment, and are exposed to violent conditions and infectious disease in overcrowded jails.[12]  *Cf. Barker v. Wingo*, 407 U.S. 514, 532–33 (1972) ("The time spent in jail awaiting trial has a detrimental impact on the individual.  It often means loss of a job; it disrupts family life; and it enforces idleness.  Most jails offer little or no recreational or rehabilitative programs.  The time spent in jail is simply dead time.").  In the Tulsa Jail, there is a documented history of denial of medical treatment, resulting in the avoidable deaths.[13]  In one instance, a mentally ill person detained for only six days died due to a "medical unit-wide attitude of inhumanity and indifference[,]" resulting in "the delay and denial of medical care in the face of … symptoms that were obviously indicative of a serious medical condition or medical emergency[.]"  *Burke v. Glanz et. al.*, No. 11-CV-720-JED-PJC at *42-43 (N.D. Okla. Nov. 17, 2011) (granting and denying motions for summary judgment).  Ultimately, a jury returned a verdict against the Tulsa County Sheriff in both his individual and official capacities.  Ms. Graff and Mr. Frazier struggle to meet the basic necessities of life, and a few days in jail will interrupt medical treatment, childcare, and their ability to pay for food and rent.  Ex. 1 at ¶¶ 7-9; Ex. 2 at ¶¶ 6, 9.

Forcing people to risk additional harms to their health because they cannot pay pre-set cash sums to purchase release further contributes to the unnecessary and irreparable harm visited on the Plaintiffs.  As the *ODonnell* court summarized, "already impoverished misdemeanor defendants [] cannot show up to work, maintain their housing arrangements, or help their families because they are detained. This factor weighs strongly in favor of granting the plaintiffs' request for injunctive relief."  251 F. Supp. 3d at 1157-58; *see also ODonnell v. Harris County*, 260 F. Supp.

---

[12] *See* Ram Subramanian *et al.*, *Incarceration's Front Door: The Misuse of Jails in America*, Vera Institute of Justice 17–18 (Feb. 2015) (discussing unsanitary conditions in jails as well as harm to families and communities that results from pretrial detention) *available at* http://www.safetyandjusticechallenge.org/wp-content/uploads/2015/01/incarcerations-front-door-report.pdf.

[13] See Andrew Cohen, *An Oklahoma Horror Story: The last six days of Elliott Earl Williams*, The Marshall Project, Jan. 23, 2017, https://www.themarshallproject.org/2017/01/23/an-oklahoma- horror-story (describing a "seemingly ceaseless stream of similar stories about abuse and neglect inside the Tulsa County jail.").

3d 810, 821 ("Time is of the essence.  Every day brings about the incarceration of another hundred

indigent misdemeanor defendants, in violation of the Constitution."); *see also Rodriguez*, 155 F.

Supp. 3d at 771.

An injunction will also serve the public interest.  As numerous courts have emphasized, "It

is always in the public interest to prevent the violation of a party's constitutional rights."  *Awad v.*

*Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) (quoting and citing cases); *Cate v. Oldham*, 707 F.2d

1176, 1190 (10th Cir. 1983); *Giovani Carandola v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)

("[U]pholding constitutional rights surely serves the public interest."); *G & V Lounge v. Michigan*

*Liquor Control Comm.*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest

to prevent the violation of a party's constitutional rights."); *ODonnell*, 251 F. Supp. 3d at 1159

(quoting and citing cases); *Rodriguez*, 155 F. Supp. 3d at 771-72 (holding that "enforcing

constitutional rights serves the public interest").

Moreover, it is expensive to house people in jail.[14]  And jailing the poor devastates lives

by disrupting stable employment and child custody arrangements.  It exacerbates poverty, and

makes it more likely that an arrestee will recidivate. *See* DOJ, National Institute of Corrections,

*Fundamentals of Bail: A Resource Guide for Pretrial Practitioners and a Framework for America*

*Pretrial Reform* (September 2014) [15] at 24-29; *see also, e.g.*, International Association of Chiefs

of Police, Resolution (October 2014), 121st Annual Congress at 15-16 ("[D]efendants rated low

---

[14] *See* Vera Institute of Justice, *The Price of Jails: Measuring the Taxpayer Cost of Local Incarceration* (May 2015), available at http://www.safetyandjusticechallenge.org/wp-content/uploads/2015/05/The-Price-of-Jails-report.pdf (explaining that even the reported costs of approximately $50 to $570 per inmate per day at local jails is a significant underestimate of the cost to local jurisdictions of incarceration in local jails).  The Tulsa Jail's overall operating expenses increased from $33.3 million in 2013 to $38.1 million in 2015, resulting in repeated budget shortfalls and increased cost to taxpayers. *See Sheriff's Office struggles to repay millions owed to county*, The Frontier, Jan. 19, 2016, https://www.readfrontier.org/stories/sheriffs-office-struggles-to-repay-millions-owed-to-county/.

[15] A*vailable at* http://static.nicic.gov/UserShared/2014-11-05_final_bail_fundamentals_september_8,_2014.pdf. Summarizing the current state of research, the DOJ report, *id.* at 29, concluded: "[R]esearchers found that low- and moderate-risk defendants held only 2 to 3 days were more likely to commit crimes and fail to appear for court before trial than similar defendants held 24 hours or less."

risk and detained pretrial for longer than one day before their pretrial release are more likely to commit a new crime once they are released, demonstrating that length of time until pretrial release has a direct impact on public safety.").[16]  As in *ODonnell*, "[t]his factor weighs strongly in favor of granting the plaintiffs' request for relief."  251 F. Supp. 3d at 1159.

Nor would an injunction harm the Defendants.  Tulsa and Rogers Counties are already required to provide notice and opportunity to be heard prior to arresting debtors under Oklahoma law, and the Counties already offer immediate release to arrestees like Ms. Graff and Mr. Frazier— but only if they can pay.  At worst, Defendants will be required to follow state and federal law. *See Rodriguez*, 155 F. Supp. 3d at 771 (noting that "Defendants do not allege any injury arising from Plaintiffs' proposed injunction other than to say that an injunction will necessitate them to 'scramble to create alternative measures to deal with probationers,'" and holding that "the need to erect the proper constitutional safeguards" is not an "injury").

### III.    The Court Should Use Its Discretion Not to Require the Posting of Security

Federal Rule of Civil Procedure 65(c) normally requires the moving party to post security to protect the other party from financial harm likely to be caused by a temporary injunction if that party is later found to have been wrongfully enjoined.  Rule 65(c), however, vests the court with broad discretion to determine the amount of security required, or to waive the bond requirement. *Winnebago Tribe v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003) ("a trial court has 'wide discretion' under Rule 65(c) in determining whether to require security."); *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987) ("[A] trial court may, in the exercise of discretion, determine a bond is unnecessary to secure a preliminary injunction if there is an absence of proof showing a likelihood of harm.").  This Court should waive the bond

---

[16] *Available at* http://www.theiacp.org/Portals/0/documents/pdfs/2014Resolutions.pdf.

requirement because the Plaintiffs are indigent, *Wayne Chem. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977) (requiring no bond for indigent person); *Henton v. Albuqerque Hous. Auth.,* 2013 U.S. Dist. LEXIS 186219 at *2 (D.N.M. 2013) (same); and this lawsuit is brought to enforce constitutional rights. *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981) (upholding district court's decision to waive the bond requirement because "plaintiffs were engaged in public-interest litigation, an area in which the courts have recognized an exception to the Rule 65 security requirement."); *ODonnell*, 251 F. Supp. 2d at 1159-60.  Numerous courts have waived the requirement in recent similar cases.[17]  Moreover, Defendants are unlikely to suffer harm from an injunction requiring them to follow what state law requires, and Plaintiffs are overwhelmingly likely to succeed on the merits.

## CONCLUSION

For the foregoing reasons, the Named Plaintiffs seek a Temporary Restraining Order and, after appropriate proceedings, a Preliminary Injunction prohibiting their arrest and detention solely because they cannot make payments toward their debts unless Defendants provide Plaintiffs with the pre-deprivation procedures and substantive findings required for lawful incarceration.

Dated: February 1, 2018

Respectfully submitted,

*/s/Jill E. Webb*
Jill Webb, OBA #21402
J Webb Law Firm PLLC
P.O. Box 1234
Tulsa, OK 74101
Tel: 918-346-5664
jill.webb@gmail.com

---

[17] *See also, e.g.*, *Mitchell  v. City of Montgomery*, 14-cv-186-MEF, Doc. 18 at 3, (2014) (waiving bond requirement for indigent court debtors); *Johnson v. Bd. of Police Comm'rs*, 351 F. Supp. 2d 929, 952 (E.D. Mo. 2004) (waiving the bond requirement for homeless plaintiffs); *Bass v. Richardson*, 338 F. Supp. 478, 490 (S.D.N.Y.1971) ("It is clear to us that indigents, suing individually or as class plaintiffs, ordinarily should not be required to post a bond under Rule 65(c)."); *see also* 11A Wright & Miller § 2954 (courts can waive the bond requirement in cases involving poor plaintiffs); *Walker*, 2016 WL 361612 at *8.

*/s/ Daniel E. Smolen*
Daniel Smolen, OBA #19943
Donald E. Smolen, II, OBA #19944
Robert M. Blakemore, OBA #18656
Smolen, Smolen & Roytman
701 South Cincinnati Avenue
Tulsa, OK 74119
Tel: 918-585-2667
Fax: 918-585-2669

/s/ *Elizabeth Rossi*
Elizabeth Rossi* (admitted *Pro Hac Vice*)
Maryland Attorney No. 1412180090
Alec Karakatsanis (admitted *Pro Hac Vice*)
D.C. Bar No. 999294
Katherine Hubbard** (admitted *Pro Hac Vice*)
California Bar No. 302729
Civil Rights Corps
910 17th Street NW, Suite 200
Washington, DC 20006
Tel: 202-599-0953
Fax: 202-609-8030
elizabeth@civilrightscorps.org
alec@civilrightscorps.org
katherine@civilrightscorps.org

*Admitted solely to practice law in Maryland; not admitted
in the District of Columbia. Practice is limited pursuant to
D.C. App. R. 49(c)(3).
**Admitted solely to practice law in California; not admitted
in the District of Columbia. Practice is limited pursuant to
D.C. App. R. 49(c)(3).

/s/ *Mary B. McCord*
Mary B. McCord (admitted *Pro Hac Vice*)
D.C. Bar No. 427563
Robert Friedman (admitted *Pro Hac Vice*)
D.C. Bar No. 1046738
Seth Wayne (admitted *Pro Hac Vice*)***
La. Bar No. 34144
Institute for Constitutional Advocacy and Protection
Georgetown University Law Center
600 New Jersey Ave. NW
Washington, D.C. 20001
Tel: 202-662-9042

26

mbm7@georgetown.edu
rdf34@georgetown.edu
sw1098@georgetown.edu

\*\*\*Admitted solely to practice law in Louisiana; not admitted in the District of Columbia. Practice is limited pursuant to D.C. App. R. 49(c)(3).

*Attorneys for the Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 1st day of February, 2018, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants who have appeared in this case.

I further certify that a copy of the foregoing will be served by personal service on the following parties: Jim D. Shofner; Rob Shofner; Oklahoma Sheriffs' Association; Vic Regalado, Sheriff of Tulsa County; Scott Walton, Sheriff of Rogers County; The Board of County Commissioners of the County of Tulsa; The Board of County Commissioners of the County of Rogers; Judge Dawn Moody; Judge Doug Drummond; Judge William J. Musseman, Jr.; Don Newberry, Tulsa County Court Clerk; Darlene Bailey, Tulsa County Cost Administrator; Judge Terrell S. Crosson; and Kim Henry, Rogers County Court Clerk.

I further certify that a copy of the foregoing will be served by U.S. Mail on the following parties: Jason Ritchie, Sheriff of Adair County; Rick Wallace, Sheriff of Alfalfa County; Tony Head, Sheriff of Atoka County; Ruben Parker, Jr., Sheriff of Beaver County; Tony Almaguer, Sheriff of Blaine County; Chris West, Sheriff of Canadian County; Chris Bryant, Sheriff of Carter County; Norman Fisher, Sheriff of Cherokee County; Todd Gibson, Sheriff of Cleveland County; Bryan Jump, Sheriff of Coal County; Heath Winfrey, Sheriff of Craig County; Bret Bowling, Sheriff of Creek County; Harlan Moore, Sheriff of Delaware County; Clay Sander, Sheriff of Dewey County; Jerry Niles, Sheriff of Garfield County; Jim Weir, Sheriff of Grady County; Scott Sterling, Sheriff of Grant County; Devin Huckabay, Sheriff of Greer County; Thomas McClendon, Sheriff of Harper County; Marcia Maxwell, Sheriff of Hughes County; Roger Levick, Sheriff of Jackson County; Jeremie Wilson, Sheriff of Jefferson County; Jon Smith, Sheriff of Johnston County; Steve Kelley, Sheriff of Kay County; Dennis Banther, Sheriff of Kingfisher County; Jesse James, Sheriff of Latimer County; Rob Seale, Sheriff of Leflore County; Marty Grisham, Sheriff of Love County; Danny Cryer, Sheriff of Marshall County; Mike Reed, Sheriff of Mayes County; Kevin Clardy, Sheriff of McCurtain County; Kevin Ledbetter, Sheriff of McIntosh County; Darrin Rodgers, Sheriff of Murray County; Sandy Hadley, Sheriff of Nowata County; Steven Worley, Sheriff of Okfuskee County; P.D. Taylor, Sheriff of Oklahoma County; Eddy Rice, Sheriff of Okmulgee County; Eddie Virden, Sheriff of Osage County; Jeremy Floyd, Sheriff of Ottawa County; Mike Waters, Sheriff of Pawnee County; R.B. Hauf, Sheriff of Payne County; Mike Booth, Sheriff of Pottawatomie County; B.J. Hedgecock, Sheriff of Pushmataha County; Darren Atha, Sheriff of Roger Mills County; Shannon Smith, Sheriff of Seminole County; Larry Lane, Sheriff of Sequoyah County; Matt Boley, Sheriff of Texas County; Bobby Whittington, Sheriff of Tillman County;  Chris Elliot, Sheriff of Wagoner County; Rick Silver, Sheriff of Washington County; Roger Reeve, Sheriff of Washita County; Rudy Briggs, Jr., Sheriff of Woods County; and Kevin Mitchell, Sheriff of Woodward County.

<u>/s/Robert D. Friedman</u>