## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1) **CARLY GRAFF;** | ) |
| 2) **RANDY FRAZIER;** | ) |
| 3) **DAVID SMITH;** | ) |
| 4) **KENDALLIA KILLMAN;** | ) |
| 5) **LINDA MEACHUM;** | ) **Case No. 4:17-CV-606-CVE-JFJ** |
| 6) **CHRISTOPHER CHOATE;** | ) |
| 7) **IRA LEE WILKINS; and** | ) **(Amended Complaint - Class Action)** |
| 8) **MELANIE HOLMES** | ) |
| | ) **JURY TRIAL DEMANDED** |
| **on behalf of themselves and all others** | ) |
| **similarly situated.** | ) |
| | ) |
| **Plaintiffs,** | ) |
| **v.** | ) |
| | ) |
| 1) **ABERDEEN ENTERPRIZES II, INC.;** | ) |
| 2) **JIM D. SHOFNER;** | ) |
| 3) **ROB SHOFNER;** | ) |
| 4) **OKLAHOMA SHERIFFS'** | ) |
| **ASSOCIATION;** | ) |
| 5) **THE BOARD OF COUNTY** | ) |
| **COMMISSIONERS OF THE** | ) |
| **COUNTY OF TULSA;** | ) |
| 6) **THE BOARD OF COUNTY** | ) |
| **COMMISSIONERS OF THE** | ) |
| **COUNTY OF ROGERS;** | ) |
| 7) **VIC REGALADO, SHERIFF OF** | ) |
| **TULSA COUNTY;** | ) |
| 8) **SCOTT WALTON, SHERIFF OF** | ) |
| **ROGERS COUNTY;** | ) |
| 9) **JASON RITCHIE, SHERIFF OF** | ) |
| **ADAIR COUNTY;** | ) |
| 10) **RICK WALLACE, SHERIFF OF** | ) |
| **ALFALFA COUNTY;** | ) |
| 11) **TONY HEAD, SHERIFF OF ATOKA** | ) |
| **COUNTY;** | ) |
| 12) **RUBEN PARKER, JR., SHERIFF OF** | ) |
| **BEAVER COUNTY;** | ) |
| 13) **TONY ALMAGUER, SHERIFF OF** | ) |
| **BLAINE COUNTY;** | ) |
| 14) **CHRIS WEST, SHERIFF OF** | ) |
| **CANADIAN COUNTY;** | ) |
| 15) **CHRIS BRYANT, SHERIFF OF** | ) |

CARTER COUNTY;                              )
16) NORMAN FISHER, SHERIFF OF              )
    CHEROKEE COUNTY;                        )
17) TODD GIBSON, SHERIFF OF                )
    CLEVELAND COUNTY;                       )
18) BRYAN JUMP, SHERIFF OF COAL            )
    COUNTY;                                 )
19) HEATH WINFREY, SHERIFF OF              )
    CRAIG COUNTY;                           )
20) BRET BOWLING, SHERIFF OF               )
    CREEK COUNTY;                           )
21) HARLAN MOORE, SHERIFF OF               )
    DELAWARE COUNTY;                        )
22) CLAY SANDER, SHERIFF OF                )
    DEWEY COUNTY;                           )
23) JERRY NILES, SHERIFF OF                )
    GARFIELD COUNTY;                        )
24) JIM WEIR, SHERIFF OF GRADY             )
    COUNTY;                                 )
25) SCOTT STERLING, SHERIFF OF             )
    GRANT COUNTY;THOMAS                     )
    MCCLENDON, SHERIFF OF                    )
    HARPER COUNTY;                          )
26) MARCIA MAXWELL, SHERIFF OF             )
    HUGHES COUNTY;                          )
27) ROGER LEVICK, SHERIFF OF               )
    JACKSON COUNTY;                         )
28) JEREMIE WILSON, SHERIFF OF             )
    JEFFERSON COUNTY;                       )
29) JON SMITH, SHERIFF OF                  )
    JOHNSTON COUNTY;                        )
30) STEVE KELLEY, SHERIFF OF KAY           )
    COUNTY;                                 )
31) DENNIS BANTHER, SHERIFF OF             )
    KINGFISHER COUNTY;                      )
32) JESSE JAMES, SHERIFF OF                )
    LATIMER COUNTY;                         )
33) ROB SEALE, SHERIFF OF                  )
    LeFLORE COUNTY;                         )
34) MARTY GRISHAM, SHERIFF OF              )
    LOVE COUNTY;                            )
35) DANNY CRYER, SHERIFF OF                )
    MARSHALL COUNTY;                        )
36) MIKE REED, SHERIFF OF MAYES            )
    COUNTY;                                 )
37) KEVIN CLARDY, SHERIFF OF               )
                                            )

2

McCURTAIN COUNTY; )
38) KEVIN LEDBETTER, SHERIFF OF )
 MCINTOSH COUNTY; )
39) DARRIN RODGERS, SHERIFF OF )
 MURRAY COUNTY; )
40) SANDY HADLEY, SHERIFF OF )
 NOWATA COUNTY; )
41) STEVEN WORLEY, SHERIFF OF )
 OKFUSKEE COUNTY; )
42) P.D. TAYLOR, SHERIFF OF )
 OKLAHOMA COUNTY; )
43) EDDY RICE, SHERIFF OF )
 OKMULGEE COUNTY; )
44) EDDIE VIRDEN, SHERIFF OF )
 OSAGE COUNTY; )
45) JEREMY FLOYD, SHERIFF OF )
 OTTAWA COUNTY; )
46) MIKE WATERS, SHERIFF OF )
 PAWNEE COUNTY; )
47) R.B. HAUF, SHERIFF OF PAYNE )
 COUNTY; )
48) MIKE BOOTH, SHERIFF OF )
 POTTAWATOMIE COUNTY; )
49) B.J. HEDGECOCK, SHERIFF OF )
 PUSHMATAHA COUNTY; )
50) DARREN ATHA, SHERIFF OF )
 ROGER MILLS COUNTY; )
51) SHANNON SMITH, SHERIFF OF )
 SEMINOLE COUNTY; )
52) LARRY LANE, SHERIFF OF )
 SEQUOYAH COUNTY; )
53) MATT BOLEY, SHERIFF OF TEXAS )
 COUNTY; )
54) BOBBY WHITTINGTON, SHERIFF )
 OF TILLMAN COUNTY; )
55) CHRIS ELLIOT, SHERIFF OF )
 WAGONER COUNTY; )
56) RICK SILVER, SHERIFF OF )
 WASHINGTON COUNTY; )
57) ROGER REEVE, SHERIFF OF )
 WASHITA COUNTY; )
58) RUDY BRIGGS, JR., SHERIFF OF )
 WOODS COUNTY; )
59) KEVIN MITCHELL, SHERIFF OF )
 WOODWARD COUNTY )
60) JUDGE DAWN MOODY; )
 )

61) **JUDGE DOUG DRUMMOND;** )
62) **JUDGE WILLIAM J. MUSSEMAN,** )
   **JR.;** )
63) **DON NEWBERRY, TULSA COUNTY** )
   **COURT CLERK;** )
64) **DARLENE BAILEY, TULSA** )
   **COUNTY COST ADMINISTRATOR;** )
65) **JUDGE TERRELL S. CROSSON; and** )
66) **KIM HENRY, ROGERS COUNTY** )
   **COURT CLERK;** )
   )
   **Defendants.** )
   )

## SECOND AMENDED CLASS ACTION COMPLAINT

## INTRODUCTION

1.      This lawsuit challenges an unlawful and extortionate court debt collection scheme

perpetrated by Defendants Aberdeen Enterprizes II, Inc. ("Aberdeen, Inc."), the Oklahoma

Sheriffs' Association (the "Sheriffs' Association"), and the Sheriffs of 54 counties[1] across

Oklahoma.  This lawsuit also challenges the unconstitutional practices that enable this scheme

and pervade Oklahoma's criminal legal system, including the practices of the Judges, Cost

Administrators[2], and Court Clerks of the Rogers and Tulsa County District Courts, who assess

court debts[3] in criminal and traffic cases that Aberdeen, Inc. later collects, and who request and

issue debt-collection arrest warrants without regard to a debtor's ability to pay and on the basis

---

[1] For a list of all Sheriff Defendants, see *infra* note 6.

[2] In Rogers County, there is no separate cost administration office; the duties of the cost administrator are handled by the court clerk.

[3] "Court debts" are made up of fines, fees, and costs arising out of a criminal case, including fees supporting retirement funds, judicial expenses, prosecutors, jailors, probation supervision, public defenders, a wide variety of civil services unrelated to criminal cases, and other entities.  After a criminal case, any debts owed become collectible in the same way as any other civil judgment under Oklahoma law.  The difference between "fees" and "costs" imposed on a person convicted of a criminal offense is not clear under Oklahoma law.  Among stakeholders in the Oklahoma criminal legal system, "fees" are generally understood to refer to payments known at the time of a guilty plea, while "costs" are generally understood to refer to payments unknown at the time of a guilty plea, and subsequently determined and imposed by the court cost administrator or court clerk's office.  For the purpose of this lawsuit, the term "court debt" refers to all of the legal financial obligations that are owed as the result of a criminal or traffic conviction, including those that courts and court clerks subsequently assess.

4

of unsworn statements.

2.      Plaintiffs are impoverished individuals who have been saddled with court debts without any inquiry into their ability to pay and who have had debt-collection arrest warrants sought and issued against them for no reason other than that they are too poor to pay these court debts.  Notwithstanding Plaintiffs' repeated pleas of financial hardship, it is the practice of Aberdeen, Inc. to repeatedly threaten Plaintiffs, and other impoverished court debtors who make up the proposed class, to make payments that they cannot afford; to coerce them with threats of arrest if they do not pay; and, with the assistance of the Defendant Judges who issue the arrest warrants sought by Aberdeen, Inc. and the Defendant Sheriffs who execute them, to have Plaintiffs actually arrested and detained solely for nonpayment.  The unflagging aim of this enterprise is to squeeze as much money out of impoverished court debtors as possible.

3.      Through these extortionate practices, Aberdeen, Inc. has collected—and all Defendants have reaped the benefits of—tens of millions of dollars in payments from the poorest individuals in Oklahoma.  This money has provided millions of dollars to Aberdeen, Inc., millions of dollars to the Sheriffs' Association, and tens of millions of dollars to the Oklahoma court system to pay for judicial salaries and other essential expenses of the district courts and court clerks' offices.

4.      To generate these payments, Defendants have subjected Plaintiffs and proposed class members to arrest, prolonged detention, and illegal threats.  Plaintiffs and proposed class members have been separated from their families and friends; lost their jobs and drivers' licenses; and sacrificed the basic necessities of life, including groceries, clothing, and shelter as a result of Defendants' conduct.

5.      Aberdeen, Inc. collects court debts pursuant to a contract it entered into with the

5

Sheriffs' Association, acting in its capacity as the agent of the 54 Sheriff Defendants.  The contract outsources the function of collecting court debt to Aberdeen, Inc., a private, for-profit company.  Under this scheme, when a person does not pay her court debt within a certain amount of time, the court clerk[4] automatically seeks a warrant for that person's arrest, based solely on the nonpayment.  Judges routinely sign these debt-collection arrest warrants.  When a judge signs a debt-collection arrest warrant for an individual with a case arising in the Defendant Sheriffs' counties, the court clerk has discretion under the contract to transfer the case to Aberdeen, Inc. to take over the collection process, and routinely does so.  Under an Oklahoma law governing court debts (enacted as a result of lobbying by the Sheriffs' Association), a 30-percent penalty surcharge is added to the amount owed when a court clerk transfers a case to the private company for collection.  Aberdeen, Inc. and the Sheriffs' Association then retain a portion of the money Aberdeen, Inc. collects, up to an amount equal to the 30-percent penalty.  The entire process of seeking arrest warrants, issuing arrest warrants, transferring the case to Aberdeen, Inc., and adding a 30-percent penalty surcharge occurs without any inquiry into the individual's ability to pay.

6.      There are currently tens of thousands of cases in Oklahoma with outstanding debt-collection arrest warrants.  As of February 2017, in Tulsa County alone, there were over 22,000 active arrest warrants based solely on alleged nonpayment.  This is a direct result of Oklahoma's ever-increasing reliance on the people who are charged with traffic violations or criminal offenses to fund the court system and other municipal and state services. Each case, whether concerning a traffic ticket, a misdemeanor, or a felony, includes over 10 separate fees on top of the fine that is

---

[4] In certain counties, a "cost administrator" sitting within the court clerk's office handles the day-to-day responsibilities of overseeing debt collections. Plaintiffs' Amended Complaint refers to "court clerks" when describing this conduct except where the actions of named defendants are involved.

the only payment imposed for the purpose of punishing a violation of the law.  These fees—which range from a generic "court cost" assessment to a "Law Library" fee to an "Oklahoma Court Information System" fee to, in some cases, a fee that helps support trauma centers at hospitals and much more—total in the hundreds and sometimes thousands of dollars per case. The fees are imposed per case, so if the District Attorney chooses to charge two or more offenses in separate cases, the court debts that the person owes multiply accordingly.

7.     Cases involving indigent debtors who cannot pay the assortment of fees the courts impose inevitably result in court clerks and cost administrators seeking and judges issuing debt-collection arrest warrants, which court clerks then routinely exercise their discretion to transfer to Aberdeen, Inc.'s control.  Once Aberdeen, Inc. takes over, regardless of an individual debtor's circumstances, the company leverages the threat of an active arrest warrant to coerce payment. Aberdeen, Inc. informs debtors that it can have their outstanding arrest warrants removed if they pay enough money to Aberdeen, Inc.  Specifically, the company requires payment at the outset of a lump sum that it determines arbitrarily, regularly in the hundreds of dollars, before it will notify the court to lift the arrest warrant.  If an individual explains that she is too poor to pay the lump sum and offers to make periodic payments instead, Aberdeen, Inc. refuses, as a matter of policy, to accept a lesser amount.  Aberdeen, Inc. does so because the threat of living under the shadow of an arrest warrant coerces individuals owing debt to sacrifice basic necessities, to beg others for money, and to divert money from means-tested disability payments.  When seeking to collect payment, Aberdeen, Inc. has trained its employees through phone call scripts to threaten debtors by emphasizing the damaging consequences of arrest, including separation from children and other family, as well as loss of employment.  If Aberdeen, Inc. has access to the debtor's family or friends, it calls them to demand payment and threaten the harmful consequences of their

7

loved one's arrest.

8.     Those who manage to cobble together money to pay the initial lump sum receive only temporary relief, as Aberdeen, Inc. then requires monthly payments that routinely exceed what the individual can afford.  The company continues its pattern of threatening phone calls, now coupled with threats of new arrest warrants, to extract payment.  Aberdeen, Inc. threatens that it will seek the debtor's arrest any time the debtor ceases to make payments in the frequency or amount determined by Aberdeen, Inc.

9.     Numerous actors in Oklahoma's criminal legal system enable Aberdeen, Inc.'s extortionate scheme.  Defendant Judges, Defendant Cost Administrator, and Defendant Court Clerks of the Rogers and Tulsa County District Courts (as well as other counties' judges, court clerks, and cost administrators not named as defendants) participate in the enterprise at critical stages.  First, they set in motion the cycle of debt that drives individuals to Aberdeen, Inc. by assessing exorbitant court debts and establishing payment plans without inquiring into individuals' ability to pay.  When individuals fall behind, court clerks and cost administrators seek and judges issue arrest warrants based solely on non-payment.  Court clerks then routinely exercise their discretion to transfer the cases to Aberdeen, Inc., which contacts debtors and uses the active arrest warrants as leverage for obtaining payments.[5]  After transfer of collection to Aberdeen, Inc., the other Defendants knowingly acquiesce in Aberdeen, Inc.'s practice of demanding an arbitrary lump sum to lift an arrest warrant.  The Defendant Court Clerks and Tulsa Cost Administrator assist Aberdeen, Inc. with obtaining new debt-collection arrest warrants at Aberdeen, Inc.'s request, without sworn oaths or affirmations of any facts, and without inquiry

---

[5] After the filing of this lawsuit, Tulsa County stopped using Aberdeen, Inc.'s services for collection of Tulsa County court debt.  The subsequent allegations reflect practices throughout the time period preceding the filing of the First Amended Complaint.  Allegations in this complaint regarding Tulsa County's use of Aberdeen, Inc. remain in the present tense to signify the state of affairs at the time the previous complaint was filed.

into the reason for nonpayment or ability to pay.  Defendant Judges routinely issue such warrants despite these constitutional defects, and without any further inquiry.

10.     The Sheriff Defendants enforce Aberdeen, Inc.'s extortionate methods by routinely arresting and jailing individuals pursuant to these debt-collection arrest warrants that are based solely on nonpayment.[6]  When a debtor is jailed for nonpayment, the Sheriff Defendants will not release her unless she pays a fixed sum payment to get out of jail.  In Tulsa County and Rogers County, release on "bond" or "bail" is not an option, as any money paid is directly applied to the debt allegedly owed, not used to secure appearance at a future court date.  Sheriffs in numerous counties detain individuals who cannot pay in jail for days before they are allowed to see a judge—again, without ever making an inquiry into ability to pay—while allowing those able to pay to go free.  In some counties, judges, including the Rogers County Judge, later order individuals to remain in jail and "sit out" their debt if they cannot make a payment at the time they are eventually brought to court.  Neither sheriffs nor judges (nor anyone else) provide any of the inquiries, findings, or procedural safeguards required by Supreme Court precedent prior to jailing a person for nonpayment.

11.     At each stage of this process, more fees are tacked on to the individual's court debts.  In addition to the 30-percent penalty surcharge that is added when a case is transferred to Aberdeen, Inc., there is a fee for each arrest warrant; a fee for executing an arrest warrant; and a daily fee for being confined in jail, just to name a few.  Thus, a large portion of debts allegedly owed by debtors are surcharges that Defendants impose upon debtors to pay for their own unconstitutional treatment.  The court debt of the individual, who was too poor to pay in the first

---

[6] Allegations against the Sheriff Defendants and pertaining to detention do not apply to the Sheriffs of Cherokee, McCurtain, Okmulgee, Pottawatomie, and Tillman Counties.  These counties have shifted responsibility for county jails to a "jail trust authority."

place, thus inflates with each new warrant for nonpayment.  Aberdeen, Inc. then threatens and the Defendant Sheriffs jail debtors on arrest warrants sought by Aberdeen, Inc., court clerks, and cost administrators when debtors cannot pay these surcharges, creating a vicious cycle of mounting debt and illegal treatment.

12.     At the root of this extortionate scheme is a criminal legal system that depends on revenue collected from the poor.  The salaries and retirement benefits of all judges in Oklahoma are paid for, in significant part, by revenue from these debts.  In addition, other revenue from court debts funds the daily operational budgets of district courts throughout Oklahoma.  In 2017 alone, the Tulsa District Court used $7,273,828 and the Rogers District Court used $664,211.41 in revenue from fines, fees, forfeitures, and costs[7] to pay for basic expenses, such as courthouse maintenance, photocopying equipment, general office supplies, postage, juror expenses, and, in Rogers County, salaries and benefits for employees of the clerk's office.  And still other revenue is allocated to support the Sheriffs' activities.  As a result of this financial dependency and entanglement, judges, court personnel, and sheriffs—the people responsible for assessing fines and fees, setting payment plans, requesting and issuing arrest warrants, executing arrest warrants, and detaining debtors—harbor a powerful financial incentive to violate the Constitution rather than to do justice.

13.     Decades ago, the Supreme Court condemned practices like these and declared them unconstitutional.  It has long been a bedrock principle of American law that an individual cannot be jailed solely because she is too poor to pay court debts.  Prior to jailing a person and depriving her of her fundamental right to bodily liberty, the government must make specific

---

[7] In 2017, Rogers County collected a total of $1,963,629 in fines, fees, forfeitures, and costs, of which $1,247,065.84, or 64 percent, came from criminal and traffic cases.  The same year, Tulsa County collected a total of $12,100,069.15, of which $5,515,962, or 46 percent, came from criminal and traffic cases.

findings and provide rigorous procedural safeguards.

14.     Congress, likewise, provided a mechanism to stop this type of wide-ranging scheme of unlawful extortion and compensate its victims when it enacted the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. §§ 1961-1968).  The practices challenged in this lawsuit have no place in our society.

15.     The Named Plaintiffs are all people who are suffering irreparable harm as a result of Defendants' illegal debt-collection practices.  On behalf of themselves and all others similarly situated, Plaintiffs seek in this action, brought under RICO, the United States Constitution pursuant to 42 U.S.C. § 1983, and Oklahoma law, declaratory relief and an injunction against the violations of their basic rights at each stage of the debt-collection process, compensation for the injuries they have suffered, and punitive damages to deter similar misconduct in the future.

## JURISDICTION AND VENUE

16.     This is a civil rights action arising under 42 U.S.C. § 1983, 18 U.S.C. § 1964(c) (RICO), 28 U.S.C. § 2201, *et seq.*, and the Fourth and Fourteenth Amendments to the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

17.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## PARTIES

18.     Plaintiff Carly Graff is a 40-year-old resident of Rogers County.  She has two children she struggles to provide for.  Ms. Graff depends on public assistance to support herself and her daughters.  Ms. Graff frequently cannot afford groceries and is currently at risk of having her electricity cut off because she cannot afford to pay the electricity bill.  Ms. Graff was unable to pay the fines and fees assessed for a single traffic ticket.  As a result, the Rogers Court Clerk sought and the Rogers County Judge issued a warrant for her arrest, and the Rogers Court Clerk

assessed more fees and transferred her case to Aberdeen, Inc.  Ms. Graff now lives in constant fear of arrest and does not leave her home unless necessary to care for her children because she is so afraid of being taken to jail for nonpayment.  If Ms. Graff is arrested, she will not be able to pay the $435.83 required to secure her release from the Rogers County jail.

19.     Plaintiff Randy Frazier is a 59-year-old resident of Tulsa County, who, in November 2015, suffered a mini-stroke.  He has been unable to work since then, and he receives social security disability payments to pay for the basic necessities of life.  Mr. Frazier has multiple cases in which he has been unable to pay his court debt because of his poverty.  Because of his nonpayment, the Tulsa Court Clerk and Cost Administrator sought, and a Tulsa County judge issued, debt-collection arrest warrants in each case, and assessed a separate $80 warrant fee for each case.  The Tulsa Clerk and Tulsa Cost Administrator transferred the cases to Aberdeen, Inc., and assessed a 30-percent penalty surcharge.  Mr. Frazier now owes more than $10,000.  Aberdeen, Inc. regularly threatens him with arrest and demands payments that he cannot afford.  If Mr. Frazier is arrested, he will not be able to pay the $250 required to secure his release from the Tulsa County jail.

20.     Plaintiff David Smith is a 32-year-old resident of Tulsa, Oklahoma.  He lives with his girlfriend and her three children.  He also has a son from a previous relationship.  Mr. Smith is indigent and struggles to support himself and his family.  Mr. Smith owes court debt in two cases, both of which have been transferred to Aberdeen, Inc. for collection by the Tulsa Clerk and Cost Administrator.  Aberdeen, Inc. has threatened Mr. Smith with arrest whenever he has missed payments.  Out of fear of arrest, Mr. Smith has regularly paid Aberdeen, Inc., even at the expense of obtaining basic necessities.  Within the past year, Mr. Smith was coerced by threats of arrest to pay money to Aberdeen, Inc. that he otherwise would have paid in child support, causing him to

be denied visitation with his son.  Mr. Smith has experienced stress and anxiety because of Aberdeen, Inc.'s threats of arrest.  He fears for himself and for his family, which he worries will not be able to support itself if he is in jail.

21.     Plaintiff Linda Meachum is a 58-year-old resident of Tulsa, Oklahoma.  Ms. Meachum is indigent.  Her only income is $194 per month in food stamps and $50 per month for helping an elderly neighbor with laundry and cooking.  She is unable to do more rigorous work because of medical problems resulting from being a survivor of domestic violence.  In 2012, the Tulsa Clerk transferred court debt from Ms. Meachum's 2007 Tulsa County shoplifting conviction to Aberdeen, Inc. for collection.  In 2014, after Ms. Meachum was arrested, the Tulsa Sheriff continued to hold Ms. Meachum in jail on a debt-collection arrest warrant from her 2007 case— which a judge issued without inquiring into Ms. Meachum's ability to pay—and would not release her until she paid an additional $200.  Ms. Meachum still owes money.  She has no money to pay Aberdeen, Inc. and fears that she will be arrested for nonpayment of court debt.

22.     Plaintiff Kendallia Killman is a 48-year-old resident of Norman, Oklahoma.  Ms. Killman is indigent.  Ms. Killman's only income is a monthly disability benefit of $543 that she receives as the caretaker of her intellectually disabled adult son, which she uses to provide him basic necessities.  In 2009, the Cleveland County district court imposed fines and fees against Ms. Killman for two misdemeanor charges.  In 2015, the Cleveland County court clerk transferred the case to Aberdeen, Inc. for collection.  Because of her poverty, Ms. Killman has been, and still is, unable to pay her court debt.  As a result, Ms. Killman was arrested twice in connection with the collection of her debt.  Ms. Killman currently has warrants issued against her in connection with the collection of her debt, and Aberdeen, Inc. has demanded a lump sum payment of $1,000 to recall them.  Even though Ms. Killman has repeatedly informed the company that she does not

have any income of her own, Aberdeen, Inc. employees continued to threaten her with jailing.  Ms. Killman cannot afford to pay Aberdeen, Inc. to have her warrant recalled, and lives in constant fear that she will be arrested and there will be nobody to care for her son, who will not be able to care for himself if she is arrested without warning.

23.     Plaintiff Christopher Choate is a 40-year-old resident of Tulsa, Oklahoma.  Mr. Choate is indigent.  His only form of steady income is federal disability benefits, which he relies on to support himself, to help support his wife and her 15-month-old grandson, and to pay child support.  Mr. Choate owes court debt on a Tulsa County criminal conviction from 2007.  Because of his limited income, he has struggled to pay this court debt, and the Tulsa Clerk and Cost Administrator sought, and a Tulsa District Court judge issued, debt-collection arrest warrants against him.  The Tulsa Clerk has transferred his case to Aberdeen, Inc. for collection.  Mr. Choate has been arrested and held in the Tulsa County Jail on a debt-collection arrest warrant.  When Mr. Choate's father contacted the Tulsa Clerk about his son's arrest, he was told he would need to get in touch with Aberdeen, Inc. to pay for his son's release.  Mr. Choate has paid Aberdeen, Inc. out of his disability income at the expense of providing basic necessities for his family, and he continues to live in fear that he will be arrested again if he does not pay Aberdeen, Inc. every month.

24.     Plaintiff Ira Lee Wilkins is a 36-year-old resident of Tulsa, Oklahoma, who is currently incarcerated in the Oklahoma State Reformatory Work Center in Granite, Oklahoma. Mr. Wilkins is indigent.  In March 2017, the Wagoner County District Court issued a debt-collection arrest warrant against Mr. Wilkins, and the Wagoner Court Clerk's office later stated that, after his release from prison, Mr. Wilkins would be transferred to Wagoner County based on the warrant.  To avoid this, Mr. Wilkins sought to get the warrant recalled.  Aberdeen, Inc.

demanded that Mr. Wilkins pay $200 to recall the warrant despite repeated explanations that he had no income and that he could not generate income because he was in prison. Mr. Wilkins' fiancée paid that amount, and his warrant was recalled. Mr. Wilkins still owes thousands of dollars in court debt. He has no job prospects for when he is released, will have no income, and will not be able to make payments to Aberdeen, Inc.

25.     Plaintiff Melanie Holmes is 41 years old. Ms. Holmes lives with her husband and her 18-year-old disabled daughter. Ms. Holmes is indigent and has for years struggled to pay court debt from cases in multiple counties, including Creek, Rogers, and Tulsa Counties. In December 2016, Ms. Holmes was arrested on a debt-collection arrest warrant and detained in the Tulsa County jail for six nights because she could not pay a $500 fixed sum required for her release. At the time of her arrest and when the warrant for her arrest issued in October 2016, Ms. Holmes had no income, she had lost her home and was living out of her car, and she had to leave her daughter with her daughter's father because she could not afford to care for her. There are currently active debt-collection warrants for Ms. Holmes that have been issued by Judge Moody and Judge Crosson, as well as the Creek County District Court, at least one of which was sought by Aberdeen, Inc.

26.     Defendant Aberdeen Enterprizes II, Inc. ("Aberdeen, Inc.") is a for-profit Oklahoma corporation registered to do business in Oklahoma. Aberdeen, Inc. contracted with Defendant Oklahoma Sheriffs' Association to collect court debts owed in court cases arising in 54 counties throughout Oklahoma. The Agreement provides that Aberdeen, Inc. receives a percentage of the money that it collects. Aberdeen, Inc.'s cut of the money that it collects constitutes Aberdeen, Inc.'s sole revenue source.

27.     Defendant Jim D. Shofner is an officer and manager of Aberdeen, Inc. Along

with Defendant Robert Shofner, Defendant Jim Shofner is responsible for establishing Aberdeen, Inc.'s collection practices, including the amount that a debtor must pay to have a warrant recalled and when to seek a new arrest warrant.  He also jointly monitors, supervises, and controls all aspects of the collection process, including by listening to subordinates' phone calls to ensure that the subordinates comply with company policies and procedures.

28.     Defendant Robert "Rob" Shofner is a director of Aberdeen, Inc.  Along with Defendant Jim Shofner, Defendant Rob Shofner is responsible for establishing Aberdeen, Inc.'s collection practices, including the amount that a debtor must pay to have an arrest warrant recalled and when to seek a new arrest warrant.  He also jointly monitors and supervises all aspects of the collection process, including by listening to subordinates' phone calls to ensure that the subordinates comply with company procedures.  Defendant Rob Shofner verbally berates employees who do not follow the debt-collection policies that he dictates.

29.     Defendant Oklahoma Sheriffs' Association, Inc. is an Oklahoma corporation. The Sheriffs' Association represents the Sheriffs of all 77 counties in Oklahoma as a lobbying organization.  Each of the 54 Sheriff Defendants has authorized the Sheriffs' Association to enter into the Agreement for debt collection services on their behalf.  The Sheriffs' Association, as the agent of and on behalf of the 54 Sheriff Defendants entered into the Agreement with Aberdeen, Inc.  The Agreement has been renewed multiple times, most recently on January 1, 2017.  The Sheriffs' Association receives a percentage of what Aberdeen, Inc. collects, amounting to millions of dollars since the contract was first signed in 2010.  In 2009, before contracting with Aberdeen, Inc., the Sheriffs' Association had only $52,754 in total assets.  By 2016, the Association's assets increased to more than 60 times that amount, totaling $3,311,433.

16

30.     The 54 Sheriff Defendants[8] are the Sheriffs of 54 Oklahoma counties.  Each Defendant Sheriff's office authorized the Sheriffs' Association to enter into the contract for debt collection services with Aberdeen, Inc. on the Sheriff's behalf.  The Sheriff Defendants have authority under Oklahoma law to execute arrest warrants, and each of the Sheriff Defendants has a policy and practice of arresting and confining individuals on debt-collection arrest warrants issued based on unsworn statements, without inquiry into the individual's ability to pay or any other pre-deprivation process, and on warrant applications that no reasonable person could believe were sufficient to justify arrest.  Each Sheriff is also responsible for operating the county jail in the Sheriff's jurisdiction except where a County has charged a Jail Trust Authority with that responsibility.[9]  The Sheriff Defendants each rely on money collected from court debts to partially fund their operations.  The Sheriff Defendants are sued in their individual and official capacities.

31.     Defendant Vic Regalado is the Sheriff of Tulsa County (the "Tulsa Sheriff").  Sheriff Regalado has served as the Tulsa County Sheriff since 2016 and was in office when the Agreement with Aberdeen, Inc. was renewed.  The Tulsa Sheriff has a policy and practice of

---

[8] In addition to the Tulsa Sheriff and the Rogers Sheriff, the Sheriff Defendants include: Jason Ritchie (Adair County); Rick Wallace (Alfalfa County); Tony Head (Atoka County); Ruben Parker, Jr. (Beaver County); Tony Almaguer (Blaine County); Chris West (Canadian County); Chris Bryant (Carter County); Norman Fisher (Cherokee County); Todd Gibson (Cleveland County); Bryan Jump (Coal County); Bret Rowling (Creek County); Harlan Moore (Delaware County); Clay Sander (Dewey County); Jerry Niles (Garfield County); Jim Weir (Grady County); Scott Sterling (Grant County); Thomas McClendon (Harper County); Roger Levick (Jackson County); Jeremie Wilson (Jefferson County); Jon Smith (Johnston County); Steve Kelley (Kay County); Dennis Banther (Kingfisher County); Jesse James (Latimer County); Rob Seale (LeFlore County); Marty Grisham (Love County); Danny Cryer (Marshall County); Mike Reed (Mayes County); Kevin Clardy (McCurtain County); Kevin Ledbetter (McIntosh County); Darrin Rodgers (Murray County); Sandy Hadley (Nowata County); Steven Worley (Okfuskee County); P.D. Taylor (Oklahoma County); Eddy Rice (Okmulgee County); Eddie Virden (Osage County); Jeremy Floyd (Ottawa County); Mike Waters (Pawnee County); R.B. Hauf (Payne County); Mike Booth (Pottawatomie County); B.J. Hedgecock (Pushmataha County); Darren Atha (Roger Mills County); Shannon Smith (Seminole County); Larry Lane (Sequoyah County); Matt Boley (Texas County); Bobby Whittington (Tillman County); Chris Elliot (Wagoner County); Rick Silver (Washington County); Roger Reeve (Washita County); Rudy Briggs, Jr. (Woods County); and Kevin Mitchell (Woodward County).

[9] Specifically, Jail Trust Authorities exist in Cherokee, McCurtain, Okmulgee, Pottawatomie, and Tillman Counties.

arresting individuals with outstanding debt-collection warrants knowing that there has been no pre-deprivation process, no inquiry into ability to pay, and no application made based on sworn assertions of fact sufficient to justify an arrest. He has a policy of detaining such individuals in the Tulsa County Jail until the following Tuesday or Friday unless the individual pays $250 in cash, without any inquiry into ability to pay. The $250 cash release payment, if paid, is not returned upon the arrestee's appearance at any future court date (indeed, there will be no future court date if the person is able to pay the debts in full), but is instead applied to the arrestee's court debts, a portion of which is retained by the Sheriffs. The Tulsa Sheriff is the final policymaker for all county jail-related and county law enforcement decisions in Tulsa County. The Tulsa Sheriff is sued in his individual and official capacities.

32.     Defendant Scott Walton is the Sheriff of Rogers County (the "Rogers Sheriff"). Sheriff Walton has served as the Sheriff of Rogers County since 2008 and was in office when the contract with Aberdeen, Inc. was first signed and when it was most recently renewed. The Rogers Sheriff has a policy and practice of arresting individuals with outstanding debt-collection warrants knowing that there has been no pre-deprivation process, no inquiry into ability to pay, and no application made based on sworn assertions of fact sufficient to justify an arrest. He has a policy of detaining arrested debtors in the Rogers County Jail, without inquiring into the arrestee's ability to pay, unless the individual pays a pre-determined cash payment equivalent to the total amount of court debt she owes. If the arrestee is taken into custody on Friday, she must wait until Monday afternoon—or Tuesday afternoon in the case of a holiday—to see a judge. The pre-determined cash payment, if paid, is not returned upon the arrestee's appearance at a future court date, but is instead applied to the arrestee's court debts. The Rogers Sheriff is the final policymaker for all county jail-related and county law enforcement decisions in Rogers

County.  The Rogers Sheriff is sued in his individual and official capacities.

33.     Defendant Judge Moody issues arrest warrants for court debtors based solely on unsworn statements alleging nonpayment without probable cause or any pre-deprivation process, including any inquiry into ability to pay.  Judge Moody is a special judge employed at will by the Tulsa County District Court judges, including Defendants Judge Doug Drummond and Judge William J. Musseman, Jr.  Defendants Judge Drummond and Judge Musseman (collectively, with Judge Moody, the "Tulsa County Judges") supervise Judge Moody.   Defendants Judge Drummond and Judge Musseman sat on a steering committee that reviewed District Court debt collection practices and, as a committee, recommended ceasing arrests based solely on debt-collection arrest warrants, i.e. the arrests that result from the warrants that Judge Moody issues. Despite their knowledge of these practices and the recommendation of the committee, Defendants Judge Drummond and Judge Musseman chose to allow the unlawful practices to continue.  The Tulsa County Judges are sued in their official capacities for declaratory relief.

34.     Defendant Judge Terrell S. Crosson (the "Rogers County Judge") presides over criminal cases in Rogers County.  The Rogers County Judge issues arrest warrants for court debtors based solely on unsworn statements alleging nonpayment without probable cause or any legal proceedings, including any inquiry into ability to pay.  The Rogers County Judge is sued in his official capacity for declaratory relief.

35.     Defendant Don Newbury is the Clerk of Court for the District Court of Tulsa County (the "Tulsa Clerk").  The Tulsa Clerk is responsible for collecting court debts.  The Tulsa Clerk maintains a policy and practice of setting initial payment plans after sentencing that require individuals owing court debt to pay a minimum amount of $25 per month, regardless of ability to pay.  The Tulsa Clerk also maintains a policy and practice of seeking debt-collection arrest

warrants (*i.e.*, arrest warrants based solely on alleged nonpayment) without inquiring into the debtor's ability to pay, without notice, and without sworn statements sufficient to justify arrest. Under the contract with Aberdeen, Inc. the Tulsa Clerk chooses which individual cases to transfer to Aberdeen, Inc. for collection, and maintains a policy and practice of transferring cases without conducting an inquiry into the debtor's ability to pay. The Tulsa Clerk maintains a policy and practice of assessing a 30-percent penalty surcharge to the debt of anyone against whom a debt-collection arrest warrant issues, regardless of the individual's ability to pay. After transferring a case to Aberdeen, Inc., the Tulsa Clerk assists Aberdeen, Inc. with seeking arrest warrants at Aberdeen, Inc.'s request. The Tulsa Clerk is sued in his individual and official capacities.

36. Defendant Darlene Bailey is the Cost Administrator for the Tulsa County District Court (the "Tulsa Cost Administrator"). The Tulsa Cost Administrator is also responsible for collecting court debts assessed by the Tulsa County Judges. The Tulsa Cost Administrator maintains a policy and practice of setting initial payment plans that require individuals owing court debts to pay a minimum amount of $25 per month, regardless of ability to pay. The Tulsa Cost Administrator also maintains a policy and practice of seeking debt-collection arrest warrants without inquiring into the warrant subject's ability to pay, without notice, and without sworn statements sufficient to justify arrest. The Tulsa Cost Administrator chooses which individual cases to transfer to Aberdeen, Inc. for collection, and maintains a policy and practice of transferring such cases without conducting an inquiry into the debtor's ability to pay. The Tulsa Cost Administrator maintains a policy and practice of assessing a 30-percent penalty surcharge to the debt of anyone against whom a debt-collection arrest warrant issues, regardless of the individual's ability to pay. After transferring a case to Aberdeen, Inc., the Tulsa Cost Administrator assists Aberdeen, Inc. with seeking arrest warrants at Aberdeen, Inc.'s request.

The Tulsa Cost Administrator is sued in her individual and official capacities.

37.     Defendant Kim Henry is the Clerk of Court for the District Court of Rogers County (the "Rogers Clerk").  The Rogers Clerk is responsible for collecting court debt in Rogers County.  The Rogers Clerk maintains a policy and practice of setting initial payment plans that require individuals owing court debt to pay a minimum amount, regardless of ability to pay.  The Rogers Clerk also maintains a policy and practice of seeking debt-collection arrest warrants without inquiring into the warrant subject's ability to pay.  As authorized under the contract with Aberdeen, Inc., the Rogers Clerk chooses which individual cases to transfer to Aberdeen, Inc. for collection, and maintains a policy and practice of transferring such cases without conducting an inquiry into the debtor's ability to pay.  The Rogers Clerk maintains a policy and practice of assessing a 30-percent penalty surcharge to the debt of anyone against whom a debt-collection arrest warrant issues, regardless of the individual's ability to pay.  After transferring a case to Aberdeen, Inc., the Rogers Clerk assists Aberdeen, Inc. with seeking arrest warrants at Aberdeen, Inc.'s request.  The Rogers Clerk is sued in her individual and official capacities.

38.     The Board of County Commissioners of the County of Tulsa ("Tulsa County") is the governing body of the County of Tulsa.  Tulsa County, through the Sheriff and the Clerk of Court, is responsible for establishing policy for the Tulsa County jail and for the collection of court debt.

39.     The Board of County Commissioners of the County of Rogers ("Rogers County") is the governing body of the County of Rogers.  Rogers County, through the Sheriff and the Clerk of Court, is responsible for establishing policy for the Rogers County jail and for the collection of court debt.

**LEGAL BACKGROUND**

21

40.     The United States Supreme Court held over 60 years ago that "[t]here can be no equal justice where the kind of trial a man gets depends on the amount of money he has." *Griffin v. Illinois*, 351 U.S. 12, 19 (1956).  The Fourteenth Amendment to the United States Constitution guarantees that all persons are entitled to the equal protection of the laws.  The Fourteenth Amendment to the United States Constitution and Art. II, § 7 of the Oklahoma Constitution guarantee that no person may be deprived of life, liberty, or property without due process of law.  Due process provides both substantive and procedural protections.  Together, due process and equal protection work to ensure that states preserve the fundamental fairness of the courts.

41.     The Oklahoma Constitution states that "The courts of justice of the State shall be open to every person, and speedy and certain remedy afforded for every wrong and for every injury to person, property, or reputation; and right and justice shall be administered without sale, denial, delay, or prejudice."  Okla. Const. art. II § 6.  The Oklahoma Supreme Court has been clear in its interpretation of that provision: The "fundamental right of court access" may not be "withheld merely for nonpayment of some liability or conditioned coercive collection devices." *Wall v. Marouk*, 302 P.3d 775, 786 (Okla. 2013).

42.     For indigent people charged with criminal offenses, these constitutional protections provide an essential barrier against deprivations by the state.  Collectively, they serve to guarantee that a person will not be prejudiced in her criminal case because she is poor.  As a basic principle of fairness, no person may be incarcerated solely because she does not have the money to pay a fine, fee, or cost.  The United States Supreme Court confirmed this principle in *Bearden v. Georgia*, 461 U.S. 660 (1983), holding that a probationer may not be imprisoned for nonpayment of a fine or restitution, unless it is shown that the nonpayment was willful.  If a person lacks the ability to pay despite bona fide efforts to acquire the resources to do so, imprisonment would

22

"deprive the probationer of his conditional freedom simply because, through no fault of his own, he cannot pay the fine." *Id.* at 672-73.

43.     Oklahoma's statutory scheme provides protections that are intended to ensure this constitutional principle is respected in state courts.  The Oklahoma Revised Statutes are explicit: a defendant found guilty of an offense may be imprisoned for nonpayment of a fine, fee, cost, or assessment only when "the trial court finds after notice and hearing that the defendant is financially able but refuses or neglects to pay."  Okla. Stat. tit. 22, § 983(A).  Similarly, nonpayment of a fine, fee, cost, or assessment may only result in a jail sentence "after a hearing and a judicial determination . . . that the defendant is able to satisfy the fine, cost, fee, or assessment by payment, but refuses or neglects to do so." *Id.*

44.     Empowered to implement these requirements to ensure their application to indigent defendants, the Oklahoma Court of Criminal Appeals created Rules that set out their procedural requirements.  Okla. Ct. Crim. App. Rule 8.1 provides that when a court imposes a fine and/or costs, "a judicial hearing shall be conducted and judicial determination made as to the defendant's ability to immediately satisfy the fine and costs."  Rule 8.3 requires that if a defendant serves a term of imprisonment as part of her sentence, "a determination shall be made as to the defendant's ability to make installment payments after completion of the term of imprisonment."

45.     The Rules also prohibit indigent persons from being imprisoned for nonpayment of court debt if they are unable to pay.  Rule 8.4 sets out the procedural requirement that if a defendant misses a payment, "he/she must be given an opportunity to be heard as to the refusal or neglect to pay the installment when due."  Rule 8.5 states clearly that if the defendant, "because of physical disability or poverty, is unable to pay the fine and/or costs either immediately or in installment payments, he/she must be relieved of the fine and/or costs; or, in the alternative, be required to

23

report back to the court at a time fixed by the court to determine if a change of condition has made it possible for the defendant to commence making installment payments toward the satisfaction of the fine and/or costs."

46.     The collapse of these protections has catastrophic results for impoverished people. Cycles of mounting debt, unmanageable payment plans, arrest warrants, and incarceration condemn people to a state of perpetual servitude and fear.  Parents are taken from their children and held in jail cells until their freedom can be ransomed. Money needed to pay for the basic necessities of life is redirected to satisfy private debt collectors and court budgets.

47.     Congress passed the Racketeer Influenced and Corrupt Organizations Statute, 18 U.S.C. §§ 1961-1968 (RICO), for the purpose of "eliminat[ing] the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce." S. Rep. No. 91-617 at 76 (1969).   In the absence of impartial judicial oversight, predatory behavior by governmental agencies that seek to fund themselves on court debts collected from indigent criminal defendants and the private companies that receive contracts from the government to do this work, becomes racketeering.   The widespread unchecked court-debt-collection practices detailed in the factual allegations below, without any of the fundamental legal protections required by state and federal law, has resulted in an extortion enterprise that is widespread and organized.

## FACTUAL ALLEGATIONS

### I.     Aberdeen Abuses Its Oversight of the Collection of Fines and Fees in Oklahoma Counties

48.     Aberdeen, Inc., a private, for-profit debt collection company, has engaged in a pattern and practice of threats, coercion, and exploitation that has inflicted enormous suffering on indigent people who have been assessed court debts in the district courts of 54 Oklahoma counties, including Plaintiffs and members of the putative classes.

24

49.     Numerous actors in Oklahoma's criminal legal system enable Aberdeen, Inc.'s extortionate activities.  Judges, court clerks, county sheriffs, and Aberdeen, Inc. routinely ignore constitutional and statutory requirements in a concerted effort to extract as much money as possible from indigent people.

50.     Aberdeen, Inc. takes control of debt collection for a specific case after a court clerk seeks, and a district court issues, a debt-collection arrest warrant against the individual owing debt, and a court clerk decides to transfer the case to Aberdeen, Inc.[10]  Court clerks automatically seek such arrest warrants based solely on nonpayment. Judges routinely issue such warrants when court clerks allege in unsworn statements that a person has not paid.[11]  In no case do Defendants provide any pre-deprivation process, inquiry into ability to pay, or sworn statements supporting the allegations of non-payment.

51.     Each of the 54 counties in which the Sheriff Defendants operate have contractually delegated to Aberdeen, Inc. the responsibility to collect court debts.  This includes delegating to Aberdeen, Inc. the authority to use its discretion to determine payment plans for the payment of court debts, monitor debtors' compliance with those plans, control when to request the recall of warrants, and determine when to request that new arrest warrants issue.

52.     Interviews with dozens of affected individuals and witnesses demonstrate the policies, practices, and procedures that characterize this scheme:  once Aberdeen, Inc. takes control of a debt-collection case, it engages in threats and extortion to extract as much money as possible from the debtor, without regard to the debtor's ability to pay or the person's need to obtain the basic necessities of life.

---

[10] In at least one county, the clerk of court sometimes transfers cases to Aberdeen, Inc. before a judge issues an arrest warrant.

[11] These debt-collection arrest warrants are frequently referred to as "failure to pay," or "FTP" warrants, or at times just "bench" warrants without further description.

### A. *The Contract Between the Sheriffs' Association and Aberdeen, Inc.*

53.    In 2003, Oklahoma enacted a law to allow government officials to outsource court debt collection to private companies.

54.    That law, amended in 2005 and 2010 to expand the scope of delegable powers and codified at Okla. Stat. tit. 19, §§ 514.4-514.5, now allows county sheriffs to enter into, and the Sheriffs' Association to administer, contracts with private entities who will "attempt to locate and notify persons of their outstanding misdemeanor or failure-to-pay warrants." *Id.* § 514.4(A).

55.    These contracts enable private debt-collection companies and the Sheriffs' Association to benefit from the money that the private companies collect from debtors. Under Okla. Stat. tit. 19, § 514.5(a), any time an arrest warrant is "referred" to the private entity, a 30-percent penalty surcharge is added. For example, if a debtor owed $1,000, as soon as the case is transferred to Aberdeen, Inc. for collection, the debtor immediately owes $1,300. Both the Sheriffs' Association and the private entity get paid from this 30-percent penalty surcharge. The surcharge, once collected, belongs to the Sheriffs' Association in the first instance, but a portion of the money collected may be allocated to the private entity as compensation. Okla. Stat. tit. 19, § 514.5(b). As a result, both the Sheriffs Association and the private entity have a direct financial interest in all of their debt-collection decisions and determinations.

56.    In 2010, the same year that the current law governing this outsourcing took effect, the Sheriffs' Association, acting as the agent of the Defendant Sheriffs, entered into a contract (the "Agreement") with Aberdeen, Inc.[12]

57.    Pursuant to the Agreement, the Sheriff and Court Clerk of each county have discretion to select cases to refer to Aberdeen, Inc.[13]  Aberdeen, Inc. is then responsible for

---

[12] Exhibit A, "Agreement for Collection".
[13] *Id.* at 3.

collecting payments from those debtors.[14]  Pursuant to the terms of the Agreement, a portion of the money collected from the debtor is remitted to the Court Clerk who referred the case, a portion is retained by the Sheriffs' Association, and a portion is paid to Aberdeen, Inc.[15]

58.      The contract allocates to the Court Clerk (with certain exceptions not relevant here) either the total amount of the court debt that the debtor owed when the debt-collection arrest warrant issued (*i.e.*, before the addition of the 30-percent penalty surcharge) or, if Aberdeen collects less than the total court debt owed, 77 percent of the amount collected.[16]

59.      Aberdeen, Inc. and the Sheriffs' Association then split the 30-percent surcharge or, if the company collects less than the full amount the debtor owes (i.e. the court debt plus the 30-percent surcharge), 23 percent of the payments collected.[17]  Although a lack of publicly available information makes it difficult to determine the exact division of these funds,[18] it is clear that the more Aberdeen, Inc. collects, the more it profits.  The Agreement contemplates collection of substantial amounts of money, as a separate payment structure takes effect once Aberdeen, Inc. collects $1,000,000.

60.      The Agreement requires government actors to assist in Aberdeen, Inc.'s collection efforts.  The Agreement guarantees Aberdeen, Inc. access to court files "utilized by the court clerks and judges of certain district courts of this state for case management and accounting purposes."[19] Each county sheriff's office and court clerk's office are to make "collective efforts" to obtain debtor information to provide to the Sheriffs' Association, which in turn must share "any debtor

---

[14] *Id.* at 4.
[15] *Id.* at 5-6.
[16] *Id.* at 6.
[17] *Id.* at 5.
[18] The provision of the Agreement addressing the division of funds is redacted from the only copy available to Plaintiffs.
[19] *Id.* at 3.

Case 4:17-cv-00606-TCK-JFJ   Document 212 Filed in USDC ND/OK on 09/21/18   Page 28 of 102

information that would be available to [the] Association for purposes of collecting the warrant" with Aberdeen, Inc.[20]

61.     In practice, the Defendants have given Aberdeen, Inc. even greater authority than the contract contemplates.  In at least one county, Aberdeen, Inc. not only has the ability to access and view the records in KellPro, the district court's internal record management system, but it also has authority to *edit* individual case files—that is, Aberdeen, Inc. exercises control over the permanent government records of criminal and traffic cases.

62.     Court clerks also delegate the function of determining when to seek a new arrest warrant for nonpayment to Aberdeen, Inc. after a case has been transferred to the company for collection.  In Tulsa County, the Tulsa Clerk has annotated case dockets in a way that shows collaboration with Aberdeen, Inc., including specifically warning: "DO NOT ISSUE WARRANT UNLESS CONTACTED BY ABERDEEN."   Aberdeen, Inc. has discretion to determine the amount of money a debtor must pay, the deadline for making the payment, and when to seek a warrant for nonpayment.  If a debtor does not pay the amount Aberdeen, Inc. requires by the deadline the company sets, then Aberdeen, Inc. contacts the court clerk to seek an arrest warrant for nonpayment of court debts.  Court clerks assist Aberdeen, Inc. in its efforts to seek arrest warrants by putting the company's requests before judges.

63.     When Aberdeen, Inc. seeks an arrest warrant, it does not swear under oath or affirmation to any factual allegations establishing probable cause.  It merely sends a message that contains an unsworn allegation that the debtor has not made payments.  Messages sent by Aberdeen, Inc. omit information that is material and relevant to the issuance of an arrest warrant,

---

[20] *Id.* at 7-8.

including that debtors are indigent, debtors' only source income is means-tested disability benefits, and debtors have offered to pay amounts less than what Aberdeen, Inc. has arbitrarily required.

64.     Judges are key to Aberdeen, Inc.'s collection efforts because they issue the debt-collection arrest warrants Aberdeen, Inc. seeks, even though the warrants are predicated on nothing more than Aberdeen, Inc.'s unsworn factual allegation that a debtor has not made payments.  There is no pre-deprivation notice or other formal process, no opportunity to be heard, and no hearing of any kind before a neutral arbiter before Aberdeen, Inc. seeks, and judges sign, debt-collection arrest warrants.

65.     The Sheriff Defendants are also key to Aberdeen, Inc.'s scheme, not only because they authorize the Sheriffs' Association to enter into the contract with Aberdeen, Inc., but also because the Sheriffs execute the illegal arrest warrants and detain debtors based solely on the unsworn allegations of nonpayment, even though they have knowledge of the company's policies and practices alleged in this lawsuit.  Sheriffs then keep debtors in jail cells if they are too poor to pay a fixed sum required for their release.[21]

**B.   *Aberdeen, Inc. Uses Threats, Material Omissions, and Unreasonable Demands to Coerce Payments from Indigent Defendants Throughout Oklahoma***

66.     To maximize its potential profit, Aberdeen, Inc. uses an ongoing scheme of threats, misrepresentations, material omissions, and manipulation of the legal system to coerce every possible dollar from debtors whose arrest warrants are assigned to Aberdeen, Inc., with no regard to the person's ability to pay or the hardship that their demands inflict on the person and her family. Aberdeen, Inc.'s practice of extorting payments through threats of unlawful arrest are widespread, commonly known, and flagrant.

---

[21] These allegations pertaining to detention do not apply to the Sheriffs in counties with jail trust authorities.  *See supra* note 6.

67.     Due to the actions of Aberdeen, Inc. and its employees, and the complicit participation of the judges, court clerks, cost administrators, and Defendant Sheriffs, indigent individuals become trapped in a cycle of mounting debts, arrest, and incarceration, in flagrant violation of their rights under the Constitutions of the United States and Oklahoma, federal civil and criminal law, and Oklahoma statutory law.

68.     As a matter of policy and practice, to coerce payments and increase profits, Aberdeen, Inc. promises to recall an active debt-collection arrest warrant if a debtor makes the payment the company demands, and threatens to issue a debt-collection arrest warrant if a debtor fails to make ongoing payments after a warrant has been recalled.

69.     Aberdeen, Inc. does not have the formal legal power to recall or issue arrest warrants by itself.  But Aberdeen, Inc. regularly explicitly misrepresents and implies by omission in communications with Plaintiffs and members of the proposed classes that it has that power (i.e., the power to control whether and when debtors are arrested).  Aberdeen, Inc. and its employees tell people with active arrest warrants that Aberdeen, Inc. can recall the arrest warrants if a certain amount is paid.  Similarly, Aberdeen, Inc. and its employees tell people who have had their arrest warrants recalled that if they fail to make continuing payments that the company itself has determined, Aberdeen, Inc. will secure new warrants for their arrest.

70.     Although these practices formally misrepresent the law, they are an accurate description of the de facto legal system put in place by the Agreement and by the racketeering enterprise.

71.     Even in those instances when Aberdeen, Inc. employees tell people who owe money that Aberdeen, Inc. can only seek the recall or issuance of an arrest warrant from the court, they regularly imply that the court will automatically follow their instructions.  Aberdeen, Inc. at

all times conveys the recall and issuance of arrest warrants as something within its own power.
People who are the subject of the arrest warrants are not advised of any rights they might have in
the process, including the right not to be incarcerated simply for being too poor to pay and the right
to procedures by which their ability to pay can be assessed.  The threat is explicit and systemic as
a matter of policy: pay Aberdeen, Inc. what it demands when it demands it, or be arrested and
jailed.

73.     Aberdeen, Inc. contacts people with arrest warrants, including Plaintiffs and
members of the proposed classes, by sending letters and making phone calls.  From the first letter,
the threatening nature of the relationship is clear.  Aberdeen, Inc. writes, "Please contact us to
make arrangements and avoid the service of any bench warrant."  Similarly, in its second letter,
Aberdeen, Inc. informs the recipient that, if contacted, "[Aberdeen, Inc.] will discuss options with
you that can allow you to make monthly payments on your balance and have your bench warrant(s)
recalled."

73.     During phone calls, Aberdeen, Inc. employees routinely state that the debtor will
be arrested if the debtor does not make sufficient payments and that the only way to remove an
active arrest warrant is to make a payment that Aberdeen, Inc. deems sufficient.

74.     Aberdeen, Inc. employees use several other specific means to convey the threat of
arrest in order to coerce payment.  For example, Aberdeen, Inc. employees are instructed to invoke
potential harm to people's children.  A sample company training script includes the following:

> Like I said I want to help you get this resolved.  I would not want
> you to get picked up on this warrant and not be there for your kids.

75.     On at least one call with a member of the proposed class, an Aberdeen, Inc.
employee passed the phone to a person who purported to be a law enforcement officer, who stated

that he would come and immediately arrest the debtor if the debtor did not pay enough money to Aberdeen, Inc.

76.     Aberdeen, Inc. also makes threats of arrest to, and collects money from, debtors and debtors' family members who live outside of Oklahoma.  Where Aberdeen, Inc. has contact information for a debtor's family member, or if a family member answers the debtor's phone, employees also threaten the family member with the debtor's arrest.

### C. *Aberdeen, Inc. Demands Unreasonably High Payments Without Regard for Ability to Pay*

77.     The only way for a person to get Aberdeen, Inc. to stop its threats, to request that a warrant be recalled, or to prevent the company from seeking an arrest warrant is to make a lump-sum payment in an amount predetermined by Aberdeen, Inc., and thereafter make ongoing payments on a "payment plan" determined by Aberdeen, Inc. at its discretion.

78.     When a debtor owes more than $500, Aberdeen, Inc.'s written policy is to require an initial payment of 40 percent of the total, followed by "reasonable" monthly payments. Aberdeen, Inc. employees and supervisors determine whether a payment is "reasonable."  To illustrate, the initial debts after a guilty plea on a misdemeanor charge of Driving Under the Influence typically total about $1,300.  If the person cannot pay the debts to the court clerk, the court clerk requests and the judge issues an arrest warrant, without constitutionally required pre-deprivation process.  When the court clerk refers the case to Aberdeen, Inc. because of the nonpayment, the 30-percent penalty surcharge increases the total debt to $1,690.  Before Aberdeen, Inc. will even consider recalling the warrant, the debtor must make a lump-sum payment of $664 and agree to a payment plan.  Impoverished individuals who are struggling to meet basic needs cannot afford the lump sum payments.

79.     Despite Aberdeen, Inc.'s policy to use its discretion to set "reasonable" payment plans before it seeks to have debtors arrested, the monthly payments it demands from indigent people are not individualized and do not account for a debtors' ability to meet the basic necessities of life.  Aberdeen, Inc. does not offer deferrals for people who have no income and no ability to pay, nor will it accept any options for resolution of debts other than payment.  Aberdeen, Inc. employees are trained not to accept monthly payment amounts below $50.

80.     Because Aberdeen, Inc. employees are required to send a request to have the warrant recalled any time it accepts payment, once Aberdeen, Inc. employees determine the amount the debtor must pay, the company will refuse to accept any payment less than that amount, even if the person cannot afford to make the full payment Aberdeen, Inc. demands. Aberdeen, Inc. refuses to accept lower payments as a matter of policy to exploit the threat of an arrest warrant to obtain as much money as possible. For example, if Aberdeen, Inc. demanded a $664 lump sum payment, but a person was only able to pay $200, Aberdeen, Inc. would refuse to accept the payment, and the person would not be able to make any payment on their debt or have their arrest warrant recalled.

### D.  *Aberdeen, Inc. Demands Payment From People Who It Knows are Indigent and Lack the Means to Pay*

81.     The Agreement ostensibly requires Aberdeen, Inc. and its employees to follow the law.  It requires that Aberdeen, Inc.:

> use its best efforts to collect any Debts associated with any Warrants referred to Aberdeen hereunder solely utilizing means which are legal, necessary and proper.  Aberdeen shall not harass or exert undue pressure on delinquent debtors or employ any procedure that would cast discredit upon the Association, the County Clerk(s), or otherwise subject the Association, the County Sheriff(s), and/or such Court Clerk(s) to public disapproval; and (ii) comply with all

> applicable federal, state, and local laws and regulations with regard
> to collection practices and procedures.[22]

Aberdeen, Inc. routinely and openly violates this provision of the Agreement, in the course of its daily activities, including engaging in activities that violate the Constitution and statutory law, with the full knowledge and informal agreement of the Association and the Defendant Sheriffs.

82.     Aberdeen, Inc. demands payment on threat of arrest from people who its employees know to be indigent, including those who were found indigent for the purposes of their previous case, those who tell Aberdeen, Inc. that they are destitute, and those whose only form of income is Supplemental Security Income (SSI) disability payments, Social Security Disability Insurance (SSDI), or other forms of means-tested government assistance.  The company does not inform people of—and, in fact, conceals—state and federal substantive and procedural rights in connection with debt-collection, such as that assets may be protected or that processes exist for debtors to vindicate their legal rights.  In its promotional materials, the company expressly states that "[t]ypically, [Aberdeen, Inc.] will put persons on disability or SSI on a minimum payment schedule of approximately $50 per month."   In its guidance to employees, Aberdeen, Inc. emphasizes the collection of money from indigent disabled people because of their steady stream of government income and provides a sample script for a conversation with a person receiving SSI disability benefits, in which it advises the employee to demand a $150 down payment, followed by monthly payments of $50 for a hypothetical outstanding balance of $680.  SSI disability payments provide income well below the federal poverty level, and the payments required by Aberdeen, Inc. are impossible for many indigent persons to make without risking irreparable harm to themselves, their families, and their children.

---

[22] Exhibit A, Agreement for Collection.

83.     Oklahoma law allows people who have had their debt-collection arrest warrants transferred to Aberdeen, Inc. to make payments directly to the courts instead of to Aberdeen, Inc. Paying Aberdeen, Inc. instead of the court is often detrimental to the payer because Aberdeen, Inc. usually demands larger payments.   Knowing this, Aberdeen, Inc. forbids its employees from informing people of their legal rights and actively attempts to prevent debtors from learning of these other lawful avenues of paying court debts.   The company includes in its guidelines the directive "You are to *NEVER* refer any defendant to call the court clerks." Aberdeen, Inc. and its employees falsely tell people that payment through Aberdeen, Inc. is the only option, and intentionally obscure the fact that payment directly to the court is an available, and almost always preferable, option for lifting a debt-collection arrest warrant.   As a result, many indigent individuals who have had their cases transferred to Aberdeen, Inc. are unaware that there are any other options.

84.     Even for those people who independently are able to determine that payments may be made directly to the court and set up a payment plan with the court, Aberdeen, Inc. will continue to call and threaten them, telling the debtor that Aberdeen, Inc. will seek an arrest warrant if they do not pay Aberdeen, Inc.

85.     If a person falls behind on payments to Aberdeen, Inc., its employees begin calling more frequently, and make additional threats to seek an arrest warrant until payment is made. Aberdeen, Inc. does not make any inquiry into whether or not the nonpayment was willful, nor does it inform indigent people that they have any option but to pay the amount demanded by Aberdeen, Inc.

86.     In fact, in Aberdeen, Inc.'s training materials, it expressly instructs its employees to "overcome" any objections to payment based on inability to pay, including the fact that a person cannot get a job or is on a fixed income.

87.     For those who have fallen behind on payments, Aberdeen, Inc. will demand an increase in the amount that must be paid to return to the previously established monthly payments. In a sample training script for employees, Aberdeen, Inc. instructs employees to warn debtors that, when an account is 60 days delinquent, the county could reissue a debt-collection arrest warrant if the debtor does not make a payment equivalent to the monthly payment plus half of the amount of missed payments.  These amounts and policies are determined by Aberdeen, Inc. at its discretion and are inconsistent with both Oklahoma and federal law.

> ### E.  *Aberdeen, Inc., the Courts, and the Sheriffs Collude to Arrest and Incarcerate Indigent Persons Who Do Not Pay Enough to Aberdeen, Inc.*

88.     If a person who has entered into a payment plan with Aberdeen, Inc. falls behind on payments and is not able to comply with Aberdeen, Inc.'s demands for additional money, Aberdeen, Inc. will seek a warrant for arrest.

89.     When Aberdeen, Inc. requests that a person be arrested, it sends a boilerplate application to the court clerk's office requesting that a warrant be issued.[23]  As a matter of policy and practice, Aberdeen, Inc. does not include information about indigence or ability to pay in its application seeking an arrest warrant, even when Aberdeen, Inc. has reason to know that the lack of payment was a result of inability to pay.

90.     As a matter of policy and practice, these arrest-warrant applications are not based on any factual allegations sworn by oath or affirmation.  They are simply the company's informal

---

[23] Warrant applications sent by Aberdeen, Inc. take the form of informal emails that only contain basic information about payment status.

requests to have a debtor arrested based solely on the debtor's nonpayment to Aberdeen, Inc. of an amount of money demanded by the company at its discretion, by a deadline also determined at its discretion.

91. As a matter of course, judges in numerous counties routinely issue debt-collection arrest warrants requested by Aberdeen, Inc.

92. Just as court clerks seek and judges issue initial arrest warrants without establishing that a debtor's nonpayment was willful, Aberdeen, Inc. seeks additional new arrest warrants without any inquiry into or knowledge of whether the person had the means to pay, and courts routinely issue those warrants. Often, both the company and the court know that the debtor who is the subject of the arrest warrant is indigent (for example, because the debtor was assigned a public defender on their underlying case).

93. No one—not Aberdeen, Inc., not court clerks, and not judges—gives notice to indigent debtors who fall behind on payments or provides debtors a meaningful opportunity to be heard regarding their ability to pay prior to arrest on the debt-collection arrest warrant (and Aberdeen, Inc. affirmatively misleads many debtors about the lack of alternative options). As a matter of policy and practice, once issued, Defendants almost never recall debt-collection arrest warrants unless payment is made.

94. As a result of these practices, indigent debtors who are unable to pay the amounts demanded by Aberdeen, Inc. live in perpetual fear of arrest, never knowing when they will be taken to jail simply because of their poverty.

95. The virtually automatic issuance of debt-collection arrest warrants for those who fall behind on payments violates the requirements of Rule 8.4 of the Oklahoma Court of Criminal Appeals, which requires a hearing on ability to pay prior to incarceration for nonpayment of court

debt, *see supra* ¶ 44.  Despite Rule 8.4's express procedural requirements, counties that contract with Aberdeen, Inc. routinely provide no hearing regarding nonpayment prior to issuance and execution of an arrest warrant, and Aberdeen, Inc. affirmatively attempts to prevent debtors from learning of these legal rights.  Aberdeen, Inc., the courts, and the Defendant Sheriffs collude to deprive the plaintiff class of their statutory and constitutional right to be heard on ability to pay prior to arrest.

96.     In all counties that make referrals to Aberdeen, Inc., the company's role does not end, or even diminish, once a person is arrested on a warrant requested by Aberdeen, Inc. Aberdeen, Inc. employees continue to call and threaten the person's family members, demanding payment and negotiating the amount required before Aberdeen, Inc. will ask that the person be released.  If Aberdeen, Inc. concludes that the debtor's family and friends have made an adequate payment, the company will ask a county official to release the debtor. As part of their ongoing scheme, the government Defendants abide by these requests, confirming Aberdeen, Inc.'s power to control whether a person is imprisoned.

97.     People arrested on debt-collection arrest warrants must pay to be released from custody before seeing a judge.  This is routinely described as a "bond," but does not function as that term is understood in American law.  As a matter of policy and practice, the money is not returned to the debtor upon appearance at any future court date (indeed, there are no further legal proceedings if the person makes payments to Aberdeen, Inc. that the company deems adequate). Instead, the cash payment is applied toward her court debt.  The amount required for release is either a standard predetermined amount or an amount tied to the amount of court debt owed, rather than to any legitimate justification for a "bond," such as an amount necessary to reasonably assure future court appearance.  As with payment to Aberdeen, Inc., an indigent arrestee who cannot

38

afford to pay the cash for release must wait in jail until a payment is made or until the Sheriff (or other county authority responsible for the jail) brings the person to court for a hearing.

98.   The Sheriffs who are responsible for jails keep debtors in jail for days, weeks, and—in some counties—several months if they are unable to afford the amount required for release.[24]

99.   Even when the jailing is for a period of days, debtors face serious consequences in addition to the irreparable harm of physical bodily confinement, including loss of employment and housing, and sometimes child custody, solely because they are too poor to pay the amount Aberdeen, Inc. demands for their release.

### F.   *Aberdeen, Inc.'s Predatory Behavior is Company Policy Established by Defendants Jim Shofner and Rob Shofner*

100.   Defendants Jim Shofner and Rob Shofner[25] ("the Shofners"), are supervising officers at Aberdeen, Inc., where they establish company policy and direct collection activities. The Shofners have personally instructed and trained Aberdeen, Inc. employees on how to obtain payment from debtors and what minimum payment amounts to demand.

101.   The Shofners routinely listen in during phone calls between Aberdeen, Inc. employees and debtors.  If one of the Shofners believes that a debt collector has not been effective or has been insufficiently aggressive in seeking payment, he will reprimand or fire the employee. Termination decisions are routinely made by the Shofners based on how much money employees are able to collect.

---

[24] Attorneys are rarely, if ever, provided to indigent people arrested on debt-collection arrest warrants.  Even after the debtor appears in court for legal proceedings, the person is regularly just returned to jail to "sit out" the debts without any inquiry into or findings concerning ability to pay or alternatives to jailing.  These routine constitutional violations enable Aberdeen, Inc. to credibly threaten prolonged periods of incarceration for non-payment to coerce increased debt payments that it shares with the Sheriffs' Association, and that fund the courts, judicial salaries, and retirement funds.

[25] Jim Shofner is Rob Shofner's father.

102.    Employees are also financially incentivized by the Shofners to extract as much money as possible from debtors without regard for their ability to pay.  As directed by the Shofners, the amount of Aberdeen, Inc. employees' compensation is affected by the amount of money they are able to collect.  Aberdeen, Inc. also stages competitions to see who can collect the most money, with the winner receiving a financial reward.

103.    The Shofners do not train or instruct employees on constitutional or statutory requirements that prevent debtors from being imprisoned for nonpayment unless the nonpayment was willful.  They affirmatively train employees to coerce payments without providing basic notice or information concerning federal and state legal rights.

### G.  *The Agreement's Lucrative Results*

104.    The arrangement between the Sheriffs' Association and Aberdeen, Inc. is a financial boon to both organizations.

105.    In 2016, the Sheriffs' Association made over $829,075 from its warrant collection program, and the Association held $3,311,433 in assets.  By contrast, in 2009, before the Association's arrangement with Aberdeen, Inc. was in place, the Sheriffs' Association had only $52,754 in total assets.

106.    From 2009 to 2015, Association funds expended on "conferences, conventions, and meetings" increased from $34,070 to $79,992.  Money spent on "advertising and promotion" grew from a meager $189 to $128,630.

107.    The Agreement has also been wildly profitable for Aberdeen, Inc., which has no other revenue source.  Aberdeen, Inc. began as a four-employee company with approximately $100,000 a month in revenue.  Through the Agreement with the Sheriffs' Association, Aberdeen, Inc. grew to 45 employees with approximately $1.2 million a month in revenue.  Although the

scheme is profitable for Aberdeen, Inc. and the Sheriffs' Association, the benefit to the public is nonexistent.  Despite growing caseloads and new or increased fees, the amount of criminal court debt collected by the state has actually decreased since 2003.[26]

## II.   Improper Incentives and Constitutional Violations Pervade the Administration of Fines and Fees in the Courts

108.   The collection of court debts in many of the 54 counties in which Defendant Sheriffs are located violates debtors' rights before a collection case is ever transferred to Aberdeen, Inc., and the violations continue once the for-profit company becomes involved.

109.   The Tulsa County Judges, the Tulsa Clerk, and the Tulsa Cost Administrator assess fines and fees and set initial payment plans in Tulsa County.  In Rogers County, the Rogers County Judge and Rogers Clerk share these responsibilities. These Defendants impose court debt and set the terms of payment with improper financial incentives to generate and maximize revenue; seek and issue debt-collection arrest warrants without inquiry into ability to pay; and jail debtors solely because they are too poor to pay the amounts demanded.

### A.  *Improper Financial Incentives in Tulsa and Rogers Counties*

110.   Tulsa and Rogers Counties illustrate the flaws with Oklahoma's use of arrests and jailing to collect court debts.

111.   Defendants Tulsa County Judges and Rogers County Judge ("Defendant Judges"), as well as Defendants Tulsa Clerk, the Tulsa County Cost Administrator, and Rogers Clerk ("Defendant Clerks") (together, "Court Defendants") depend on court debt to fund a number of necessary operations in their courthouses.

---

[26] *See* Ryan Gentzler, *The Cost Trap: How Excessive Fees Lock Oklahomans Into the Criminal Justice System Without Boosting State Revenue*, Okla. Pol. Inst., at 11–17 (2017), *available at* https://okpolicy.org/wp-content/uploads/The-Cost-Trap-How-Excessive-Fees-Lock-Oklahomans-Into-the-Criminal-Justice-System-without-Boosting-State-Revenue-updated.pdf [hereinafter *The Cost Trap*].

112.     Numerous fines and fees that the Defendant Clerks collect in criminal and traffic cases are deposited into each county's "Court Fund."  The Court Fund is used to pay for many expenses, without which Court Defendants' duties would not be possible.  Expenses covered by the Court Fund include compensation of bailiffs, juror fees, witness fees, office supplies, renovation and maintenance of courtrooms and judges' chambers, judicial robes, transcripts, utility bills, training for court staff, and indigent defense services.  *See* Okla. Stat. tit. 20, § 1394(B).  Additionally, Court Fund money is used to pay some employees' salaries.  For example, from July through September 2017 (the first quarter of fiscal year 2018), the Rogers County Clerk of Court's office collected $304,396.07 in court debt in criminal and traffic cases, accounting for 62 percent of the money in the Rogers County Court Fund.  In that same quarter, Rogers County spent $79,967.21 in Court Fund revenue to pay employees of the Clerk's Office.  During that same period, the Tulsa County Clerk of Court collected $1,438,766.32 in criminal and traffic cases, accounting for 47 percent of the money in the Tulsa County Court Fund.

113.     Pursuant to statute, expenditures of Court Fund money are determined by a Governing Board consisting of, in each county, one district judge, one associate district judge, and the Defendant Clerk. *See* Okla. Stat. tit. 20, § 20-1302.

114.     Both courts and Defendant Clerks' offices also receive additional money from court debts through their Court Clerk's Revolving Fund and District Court Revolving Fund. Although the Defendant Clerks initially collect all fees (with exceptions not relevant here), certain fees are earmarked for other agencies, instead of being deposited into the Court Fund.  At the time the Defendant Clerks remit those fees to the other agencies, they retain (again, with certain exceptions not relevant here) 10 percent for the Court Clerk's Revolving Fund and 15 percent for the District Court Revolving Fund.  Defendant Clerks rely on the money in their respective Court Clerk's

42

Revolving Funds to pay for the operation of their offices.  Expenditures from the Court Clerk's Revolving fund in each county must be approved by the Defendant Clerk and either a district judge or an associate judge.  In fiscal year 2017, the Rogers Clerk used $86,576.06 from this fund, on court operations, including salaries.

115.    In addition, salaries and retirement benefits of the Defendant Judges and certain members of their staff depend in large part on the money Defendants collect from debtors. Any surplus in a Court Fund must be remitted to the State Judicial Revolving Fund.  The money in that Fund is then used to pay salaries and retirement benefits for judges, court reporters, and secretary-bailiffs.  In fiscal year 2017, the State Judicial Revolving Fund spent $34,336,861 on salaries and $5,186,700 on contributions to the State of Oklahoma Uniform Retirement System for Justices and Judges.  By contrast, only $6,762,504 in general revenue funding (*i.e.*, tax revenue) was used on judicial and court personnel salaries and only $17 was contributed to the judges' retirement accounts.  Without the money from court debt, there would be woefully insufficient funding for judges' salaries and retirements.

### B.   *Practices in Tulsa and Rogers Counties*

116.    It is against this backdrop of misaligned incentives—where there is a substantial risk that a desire to maximize revenue will overcome the need to do justice—that Defendants collect court debts.

### i.   Tulsa County

117.    In Tulsa County, every time a defendant enters a guilty plea to a criminal offense, the judge is required to sign a "Rule 8" form.  The form purports to outline certain fines and fees for each count.  However, the form does not include a number of "costs."  These extra debts are later charged to the defendant outside of the legal proceedings by the Cost Administrator and Court

43

Clerk.  There are a large number of different costs, including those imposed for vindication of constitutional rights like appearing in court, having an interpreter, or requesting a jury trial.[27]

118.     After entry of the guilty plea in court, or upon release from incarceration following a prison sentence, the debtor is instructed to go to the Cost Administrator, a division of the Tulsa Clerk's office, to make payment or set up a payment plan.  Per policy established by the Tulsa Clerk, the Tulsa Cost Administrator presents the following choices: either pay the full amount by the end of the probation period (if a probationary term is imposed), or make minimum payments to the court every month.  Minimum payments are typically $50 or $75—and never below $25 per month—regardless of the debtor's ability to pay or whether the debtor depends on government assistance to survive.  For debtors living in poverty, this is a practical impossibility. The Tulsa County Judges, the Tulsa Clerk, and the Tulsa Cost Administrator provide no options for alternatives to payment when fines and fees are imposed, nor do they make a meaningful inquiry into, or make findings concerning, ability to pay. The practice of demanding that debtors use government assistance to pay debts conflicts with multiple judicial rulings declaring such conduct illegal, and conflicts with federal law.  *See, e.g.*, *In re Lampart*, 856 N.W. 2d 192 (Mich. Ct. App. 2014); *State v. Eaton*, 99 P.3d 661 (Mont. 2004); 42 U.S.C. § 407 (exempting federal benefits from attachment, garnishment or other legal collection processes, with certain exceptions not relevant here).

---

[27] At the time of initially assessing fines, Defendant Tulsa County Judges will routinely check the box "able to pay" on the Rule 8 form even though they know that they have made no inquiry into that question.  At times, no box will be checked by the judge, but the presumption is always the same—that the defendant will have to pay.  This procedure of imposing fines and fees without regard to a defendant's poverty violates the clear directives of the Rules of the Oklahoma Court of Criminal Appeals, as stated in ¶ 44 above.  Tulsa County Judges ignore these directives as a matter of course. If a person's public defender represents to the court that her client is indigent and requests a hearing or for deferral of fines and costs, the Tulsa County Judges typically deny the request or assert that they have no authority to grant the request.

119.    If a debtor tells the Tulsa Cost Administrator that she cannot pay any amount, the Cost Administrator informs the debtor that she must pay nevertheless.

120.    If a debtor does not make a payment during the first six months of the payment period, the Tulsa Cost Administrator's office, pursuant to policy established by the Tulsa Clerk, seeks a debt-collection arrest warrant based solely on the nonpayment, which as a matter of course is signed by Defendant Judge Moody.  The application for this warrant is not based on any factual allegations supported by oath or affirmation, and no pre-deprivation legal process is provided.  As a matter of policy and practice, no information concerning the debtor's indigence is included, even when the debtor had informed the Cost Administrator that the debtor is unable to pay.

121.    For active debt-collection cases, if the debtor makes a payment during the initial six-month period, employees of the Tulsa Cost Administrator's office, pursuant to policy established by the Tulsa Clerk, will then begin conducting annual reviews.  Once the annual review process begins, the Tulsa Cost Administrator's office will seek an arrest warrant if the debtor makes no payment for twelve months.  No notice or opportunity to be heard is provided to the debtor before or after Judge Moody signs and issues the warrant.

122.    Once Judge Moody issues the arrest warrant sought by the Cost Administrator, the Tulsa Clerk's and Cost Administrator's offices typically require a $250 payment to recall the warrant.  However, as a matter of practice, Tulsa Clerk employees will informally negotiate the price of recalling the arrest warrant with debtors who personally come to the office.  Regardless of the reasons for nonpayment, debt-collection arrest warrants are not recalled without some amount of payment.

123.    Though the indigent debtor may have been unable to pay because of poverty, the Tulsa Clerk adds an $80 fee to the individual's court debts as the purported "cost" of the arrest

warrant.  If a debtor has multiple cases, the Tulsa Clerk adds the $80 fee to each case.  This is true even if, for example, two tickets issued during a single traffic stop are filed under two separate case numbers.  The Tulsa Clerk and Cost Administrator seek, and Tulsa County Judges issue, arrest warrants without any inquiry into ability to pay and often in the face of evidence—such as the fact that the debtor was designated indigent and assigned a public defender—that the debtor lacks the ability to pay.

124.    After the filing of this lawsuit, Tulsa County stopped using Aberdeen, Inc.'s services for collection of Tulsa County court debt.  The subsequent allegations reflect practices throughout the time period preceding the filing of the First Amended Complaint.

125.    If no payments have been made within 30 days after the issuance of a debt-collection arrest warrant, the Clerk and Cost Administrator exercise their discretion under the Agreement to transfer the case to Aberdeen, Inc.  The Tulsa Clerk's office then adds the 30-percent penalty surcharge to the debt because of the transfer.

126.    Once Aberdeen, Inc. has received the case, it conducts the extortionate activities described above in Sections I.B-E.  If debtors make an initial lump sum payment to Aberdeen, Inc. and enter into a payment plan, Aberdeen, Inc. will contact the Tulsa Clerk with a request to recall the warrant, which the Tulsa Clerk will do automatically.  If a debtor misses a sufficient number of payments after a warrant has been recalled, Aberdeen, Inc. will contact the Tulsa Clerk's office with a request that a debt-collection arrest warrant be re-issued.  As a matter of course, the Tulsa Clerk and Cost Administrator assist in seeking warrants by putting Aberdeen, Inc.'s requests before the judge.  As a matter of course, the Tulsa County Judges routinely issue debt-collection arrest warrants in response to Aberdeen, Inc.'s requests.  The Tulsa County Judges' actions accordingly make Aberdeen, Inc.'s threats to debtors to coerce payments credible.

127.     The system is set up to fail, and it does.  From 2008 to 2015, 43.5 percent of felony and misdemeanor cases arising in Tulsa County District Court resulted in the issuance of a debt-collection arrest warrant (and, as a result, transfer to Aberdeen, Inc. for collection).[28] As of February 2017, there were over 22,000 active debt-collection arrest warrants issued from the Tulsa County District Court.

128.     In Tulsa County, indigent people arrested on debt-collection arrest warrants are routinely taken to the county jail operated by the Tulsa Sheriff.[29]  The Tulsa Sheriff will not release these arrestees unless they pay the required $250.  This money is not a "bond" that is even ostensibly intended to secure any future court appearance: if it is paid, it is applied to the debt, and the person never gets it back.

129.     The Tulsa Sheriff imprisons those who cannot pay.  They remain in jail until the Tulsa Sheriff brings the person to see a judge at the next in-custody "cost docket," which occurs only on Tuesdays and Fridays.  People arrested on debt-collection warrants are not appointed counsel.  Instead, those who cannot pay the price of release simply wait until the next cost docket, potentially as long as four days (and longer if there is a holiday).

130.     The "cost docket" hearing consists of an uncounseled conversation between the debtor, who appears via video link from jail, and Defendant Judge Moody.  After the hearing, Judge Moody will, as a matter of course, release indigent debtors without further payment (unless they have other unrelated warrants) and set a review date for them to return to court.

---

[28] Ryan Gentzler, *Oklahoma's Debtors' Prisons Aren't Just a Nuisance—They're an Epidemic*, Okla. Pol. Inst. (Jan. 30, 2018), https://okpolicy.org/oklahomas-debtors-prisons-arent-just-nuisance-theyre-epidemic/.
[29] Arrests based solely on nonpayment continue in spite of the Tulsa Defendants' knowledge of the wrongfulness of the practice.  A Steering Committee on which Defendants Drummond and Musseman sat recommended ceasing arrests based solely on debt-collection arrest warrants.  The recommendation was not implemented, and the arrests continue.

131.    That these individuals are released as a matter of course after seeing Judge Moody further demonstrates that there is no conceivable, let alone compelling, government interest in their wealth-based detention and reveals that their detention for up to four days was intended to pressure them to pay court debts.

132.    After release, the cycle of debt, threats, arrest, and incarceration resumes.

### ii.  Rogers County

133.    As in Tulsa County, criminal defendants in Rogers County are given only partial information about the fines and fees they owe by the Rogers County Judge at the time of plea and sentencing (which occur simultaneously).  Numerous fees, labeled "costs," are not added until the defendant reports to the Rogers Clerk's office after she has been sentenced.[30]

134.    After leaving the courtroom or being released from incarceration after any term of imprisonment imposed, the debtor must report to the Rogers Clerk's office to set up a payment plan.  The Rogers Clerk's office conducts no meaningful inquiry into ability to pay before setting a plan.  The Rogers Clerk regularly sets a minimum payment of $75 per month.

135.    Debtors are provided a boilerplate form that informs them that they must report to the Rogers Clerk's office on the date payment is due, if they are unable to pay.  If a debtor so reports, she must explain to a Clerk's office employee why she is unable to pay and provide any associated documentation to receive an extension of time to pay or a reduced payment plan. Although the Clerk's office may allow a limited number of extensions, the Clerk will not waive or reduce court debts as a matter of policy.

---

[30] Contrary to Oklahoma law, the Rogers County Judge does not hold a hearing or make any inquiry into ability to pay when assessing these fines and uncalculated fees. Nonetheless, the Rogers County Judge routinely checks the box on the "Rule 8 form" that indicates that the defendant is able to pay.

136.    After three months of nonpayment, or if the debtor seeks too many extensions of time to pay (as determined at the discretion of the Rogers Clerk), the Rogers Clerk submits a boilerplate, bare-bones debt-collection arrest warrant application to a Rogers County Judge, who signs it as a matter of course.  Other than the amount of money owed and nonpayment, no other information is provided by the Rogers Clerk to the Rogers County Judge, and no notice or opportunity to be heard is provided to the debtor.  None of the information is provided under oath or affirmation.

137.    The Rogers Clerk routinely seeks debt-collection arrest warrants in the face of evidence—such as the fact that the debtor was designated indigent and assigned a public defender—that the debtor lacks the ability to pay.  The Rogers County Judge routinely issues warrants based on the Rogers Clerk's misleading applications.  The automatic $80 warrant fee is then added—in each case in which a warrant issues—and the Rogers Clerk uses its discretion to transfer the case to Aberdeen, Inc. for collection.  The Clerk adds an additional 30 percent penalty surcharge to the total debt owed because of the transfer.

138.    Once a case has been transferred to Aberdeen, Inc., it begins the extortionate collection activities described above in Section I.B-E.  Aberdeen, Inc. sends boilerplate requests to the Rogers Clerk when it seeks to recall or issue a debt-collection arrest warrant.  As a matter of course, the Rogers Clerk assists Aberdeen, Inc. in seeking warrants by putting Aberdeen, Inc.'s requests before the judge.  As a matter of course, the Rogers County Judge recalls and issues debt-collection arrest warrants at the direction of Aberdeen, Inc., which is assisted by the Rogers Clerk, even though these requests lack any pre-deprivation process or sworn statements establishing probable cause.

139.     Once a debtor is arrested on a debt-collection arrest warrant, she is brought to the County Jail, operated by the Rogers Sheriff.  To get out, the arrestee is required to pay the total amount of court debts owed.  As in Tulsa County, the predetermined payment does not function as a bond or bail amount, and it will not be returned.  It is simply a cash payment to be applied to the amount owed by the debtor.  As a result, the Rogers Sheriff releases those wealthy enough to pay, but detains in the jail those who are too poor to pay.

140.     Imprisoned debtors who are too poor to pay remain in jail until a hearing occurs at the next "arraignment" setting, which occurs every weekday other than Wednesday. At the hearing, the debtor has a cursory uncounseled conversation with either Defendant Rogers County Judge or another judge (at one arraignment setting per week), depending on who is presiding that day.  Defendant Rogers County Judge will ask the debtor if she can pay $100 and order those who are too poor to pay $100 to "sit it out" in jail at a rate of $25 per day. The continued detention is designed to coerce payment from the arrestee's family and friends.  These illegal policies enable Aberdeen, Inc. to credibly threaten Rogers County arrestees with extended detention pursuant to debt-collection arrest warrants in order to coerce increased payments that benefit each of the Defendants.

141.     In both Tulsa and Rogers Counties, as well as many other counties across Oklahoma, judges, clerks, sheriffs, and other actors in the criminal legal system spend a large amount of their time and resources assigning court debts, collecting money, administering payment plans, and imprisoning debtors for nonpayment.  The district courts' intended purposes of adjudicating justice and preserving constitutional safeguards have been subordinated to the need to collect money to fund their own salaries and work activities and by their agreement to empower a financially interested for-profit actor to maximize revenue collection.

### III.    Oklahoma Funds Public Services Through Criminal Fines and Fees

142.    The shift from courts of justice to courts of debt collection has occurred in conjunction with, and exacerbated, an escalating expansion of Oklahoma's criminal legal system. Massively inflated court debt and associated cycles of arrest have kept impoverished Oklahomans from extricating themselves from the criminal legal system, and contributed to Oklahoma's skyrocketing incarceration rate, now second among all States.  Oklahoma is predicted to have the highest rate of incarceration in the country by later this year.[31]

143.    The increased pressure has created a negative feedback loop, in which more cases and imprisoned people place larger financial burdens on the criminal legal system, which then must seek new ways to fund its activities in the absence of increased tax revenue.

144.    The primary mechanism used to generate funding is the subject of this lawsuit: a systematic shift of the burden of revenue raising to people convicted of crimes and traffic offenses through the assessment of new and increasing fees and costs (the amounts charged to defendants purportedly to account for the cost of administering their cases) and, in some cases, increasing fines (the penalties imposed for violating the law).

145.    Fines and fees now fund a litany of government programs.

146.    As discussed above, fines and fees pay for numerous court expenses, including security, drug court, mailing materials, court reporters, transcripts, courthouse maintenance, furniture, general supplies, and maintenance of the court's information database.  They also personally benefit judges, court clerks, and other court employees by contributing to their salaries and retirement.

---

[31] *Louisiana's Criminal Justice Reforms Will Reduce Its Prison Population*, Economist (July 6, 2017), https://www.economist.com/blogs/democracyinamerica/2017/07/right-and-just.

147. Fines and fees also directly benefit the enforcement actors who make decisions in criminal and debt-collection cases, including money assessed directly to fund Sheriffs and prosecutors, as well as fees for the clerks performing administrative collection enforcement functions.

148. Fines and fees also fund numerous ancillary programs, including programs that bear little or no connection to the court system, such as the Trauma Care Revolving Fund, which is used to reimburse hospitals for the provision of uncompensated emergency services.

149. The vast majority of the fines and fees assessed are either new or have been increased since 1992. The following comparison of the debts imposed for a conviction for driving 16 miles over the speed limit[32] illustrates how old fees have been inflated and new ones have been added over the last quarter century:

|  | **1992** | **2016** |
|---|---|---|
| Fine | $30 | $35 |
| Court Costs | $49 | $88 |
| CLEET Penalty Assessment | $4 | $9 |
| Law Library | $3 | $6 |
| Automated Fingerprint Identification System | $3 | $5 |
| Sheriff's Fees | $5 | $5 |
| Clerk's Fees | $13 | -- |
| Oklahoma Court Information System | -- | $25 |
| Department of Public Safety Patrol Vehicle Fund | -- | $20 |
| District Attorney Council Prosecution Assessment | -- | $20 |
| Trauma Care Assistance Fund | -- | $10 |
| Sheriff's Fee for Courthouse Security | -- | $10 |
| Forensic Science Improvement Assessment | -- | $5 |
| Court Clerk Administrative Fee on Collections | -- | $8.50 |
| Child Abuse Multidisciplinary Account | -- | $3 |
| Attorney General Victim Services unit | -- | $3 |

---

[32] For the purposes of collection of fines and fees, moving traffic violations are combined with criminal offenses under Oklahoma law. *See* Okla Stat. tit. 28, § 153 ("The clerks of courts shall collect as costs in every criminal case . . . except for standing and parking violations and for charges otherwise provided for by law.").

| District Court Administrative Fee | -- | $12.75 |
|---|---|---|
| Total | $107.00 | $265.25 |

150.     These assessments are not limited to traffic offenses.  A misdemeanor DUI in 2016 came with $1,328 in court fees—up from $407 in 1992, despite no increase in the underlying $200 fine.[33]

151.     The fees for defendants who are incarcerated in county jails or sentenced to supervision are even steeper.  In most Oklahoma counties, defendants must pay a fee for each day they are incarcerated in the county jail.  In Oklahoma County, for instance, presumptively innocent arrestees, jailed court debtors, and those serving shorter sentences in local jails are charged $32 per day (ironically, many of these people are in jail only because they are too poor to pay the amount of money required for their release).[34]

152.     Anything more than the briefest periods of detention can result in insurmountable debt that will be owed in perpetuity.  Because debtors cannot pay these large amounts, once released from custody, many debtors are forced to pay monthly "supervision fees" of $40 to the District Attorney's Office or the Department of Corrections—or more, if community service hours are required by the sentence.  Despite the name, "supervision fees" to the District Attorney's Office are typically not associated with any type of actual supervision by that Office.

153.     People charged with crimes who are too poor to hire their own lawyer—*i.e.*, members of the proposed classes in this case—must also pay for the lawyer appointed under Oklahoma's Indigent Defense Act.  Every applicant must pay $40 to apply for a court-appointed lawyer, and may thereafter be required to pay as much as $1,000 for their representation if the case

---

[33] *See The Cost Trap*, *supra* note 22 at 3-5 (2017).
[34] The $32 charge is as of February 2017.  Oklahoma County recently hired Florida-based MGT of America Consulting LLC to perform an analysis of the county jail and to recommend a new daily fee.  Oklahoma County will pay up to $20,000 for the analysis.

is a felony that proceeds to jury trial. The cycle of poverty, jailing, suspension of licenses, and related disruption of employment and family relationships means that the increased attempt to extract fines and fees has been self-defeating on its own terms. A study of the fines and fees collected in nine counties from 2003 to 2015 revealed that, despite the growing number and amount of these assessments, more money was collected in 2003 ($14.55 million) than in 2015 ($14.27 million), without any consideration of the significant increases in enforcement costs. And the totals for the intervening years show that the amount collected has, in effect, plateaued, as $15.5 million was collected in 2006, $14.35 million in 2009, and $14 million in 2012.

154.    The contract with Aberdeen, Inc. and the extortionate enterprise it perpetuates are products of these increasingly desperate attempts to fund an unnecessarily bloated criminal legal system. Because of systemic and personal pressures, the governmental Defendants have allowed Aberdeen, Inc.'s unlawful activities to continue, and, as a result, Plaintiffs and members of the putative classes have suffered serious, persistent, and ongoing harms.

### INJURY TO THE NAMED PLAINTIFFS

155.    Plaintiff Carly Graff is a 40-year-old resident of Claremore, in Rogers County, where she lives with her two children, ages 6 and 10, and her boyfriend.

156.    Ms. Graff is indigent. She has no job, and she depends on food stamps to support herself and her children. But what little she has is not enough. She often struggles to afford the basic necessities of life, including food, medicine, and clothing. Her refrigerator is often empty, she is at risk of falling behind on rent, and she is regularly past due on her utilities bills to such an extent that she fears her electricity will be cut off.

157.    In May 2017, Ms. Graff was pulled over and ticketed for failing to properly use a car seat.[35]

158.    Ms. Graff was assessed over $250 for the ticket, an unattainable amount in light of her poverty.  Solely because she had not paid, the Rogers Clerk sought, and the Rogers County Judge issued, a debt-collection arrest warrant against her on October 18, 2017.  The associated arrest warrant fee added $80 in fees to her total.  The same day, the Rogers Clerk made the decision to transfer her debts to Aberdeen, Inc. for collection, adding the 30-percent penalty surcharge of $100.58.  Neither the Rogers County Judge nor the Rogers Clerk provided Ms. Graff with notice before the Clerk sought and the Rogers County Judge issued the arrest warrant.  The application for the arrest warrant did not contain sworn statements supporting any factual claim in the application and does not even contain unsworn assertions that would provide probable cause.

159.    Ms. Graff has received four letters from Aberdeen, Inc. demanding payment and telling her that she may be arrested if she does not pay the company.

160.    Ms. Graff cannot live a normal life because of the arrest warrant.  She only leaves her home to take her children to their school bus stop.  Otherwise, she remains at home for fear of being arrested.

161.    Plaintiff Randy Frazier is a veteran and a 59-year-old resident of Tulsa, where he lives with his wife of 40 years.

162.    Mr. Frazier is indigent.  In November 2015, Mr. Frazier had a mini-stroke that limited his mobility and feeling.  He has been unable to work since his mini-stroke, and he now receives Social Security disability payments.  Even before his mini-stroke, Mr. Frazier had difficulty finding work: he could only secure odd jobs and struggled to make ends meet.

---

[35] Because her daughter has eating issues, Ms. Graff had put her car seat in the front seat.

163.     Mr. Frazier depends on his wife to fulfill basic tasks.  She drives him when he needs to travel, performs basic chores on his behalf, monitors his medication, and arranges his appointments.

164.     Mr. Frazier has multiple cases in which he has been unable to pay his court debt because of his poverty.  In January 2017, the Cost Administrator and Tulsa Clerk sought and a Tulsa County Special Judge issued debt-collection arrest warrants in each case and assessed a separate $80 warrant fee for each of the cases.  The Tulsa Clerk and Tulsa Cost Administrator then decided to transfer the case to Aberdeen, Inc. and assessed a 30-percent penalty.  Mr. Frazier now owes more than $10,000.

165.     Mr. Frazier cannot afford to pay Aberdeen, Inc. the amounts it has demanded.  At one point, Aberdeen, Inc. demanded that Mr. Frazier pay $250 to have the arrest warrant recalled. After explaining that he did not have $250, Mr. Frazier offered to pay $125 in two consecutive months.  Aberdeen, Inc. refused and informed him that it would leave the arrest warrant in place.

166.     Mr. Frazier informed Aberdeen, Inc. of his medical issues, but Aberdeen, Inc. continued to demand payment and threaten arrest.

167.     Aberdeen, Inc. contacted Mr. Frazier's daughter, telling her that if money was not paid on her father's case, he would be arrested.

168.     Aberdeen, Inc. has also sent letters to Mr. Frazier that demand payment and tell him that he may be arrested if he does not pay.

169.     Plaintiff David Smith is a 32-year-old resident of Tulsa, Oklahoma.  He lives with his girlfriend and her three children.  He also has a son from a previous relationship.

170.     Mr. Smith is indigent.  He currently earns approximately $1,200 a month, though the amount fluctuates because his work as a landscaper is seasonal.  Mr. Smith uses this money to

support himself, to help support his girlfriend and her children, and to pay child support to assist his own son.

171.    Mr. Smith owes court debt in two cases.  When he was first released from prison, Aberdeen, Inc. demanded $100 in monthly payments notwithstanding that Mr. Smith informed it that he had just been released from prison and had no money.

172.    After finding work, Mr. Smith began making monthly payments.  When he lost his job and missed payments, Aberdeen, Inc. began threatening him that he would be arrested if he did not pay.

173.    Once he could find the money, out of fear of arrest, Mr. Smith began paying Aberdeen, Inc. again, sometimes instead of obtaining basic necessities.  Within the past year, Mr. Smith was coerced by threats of arrest to pay money to Aberdeen, Inc. that he otherwise would have paid in child support.  This caused him to be denied visitation with his son.

174.    Mr. Smith has experienced stress and anxiety because of Aberdeen, Inc.'s threats of arrest.  He fears for himself and for his family, which he worries will not be able to support itself if he is in jail.

175.    Mr. Smith has asked Aberdeen, Inc. if he can pay the Tulsa District Court directly, and Aberdeen, Inc. has informed him that he cannot and must pay Aberdeen, Inc.  Last year, Aberdeen, Inc. stopped sending receipts of Mr. Smith's payments, contrary to his requests.  Mr. Smith has asked for an accounting of what he owes, but Aberdeen, Inc. has refused.

176.    Plaintiff Linda Meachum is a 58-year-old resident of Tulsa, Oklahoma.

177.    Ms. Meachum is indigent.  Her only income is $194 per month in food stamps and $50 per month for helping an elderly neighbor with laundry and cooking.  She is unable to do more rigorous work because of medical problems resulting from being a survivor of domestic violence.

178. In 2012, the Tulsa Clerk decided to transfer the court debt from Ms. Meachum's 2007 Tulsa County shoplifting conviction to Aberdeen, Inc. for collection. When Ms. Meachum was unable to pay, Aberdeen, Inc. sought a debt-collection arrest warrant, the Tulsa Clerk and Cost Administrator assisted in seeking the warrant by processing the request, and a judge issued the warrant without inquiry into the reasons for nonpayment.

179. In 2014, Ms. Meachum was arrested and charged with possession of a controlled substance and traffic violations, and was forced to pay an additional $200 to be released because of the debt-collection arrest warrant from her previous case.

180. Ms. Meachum has no money to pay Aberdeen, Inc., and fears that she will be arrested for nonpayment of court debt.

181. Plaintiff Kendallia Killman is a 48-year-old resident of Norman, Oklahoma.

182. Ms. Killman is indigent. Ms. Killman's only income is a monthly disability benefit of $543 that she receives as the caretaker of her intellectually disabled adult son, which she uses to provide him basic necessities.

183. In 2009, the Cleveland County district court imposed fines and fees against Ms. Killman for two misdemeanor charges. In 2015, the court clerk decided to transfer the case to Aberdeen, Inc. for collection.

184. Because of her poverty, Ms. Killman has been and still is unable to pay her court debt. Ms. Killman was arrested twice as a result of warrants issued related to her court debt.[36] Aberdeen, Inc. has demanded a lump sum payment of $1,000 to recall her warrants. Despite the fact that Ms. Killman has repeatedly informed the company that she does not have any income of her own, Aberdeen, Inc. employees continued to threaten her that she would be jailed if she did

---

[36] Although the warrants purport to be for failure to attend court dates regarding payment of court debt, Ms. Killman never received actual notice of those court dates and not was validly summoned to court.

not pay.  The latest warrant was sought by Aberdeen, Inc. and issued by the court in August, 2017.[37]

185.    Ms. Killman cannot afford to pay Aberdeen, Inc. to have her warrant recalled, and lives in constant fear that she will be arrested and there will be nobody to care for her son, who will not be able to care for himself if she is arrested without warning.

186.    Plaintiff Christopher Choate is a 40-year-old resident of Tulsa, Oklahoma.

187.    Mr. Choate is indigent.  His only form of steady income is federal disability benefits, which will soon be reduced from approximately $800 per month to $588 per month.

188.    Mr. Choate uses his disability money to support himself, to help support his wife and her 15-month-old grandson, and to pay child support.

189.    Mr. Choate owes court debt on a Tulsa County criminal conviction from 2007.  He has been making payments toward his court debt since he was released from prison in 2009. Because of his limited income, he has struggled to pay.

190.    Tulsa County issued a first debt-collection arrest warrant in 2012, which he was able to pay to have recalled, and another in June 2014 when he fell behind on payments, after which the Tulsa Clerk decided to transfer his case to Aberdeen, Inc. for collection and added a 30-percent penalty surcharge.  He was arrested on the warrant and spent the night in jail.

191.    When Mr. Choate's father contacted the Tulsa Clerk about his arrest, he was told he would need to get in touch with Aberdeen, Inc. to pay for his son's release.

192.    Despite his indigence, Aberdeen, Inc. set Mr. Choate's payment plan at $50 per month after his release, and told him that he would be arrested again if he did not pay.

---

[37] The most recent warrant, on its face, purports to be for failure to obey a court order to contact Aberdeen, Inc. However, not only did Ms. Killman contact Aberdeen, Inc. within the timeframe required by the court order, she also has been in repeated contact with the company both before and after the warrant was issued.

193.     Because of Aberdeen, Inc.'s threats, Mr. Choate has continued to pay Aberdeen, Inc., often having to decide between taking care of his family or paying the company.  Mr. Choate is afraid that he will get arrested again if he does not pay Aberdeen, Inc. every month.

194.     Plaintiff Ira Lee Wilkins is a 36-year-old resident of Tulsa, Oklahoma, who is currently incarcerated in the Oklahoma State Reformatory Work Center in Granite, Oklahoma.

195.     Mr. Wilkins is indigent.

196.     In March 2017, the Wagoner County District Court issued a debt-collection arrest warrant against Mr. Wilkins. Aberdeen, Inc. demanded that Mr. Wilkins pay $900 for Aberdeen, Inc. to recall the warrant.

197.     Mr. Wilkins's fiancée then contacted Aberdeen, Inc. in November 2017 in an attempt to get Aberdeen, Inc. to recall the warrant.  During a phone call, an Aberdeen, Inc. employee stated that, because Mr. Wilkins was incarcerated, her supervisor allowed her to lower the lump sum payment to $200.

198.     Mr. Wilkins' fiancée stated multiple times that Mr. Wilkins had no income and could not pay.  The employee responded that Aberdeen, Inc. exercised control over the recall of the warrant and that, notwithstanding Mr. Wilkins's lack of income, it would not recall the warrant without a lump sum payment.  Mr. Wilkins' fiancée eventually paid Aberdeen, Inc. to have the warrant recalled.

199.     Mr. Wilkins still owes thousands of dollars in court debt.  He has no job prospects for when he is released, will have no income, and will not be able to make payments to Aberdeen, Inc.

200.     Plaintiff Melanie Holmes is a 41-year-old woman.

201.     Ms. Holmes has struggled for years to pay court debt owed in multiple cases.

202.     After being released from her most recent prison sentence in 2011, Ms. Holmes was able to secure low-paying jobs on and off until 2015.  During that time her income varied, but when she was employed, she earned approximately $1500 per month.  Even when combined with her husband's earnings, the couple never made more than approximately $3,000 in a single month. That income was used to support not only Ms. Holmes and her husband, but also Ms. Holmes' disabled daughter and, at times, her other daughter, now 25 years old, and her son, now 21 years old.

203.     Notwithstanding her minimal income during that time, Ms. Holmes still made payments to Aberdeen, Inc. that forced her to struggle to the meet basic necessities of life.  She did so because Aberdeen, Inc. threatened that she would be arrested if she did not pay, and Ms. Holmes was "scared to death" of being arrested.  Ms. Holmes at times paid Aberdeen, Inc. at the expense of obtaining groceries for herself and her family because she feared arrest.

204.     Ms. Holmes repeatedly explained to Aberdeen, Inc. that she could not afford to pay. Despite these explanations, the company did nothing, continuing to demand payments and refusing to adjust her payment plans and lump sum payments to accommodate her ability to pay.  In one instance, an Aberdeen, Inc. employee informed Ms. Holmes that she should go directly to court to see a judge instead of dealing with the company, but before doing so, the employee told Ms. Holmes that, under company policy, he was not supposed to share that information with her.

205.     In 2015, Ms. Holmes lost her job and was unable to find new work.  In an attempt to generate some income, she repaired furniture and sold items at flea markets.  Often, she would make zero dollars in an entire week.  Because of their poverty, she and her husband were evicted from their home and became homeless.  They were forced to live out of their car and friends' homes when they could find one.  Because Ms. Holmes lacked a permanent place to live and could

61

no longer afford to care for her youngest daughter, she had to leave her in the care of the daughter's father.  During this time, Aberdeen, Inc. continued calling Ms. Holmes and demanding payment on a near-daily basis, telling her that she could be jailed if she did not pay the company.

206.    In August 2016, the Rogers Clerk sought, and Judge Crosson issued, a debt-collection arrest warrant for Ms. Holmes in her Rogers County case.  No inquiry was conducted into Ms. Holmes' ability to pay prior to the issuance of the arrest warrant.  The warrant application contains no sworn statement or other information establishing probable cause, or any information whatsoever other than the letters "FTP BW" (which, presumably, stands for "failure to pay bench warrant").

207.    In October 2016 in Tulsa County, Aberdeen, Inc. requested a debt-collection arrest warrant, the Tulsa Clerk's Office transmitted the warrant to a Tulsa County District Judge, and the judge issued the warrant.  The public docket states, "DID NOT PAY ABERDEEN, 2ND BENCH WARRANT ISSUED, DO NOT RELEASE."

208.    Ms. Holmes was arrested on the Tulsa County debt-collection arrest warrant in December 2016.  At the time of her arrest, Ms. Holmes's husband was injured and unable to work, Ms. Holmes and her husband had no income and were living out of their car, and Ms. Holmes had left her youngest daughter with her daughter's father.

209.    An Order of Commitment signed by an employee of the Tulsa Clerk on December 2, 2016, directed the Tulsa Sheriff that Ms. Holmes would have to pay $500 to be released.  No judicial officer signed the document, and in the line for the signature of "COURT/JUDGE," all that is written is "Cost."  Because Ms. Holmes could not afford to pay $500, she was detained in a jail cell until December 8, when she was finally brought to see a judge.

210.    The judge released Ms. Holmes that day.  No inquiry was made into Ms. Holmes's ability to pay, and the Judge simply directed Ms. Holmes to contact Aberdeen, Inc. to set up a payment plan.

211.    As ordered, Ms. Holmes contacted Aberdeen, Inc.   Aberdeen, Inc., however, refused to allow Ms. Holmes to set up a payment plan because of her debt-collection arrest warrant from Rogers County.  Aberdeen, Inc., instead, demanded that Ms. Holmes pay hundreds of dollars to have her warrant from Rogers County recalled, despite Ms. Holmes having explained her situation and that she could not afford to pay.

212.    In August 2017, struggling to support herself and her family, Ms. Holmes left Oklahoma to live with her sister-in-law.  She and her husband took a bus to Oregon with nothing more than the bags they could carry, where they now live with her youngest daughter.

213.    Ms. Holmes's other children and family members still live in Oklahoma, but she is afraid to return because of her debt-collection arrest warrants.

## CLASS ACTION ALLEGATIONS

214.    Plaintiffs bring this Class action on behalf of themselves and all others similarly situated, for the purpose of asserting the claims alleged in this Complaint on a common basis.

215.    A class action is a superior means, and the only practicable means, by which Plaintiffs and unknown Class members can challenge the Defendants' unlawful debt-collection scheme, detention policies, and warrant-execution practices.

216.    Plaintiffs seek to certify the following four classes:

- ***Aberdeen, Inc. Prospective Relief Class.*** Plaintiffs propose the following Class for which they seek declaratory and injunctive relief:  All persons who owe or who will incur court debts arising from traffic, misdemeanor, and

felony cases in Oklahoma courts and whose debt Aberdeen, Inc. is or will be attempting to collect pursuant to an agreement with the Sheriff Defendants and the Sheriffs' Association. This class will be referred to as the "Aberdeen, Inc. Prospective Relief Class."[38]

- **Damages Class.** Plaintiffs propose the following class for which they seek monetary damages: All persons who have been subjected to Defendants' debt collections practices as a result of court debts arising from traffic, misdemeanor, and felony cases in Oklahoma courts. This class will be referred to as the "Damages Class."[39]

- **Tulsa Court Debt Prospective Relief Class.** Plaintiffs propose the following Class for which they seek declaratory and injunctive relief: All persons who owe court debt from a traffic, misdemeanor, or felony case arising in the Tulsa County District Court and who are or will be unable to pay that debt. This Class will be referred to as the "Tulsa Court Debt Prospective Relief Class."[40]

- **Rogers Court Debt Prospective Relief Class.** Plaintiffs propose the following Class for which they seek declaratory and injunctive relief: All persons who owe court debt from a traffic, misdemeanor, or felony case arising in the Rogers County District Court and who are or will be unable to pay that debt. This Class will be referred to as the "Rogers Court Debt Prospective Relief

---

[38] The named Plaintiffs representing the Aberdeen, Inc. Prospective Relief Class are: Carly Graff, Randy Frazier, David Smith, Ira Wilkins, Kendallia Killman, Linda Meachum, Melanie Holmes, and Christopher Choate.

[39] The named Plaintiffs representing the Damages Class are: Carly Graff, David Smith, Randy Frazier, Ira Wilkins, Kendallia Killman, Linda Meachum, Melanie Holmes, and Christopher Choate.

[40] The named Plaintiffs representing the Tulsa Court Debt Prospective Relief Class are: Christopher, Randy Frazier, Choate, David Smith, Linda Meachum, Melanie Holmes, and Ira Wilkins.

Class."[41]

**The Aberdeen Class**

A. *Numerosity. Fed. R. Civ. P. 23(a)(1)*

217.    Joinder of all members of the proposed Aberdeen Class would be impracticable.

218.    Aberdeen, Inc. is in charge of collecting the debt of thousands of people who owe court debt from fines and fees assessed in criminal and traffic cases in Oklahoma District Courts. These people, collectively, make up the Aberdeen Class.

219.    The names, case numbers, financial receipts, and relevant records of the Aberdeen Class members are in the possession of the Defendants and are easily ascertainable.

220.    Defendants have followed and continue to follow materially the same policies, practices, and procedures with respect to all members of the proposed Class.

221.    Those who still owe debt collected by Aberdeen, Inc. or who will incur such debt will be subjected to the same ongoing policies and practices absent the relief sought in this Complaint.

B. *Commonality. Fed. R. Civ. P. 23(a)(2)*

222.    The relief sought is common to all members of the Class, and common questions of law and fact exist as to all members of the Class.   The Plaintiffs seek declaratory relief concerning whether the Defendants' policies, practices, and procedures violated their rights and injunctive relief requiring that those policies, practices and procedures be changed to protect their rights in the future.

223.    Among the most important, but not the only, common questions of fact are:

- Whether the Sheriffs' Association and Aberdeen, Inc. contracted for the provision of debt collection services by Aberdeen, Inc.;

---

[41] The named Plaintiffs representing the Rogers Court Debt Prospective Relief Class are: Carly Graff and Melanie Holmes.

- How Aberdeen, Inc. earns its profits and what fees it charges pursuant to the contractual arrangement;
- How Aberdeen, Inc. credits the accounts of persons from whom Aberdeen, Inc. collects debt;
- What role Aberdeen, Inc. plays in seeking arrest warrants;
- What role Aberdeen, Inc. plays in the recall of arrest warrants;
- What policies and practices, if any, Aberdeen, Inc. uses to determine indigency;
- How, if at all, Aberdeen, Inc. accounts for indigency when setting payment plans;
- Whether Aberdeen, Inc. demands a lump sum payment when a case is transferred to exploit the consequences of an outstanding warrant;
- Whether Aberdeen, Inc. has collected money from indigent debtors based on threats of arrest;
- What role Aberdeen, Inc. plays in setting "bond" for persons arrested for nonpayment; and
- The basic facts surrounding all of Aberdeen, Inc.'s policies and practices relating to collecting debts, communicating with debtors, and agreements with government officials.

224.    Among the most important, but not the only, common questions of law are:

- Whether it is lawful to seek, obtain, and enforce arrest warrants based solely on nonpayment without any pre-deprivation process or inquiry into ability to pay;
- Whether it is lawful to seek, obtain, and enforce arrest warrants based solely on non-payment without sworn factual assertions supporting probable cause to arrest for any offense and relying on material omissions of critical facts that demonstrate indigence;
- Whether a government and a private for-profit company, working together, can circumvent state debt-collection protections by using onerous collection methods that no private creditor could lawfully use;
- Whether it is lawful to detain a person after arrest because the person cannot afford to pay a preset monetary payment without any inquiry into ability to pay or any other findings;
- Whether it is lawful to use legal process purportedly concerning the collection of fines and fees with the ulterior motive to earn profit;
- Whether Aberdeen, Inc., Defendants Jim and Rob Shofner, the Sheriffs' Association, and the Sheriff Defendants for the purpose of collecting court debt constitutes a RICO enterprise; and
- Whether Aberdeen, Inc., Defendants Jim and Rob Shofner, the Sheriffs' Association, and the Sheriff Defendants collection of payment using threats of unlawful arrest constitutes extortionate activity for the purposes of RICO predicate offenses.

225.    These common legal and factual questions arise from Defendants' ongoing

contractual relationship and association in fact. Defendants operate this debt-collection scheme

openly and in materially the same manner every day.  The material components of the scheme do not vary from Class member to Class member, and the resolution of these legal and factual issues will determine whether all of the members of the class are entitled to the relief that they seek.

### C.  *Typicality.  Fed. R. Civ. P. 23(a)(3)*

226.    The named Plaintiffs' claims are typical of the claims of the members of the proposed Class, and they have the same interests in this case as all other members of the Class that they represent.  Each of them suffered or will suffer injuries from the failure of the Defendants to comply with the basic constitutional and statutory provisions detailed below.  The answer to whether the Defendants' scheme is unlawful in the ways alleged will determine the claims of the named Plaintiffs and every other member of the Class.

227.    If the named Plaintiffs succeed in their claims that the Defendants' policies and practices concerning debt collection, detention, and warrants violate the law in the ways alleged in the Complaint, then that ruling will likewise benefit every other member of the Class.

### D.  *Adequacy.  Fed. R. Civ. P. 23(a)(4)*

228.    The named Plaintiffs are adequate representatives of the Class because they are members of the Class and because their interests coincide with, and are not antagonistic to, those of the Class.  There are no known conflicts of interest among members of the Class, all of whom have a similar interest in vindicating the constitutional and statutory rights to which they are entitled.

229.    The named Plaintiffs are represented by experienced and adequate class counsel, including Dan Smolen, Jill Webb, and attorneys from the Institute for Constitutional Advocacy and Protection at the Georgetown University Law Center, and Civil Rights Corps, who have extensive experience litigating complex class action cases involving similar practices in federal

court in other states.

### E. *Rule 23(b)(2)*

230.    Certification of a Class is appropriate under Rule 23(b)(2) because Defendants, through their policies, practices, and procedures regarding debt collection, detention, and warrants have acted and/or refused to act on grounds generally applicable to the Class.  Thus, a declaration that the policy, pattern, and practice of seeking, issuing, and executing arrest warrants based solely on non-payment without any pre-deprivation process or inquiry into ability to pay such warrants violates the Constitution would benefit every member of the proposed Class. The same applies to legal rulings on the other claims, including: that they are entitled to a neutral administrator of their debt-collection proceedings who has no personal financial conflict of interest in  infringing their liberty; that the arrangement and the Defendants' policies and practices violate the Equal Protection Clause by employing debt-collection methods far more onerous than any private creditor could lawfully impose; that the policy, pattern, and practice of threats to jail people for nonpayment without informing them of their legal rights or inquiring into their ability to pay constitutes an extortion enterprise in violation of racketeering laws; that the scheme to seek, issue, and execute arrest warrants based solely on non-payment violates the Fourth and Fourteenth Amendments; and that Aberdeen, Inc. abuses process by commandeering specific legal processes for the ulterior motive of earning profit.

231.    Injunctive relief compelling the Aberdeen Class Defendants to comply with the Fourth and Fourteenth Amendments will similarly protect each member of the Class from being subjected to the Defendants' unlawful policies and practices with respect to warrants, arrests, and jailing and protect those against whom an arrest warrant would issue in the future.  Therefore, declaratory and injunctive relief with respect to the Class as a whole is appropriate.

## The Damages Class

### A. *Numerosity. Fed. R. Civ. P. 23(a)(1)*

232.   Joinder of all members of the proposed Damages Class would be impracticable.

233.   Defendants have subjected thousands of people to their extortionate practices when attempting to collect court debt from people who have been assessed fines and fees assessed in criminal and traffic cases in Oklahoma District Courts.   These people make up the Damages Class.

234.   The names, financial receipts, and relevant records of the Damages Class members are in the possession of the Defendants and are easily ascertainable.

235.   Defendants have followed and continue to follow materially the same policies, practices, and procedures with respect to all members of the proposed Class.

### B. *Commonality. Fed. R. Civ. P. 23(a)(2)*

236.   The relief sought is common to all members of the Class, and common questions of law and fact exist as to all members of the Class.

237.   Among the most important, but not the only, common questions of fact are:

- Whether the Sheriffs' Association and Aberdeen, Inc. contracted for the provision of debt collection services by Aberdeen, Inc.;
- How Aberdeen, Inc. earns its profits and what fees it charges pursuant to the contractual arrangement;
- How Aberdeen, Inc. credits the accounts of persons from whom Aberdeen, Inc. collects debt;
- What role Aberdeen, Inc. plays in seeking arrest warrants;
- What role Aberdeen, Inc. plays in the recall of arrest warrants;
- Whether the Tulsa Clerk and Tulsa Cost Administrator's warrant applications are supported by sworn statements;
- Whether the Tulsa and Rogers County Sheriffs detain people who have been arrested for nonpayment if they cannot afford to pay a cash amount;
- What policies and practices, if any, Aberdeen, Inc. uses to determine indigency;
- How, if at all, Aberdeen, Inc. accounts for indigency when setting payment plans;
- Whether Aberdeen, Inc. demands a lump sum payment when a case is transferred to exploit the consequences of an outstanding warrant;
- Whether Aberdeen, Inc. has collected money from indigent debtors based on threats of arrest;

- What role Aberdeen, Inc. plays in setting "bond" for persons arrested for nonpayment; and
- The basic facts surrounding all of Aberdeen, Inc.'s policies and practices relating to collecting debts, communicating with debtors, and agreements with government officials.

238.   Among the most important, but not the only, common questions of law are:

- Whether it is lawful to seek, obtain, and enforce arrest warrants based solely on non-payment without any pre-deprivation process or inquiry into ability to pay;
- Whether it is lawful to seek, obtain, and enforce arrest warrants based solely on non-payment without sworn factual assertions supporting probable cause to arrest for any offense and relying on material omissions of critical facts that demonstrate indigence;
- Whether a government and a private for-profit company, working together, can circumvent state debt-collection protections by using onerous collection methods that no private creditor could lawfully use;
- Whether it is lawful to detain a person after arrest because the person cannot afford to pay a preset monetary payment without any inquiry into ability to pay or any other findings;
- Whether it is lawful to use legal process purportedly concerning the collection of fines and fees with the ulterior motive to earn profit;
- Whether the Tulsa and Rogers Clerks and the Tulsa Cost Administrator have violated Plaintiffs' clearly established rights;
- Whether the Tulsa and Rogers Clerks and/or the Tulsa Cost Administrator are county policy makers;
- Whether Aberdeen, Inc., Defendants Jim and Rob Shofner, the Sheriffs' Association, and the Sheriff Defendants for the purpose of collecting court debt constitutes a RICO enterprise; and
- Whether Aberdeen, Inc., Defendants Jim and Rob Shofner, the Sheriffs' Association, and the Sheriff Defendants collection of payment using threats of unlawful arrest constitutes extortionate activity for the purposes of RICO predicate offenses.

239.   These common legal and factual questions arise from Defendants' ongoing contractual relationship and association in fact and ongoing efforts to collect court debt. Defendants operate this debt-collection scheme openly and in materially the same manner every day. The material components of the scheme do not vary from Class member to Class member, and the resolution of these legal and factual issues will determine whether all of the members of the class are entitled to the relief that they seek.

70

### C.  *Typicality.  Fed. R. Civ. P. 23(a)(3)*

240.    The named Plaintiffs' claims are typical of the claims of the members of the proposed Class, and they have the same interests in this case as all other members of the Class that they represent.  Each of them suffered injuries from the failure of the Defendants to comply with the basic constitutional and statutory provisions detailed below.  The answer to whether the Defendants' scheme is unlawful in the ways alleged will determine the claims of the named Plaintiffs and every other member of the Class.

241.    If the named Plaintiffs succeed in their claims that the Defendants' policies and practices concerning debt collection, detention, and warrants violate the law in the ways alleged in the Complaint, then that ruling will likewise benefit every other member of the Class.

### D.  *Adequacy.  Fed. R. Civ. P. 23(a)(4)*

242.    The named Plaintiffs are adequate representatives of the Class because they are members of the Class and because their interests coincide with, and are not antagonistic to, those of the Class.  There are no known conflicts of interest among members of the Class, all of whom have a similar interest in vindicating the constitutional and statutory rights to which they are entitled.

243.    The named Plaintiffs are represented by experienced and adequate class counsel, including Dan Smolen, Jill Webb, and attorneys from the Institute for Constitutional Advocacy and Protection at the Georgetown University Law Center, and Civil Rights Corps, who have extensive experience litigating complex class action cases involving similar practices in federal court in other states.

### E.  *Rule 23(b)(3)*

244.    Class treatment is also appropriate under Rule 23(b)(3) because the common

questions of law and fact overwhelmingly predominate in this case.  This case turns, for every named Class representative, as well as for the members of the Class, on what the Defendants' policies and practices are and on whether those policies are lawful.

245.    The common questions of law and fact listed above are dispositive questions in the case of every member of the Class.  The question of liability can therefore be determined on a class-wide basis.  Class-wide treatment of liability is a far superior method of determining the content and legality of the Defendants' policies and practices than individual suits by the thousands of people who have been subjected to Defendants' debt collection practices.  To the extent that individual damages will vary, they will vary depending in large part on the amount of time that a person was subjected to the unlawful scheme and the amount of money extorted from them or obtained through abuse of process.  Determining damages for individual Class members can thus typically be handled in a ministerial fashion based on easily verifiable records in the Defendants' possession.  If need be, individual hearings on Class-member specific damages based on special circumstances and particular hardships endured as a result of Defendants' debt collection practices can be held after Class-wide liability is determined—a method far more efficient than the wholesale litigation of hundreds or thousands of individual lawsuits.

**The Tulsa Court Debt Class**

  **A.  *Numerosity.  Fed. R. Civ. P. 23(a)(1)***

246.    Joinder of all members of the proposed Tulsa Court Debt Class would be impracticable.

247.    The members of the proposed Tulsa Court Debt Class are not known but number in the thousands.  Debt-collection arrest warrants issue in Tulsa County without any inquiry into the warrant subject's ability to pay.  As of February 2017, there were over 22,000 active,

unexecuted debt-collection arrest warrants.

248. The names, case numbers, dates of warrants, and other relevant records of the Tulsa Court Debt Class members are in the possession of Defendants and are easily ascertainable.

### B. *Commonality. Fed. R. Civ. P. 23(a)(2)*

249. The relief sought is common to all members of the Tulsa Court Debt Class, and common questions of law and fact exist as to all members of the Class. The Plaintiffs seek relief concerning whether the Tulsa County Judges, the Tulsa Clerk, the Tulsa Cost Administrator, and the Sheriff Defendants' (the "Tulsa Court Debt Defendants") policies, practices, and procedures violated their rights, and relief requiring that those policies, practices, and procedures be changed to protect their rights in the future.

250. Among the most important, but not the only, common questions of fact are:

- Whether any meaningful inquiry into ability to pay is made at the time a debt-collection arrest warrant issues;
- Whether any meaningful inquiry into ability to pay is made at the time a payment plan is set;
- Whether debt-collection arrest warrants in Tulsa issue on the basis of sworn statements;
- Whether people are held in Tulsa County Jail on debt-collection arrest warrants pursuant to a predetermined cash ransom amount;
- Whether the Tulsa County Sheriff detains people who cannot afford that cash ransom;
- Whether the Tulsa Sheriff's detention policies are necessary to ensure court appearances; and
- Whether the Tulsa Sheriff's detention policies advance public safety.

251. Among the most important common questions of law are:

- Whether due process requires pre-deprivation process and an inquiry into ability to pay prior to arrest and confinement in jail based solely on nonpayment of a monetary sum;
- Whether an arrest warrant issued without any inquiry into ability to pay lacks probable cause;
- Whether an application for an arrest warrant requires the factual allegations to be based on oath or affirmation;
- Whether Defendants may seek, issue, and execute arrest warrants for non-payment

by making material omissions concerning the inability of a debtor to pay the amount required;

- Whether issuing and executing a warrant for nonpayment without any inquiry into ability to pay or consideration of alternatives violates the Fourth and Fourteenth Amendments;

- Whether the Tulsa County Sheriff can lawfully detain a person in jail solely because the person cannot pay a cash ransom; and

- Whether there is an obligation to inquire into an arrestee's ability to pay before setting the amount of a cash ransom.

## C. *Typicality. Fed. R. Civ. P. 23(a)(3)*

252.    Plaintiffs Christopher Choate, Randy Frazier, David Smith, Linda Meachum, Ira Wilkins, and Melanie Holmes's claims are typical of the claims of the members of the Tulsa Court Debt Class, and they have the same interests in this case as all other members of the Class that they represent.  Each of them has suffered or is imminently at risk of suffering injuries from the Tulsa Court Debt Defendants' practice of seeking, issuing, and executing warrants solely because a person has not made monetary payments, without a determination of ability to pay and an opportunity to be heard, and from those Defendants' practice of detaining people in jail because of nonpayment of $250, without a determination of ability to pay and an opportunity to be heard. The answer to whether these practices are unlawful in the ways alleged will determine the claims of the named Plaintiffs and every other member of the Class.

253.    If the named Plaintiffs succeed in their claims that the Tulsa Court Debt Defendants' policies and practices concerning detention violate the law in the ways alleged, then that ruling will likewise benefit every other member of the Class.

## D. *Adequacy. Fed. R. Civ. P. 23(a)(4)*

254.    The named Plaintiffs are adequate representatives of the Class because they are members of the Class and because their interests coincide with, and are not antagonistic to, those of the Class.  There are no known conflicts of interest among members of the Class, all of whom

74

have a similar interest in vindicating the constitutional and statutory rights to which they are entitled.

### E.  *Rule 23(b)(2)*

255.    Certification of this Class is appropriate because the Tulsa Court Debt Defendants, through the policies, practices, and procedures regarding seeking, issuing, and executing debt-collection arrest warrants that have issued without any inquiry into ability to pay and jailing people for nonpayment of $250 without any inquiry into ability to pay, have acted and/or refused to act on grounds generally applicable to the Class.  Thus, a declaration that the policy, pattern, and practice of seeking, issuing, and executing such warrants violates the Constitution would benefit every member of the proposed Class.

256.    Injunctive relief compelling the Tulsa Court Debt Defendants to comply with the Fourth and Fourteenth Amendments will similarly protect each member of the Class from being subjected to the Defendants' unlawful policies and practices with respect to warrants, arrests, and jailing and protect those against whom an arrest warrant would issue in the future.  Therefore, declaratory and injunctive relief with respect to the Class as a whole is appropriate.

### The Rogers Court Debt Class

### A.  *Numerosity.  Fed. R. Civ. P. 23(a)(1)*

257.    Joinder of all members of the proposed Rogers Court Debt Class would be impracticable.

258.    The members of the proposed Rogers Court Debt Class are not known but number in the hundreds and possibly thousands.  Debt-collection arrest warrants issue in Rogers County without any inquiry into the warrant subject's ability to pay.

259.    The names, case numbers, dates of warrants, and other relevant records of the

Rogers Court Debt Class members are in the possession of Defendants and are easily ascertainable.

### B.  *Commonality.  Fed. R. Civ. P. 23(a)(2)*

260.    The relief sought is common to all members of the Rogers Court Debt Class, and common questions of law and fact exist as to all members of the Class.  The Plaintiffs seek relief concerning whether the Rogers County Judge, the Rogers Clerk, and the Sheriff Defendants' (the "Rogers Court Debt Defendants") policies, practices, and procedures violated their rights, and relief requiring that those policies, practices, and procedures be changed to protect their rights in the future.

261.    Among the most important, but not the only, common questions of fact are:

- Whether any meaningful inquiry into ability to pay is made at the time a debt-collection arrest warrant issues;
- Whether any meaningful inquiry into ability to pay is made at the time a payment plan is set;
- Whether debt-collection arrest warrants in Tulsa issue on the basis of sworn statements;
- Whether people are held in Rogers County Jail on debt-collection arrest warrants pursuant to a predetermined cash ransom amount;
- Whether the Rogers County Sheriff detains people who cannot afford that cash ransom;
- Whether the Rogers Sheriff's detention policies are necessary to ensure court appearances; and
- Whether the Rogers Sheriff's detention policies advance public safety.

262.    Among the most important common questions of law are:

- Whether due process requires pre-deprivation process and an inquiry into ability to pay prior to arrest and confinement in jail based solely on nonpayment of a monetary sum;
- Whether an arrest warrant issued without any inquiry into ability to pay lacks probable cause;
- Whether an application for an arrest warrant requires the factual allegations to be based on oath or affirmation;
- Whether Defendants may seek, issue, and execute arrest warrants for non-payment by making material omissions concerning the inability of a debtor to pay the amount required;
- Whether issuing and executing a warrant for nonpayment without any inquiry into ability to pay or consideration of alternatives violates the Fourth and Fourteenth

76

Amendments;

- Whether the Rogers County Sheriff can lawfully detain a person in jail solely because the person cannot pay a cash ransom; and
- Whether there is an obligation to inquire into an arrestee's ability to pay before setting the amount of a cash ransom.

### C. *Typicality. Fed. R. Civ. P. 23(a)(3)*

263.    Plaintiffs Carly Graff and Melanie Holmes's claims are typical of the claims of the members of the Rogers Court Debt Class, and they have the same interests in this case as all other members of the Class that they represent.  Each of them has suffered or is imminently at risk of suffering injuries from the Rogers Court Debt Defendants' practice of seeking, issuing, and executing warrants solely because a person has not made monetary payments, without a determination of ability to pay and an opportunity to be heard, and from those Defendants' practice of detaining people in jail because of nonpayment of the amount owed in court debt in cash, without a determination of ability to pay and an opportunity to be heard.  The answer to whether these practices are unlawful in the ways alleged will determine the claims of the named Plaintiffs and every other member of the Class.

264.    If the named Plaintiffs succeed in their claims that the Rogers Court Debt Defendants' policies and practices concerning detention violate the law in the ways alleged, then that ruling will likewise benefit every other member of the Class.

### D. *Adequacy. Fed. R. Civ. P. 23(a)(4)*

265.    The named Plaintiffs are adequate representatives of the Class because they are members of the Class and because their interests coincide with, and are not antagonistic to, those of the Class.  There are no known conflicts of interest among members of the Class, all of whom have a similar interest in vindicating the constitutional and statutory rights to which they are entitled.

### E.  *Rule 23(b)(2)*

266.    Certification of this Class is appropriate because the Rogers Court Debt Defendants, through the policies, practices, and procedures regarding seeking, issuing, and executing debt-collection arrest warrants that have issued without any inquiry into ability to pay and jailing people for nonpayment of the amount owed in court debt in cash without any inquiry into ability to pay, have acted and/or refused to act on grounds generally applicable to the Class. Thus, a declaration that the policy, pattern, and practice of seeking, issuing, and executing such warrants violates the Constitution would benefit every member of the proposed Class.

267.    Injunctive relief compelling the Rogers Court Debt Defendants to comply with the Fourth and Fourteenth Amendments will similarly protect each member of the Class from being subjected to the Defendants' unlawful policies and practices with respect to warrants, arrests, and jailing and will protect those against whom an arrest warrant would issue in the future.  Therefore, declaratory and injunctive relief with respect to the Class as a whole is appropriate.

### Rule 23(g)

268.    Plaintiffs are represented by attorneys from Smolen, Smolen & Roytman PLLC, J Webb Law Firm PLLC, Civil Rights Corps, and the Institute for Constitutional Advocacy and Protection at Georgetown University Law Center, who collectively have experience in litigating complex civil rights matters in federal court and extensive knowledge of both the details of the Defendants' scheme and the relevant constitutional and statutory law.

269.    Counsels' efforts have so far included extensive investigation over a period of months, including numerous interviews with witnesses, government employees, former jail inmates, families, attorneys practicing in Oklahoma, community members, and experts in the functioning of Oklahoma's criminal justice system.

270.    Counsel have also observed numerous courtroom hearings in Oklahoma District Courts in order to compile a detailed understanding of state law and practices as they relate to federal constitutional requirements.  Counsel have studied the way that these systems function in multiple courts to investigate the wide array of options in practice.

271.    As a result, counsel has devoted enormous time and resources to becoming intimately familiar with the Defendants' scheme and with all of the relevant state and federal laws and procedures that can and should govern it.

272.    Among other matters, counsel for the Plaintiff has also been lead counsel in several similar class action constitutional challenges to unlawful debt-collection regimes in Tennessee, Missouri, Alabama, Mississippi, and Louisiana.  *See, e.g., Rodriguez v. Providence Comm. Corrections, Inc*., 154 F. Supp. 3d 758 (M.D. Tenn. 2015) (class action settlement against a private for-profit probation company and Rutherford County, Tennessee obtaining classwide preliminary injunctive relief for a class of tens of thousands of probationers and debtors and resulting in a $14.3 million settlement); *see also, e.g.*, *Jenkins  v. City of Jennings*, 15-cv-252-CEJ (E.D. Mo. 2015) (settled with classwide injunction and $4.75 million in damages for nearly 2,000 court debtors who were illegally jailed); *Mitchell  v. City of Montgomery*, 14-cv-186 (M.D. Ala. 2014) (landmark litigation and consent decree to end widespread injustices involving the use of private for-profit probation and the jailing of impoverished debtors by the City of Montgomery); *Bell v. City of Jackson*, 3:15-cv-732 TSL-RHW (S.D. Miss. 2015) (settled with consent decree ending jailing of court debtors in Jackson, Mississippi).  Counsel is also lead attorney in pending lawsuits challenging the treatment of indigent court debtors in Ferguson, Missouri, and New Orleans, Louisiana.  *Fant v. City of Ferguson*, 15-cv-253-AGF (E.D. Mo. 2015) (pending); *Cain v. City of*

*New Orleans*, Case No. 15-4479, 2:15-cv-04479-SSV-JCW (E.D. La. 2015) (pending).[42]

273.    The interests of the members of the Class will be fairly and adequately protected by counsel.

## CAUSES OF ACTION

### Count One: Racketeer Influenced and Corrupt Organizations Act.
### 18 U.S.C. § 1962 (c) and (d)
### (Against Aberdeen, Inc., Jim Shofner, Robert Shofner, the Sheriffs' Association, and the 54 Sheriff Defendants in their Individual Capacities)

274.    The Plaintiffs incorporate by reference the allegations in paragraphs 1-257.

275.    Plaintiffs David Smith, Christopher Choate, Linda Meachum, and Melanie Holmes bring this claim under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 ("RICO"), on behalf of themselves and members of the putative damages class, against Aberdeen, Inc., Jim Shofner, Rob Shofner, the Sheriffs' Association, and the 54 Sheriff Defendants (the "RICO Defendants").

276.    The Plaintiffs are "persons" with standing to sue within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

277.    The RICO Defendants are "RICO persons" within the meaning of 18 U.S.C. § 1961(3) because they are individuals and/or entities capable of holding a legal or beneficial interest in property.

## I.   The RICO Enterprise

278.    The RICO Defendants and other named and unnamed conspirators constitute an association-in-fact and therefore an enterprise within the meaning of 18 U.S.C. § 1961(4).  This

---

[42] Counsel from Civil Rights Corps has also been appointed class counsel in recent cases certifying classes of indigent arrestees challenging their detention due solely to their inability to pay money bail.  *See, e.g.*, *ODonnell v. Harris County*, No. 16-CV-1414, 2017 WL 1542457 (S.D. Tex. Apr. 28, 2017); *Caliste v. Cantrell*, No. 17-CV-6197, 2018 WL 1365809 (E.D. La. Mar. 16, 2018); *Walker v. City of Calhoun*, No. 15-CV-170, 2016 WL 361580, at *10 (N.D. Ga. Jan. 28, 2016).

RICO Enterprise is an ongoing business relationship with the common purpose of maximizing the collection of court debts by Aberdeen, Inc. without consideration of ability to pay or other required legal process.

279.     The RICO Enterprise is engaged in interstate commerce because its activities and transactions relating to the collection of money, and the movement of the profit received by the Defendants through the enterprise, frequently require movement and communications across state lines.  Aberdeen, Inc.'s case managers use electronic and telephone communications and United States mail to communicate with plaintiffs and members of the proposed class, including those who live outside of Oklahoma, including using those means to transmit threats of incarceration for nonpayment.  Aberdeen, Inc. also collects payments from people who live outside of Oklahoma using interstate mail and/or wires.  The RICO Enterprise has collected millions of dollars in payments from thousands of debtors who would have used some of that money to purchase goods in interstate commerce.  Aberdeen, Inc.'s policies also direct employees to collect money from people who receive federal disability payments.

280.     The members of the RICO Enterprise function as a continuing unit.

281.     Aberdeen, Inc. threatens unlawful arrest and incarceration and refuses to request that arrest warrants be recalled for the purpose of extracting payment of court debts from plaintiffs and members of the proposed class without regard to their indigence or ability to pay. Aberdeen, Inc. adds additional fees to the court debts and determines how much payment it will require to request that an arrest warrant be lifted or defer seeking an arrest warrant (which it knows that the other Defendants will issue and execute pursuant to their common enterprise), demands such payment under threat of unlawful arrest, intentionally conceals alternative options that would avoid issuance of an arrest warrant, and seeks warrants for the arrest of persons who it

knows to be indigent without disclosing such information.  Once a person is arrested on an arrest warrant for nonpayment, Aberdeen, Inc. calls family members and threatens prolonged incarceration of the indigent person if the family does not pay money to Aberdeen, Inc.

282.   The Sheriffs' Association has contracted with Aberdeen, Inc. to conduct the activities in the above paragraph, and knows that Aberdeen, Inc. is engaging in these activities. It receives and reviews regular reports regarding Aberdeen, Inc.'s collection activities, and administers the contract with Aberdeen, Inc.  With knowledge of its unlawful activities, the Sheriffs' Association has decided to renew the contract with Aberdeen, Inc. multiple times.  The Sheriffs' Association has allowed the contract to continue in full force even after having been served with this lawsuit and being notified of Aberdeen, Inc.'s unlawful activities.  The Sheriffs' Association provides assistance to Aberdeen, Inc. in its extortionate activities by enlisting government entities to procure debtor information and relay that information to Aberdeen, Inc. The Sheriffs' Association benefits financially from Aberdeen, Inc.'s extortionate collection of money from indigent persons under threat of arrest.

283.   The individual Defendant Sheriffs execute the arrest warrants threatened and obtained by Aberdeen, Inc., which they know were procured as a result of Aberdeen, Inc.'s policies and practices, in order to provide a credible threat of incarceration to maximize the coercive effect of the company's threats.  Defendant Sheriffs also are required by the contract to provide debtor information to Aberdeen, Inc., and are granted "sole discretion" along with court clerks to choose cases to transfer to Aberdeen, Inc.  They have continued to transfer cases to Aberdeen, Inc. for collection in order to maximize debts collected for generating Aberdeen, Inc.' profits, generating revenues locally, and to maximize revenues to the Sheriffs' Association.

284.   Defendant Sheriffs are constituent members of the Sheriff's Association and

thereby benefit financially from the conduct of the RICO Enterprise.  Defendant Sheriffs also

benefit financially because, apart from the Sheriffs' Association's contract with Aberdeen, Inc.,

certain fees that Aberdeen, Inc. collects must (after being sent to the district court clerk) be

remitted to the Defendant Sheriff of that county.   Defendant Sheriffs execute the warrants issued

upon Aberdeen, Inc.'s request and, except in those counties with Jail Trust Authorities

responsible for the county jail, detain persons in jail pending payment to Aberdeen, Inc.,

including those who are unable to pay due to indigence.

285.    The Shofners direct Aberdeen, Inc.'s collection activities.  They set company

policy as to collections; exercise direct supervision over Aberdeen, Inc. employees who are

responsible for individual cases, including by listening in on their phone calls; and determine the

collection practices Aberdeen, Inc. employs.

286.    Through these actions, the RICO Defendants conduct and participate in a pattern

of racketeering activity (through predicate acts of extortion and extortionate collection of

extensions of credit), as well as conspiring with each other to do the same.  Defendants continue

to engage in these racketeering acts, and pose a continuous threat of engaging in these

racketeering acts.

287.    These practices are a regular way of conducting the ongoing business of each

Defendant and of conducting or participating in the ongoing enterprise.

288.    Defendants have violated 18 U.S.C. § 1962(c) because they are part of an enterprise

that is engaged in a pattern of racketeering activity.

289.    Defendants have violated 18 U.S.C. § 1962(d) because they have conspired with

each other to violate 18 U.S.C. § 1962(c).

290.    Specifically, Defendants have conducted or participated in and conspired to

conduct the affairs of the RICO Enterprise by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

      a.  Extortion in violation of the Hobbs Act, 18 U.S.C. § 1951;

      b.  Extortion in violation of the Travel Act, 18 U.S.C. § 1952;

      c.  Extortion in violation of Okla. Stat. tit. 21, §§ 1481 & 1482; and

      d.  Extortionate collection of extension of credit in violation of 18 U.S.C. § 894.

## II.   <u>Predicate Acts</u>

291.    Plaintiffs incorporate by reference the previously described allegations.

292.    Defendants have, individually and in conspiracy with the other participants in the RICO Enterprise, obtained by threat and force payments associated with the various court debts related to criminal and traffic cases from Plaintiffs and members of the putative class, with intent to deprive indigent persons of this money.

293.    Because of these unlawful threats, Plaintiffs paid the court debts demanded by Aberdeen, Inc.

### A.  *Extortion in violation of the Hobbs Act, 18 U.S.C. § 1951*

294.    Plaintiffs incorporate by reference the previously described allegations.

295.    The RICO Defendants have, through the RICO Enterprise, individually and in conspiracy with the other participants, obtained payments from Plaintiffs and members of the proposed class with their consent, which was induced by threatening arrest in violation of constitutionally protected rights, arresting individuals, and detaining them pending payment of money to Aberdeen, Inc.  These acts constitute the wrongful use of actual and threatened force and fear, in violation of 18 U.S.C. § 1951 (the "Hobbs Act").

296.    The proceeds of RICO Defendants' extortionate activities were used in interstate

commerce and prevented Plaintiffs from purchasing goods in interstate commerce, and therefore affected commerce or the movement of any article or commodity in commerce, as these terms are understood by 18 U.S.C. § 1951(a).

297.    As a direct and proximate result of the Defendants' willful, knowing, and intentional acts discussed above, Plaintiffs and proposed class members have suffered injuries to their property, including payment of unlawful debt to RICO Defendants.

> B.  *Extortion in Violation of the Travel Act, 18 U.S.C. § 1952*

298.    Plaintiffs re-allege and incorporate by reference the previously described allegations.

299.    RICO Defendants have, through the RICO Enterprise, individually and in conspiracy with the other participants, obtained by threat payments associated with court debts from Plaintiffs and members of the putative class, with intent to deprive them of this money and the enjoyment of their state and federal rights, in violation of 18 U.S.C. § 1952 (the "Travel Act").

300.    RICO Defendants have used the mail and facilities in interstate commerce to distribute the proceeds of the extortionate scheme and to communicate with each other and with their victims concerning the operation of the scheme in violation of 18 U.S.C. § 1952(a)(1). RICO Defendants have used the mail and facilities in interstate commerce to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, or carrying on, of an extortionate scheme, in violation of 18 U.S.C. § 1952(a)(3).

301.    As a direct and proximate result of RICO Defendants' willful, knowing, and intentional acts discussed in this claim, Plaintiffs and proposed class members have suffered injuries to their property and/or business, including being deprived of money unlawfully

obtained by Defendants through extortion.

C. *Extortion in Violation of Okla. Stat. tit. 21, §§ 1481 & 1482*

302.   Plaintiffs re-allege and incorporate by reference the previously described allegations.

303.   The RICO Defendants have, through the RICO Enterprise, individually and in conspiracy with the other participants, obtained by threat payments associated with court debts from Plaintiffs and members of the putative class.  The RICO Defendants obtained these payments by threats to (1) unlawfully injure Plaintiffs and members of the putative class, (2) accuse them of a crime, and (3) expose them to or impute to them disgrace in violation of Okla. Stat. tit. 21, §§ 1481 & 1482.  These threats include, but are not limited to, threats to have Plaintiffs and the other class members unlawfully arrested if they do not make sufficient payments to Aberdeen, Inc.  These unlawful threats are designed to coerce payment in ways that violate state and federal law and that deliberately prevent Plaintiffs from taking advantage of their legal rights.

304.   As a direct and proximate result of Defendants' willful, knowing, and intentional acts discussed in this Complaint, Plaintiffs and proposed class members have suffered injuries to their property, including being deprived of money unlawfully obtained by Defendants through extortion.

D. *Extortionate Collection of Extension of Credit, 18 U.S.C. § 894*

305.   Plaintiffs re-allege and incorporate by reference the previously described allegations.

306.   The RICO Defendants have, through the RICO Enterprise, individually and in conspiracy with the other participants, extended credit to Plaintiffs and members of the putative

class by offering and entering into payment plans and other agreements to defer repayment of debt, as defined by 18 U.S.C. § 891(1).

307.    The RICO Defendants have, through the RICO Enterprise, individually and in conspiracy with the other participants, used extortionate means to collect on the credit extensions, including actual and threatened wrongful arrest and detention.

308.    As a direct and proximate result of the RICO Defendants' willful, knowing, and intentional acts discussed in this claim, Plaintiffs and proposed class members have suffered injuries to their property, including being deprived of money unlawfully obtained by Defendants through extortion.

**III.    Pattern of Racketeering Activity**

309.    RICO Defendants and the other participants in the RICO Enterprise have engaged in the racketeering activity described in this Complaint repeatedly since at least 2010 and continuing through the present with respect to thousands of indigent persons.  These racketeering acts are part of the enterprise's regular way of doing business.

310.    The racketeering acts of RICO Defendants and the other participants in the RICO Enterprise have a similar purpose: to maximize the collection of court debts by Aberdeen, Inc. without consideration of the ability to pay and without informing debtors of their legal rights.

311.    The racketeering acts of RICO Defendants and the other participants in the RICO Enterprise have yielded similar results and caused similar injuries to Plaintiffs and members of the proposed class: Plaintiffs have, inter alia, been subjected to hardship as a result of payments made to Aberdeen, Inc. as a result of its unlawful conduct.  Additionally, Plaintiffs and members of the proposed class have been subjected to threats of wrongful detention and actual wrongful detention in violation of their rights under federal and state constitutional and statutory law.

312.    As set forth in the preceding paragraphs, the racketeering acts have similar participants: Aberdeen, Inc., the Sheriffs' Association, the Defendant Sheriffs, the Shofners, as well as other participants who are not named as RICO Defendants.

313.    As set forth in the preceding paragraphs, RICO Defendants and the other participants in the RICO Enterprise, through the RICO Enterprise, directed their racketeering activities at similar victims: named Plaintiffs and members of the proposed class.

314.    As set forth in the preceding paragraphs, the racketeering acts of Defendants and the other participants in the RICO Enterprise have similar methods of commission, namely, extorting payments associated with court debt from named Plaintiffs and members of the proposed class.

## IV.    <u>Injury</u>

315.    As a direct and proximate result of RICO Defendants' and the other participants in the RICO Enterprise's willful, knowing, and intentional acts discussed in this Complaint, Plaintiffs David Smith, Christopher Choate, Linda Meachum, Melanie Holmes, and members of the Damages Class have suffered injuries to their property.  Plaintiffs and members of the proposed class have paid money to Aberdeen, Inc. and the Sheriffs' Association, and they have been forced to continue paying under threat of jailing and other legal consequences even when they cannot afford to do so without sacrificing the basic necessities of life, resulting in economic harm to themselves and their families.

316.    Plaintiff Choate has made payments to Aberdeen, Inc. with money from protected SSI and/or SSDI benefits.  All plaintiffs made payments that they would have been entitled to keep had they been afforded the substantive and procedural rights that they are guaranteed under state and federal law.

317.     The Plaintiffs are entitled to an award of damages in an amount to be determined at trial, including treble damages and attorneys' fees and costs associated with this action.

**Count Two: Seeking, Issuing, and Executing Debt-Collection Arrest Warrants Based Solely on Nonpayment, Without Inquiry into Ability, to Pay Violates Plaintiffs' Rights Under the Fourteenth Amendment**
**(Against Tulsa County, Rogers County, the Tulsa County Judges, the Rogers County Judge, the Tulsa Clerk, the Tulsa Cost Administrator the Tulsa County Sheriff, the Rogers Clerk, and the Rogers County Sheriff, in their individual and official capacities; and against Aberdeen, Inc., Jim Shofner, Robert Shofner, and the Sheriffs' Association)**

318.     Plaintiffs incorporate by reference the allegations above.

319.     It is a bedrock principle of due process that, absent exigent circumstances, individuals are entitled to pre-deprivation notice and an opportunity to be heard before the government deprives them of a liberty or property interest, particularly the fundamental interest in bodily liberty.

320.     Moreover, it has long been established that due process and equal protection principles converge to guarantee that no person be imprisoned solely for nonpayment of money assessed by a court, unless the nonpayment was willful.

321.     Defendants, as a matter of policy and practice, seek, issue, and execute debt-collection arrest warrants solely for nonpayment.

322.     Specifically, the Tulsa Clerk, the Tulsa Cost Administrator, the Rogers Clerk, Aberdeen, Inc., Jim Shofner, and Rob Shofner seek warrants for nonpayment of court debt without inquiry into ability to pay and even where they know or should know that the debtor is indigent. As a matter of policy and practice, they omit material evidence from warrant applications, including evidence of indigence and offers by debtors to pay amounts less than they required in their discretion.  These warrant applications are made without any pre-deprivation process.  When

Aberdeen, Inc. and the Shofners seek such arrest warrants, the Tulsa Clerk, Tulsa Cost Administrator, and Rogers Clerk assist in having the requests signed by a judge.

323.    At the request of the Defendants who seek warrants, the Tulsa County Judges and Rogers County Judge issue arrest warrants for nonpayment without any pre-deprivation process, including without any inquiry into ability to pay or consideration of alternatives prior to incarceration for nonpayment.

324.    The Tulsa County and Rogers County Sheriffs execute these warrants with knowledge that they were issued without any pre-deprivation process, and detain persons in jail pending payment.

325.    The Sheriffs' Association contracts with Aberdeen, Inc., and has periodically renewed the contract, with knowledge of its unlawful policies and practices.

326.    As a result of these Defendants' actions, Plaintiffs and members of the proposed classes are arrested and imprisoned for nonpayment, even though nonpayment was not willful, in violation of the Fourteenth Amendment.

327.    Defendants' infringement of Plaintiffs' liberty interest causes additional injuries beyond physical restraint.  As a direct and proximate result of Defendants' denial of Plaintiffs' rights under the Due Process Clause, Plaintiffs' court debt has increased, including, but not limited to, the addition of $80 in warrant fees, a 30-percent penalty surcharge resulting from the transfer of Plaintiffs' cases to Aberdeen, Inc., and fees for each day spent in jail.

328.    Plaintiffs Frazier, Graff, and Holmes bring this claim for damages and injunctive relief.  Plaintiffs Choate, Smith, Meachum and Wilkins bring this claim for injunctive relief only.

**Count Three: Seeking, Issuing, and Executing Debt-Collection Arrest Warrants Based Solely on Unsworn Allegations of Nonpayment Containing Material Omissions Violates Plaintiffs' Rights Under the Fourth Amendment**

**(Against Tulsa County, Rogers County, the Tulsa County Judges, the Rogers County Judge, the Tulsa Clerk, the Tulsa Cost Administrator the Tulsa County Sheriff, the Rogers Clerk, and the Rogers County Sheriff, in their individual and official capacities; and against Aberdeen, Inc., Jim Shofner, Robert Shofner, and the Sheriffs' Association)**

329.    Plaintiffs incorporate by reference the allegations above.

330.    The Fourth Amendment (applicable to the States through the Fourteenth Amendment) prohibits government agents from seeking a warrant on the basis of a knowingly false or misleading affidavit.  Notwithstanding this prohibition, Defendants routinely seek, issue, and execute warrants for nonpayment that do not include material information regarding a debtor's inability to pay that Defendants either know, or should know but for their reckless disregard for the indigent debtor's rights.

331.    The Fourth Amendment also prohibits the issuance of arrest warrants unless there is probable cause that an offense has been committed, and the probable cause is supported by oath or affirmation.  Notwithstanding this prohibition, Defendants routinely seek, issue, and execute warrants that are based on unsworn allegations of nonpayment containing no information supported by oath or affirmation, and containing no information regarding an essential element of the alleged offense—willful refusal to pay—necessary to establish probable cause.

332.    Specifically, the Tulsa Clerk, the Tulsa Cost Administrator, the Rogers Clerk, Aberdeen, Inc., Jim Shofner, and Rob Shofner seek arrest warrants for nonpayment of court debt without sworn statements supporting any of the factual basis for the warrant application, lacking in probable cause, and omitting relevant information within their knowledge about debtors' inability to pay.  When Aberdeen, Inc. and the Shofners seek these warrants, the Tulsa Clerk, Tulsa Cost Administrator, and Rogers Clerk assist in having the requests signed by a judge.

333.    At the request of the Defendants who seek warrants, the Tulsa County Judges and Rogers County Judge issue these warrants.

334.    The Tulsa County and Rogers County Sheriffs execute these warrants and detain persons in jail with knowledge that the warrants lacked sworn statements supporting the factual basis, lacked probable cause, and omitted relevant information as a matter of policy and practice, or with reckless disregard for the same.

335.    The Sheriffs' Association contracts with Aberdeen, Inc., and has periodically renewed the contract, with knowledge of its unlawful policies and practices.

336.    By seeking, issuing, and executing warrants that are unlawful because they omit material information pertaining to ability to pay, are based on allegations of nonpayment not supported by oath or affirmation, and do not establish probable cause for arrest, Defendants violate Plaintiffs' Fourth Amendment rights.

337.    Defendants' infringement of Plaintiffs' liberty interest causes additional injuries beyond physical restraint.  As a direct and proximate result of Defendants' denial of Plaintiffs' rights under the Due Process Clause, Plaintiffs' court debt has increased, including, but not limited to, the addition of $80 in warrant fees, a 30% penalty resulting from the transfer of Plaintiffs' cases to Aberdeen, Inc., and fees for each day spent in jail.

338.    Plaintiffs Frazier, Graff, and Holmes bring this claim for damages and injunctive relief.  Plaintiffs Choate, Smith, Meachum and Wilkins bring this claim for injunctive relief only.

**Count Four: Detaining Persons Arrested on Debt-Collection Arrest Warrants Because of an Inability to Pay Violates Plaintiffs' Rights Under the Fourteenth Amendment (Against Tulsa County, Rogers County, the Tulsa County Judges, the Rogers County Judge, the Tulsa Clerk, the Tulsa County Sheriff, the Rogers Clerk, and the and the Rogers County Sheriff in their official capacities; and the Tulsa County Sheriff in his official and individual capacities)**

339.    Plaintiffs incorporate by reference the allegations above.

340.    The Fourteenth Amendment's Equal Protection and Due Process Clauses prohibit jailing a person solely because of her inability to afford a monetary payment.

341.    The Fourteenth Amendment additionally prohibits jailing a person without a hearing, held by a neutral decisionmaker, that addresses whether detention is necessary because the person is a flight risk or danger to the community.

342.    The Tulsa County Judges set the amount required for those who have been arrested on debt-collection arrest warrants to be released at $250.  The Rogers County Judge sets the amount at the total amount owed for those who have been arrested on debt-collection arrest warrants.  These payments are pre-set without inquiry into ability to pay.   The Rogers and Tulsa Clerks assist in setting and implementing these required fix-sum payments.

343.    Based on the amounts pre-set by the judges, the Tulsa County and Rogers County Sheriffs detain indigent persons on these debt-collection arrest warrants, while allowing those who can make the payment to go free.  These practices violate the Fourteenth Amendment.

344.    Plaintiff Melanie Holmes brings this claim for damages and injunctive relief. Plaintiffs Frazier, Graff, Choate, Smith, Meachum, and Wilkins bring this claim for injunctive relief only.

### Count Five: Jailing Debtors Without Proof of Willfulness Without Notice and a Hearing Violates Their State-Created Liberty Interests
### (Against Tulsa County, Rogers County, the Tulsa County Judges, the Rogers County Judge, the Tulsa Clerk, the Tulsa Cost Administrator the Tulsa County Sheriff, the Rogers Clerk, and the Rogers County Sheriff, in their individual and official capacities; and against Aberdeen, Inc., Jim Shofner, Robert Shofner, and the Sheriffs' Association)

345.    Plaintiffs incorporate by reference the allegations above.

346.    Oklahoma law provides every person owing court debt with an affirmative right to be free from jailing in the absence of proof that the person has willfully refused to pay her court debt.  *See* Okla. Stat. tit. 22, § 983(A); *see also* Oklahoma Court of Criminal Appeals Rule 8.4.  This right is mandatory and non-discretionary, and it creates a substantive liberty interest that

the Fourteenth Amendment's Due Process Clause protects.  A person cannot be deprived of such a liberty interest without adequate process, including notice and a hearing.

347.    Specifically, the Tulsa Clerk, the Tulsa Cost Administrator, the Rogers Clerk, Aberdeen, Inc., Jim Shofner, and Rob Shofner seek arrest warrants for nonpayment of court debts without inquiry into ability to pay and even where they know or should know that the debtor is indigent.  When Aberdeen, Inc. and the Shofners seek warrants, the Tulsa Clerk, Tulsa Cost Administrator, and Rogers Clerk assist in seeking the issuance of these warrants from a judge.

348.    At the request of the Defendants who seek warrants, the Tulsa County Judges and Rogers County Judge issue arrest warrants for nonpayment without any pre-deprivation process, including without any inquiry into ability to pay or consideration of alternatives prior to incarceration for nonpayment.

349.    The Tulsa County and Rogers County Sheriffs execute these warrants with knowledge that they were issued without any pre-deprivation process, and detain persons in jail pending payment.

350.    The Sheriffs' Association contracts with Aberdeen, Inc., and has periodically renewed the contract, with knowledge of its unlawful activities.

351.    As a result of these practices, Plaintiffs, who all owe court debt, as well as members of the putative class, have been deprived, or are imminently at risk of being deprived, of their liberty right to be free from physical restraint and jailing without the process that the Fourteenth Amendment requires.

352.    Defendants' infringement of Plaintiffs' liberty interest causes additional injuries beyond physical restraint.  As a direct and proximate result of Defendants' denial of Plaintiffs' rights under the Due Process Clause, Plaintiffs' court debt has increased, including, but not limited

to, the addition of $80 in warrant fees, a 30-percent penalty resulting from the transfer of Plaintiffs' cases to Aberdeen, Inc., and fees for each day spent in jail.

353.    Plaintiff Melanie Holmes brings this claim for damages and injunctive relief. Plaintiffs Frazier, Graff, Choate, Smith, Meachum, and Wilkins bring this claim for injunctive relief only.

### Count Six: Aberdeen, Inc.'s Role in Collecting Court Debts and Requesting and Recalling Arrest Warrants Violates the Due Process Clause
### (Against Aberdeen, Inc., Jim Shofner, Robert Shofner, the Sheriffs' Association, and the 54 Sheriff Defendants in their official capacities)

354.    Plaintiffs incorporate by reference the allegations in paragraphs 1-316 above.

355.    The Due Process Clause of the Fourteenth Amendment prohibits government law enforcement actors from having a direct and personal financial stake in the cases under their authority.  This principle extends to those charged with administering the government's collection of court debt and who thus wield power over who is arrested and how long they remain confined.

356.    In signing the Agreement, the Sheriffs' Association, acting on behalf of the Sheriff Defendants, delegated collection of court debts to Aberdeen, Inc.

357.    The terms of the Agreement, in turn, leave Aberdeen, Inc. with an impermissible and unconstitutional financial bias by making Aberdeen, Inc.'s revenue depend entirely on the gross amount that it collects.  In so doing, the Agreement vests Aberdeen, Inc. with an incentive to use the tools at its disposal—access to and authority to edit government files, authority to seek an arrest warrant, authority to request recall of a warrant, authority to set ransom amounts arrestees must pay to get out of jail, and authority to set payment plans and due dates—to maximize its own revenue rather than to further the ends of justice or to comply with basic legal rights.  And, apart from the Agreement, Defendants' scheme in practice vests Aberdeen, Inc. with nearly unfettered authority in these realms because the other Defendants issue and execute the arrest warrants that

95

Aberdeen, Inc. seeks with their shared common purpose of creating in debtors the credible fear that Aberdeen, Inc. can make good on its threats if sufficient payments are not made. This financial incentive is particularly potent because Aberdeen, Inc. has no other business outside of its work collecting fines and fees.

358.     Consistent with its financial incentive, Aberdeen, Inc. exploits its authority over Plaintiffs and the proposed class in a manner aimed solely at extracting as much money as possible without regard to their ability to pay or to obtain basic living necessities thereby causing injury to Plaintiffs.

359.     This claim is brought by all Plaintiffs, who seek damages and injunctive relief.

### Count Seven: Defendants' Policy and Practice of Subjecting Individuals Who Owe Court Debt to Onerous Collection Enforcement Methods Violates the Fourteenth Amendment
### (Against All Defendants in all capacities)

360.     Plaintiffs incorporate by reference the allegations in paragraphs 1-321 above.

361.     Individuals who are wealthy enough to pay the full amount of their fines and fees may do so without any continued contact with any governmental official or private contractor. By contrast, for individuals too poor to pay their court debt, including Plaintiffs, Defendant Judges issue arrest warrants, and Defendant Clerks and the Tulsa Cost Administrator and the Sheriff Defendants, pursuant to the Agreement, transfer Plaintiffs' cases to Aberdeen, Inc. Defendant Clerks and the Tulsa Cost Administrator then assess an additional 30-percent penalty surcharge to be added to the amount of court debt owed and, depending on the nature of the underlying offense, suspension of a driver's license. Aberdeen, Inc. then subjects those too poor to pay, including Plaintiffs, to repeated threats of arrests, forces them to pay arbitrary and unachievable amounts to have a warrant recalled, and harasses family members whose contact information they possess. The Sheriff Defendants arrest persons in connection with these onerous collection enforcement

activities.  This policy and practice of subjecting individuals, including Plaintiffs, to more extreme penalties and threats, while allowing those who can afford to pay to be left alone, violates the Equal Protection Clause.

362.    This claim is brought by all Plaintiffs, who seek damages and injunctive relief.

**Count Eight: The Practice of Using Arrest Warrants to Coerce Plaintiffs into Making Monetary Payments They Cannot Afford Constitutes Abuse of Process (Against Aberdeen, Inc., the Sheriffs' Association, Robert Shofner, and Jim Shofner)**

363.    Plaintiffs incorporate by reference the allegations above.

364.    Aberdeen, Inc. misuses arrest warrants to further its unlawful scheme and for the improper purpose of extracting revenue from the impoverished plaintiffs.

365.    When a case is transferred to Aberdeen, Inc. for collections, Aberdeen, Inc. exploits the threat that a warrant poses and prolongs the amount of time a warrant remains active with the improper purpose of extracting as much money as possible from debtors.

366.    The Sheriffs' Association by renewing the contract (and continuing to refuse to revoke it) with knowledge of Aberdeen's policies and practices, has authorized Aberdeen, Inc. to engage in the abuse of process.

367.    All Plaintiffs have been injured by Aberdeen, Inc.'s abuse of process and seek damages and injunctive relief.

**Count Nine: Duress (Against Aberdeen, Inc., the Sheriffs' Association, Robert Shofner, and Jim Shofner)**

368.    Plaintiffs incorporate by reference the allegations above.

369.    When an individual cannot pay court debt, Aberdeen, Inc. threatens to obtain, or threatens not to recall, a debt-collection arrest warrant even when it knows that the individual is indigent, that the individual cannot afford to pay, and thus that there are no lawful grounds for an

97

arrest warrant.  Plaintiffs have paid Aberdeen, Inc. because of these threats, and in return, Aberdeen, Inc. has recalled warrants and/or not sought new warrants.  Aberdeen, Inc. engages in this practice with full knowledge of debtors' lack of sophistication and vulnerability to these threats.

370.    Plaintiffs Smith, Choate, Meachum, and Holmes have been injured as a result of agreements formed under duress from Aberdeen, Inc., and seek damages.

## Count Ten: Unjust Enrichment
### (Against Aberdeen, Inc., the Sheriffs' Association, Robert Shofner, and Jim Shofner)

371.    Plaintiffs incorporate by reference the allegations above.

372.    Plaintiffs David Smith, Christopher Choate, Ira Lee Wilkins, and Linda Meachum have paid money that has enriched Aberdeen, Inc. and the Sheriffs' Association.  Aberdeen, Inc. obtained these payments through unjust methods, including threatening arrest and concealing Plaintiffs' legal rights.  The transfer of money from Plaintiffs to Aberdeen, Inc. has resulted in the injustice of Plaintiffs struggling to obtain the basic necessities of life and the perpetuation of an extortionate scheme.  Plaintiffs seek damages and injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court provide the following relief:

a.      Certification of the classes, represented by the named Plaintiffs, described in paragraphs 214-273.

b.      An award of treble damages as authorized by RICO, 18 U.S.C. § 1964(c);

c.      An order declaring it unlawful for Defendants to seek, issue, and execute debt-collection arrest warrants based solely on alleged nonpayment, and similarly that it is unlawful to

seek, issue, and execute such warrants without inquiry into ability to pay, consideration of alternatives, pre-deprivation process, and factual allegations based on oath or affirmation;

        d.      An order prohibiting Aberdeen, Inc., Jim Shofner, Rob Shofner, the Tulsa Cost Administrator, the Tulsa and Rogers County Court Clerks, Tulsa County, Rogers County, the Sheriffs' Association, and the 54 Sheriff Defendants from seeking or enforcing debt-collection arrest warrants based on nonpayment without making inquiry into the warrant subject's ability to pay and consideration of alternatives;

        e.      An order declaring it unlawful for the Tulsa County Judges and Rogers County Judge to issue debt-collection arrest warrants on the basis of unsworn statements, and declaring the same unconstitutional;

        f.      An order prohibiting the Tulsa County and Rogers County Sheriffs from holding individuals arrested on debt-collection arrest warrants in jail unless they pay a pre-set sum, without any inquiry into ability to pay and without advancing a compelling government interest, and declaring the same unconstitutional;

        g.      An order enjoining Defendants from using a debt collection company that exercises control over debtors' liberty and also has a direct financial interest to infringe on that liberty, and declaring the same unconstitutional;

        h.      An order enjoining the practice of subjecting individuals too poor to pay their court debts to more onerous collection methods, including, but not limited to, imposing additional financial penalties, threats of arrest, arrest and detention, and declaring the same unconstitutional;

i.      An order enjoining the collection of a 30-percent penalty surcharge from

individuals too poor to pay their court debt, and declaring the assessment of that penalty, without

any inquiry into an individual's ability to pay, unconstitutional;[43]

j.      An award of compensatory and punitive damages;

k.      An award of declaratory and injunctive relief;

l.      An award of Plaintiffs' costs and reasonable attorneys' fees; and

m.      An order of such other relief as the Court deems just and appropriate.


Respectfully Submitted,

/s/ Jill E. Webb
Jill Webb, OBA #21402
J Webb Law Firm PLLC
P.O. Box 1234
Tulsa, OK 74101
Tel: 918-346-5664
jill.webb@gmail.com

/s/ Daniel E. Smolen
Daniel Smolen, OBA #19943
Donald E. Smolen, II, OBA #19944
Robert M. Blakemore, OBA #18656
Smolen, Smolen & Roytman
701 South Cincinnati Avenue
Tulsa, OK 74119
Tel: 918-585-2667
Fax: 918-585-2669

/s/ *Katherine Hubbard*
Katherine Hubbard (admitted *Pro Hac Vice*)
California Bar No. 302729
Alec Karakatsanis (admitted *Pro Hac Vice*)
D.C. Bar No. 999294
Marco Lopez* (motion to appear *Pro Hac Vice* forthcoming)
California Bar No. 316245
Tara Mikkilineni (motion to appear *Pro Hac Vice* forthcoming)
D.C. Bar No. 997284

---

[43] Claims for injunctive relief are not brought against the Tulsa County Judges or Rogers County Judge, against whom only declaratory relief is sought.

Civil Rights Corps
910 17th Street NW, Suite 200
Washington, DC 20006
Tel: 202-599-0953
Fax: 202-609-8030
katherine@civilrightscorps.org
alec@civilrightscorps.org
marco@civilrightscorps.org
tara@civilrightscorps.org

*Admitted solely to practice law in California; not admitted in the District of Columbia. Practice is limited pursuant to D.C. App. R. 49(c)(3).*

/s/ Seth Wayne
Mary B. McCord (admitted *Pro Hac Vice*)
D.C. Bar No. 427563
Douglas N. Letter
D.C. Bar No. 253492 (motion to appear *Pro Hac Vice* forthcoming)
Robert D. Friedman (admitted *Pro Hac Vice*)
D.C. Bar No. 1046738
Seth Wayne (admitted *Pro Hac Vice*)
D.C. Bar No. pending
Institute for Constitutional Advocacy and Protection
Georgetown University Law Center
600 New Jersey Ave. NW
Washington, D.C. 20001
Tel: 202-662-9042
Fax: 202-662-9248
mbm7@georgetown.edu
dl1016@georgetown.edu
rdf34@georgetown.edu
sw1098@georgetown.edu

<u>**CERTIFICATE OF SERVICE**</u>

      I hereby certify that on the 21st day of September, 2018, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants who have appeared in this case.


<u>/s/ Seth Wayne</u>