**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **CARLY GRAFF, et al.,** | |
| *Plaintiffs,* | |
| v. | **Case No. 4:17-CV-606-TCK-JFJ** |
| **ABERDEEN ENTERPRIZES II, INC., et al.,** | |
| *Defendants.* | |

<u>**PLAINTIFFS' OPPOSITION TO RENEWED MOTION TO DISMISS BY SCOTT**</u>
<u>**WALTON, SHERIFF OF ROGERS COUNTY, IN HIS INDIVIDUAL CAPACITY**</u>

**BRIEF D**

Daniel Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Smolen & Roytman
701 South Cincinnati Avenue
Tulsa, OK 74119
Tel: 918-585-2667
Fax: 918-585-2669

Seth Wayne (admitted *pro hac vice*)
D.C. Bar No. 888273445
Shelby Calambokidis (admitted *pro hac vice*)
D.C. Bar No. 1684804
Mary B. McCord (admitted *pro hac vice*)
D.C. Bar No. 427563
Institute for Constitutional Advocacy
   and Protection
Georgetown University Law Center
600 New Jersey Ave. NW
Washington, D.C. 20001
Tel.: 202-662-9042
sw1098@georgetown.edu
sc2053@georgetown.edu
mbm7@georgetown.edu

*Attorneys for the Plaintiffs*

Ryan Downer (admitted *pro hac vice*)
D.C. Bar No. 1013470
Katherine Hubbard (admitted *pro hac vice*)
D.C. Bar No. 1500503
Marco Lopez (admitted *pro hac vice*)
D.C. Bar No. 888324793
Leonard J. Laurenceau (admitted *pro hac vice*)
D.C. Bar No. 90007729
Ellora Thadaney Israni (admitted *pro hac vice*)
D.C. Bar No. 1740904
Civil Rights Corps
1601 Connecticut Ave. NW, Suite 800
Washington, D.C. 20009
Tel.: 202-844-4975
ryan@civilrightscorps.org
katherine@civilrightscorps.org
marco@civilrightscorps.org
leo@civilrightscorps.org
ellora@civilrightscorps.org

<u>**Index of Plaintiffs' Opposition Briefs**</u>

For ease of reference, each of Plaintiffs' opposition briefs has been labeled by letter according to the motion to dismiss to which it responds, listed below.

A.  51 County Sheriff Defendants, Individual Capacity (Doc. 407)

B.  Rogers County Defendants, Official Capacity (Doc. 406)

C.  Kim Henry, Former Court Clerk of Rogers County, Individual Capacity (Doc. 402)

D.  Scott Walton, Sheriff of Rogers County, Individual Capacity (Doc. 408)

E.  Aberdeen Enterprizes II, Inc. (Doc. 404)

F.  Jim and Rob Shofner (Doc. 403)

G.  Oklahoma Sheriffs' Association (Doc. 405)

H.  Defendant Judges (Doc. 412)

I.  51 County Sheriff Defendants, Official Capacity (Doc. 398)

J.  Vic Regalado, Sheriff of Tulsa County, Individual Capacity (Doc. 409)

K.  Don Newberry, Court Clerk of Tulsa County, Individual Capacity (Doc. 411)

L.  Darlene Bailey, Cost Administrator of Tulsa County, Individual Capacity (Doc. 410)

M.  Tulsa County Defendants, Official Capacity (Doc. 399)

BRIEF D

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION .............................................................................................1

RELEVANT BACKGROUND ...............................................................................1

ARGUMENT ...................................................................................................3

    I.    Plaintiffs Have Standing to Sue Walton, Who Caused Constitutional
        Violations That Harmed Plaintiffs. ...........................................................3

    II.   Walton Cannot Escape His Liability Through a Claim of Absolute
        Immunity. ............................................................................................6

    III.  Qualified Immunity Does Not Shield Walton from Suit. .........................9

        A.    Walton Violated Plaintiffs' Clearly Established Rights Under the
             Fourth and Fourteenth Amendments. ..........................................10

        B.    State Law Does Not Excuse Walton's Conduct. ........................13

    IV.  Plaintiffs Have Adequately Pled Violations of the RICO Act. ...............15

        A.    Plaintiffs Have Been Injured by the RICO Enterprise. ...............15

        B.    Plaintiffs Have Identified a RICO Enterprise. ...........................17

        C.    The RICO Enterprise Affects Interstate Commerce. ..................18

        D.    Walton Has Participated in the Conduct of the RICO Enterprise. .............19

        E.    Plaintiffs Allege a Pattern of Racketeering Activity. .................21

             1.    Plaintiffs Adequately Plead Multiple Predicate Acts of
                 Extortion. ............................................................................21

             2.    The Extortion Benefitted Private Entities as Well as the
                 Government. ........................................................................25

    V.   Plaintiffs' Claims Against Walton Are Not Moot. ................................25

CONCLUSION................................................................................................25

BRIEF D

## TABLE OF AUTHORITIES

**Cases**

*Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429 (1993) ............................................... 6

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ...................................................................... 13

*Bearden v. Georgia*, 461 U.S. 660 (1983) ....................................................... 10, 11, 12

*Boyle v. United States*, 556 U.S. 938 (2009) ................................................................. 18

*Brown v. Cameron-Brown Co.*, 30 Fed. R. Serv. 2d 1181, 1980 WL 1856 (E.D. Va. 1980) ......... 5

*Cannon v. City & Cnty. of Denver*, 998 F.2d 867 (10th Cir. 1993) ................................. 14

*Colite Int'l Inc. v. Robert L. Lipton, Inc.*, No. 05-cv-60046, 2006 WL 8431505 (S.D. Fla. Jan. 20, 2006) ............................................................................................................. 16

*Dow v. Baird*, 389 F.2d 882 (10th Cir. 1968) ................................................................ 12

*Evans v. United States*, 504 U.S. 255 (1992) ................................................................. 22

*George v. Urb. Settlement Servs.*, 833 F.3d 1242 (10th Cir. 2016) .......................... 17, 20

*Graff v. Aberdeen Enterprizes, II, Inc.*, 65 F.4th 500 (10th Cir. 2023) ................... 4, 8, 9

*Hackett v. Artesia Police Dep't*, 379 Fed. App'x 789 (10th Cir. 2010) ............................ 7

*Hackett v. Artesia Police Dep't*, Civ. No. 08-306, 2009 WL 10681494 (D.N.M. Sept. 23, 2009) ............................................................................................................................. 7

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ..................................................................... 9

*In re Lampart*, 856 N.W.2d 192 (Mich. Ct. App. 2014) ................................................ 16

*James v. Strange*, 407 U.S. 128 (1972) ................................................................... 12, 13

*Juriss v. McGowan*, 957 F.2d 345 (7th Cir. 1992) .................................................... 8, 20

*Kneisser v. McInerney*, No. 1:15-cv-07043, 2018 WL 1586033 (D.N.J. Mar. 30, 2018) .............. 8

*Lawrence v. Kuenhold*, 271 F. App'x 763 (10th Cir. 2008) ............................................ 9

*Lopez v. Shapiro*, 139 F.3d 912 (10th Cir. 1998) ............................................................ 7

*Malley v. Briggs*, 475 U.S. 335 (1986) ............................................................... 6, 12, 20

*Martin v. Bd. of Cnty. Comm'rs of Cnty. of Pueblo*, 909 F.2d 402 (10th Cir. 1990) ................... 7

*Messerschmidt v. Millender*, 565 U.S. 535 (2012) ....................................................... 12

*Mont v. United States*, 139 S. Ct. 1826 (2019) ............................................................. 11

*Moore v. Comfed Sav. Bank*, 908 F.2d 834 (11th Cir. 1990) ........................................... 5

*Moss v. Kopp*, 559 F.3d 1155 (10th Cir. 2009) ............................................................... 8

*Payton v. County of Kane*, 308 F.3d 673 (7th Cir. 2002) ................................................ 5

*People v. Whaley*, 6 Cow. 661, 1827 WL 2284 (N.Y. 1827) .......................................... 25

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) ............................................................. 16

*Rios v. Marshall*, 100 F.R.D. 395 (S.D.N.Y. 1983) ......................................................... 5

*Robbins v. BLM*, 252 F. Supp. 2d 1286 (D. Wyo. 2003) ............................................... 15

*Robertson v. Lucas*, 753 F.3d 606 (6th Cir. 2014) .......................................................... 7

*Safe Sts. All. v. Hickenlooper*, 859 F.3d 865 (10th Cir. 2017) ...................................... 20

*State v. Catling*, 438 P.3d 1174 (Wash. 2019) .............................................................. 16

*Tal v. Hogan*, 453 F.3d 1244 (10th Cir. 2006). ........................................................... 15

*Thomas v. Kaven*, 765 F.3d 1183 (10th Cir. 2014) ....................................................... 10

*Turner v. Rogers*, 564 U.S. 431 (2011) ................................................................... 11, 12

*Turney v. O'Toole*, 898 F.2d 1470 (10th Cir. 1990) ........................................................ 6

*United States v. Analetto*, 807 F.3d 423 (1st Cir. 2015) ............................................... 24

*United States v. Boulahanis*, 677 F.2d 586 (7th Cir. 1982) ........................................... 19

BRIEF D

*United States v. Briola*, 465 F.2d 1018 (10th Cir. 1972) ............................................... 24
*United States v. Curtis*, 344 F.3d 1057 (10th Cir. 2003) ................................................ 19
*United States v. Enriquez*, 106 F.3d 414, 1997 WL 31567 (10th Cir. 1997) ............... 24
*United States v. French*, 628 F.2d 1069 (8th Cir. 1980) ............................................... 23
*United States v. Garcia*, 793 F.3d 1194 (10th Cir. 2015) ............................................. 18
*United States v. Goode*, 945 F.2d 1168 (10th Cir. 1991) .............................................. 24
*United States v. Hutchinson*, 573 F.3d 1011 (10th Cir. 2009) ............................... 17, 18
*United States v. Kamahele*, 748 F.3d 984 (10th Cir. 2014) .......................................... 17
*United States v. Leon*, 468 U.S. 897 (1984) .................................................................. 20
*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008) .................................................... 19
*United States v. Nardello*, 393 U.S. 286 (1969) ........................................................... 23
*United States v. Natale*, 526 F.2d 1160 (2d Cir. 1975) ................................................. 24
*United States v. Renzi*, 861 F. Supp. 2d 1014 (D. Ariz. 2012) ..................................... 25
*United States v. Serrantonio*, 159 F.3d 1349, 1998 WL 611981 (2d Cir. 1998) .......... 24
*United States v. Smalley*, 754 F.2d 944 (11th Cir. 1985) .............................................. 22
*United States v. Turkette*, 452 U.S. 576 (1981) ........................................................... 17
*United States v. Vigil*, 523 F.3d 1258 (10th Cir. 2008) ................................................ 22
*Valdez v. City & Cnty. of Denver*, 878 F.2d 1285 (10th Cir. 1989) ......................... 7, 8, 9
*Welch v. Saunders*, 720 F. App'x 476 (10th Cir. 2017) ................................................. 6
*Wilkie v. Robbins*, 551 U.S. 537 (2007) ........................................................................ 25

**Constitutional Provisions**
U.S. Const. amend. IV .................................................................................................... 12

**Statutes**
18 U.S.C. § 1951 ....................................................................................................... 21, 22
18 U.S.C. § 1952 ............................................................................................................ 23
18 U.S.C. § 1961 ............................................................................................................ 17
18 U.S.C. § 1962 ................................................................................................... 1, 15, 18
18 U.S.C. § 1964 ............................................................................................................ 16
18 U.S.C. § 894 .............................................................................................................. 24
18 U.S.C. §§ 891–894 .................................................................................................... 23
18. U.S.C. § 891 ............................................................................................................. 24
42 U.S.C. § 1983 .......................................................................................................... 3, 9
42 U.S.C. § 407 .............................................................................................................. 16
Okla Stat. tit. 21, § 1481 ............................................................................................... 23
Okla. Stat. tit. 19, § 514 ............................................................................................. 7, 14
Okla. Stat. tit. 19, § 514.4 ............................................................................................. 13
Okla. Stat. tit. 19, § 514.5 ........................................................................................ 13, 16
Okla. Stat. tit. 19, § 516 ................................................................................................ 14
Okla. Stat. tit. 21, § 1482 ............................................................................................. 23
Okla. Stat. tit. 22, § 983 ................................................................................................ 11

**Rules**
Rule 8.4, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (Okla. R.
    Crim. App. 8.4) ....................................................................................................... 11
Rule 8.5, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (Okla. R.
    Crim. App. 8.5) ....................................................................................................... 16

BRIEF D

**Legislative Materials**

S.B. 689, 56th Leg., 2d Reg. Sess. (Okla. 2018) ........................................................ 11

**Other Authorities**

7AA Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1785.1 (3d ed.) ........... 5

Oklahoma Supreme Court Order S.C.A.D. 2011-08 (Docs. 99-35 & 406-1).............................. 13

BRIEF D

## INTRODUCTION

The Court should deny the motion to dismiss of Defendant Scott Walton, Sheriff of Rogers County, in his individual capacity (Doc. 408). Indigent court debtors in Rogers County have for years been subjected to illegal arrest and imprisonment at Walton's hands, and to threats and harassment from Aberdeen Enterprizes II, Inc. ("Aberdeen") as a result of Walton's decision to contract with that company. Walton raises a number of defenses, many of which are identical to those of his co-defendants, and all of which lack merit. Like in his official capacity brief, he attempts to evoke a fictional scenario where the debt-collection arrest warrants he executes are merely court summonses. As alleged in the complaint, nothing could be further from the truth.

## RELEVANT BACKGROUND

Plaintiffs assert claims against Walton in his individual capacity for participating, and conspiring to participate, in the RICO enterprise under 18 U.S.C. § 1962(c) and (d) (Count 1); executing arrest warrants for nonpayment without inquiry into ability to pay, in violation of the Fourteenth Amendment (Count 2); executing arrest warrants based on unsworn allegations of nonpayment with material omissions in violation of the Fourth Amendment (Count 3); depriving Plaintiffs of state-created liberty interests by executing unlawful arrest warrants and detaining them unlawfully (Count 5); and employing onerous enforcement methods in violation of the Fourteenth Amendment (Count 7). Second Am. Compl. ("SAC"), Doc. 212, ¶¶ 274-338, 345-53, 360-62. These claims are well pled in the Second Amended Complaint.

Walton is one of the dozens of Defendant county sheriffs in Oklahoma who unlawfully participate in a wide-ranging enterprise with the "unflagging aim . . . to squeeze as much money out of impoverished court debtors as possible." *Id.* ¶ 2. Walton has "contractually delegated to Aberdeen, Inc. the responsibility to collect court debts" on behalf of his county, through the Oklahoma Sheriffs' Association ("OSA") as his agent. *Id.* ¶¶ 30, 32, 51. This responsibility

1

BRIEF D

includes the authority to determine when arrest warrants issue and to control the recall of warrants. *Id.* ¶ 51. Walton was in office when the contract with Aberdeen was first signed and when it was most recently renewed. *Id.* ¶ 32. He has authorized OSA to renew the contract with Aberdeen despite his personal knowledge of its misconduct. *Id.* ¶¶ 30, 65, 81. Under the contract, he possesses "'sole discretion' along with the court clerks to choose cases to transfer to Aberdeen," *id.* ¶ 283; *see* SAC Ex. A, Doc. 212-1, at 3, and he is required to assist Aberdeen by making efforts to obtain debtor information, which OSA shares with the company, SAC ¶ 60. Walton is a member of the OSA, which administers the contract and profits enormously from it. *Id.* ¶¶ 105-06.

The Sheriff Defendants, including Walton, "routinely arrest[] and jail[] individuals pursuant to . . . debt-collection arrest warrants that are based solely on nonpayment." *Id.* ¶ 10; *see id.* ¶ 32. In Rogers County, the clerk seeks warrants based on her own request or Aberdeen's, and a judge issues them without inquiry into ability to pay (or sworn statements or indicia of probable cause). *See id.* ¶¶ 136-38. Walton arrests debtors with active debt-collection arrest warrants, and Rogers County debtors arrested by any law enforcement agency are taken to the county jail he operates. *Id.* ¶ 139. Walton does not release them unless they pay a "fixed sum payment to get out of jail," and debtors who cannot pay may spend days in jail before they are able to see a judge. *Id.* ¶ 10; *see id.* ¶¶ 32, 139-40. Walton does so without providing, and knowing that others have not provided, "any of the inquiries, findings or procedural safeguards required by Supreme Court precedent [and state law] prior to jailing a person for nonpayment." *Id.* ¶ 10; *see id.* ¶ 32.

Plaintiffs Carly Graff and Melanie Holmes assert claims against Walton on behalf of the putative class. Both had debt-collection arrest warrants issued against them in Rogers County without any inquiry into their ability to pay; were threatened by Aberdeen; and could not afford to pay for their release if arrested. *See id.* ¶¶ 9, 18, 25, 34, 37, 137-38, 156-59, 206, 211. Ms. Graff

BRIEF D

lived in constant fear of arrest, afraid to leave her house. *Id.* ¶ 160. Ms. Holmes lives in Oregon and is still afraid to return to Oklahoma to visit her children and other family members out of fear of arrest. *Id.* ¶¶ 212-13. These Plaintiffs' injuries—and those of many putative class members—are the direct result of Walton's actions enabling Aberdeen to operate unchecked in Rogers County.

## ARGUMENT

## I. Plaintiffs Have Standing to Sue Walton, Who Caused Constitutional Violations That Harmed Plaintiffs.

Walton argues that Plaintiffs lack standing because they "have identified no actions by [him] that violate their constitutional rights." Doc. 408 at 3 (emphasis omitted).[1] Walton maintains that Plaintiffs challenge the "court's system" and therefore cannot establish that their injury is traceable to him. *Id.* He also argues that because he had "no personal involvement in any arrest, detention or confinement" of the named plaintiffs, he is not liable under § 1983. *Id.* at 4-5; *accord id.* at 10. Because these arguments largely overlap, Plaintiffs address them together.

It simply is false that Plaintiffs have not alleged that Walton took actions that violate their constitutional rights. Plaintiffs allege that Walton has repeatedly authorized OSA to enter into a contract with Aberdeen, which then uses threats of family separation and imprisonment against—and seeks arrest warrants for—those who cannot pay their court debt, without sworn statements or indicia of probable cause that nonpayment was willful. *See generally* SAC ¶¶ 5, 26, 29-30, 56, 62-63, 65, 66, 68-76, 82, 88-94, 138, 281-84. Walton and the Rogers County Clerk possess "sole discretion" to transfer cases to Aberdeen, resulting in an automatic 30-percent penalty surcharge, and Walton is required to assist Aberdeen by providing debtor information, thus enabling the

---

[1] Plaintiffs address Walton's "standing" argument with respect to RICO below in Section IV.A.

BRIEF D

company's onerous debt collection practices. *Id.* ¶¶ 57, 60, 283; *see also* SAC Ex. A at 3, 7-8.

Plaintiffs also allege that Walton executes—and detains indigent debtors based on—

unconstitutional arrest warrants. SAC ¶¶ 30, 32, 65, 139-40, 283-84. Critically, Plaintiffs allege

that Walton does all this with full knowledge of Aberdeen's impermissible financial bias, their

unlawful debt-collection practices, and the illegality of the arrest warrants. *See id.* ¶¶ 65, 81, 281-

84. There is plainly a direct causal link between authorizing the commission and renewal of the

contract with Aberdeen and the harms Plaintiffs suffer *because of* the contract (Count 7). Indeed,

the allegations establish that *none* of the harms Plaintiffs have suffered at the hands of Aberdeen

in Rogers County would have been possible but for decisions made and actions taken by Walton.

So, too, is there a direct causal link between the harms suffered by Plaintiffs who are

unconstitutionally arrested and detained based on illegal arrest warrants, and Walton's executing

those warrants and detaining those who cannot afford to pay for their release (Counts 2, 3, and 5).

To the extent Walton argues that as a county officer, he "lack[s] authority to act" with

respect to "the court system's assessment and collection of fines, fees and costs as authorized by

Oklahoma law," Doc. 408 at 3, his argument fails. As an initial matter, Plaintiffs challenge

Defendants' method of collecting—not assessing—court debt. *See Graff v. Aberdeen Enterprizes,*

*II, Inc.*, 65 F.4th 500, 517-18 (10th Cir. 2023). And the harmful collections activities Plaintiffs

allege Walton has engaged in have not been mandated by any court or any state statute. Under

state law, Walton was acting as a county officer for each of his actions that Plaintiffs challenge in

this lawsuit. *See* Br. B, Section I.B. Plaintiffs' resulting injuries are traceable to him, not the courts.

Walton also attempts to disclaim all responsibility for the injuries of Ms. Graff and Ms.

Holmes solely because he has not arrested or detained them yet, which again overlooks the

substance of Plaintiffs' allegations. First, Plaintiffs allege that Walton has entered into a conspiracy

BRIEF D

that has harmed the named Plaintiffs. Nothing requires that every defendant in a conspiracy needs to have interacted directly with a named plaintiff to be held liable. When a plaintiff alleges harm at the hands of a conspiracy, she has standing to sue all participants in the conspiracy, regardless of whether she interacted directly with each individual participant. *See, e.g.*, *Rios v. Marshall*, 100 F.R.D. 395, 404 (S.D.N.Y. 1983); *Brown v. Cameron-Brown Co.*, 30 Fed. R. Serv. 2d 1181, 1980 WL 1856, at *3 (E.D. Va. 1980), *aff'd in relevant part by* 652 F.2d 375 (4th Cir. 1981). This conspiracy underpins Plaintiffs' RICO claim (Count 1), as well as Plaintiffs' constitutional claims against Walton in his individual capacity (Counts 2, 3, 5, and 7), which incorporate the RICO allegations and challenge the same conduct that was carried out as part of the conspiracy. *See* SAC ¶¶ 283-84, 318, 322-25, 329, 332-35, 347-50, 360-61.[2]

Second, the fact that Walton has not arrested Ms. Graff or Ms. Holmes does not impact Count 7, as that claim, and the harms it identifies come from Walton's decision to contract with Aberdeen and assist in its debt-collection activities. *See infra* pp. 6, 12-13. Walton was Sheriff of Rogers County at the time he authorized the initial contract with Aberdeen, and has remained Sheriff through multiple renewals. He is legally responsible for Plaintiffs' injuries as a result of their subjection to its methods. Likewise, Plaintiffs' requests for equitable relief, which are merited given the injuries inflicted by the existence of a warrant, are not impacted by Walton's argument that he has not arrested Plaintiffs.[3]

---

[2] Plaintiffs also have standing to bring their § 1983 claims against Sheriff Walton pursuant to the "juridical link" doctrine. *See Payton v. County of Kane*, 308 F.3d 673, 679 (7th Cir. 2002), *cert. denied*, 540 U.S. 812 (2003); *Moore v. Comfed Sav. Bank*, 908 F.2d 834, 838-39 (11th Cir. 1990); 7AA Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1785.1 (3d ed.).

[3] Walton also argues that the lack of arrest entitles him to immunities, but even if that were true, any immunity only applies to claims seeking damages. *See infra* Sections II-III.

BRIEF D

## II.    Walton Cannot Escape His Liability Through a Claim of Absolute Immunity.

Walton asserts that he is entitled to "absolute 'quasi-judicial' immunity" for the claims against him that derive from "service of court process/warrants." Doc. 408 at 5. This argument is incorrect, and Walton cannot meet his burden to establish such immunity. *See Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 432 (1993). As a threshold matter, Plaintiffs' claims against Walton are not principally about "serving warrants." Doc. 408 at 6. Count 1 alleges that Walton participates in the RICO enterprise by exercising "'sole discretion' along with court clerks to choose cases to transfer to Aberdeen" and "provid[ing] debtor information to Aberdeen," and that he "benefits financially" from this arrangement." SAC ¶¶ 283-84. Count 7 also relies on Walton's decision to contract with Aberdeen and assist in its efforts. I*d.* ¶ 361. Walton only asserts quasi-judicial immunity from claims about executing warrants, Doc. 408 at 6, but Plaintiffs allege he does much more than that.

In any event, Walton is not immune from the claims that challenge his execution of warrants (Counts 2, 3 & 5). Officers who help procure a court order they know to be invalid are not immune for executing that order. *See Turney v. O'Toole*, 898 F.2d 1470, 1473 n.3 (10th Cir. 1990) (noting that "[s]uch an order does not provide the same quasi-judicial immunity as an order which the defendant played no part in procuring," and citing cases to that effect). This conclusion flows from the Supreme Court's reasoning in *Malley v. Briggs*, 475 U.S. 335, 342-43 (1986), denying absolute immunity to an officer when seeking a warrant. As *Turney* found, the good faith normally attributed to an officer who is executing a facially valid court order dissolves when the officer has invalidly procured it. In addition, courts have recognized that an officer who executes a facially valid court order—whether or not he took part in procuring it—might not enjoy absolute immunity if he knows that the order is in fact invalid. *See Welch v. Saunders*, 720 F. App'x 476, 481 (10th Cir. 2017) (explaining that if the deputy sheriffs knew that the facially valid protection

6

order had been superseded, "we would have a more challenging issue to resolve"); *see also, e.g.*, *Robertson v. Lucas*, 753 F.3d 606, 619 (6th Cir. 2014).

In this case, Plaintiffs allege that Walton, through his participation in the OSA, contracts with Aberdeen, assists Aberdeen as required under the contract, and knowingly procures invalid warrants. *See, e.g.*, SAC ¶¶ 5, 32, 52-60. The law does not permit him to play an active role in procuring invalid warrants and then claim to be unaware of their invalidity. And even if Walton had not played a role in the procurement of these warrants, he would not be able to rely on their "facial" validity because he knows that they are, in fact, invalid: He knows that they have no sworn factual basis sufficient to justify arrest and are issued upon nonpayment of arbitrary sums without any pre-deprivation process or inquiry into ability to pay, and that Aberdeen uses them to threaten indigent debtors with jail in order to extort payments. *Id.* ¶¶ 31-32, 52, 65-66, 281-83, 324-25.[4]

Moreover, the failure-to-pay warrants challenged here, unlike the judicial contempt orders at issue in *Valdez v. City & Cnty. of Denver*, 878 F.2d 1285 (10th Cir. 1989),[5] are not issued on a judge's initiative based on that judge's observations. They are sought by non-judicial officers without judicial direction and on the basis of facts outside any court's personal knowledge, purely

---

[4] The state statute and unpublished, *pro se* cases cited by Walton (Doc. 408 at 6) provide him no cover. Okla. Stat. tit. 19, § 514 merely provides that the sheriff shall serve and execute "according to law" all process, writs, precepts and orders issued by lawful authorities. Far from mandating the execution of warrants that law enforcement knows to be invalid, this statute prohibits it. The cases are similarly unavailing. In *Lopez v. Shapiro*, 139 F.3d 912 (10th Cir. 1998)—a four-paragraph order—the warrant at issue was for failure to appear at a court date, not failure to *pay* or some other administrative matter. And in *Hackett v. Artesia Police Dep't*, 379 Fed. App'x 789, 793 (10th Cir. 2010), the district court's conclusion that the judge "was authorized to issue the bench warrant, any alleged procedural irregularities notwithstanding," *Hackett v. Artesia Police Dep't*, Civ. No. 08-306, 2009 WL 10681494, at *10 (D.N.M. Sept. 23, 2009), was crucial to the court's conclusion that the officer executing the warrant was due absolute immunity.

[5] *See Martin v. Bd. of Cnty. Comm'rs of Cnty. of Pueblo*, 909 F.2d 402, 405 n.4 (10th Cir. 1990) (citing cases denying quasi-judicial immunity to officers executing warrants distinct from the "judicial contempt orders" at issue in *Valdez*).

BRIEF D

for the purpose of collecting court debt. When the purpose of arrest warrants is simply to coerce payment, they "are extra-judicial and focus more on the administrative task of collecting fines than the judicial act of imposing them." *Kneisser v. McInerney*, No. 1:15-cv-07043, 2018 WL 1586033, at *14 (D.N.J. Mar. 30, 2018) (declining to grant absolute immunity where the "whole point of incarceration was to collect fines"). Just as a judge is not entitled to judicial immunity for his administrative acts, no quasi-judicial immunity flows from a warrant that was issued as an administrative act.

To be clear, Plaintiffs are not asking Walton to make independent ability-to-pay determinations or act as a "pseudo-appellate court[] scrutinizing the orders of judges." *Moss v. Kopp*, 559 F.3d 1155, 1165 (10th Cir. 2009) (quoting *Valdez*, 878 F.2d at 1289). Rather, Plaintiffs allege that Walton *knows* that these warrants are invalidly obtained from the outset—because he is involved in obtaining them—and that he cannot ignore that knowledge any more than he could if he himself put false or misleading information into the warrant application. *See Juriss v. McGowan*, 957 F.2d 345, 351 (7th Cir. 1992). That is, Plaintiffs seek to hold Walton liable based on his knowledge of what had occurred before the warrant issued—not on the basis of any hypothetical duty to conduct an after-the-fact independent review.

Walton's additional, scattershot arguments—such as his argument that Ms. Graff entered into a payment plan at the time of her plea agreement, Doc. 408 at 7—have nothing to do with immunity, where the inquiry is whether Walton acted in a quasi-judicial manner, and would not help him in any event. *See generally Graff v. Aberdeen Enterprizes, II, Inc.*, 65 F.4th 500, 517 (10th Cir. 2023) (acknowledging that all of Plaintiffs' claims "challenge[] debt-collection practices commenced *after* Plaintiffs are convicted and sentenced" (emphasis added)); SAC ¶¶ 158, 206 (challenging lack of process at the time a warrant issues). Furthermore, contrary to Walton's

8

BRIEF D

assertions, as has been repeated many times in this litigation, these warrants do not function as mere "summons[es]" to appear in court, Doc. 408 at 6. Plaintiffs have alleged that what Defendants refer to as "bench" warrants are, in fact, arrest warrants, for which Plaintiffs and members of the putative class are held in jail for days. *See Graff*, 65 F.4th at 509-11.

Finally, even if this Court finds that quasi-judicial immunity shields Walton from damages, it does not apply to Plaintiffs' claims for prospective relief. *See Valdez*, 878 F.2d at 1286. The sole case Walton cites to support his alleged immunity from injunctive relief, *Lawrence v. Kuenhold*, 271 F. App'x 763, 765 n.6 (10th Cir. 2008), applied *judicial* immunity to injunctive relief based on amendments to 42 U.S.C. § 1983. It did not purport to extend that holding to immunity for quasi-judicial actors. *See* Doc. 270 at 4-6.[6] Walton does not enjoy quasi-judicial immunity.

### III.   Qualified Immunity Does Not Shield Walton from Suit.

Qualified immunity protects government officials from liability for damages only insofar as their conduct does not violate clearly established rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Walton raises qualified immunity, claiming that (1) there was no underlying constitutional violation, Doc. 408 at 8-14, (2) the right at issue was not clearly established, *id.* at 14-15, and (3) he was reasonably relying on duly enacted statutes and the Oklahoma Supreme Court's directive, *id.* at 16-17. His arguments fail. Plaintiffs have alleged clearly established constitutional violations that are not excused by state law. As an initial matter, qualified immunity is more properly raised at summary judgment, rather than in a motion to dismiss. Given the fact-specific nature of qualified immunity, early consideration of qualified immunity "subjects the defendant to a more challenging standard of review than would

---

[6] In any event, even as applied to the judge in *Lawrence*, the court merely recognized that *retrospective* declaratory relief was inappropriate. *See* 271 F. App'x at 766-67 & n.7. Plaintiffs seek no such relief here.

BRIEF D

apply on summary judgment." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). In any case, Walton does not enjoy such immunity.

### A.    Walton Violated Plaintiffs' Clearly Established Rights Under the Fourth and Fourteenth Amendments.

Plaintiffs have plausibly alleged four constitutional claims against Walton: (1) executing debt-collection arrest warrants based solely on nonpayment without inquiry into ability to pay (Count 2) and (2) based on unsworn allegations containing material falsehoods and lacking probable cause (Count 3); (3) jailing debtors without proof of willfulness and without procedural due process in violation of state-created liberty interests (Count 5); and (4) subjecting debtors to onerous collection methods (Count 7).[7]

Walton protests that *Bearden v. Georgia*, 461 U.S. 660 (1983) and its progeny do not "clearly establish" "rights related to the processes by which a state court satisfies the principles identified in *Bearden*." Doc. 408 at 11. Walton suggests that when a person fails to pay court debt, it is legally permissible for a "bench warrant" to "issue for purposes of compelling the [person] to return to Court and explain their failure." *Id.*; *see also id.* at 12 ("The mere issuance of a bench warrant does not violate the principles enunciated in *Bearden*."). Walton also argues that the constitutional rights at issue are not clearly established because although a debtor has "a right to be free from imprisonment when he or she lacks funds to pay a fine and, upon failure to pay a fine, a right to a judicial determination regarding ability to pay as discussed in *Bearden*," there is no clearly established right to be free from "the mere issuance of a bench warrant." Doc. 408 at 14-15 (emphasis omitted). There are both factual and legal problems with these arguments.

---

[7] Plaintiffs previously detailed the legal bases underlying Counts 2 and 3 in their motion for preliminary injunction. *See* Doc. 77 at 5-16. The legal bases underlying each claim are discussed in greater detail in Plaintiffs' brief in opposition to Tulsa Sheriff Regalado's personal-capacity motion to dismiss. *See* Br. J, Section I.

BRIEF D

Factually, the failure-to-pay warrants at issue here are not mere summonses commanding a person to appear in court. Whatever they are titled, they are alleged to be *arrest* warrants in every meaningful sense of the term. When Walton (or his agent) serves a debtor with a warrant, he does not bring the debtor to court; he brings her to jail, where she must remain, sometimes for days at a time, before seeing a judge. SAC ¶¶ 96-99. Even a relatively short stay in jail can have devastating consequences for the impoverished person, including loss of employment, removal from housing, and inability to arrange child care. *Id.* ¶ 99. This is an arrest.[8]

Legally, the procedures necessary to satisfy *Bearden* are clearly established. *Bearden* itself held that the state must make "a careful inquiry" before subjecting a person to adverse consequences solely because she cannot afford a payment, 461 U.S. at 666-67, and in *Turner v. Rogers*, 564 U.S. 431 (2011), the Supreme Court established minimum procedural safeguards that must be met before the government may arrest or jail a person for nonpayment. These safeguards include notice that ability to pay is a critical issue in the proceeding; the use of a form or equivalent to elicit information about the defendant's finances and an opportunity for the person to respond to questions at a hearing; and an express finding by the court that the defendant has the ability to pay. *Id.* at 447-48. Oklahoma law codifies these basic principles of pre-deprivation process, *see* Okla. Stat. tit. 22, § 983(A);[9] Okla. R. Crim. App. 8.4, which Walton violates when he arrests and

---

[8] The notion that there is some constitutional distinction between being jailed before or after a hearing such that only the latter constitutes "imprisonment" is simply wrong. *See Mont v. United States*, 139 S. Ct. 1826, 1832 (2019) ("the term 'imprison' . . . . encompass[es] pretrial detention").

[9] Plaintiffs have attached a copy of Section 983 that will remain in effect until November 1, 2023, as an exhibit to their first brief in opposition. *See* Br. A, Ex. 2. Although this version of the law went into effect after Plaintiffs filed this lawsuit, the prior version was identical in all relevant respects. *See* S.B. 689, 56th Leg., 2d Reg. Sess. (Okla. 2018).

BRIEF D

detains indigent persons solely due to nonpayment, knowing that they have not received the required procedural safeguards.

Walton's remaining arguments are unavailing. For example, he suggests that "a defendant can request a Rule 8 hearing at any time." Doc. 408 at 12. But Plaintiffs allege that Rule 8's procedural protections are regularly not given, SAC ¶ 95 (in fact, the failure to follow Rule 8 is in large part the basis of Count 5, *id.* ¶ 346). In any case, it is the *State's* burden to provide such hearings, not Plaintiffs' to request them. *See Turner*, 564 U.S. at 448 (requiring the "*State* [to] provide[] . . . procedural safeguards" (emphasis added)). Furthermore, *Bearden* clearly required a *pre-imprisonment* "inquir[y] into the reasons for the failure to pay," 461 U.S. at 672; it would turn this requirement on its head to suggest that a debtor's ability to request a *post-arrest* Rule 8 hearing satisfies *Bearden*'s requirements. Walton also suggests that there is no law precluding him from serving "bench" warrants on indigent debtors, or requiring that such warrants be supported by "oaths and affirmations." Doc. 408 at 12. But as explained above, the warrants that Walton executes *are* arrest warrants—and longstanding precedent states that warrants not supported by sworn affidavits are "clearly and obviously invalid." *Dow v. Baird*, 389 F.2d 882, 884 (10th Cir. 1968); *see* U.S. Const. amend. IV ("[N]o warrant shall issue except on probable cause, supported by Oath or affirmation"); *see also Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012) (no qualified immunity when "it is obvious that no reasonably competent officer would have concluded that a warrant should issue" (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986))).

Finally, contrary to Walton's assertions, Doc. 408 at 12, there is Supreme Court law supporting Plaintiffs' right to be free from "unduly harsh or discriminatory" collections methods, whether they are executed by a private contractor or otherwise. *James v. Strange*, 407 U.S. 128, 138 (1972). In *James*, the Court struck down a Kansas recoupment statute that expressly denied

BRIEF D

indigent defendants who owed money to the state protections available to civil judgment debtors. *Id.* at 135, 141-42. Defendants' use of a private debt-collection company that harasses and threatens debtors; a process that imposes a surcharge that dramatically increases the debt owed; and arrest warrants, jailing, and indefinite detention until payment is received singles out indigent criminal court debtors for treatment in an even more extreme manner than seen in *James*, and is thus clearly prohibited by it. Any subtle differences in fact between that case and this one are inconsequential. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (qualified immunity does not require "a case directly on point" so long as the constitutional question is beyond debate).

### B.   State Law Does Not Excuse Walton's Conduct.

Finally, Walton protests that he was simply following Oklahoma law in contracting with and referring cases to Aberdeen and executing failure-to-pay warrants. The problem with this argument is that none of the legal provisions to which Walton cites actually require the problematic conduct in which Plaintiffs allege he engages. In fact, the crux of Count Five is that Walton and his co-Defendants do *not* follow state law. SAC ¶¶ 346-53. Walton attempts to lean on an Oklahoma Supreme Court Administrative Order that "authorized and directed" district courts "to participate in the misdemeanor or failure-to-pay warrant collection program authorized" by certain statutes. S.C.A.D. 2011-08 (Docs. 99-35 & 406-1). The statutes, in turn, allow courts to enter into contracts with private debt collectors, Okla. Stat. tit. 19, § 514.4(A)-(B) (eff. Nov. 1, 2010), via the Oklahoma Sheriffs' Association, *id.* § 514.4(E), and permit the courts to tack an administrative fee onto any warrants referred to a private collector, *id.* § 514.5(A), with the proceeds to be shared between the collector and the court, *id.* § 514.5(B).[10]

---

[10] An amended version of these laws went into effect on November 1, 2018, and yet another version is set to go into effect on November 1, 2023. At the time this suit was filed in 2017, the law allowed sheriffs to contract with a debt collector directly with OSA administering the contract (§ 514.4), and authorized a 30-percent surcharge to be split among OSA and the collector (§ 514.5). In 2018,

BRIEF D

Neither the order nor the statutes provide Walton any cover, because they simply direct *courts* (not sheriffs) to participate in a program. They do not prescribe the specific, problematic conduct in which Plaintiffs allege *Walton* engages: repeatedly contracting with one particular company, with knowledge of its extortionate practices; referring individual cases to Aberdeen solely for nonpayment without inquiry into ability to pay or any other process; and executing arrest warrants knowing that those warrants lack a valid basis. SAC ¶¶ 31-32, 52, 65-66, 71-82, 96, 281-83, 324-25.

Walton points out that Oklahoma law directs sheriffs to "execute, *according to law*, all process, writs, precepts and orders issued or made by lawful authorities, and to him directed." Okla. Stat. tit. 19, § 514 (emphasis added); *see also id.* § 516. But warrants sought, issued, and executed in violation of the U.S. Constitution—as Plaintiffs allege with the failure-to-pay warrants here—are plainly not executed "according to law." As such, this statute does not obligate Walton to execute warrants obtained in violation of the law; in fact, it prohibits him from doing so.

Because Plaintiffs have alleged that Walton violates clearly established law, he is not entitled to qualified immunity.[11]

---

the laws were amended to require that any such contract be made with OSA as a go-between, but otherwise remained unchanged, and will continue to remain so when the new amendments take effect. Plaintiffs have attached the 2010 and 2018 versions of the laws as an exhibit to their first brief in opposition to Defendants' renewed motions to dismiss, *see* Br. A, Ex. 1, and the forthcoming amendments are attached as an exhibit to various motions to dismiss filed by Walton's co-defendants. *See, e.g.*, Doc. 399-4 (Exhibit 4 to Tulsa County's renewed motion to dismiss).

[11] Finally, regardless of whether Walton can claim qualified immunity, Plaintiffs' claims for prospective relief should go forward. Immunity applies only to damages claims, if at all. *See Cannon v. City & Cnty. of Denver*, 998 F.2d 867, 876 (10th Cir. 1993). So, too, should Plaintiffs' RICO claims. As explained in greater detail in response to Tulsa Sheriff Regalado's personal-capacity motion to dismiss, qualified immunity is traditionally a defense to constitutional claims, and even the courts that have left open the possibility that it may apply to RICO claims have typically found that the right to be free from extortion by a RICO enterprise is "clearly established"

BRIEF D

IV.    **Plaintiffs Have Adequately Pled Violations of the RICO Act.**

The Second Amended Complaint states a valid RICO claim. In Count 1, Plaintiffs allege that Walton in his individual capacity—together with Aberdeen, Jim and Robert Shofner, OSA, and the other Sheriff Defendants in their individual capacities—are members of an enterprise that uses the threat of arrest and incarceration to extort millions of dollars in payments from thousands of impoverished debtors. SAC ¶¶ 275-317. It is unlawful for any person associated with any enterprise, the activities of which affect interstate commerce, to participate in the conduct of the enterprise's affairs through a pattern of racketeering activity. 18 U.S.C. § 1962(c). It is also unlawful "to conspire to violate" the RICO statute. *Id.* § 1962(d). As Walton notes, the statute aims "to curb the infiltration of legitimate business organizations by racketeers." Doc. 408 at 18. Here, what might otherwise be a legitimate purpose has become corrupted by the pattern of extortion carried out by the enterprise through Aberdeen, and enabled by the remaining RICO participants. "The elements of a civil RICO claim are (1) investment in, control of, or conduct of (2) an enterprise (3) through a pattern (4) of racketeering activity." *Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006). They are adequately alleged for each RICO Defendant, including Walton.

A.    **Plaintiffs Have Been Injured by the RICO Enterprise.**

Walton states that Plaintiffs lack standing because there are "no allegations that [they] were injured in their 'business or property' by reason of Defendants' violation of § 1962." Doc. 408 at 19 (emphasis omitted). But the complaint alleges injury in the form of money that Plaintiffs Killman, Meachum, Choate, Smith, and Holmes paid to Aberdeen as a consequence of extortionate threats. *See* SAC ¶ 315. A loss of money is a classic injury to "property" sufficient to satisfy

---

by the RICO statute itself. *See* Br. J at 14-15 (citing *Robbins v. BLM*, 252 F. Supp. 2d 1286, 1294-45 (D. Wyo. 2003)).

BRIEF D

Plaintiffs' burden. *See, e.g.*, *Colite Int'l Inc. v. Robert L. Lipton, Inc.*, No. 05-cv-60046, 2006 WL 8431505, at *10 (S.D. Fla. Jan. 20, 2006); *cf. Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979). Walton nevertheless suggests that Plaintiffs have suffered no injury to their "business or property" because they "owe" court debt to Aberdeen. Doc. 408 at 19 (emphasis omitted). Walton seems to be arguing that Plaintiffs have not established cause in fact—or, in RICO parlance, that Plaintiffs suffered their injuries "by reason of" the enterprise's activities. 18 U.S.C. § 1964(c). This is simply wrong. Aberdeen extorted money indigent Plaintiffs needed for basic living necessities, such as groceries, which they were forced to forgo as a result of the extortion. *See* SAC ¶¶ 21-24. Oklahoma law exempts indigent persons from payment under such circumstances, *see* Okla. R. Crim. App. 8.5, but Aberdeen actively worked to conceal this, instructing employees to "***NEVER*** refer any defendant to call the court clerks," SAC ¶ 83. The injury is not a result of the assessment of court debt at the time of their convictions, but of Aberdeen's manner of collection at the time the money was paid. But for Aberdeen's conduct, Plaintiffs would not have made the payments, and Oklahoma law did not require them to.[12] Because Plaintiffs paid that money only in response to the enterprise's extortionate conduct, their loss is an injury that came about "by reason of" the RICO enterprise.[13]

---

[12] Aberdeen's scheme also inflicted a RICO injury upon Plaintiffs Killman and Choate by extracting means-tested benefit income. Federal law prohibits such monies from being subject to "execution, levy, attachment, garnishment, or other legal process," 42 U.S.C. § 407(a), which encompasses court-ordered payments of fines and fees, *see, e.g.*, *State v. Catling*, 438 P.3d 1174, 1178-79 (Wash. 2019); *In re Lampart*, 856 N.W.2d 192, 199-200 (Mich. Ct. App. 2014).

[13] At a minimum, the money that has been retained by Aberdeen and OSA constitutes a RICO injury resulting from the enterprise's misconduct. *See, e.g.*, SAC ¶¶ 20, 29. Aberdeen and OSA collect a 30-percent surcharge that is triggered when a warrant issues and a debtor's case is "referred to" Aberdeen. *See* Okla. Stat. tit. 19, § 514.5(A) (eff. Nov. 1, 2010). The warrants here issue and the cases are referred in violation of the federal constitution and state law. Plaintiffs should not be considered to "owe" the surcharged amounts.

BRIEF D

Finally, Walton seems to argue that Plaintiffs' injuries were not proximately caused by the RICO enterprise, because (1) they have not identified any racketeering activity or associated harms, and (2) any harm they suffered is "directly connected to their violation of Oklahoma law, their agreement to pay fines in [their] plea agreements, and their admitted failure to comply with the terms of those agreements or otherwise seek a Rule 8 hearing." Doc. 408 at 24. This claim cites no facts or case law, and is mistaken. On the first point, as established *infra*, Plaintiffs have pled a pattern of racketeering activity and resulting injuries. On the second, regardless of whether Plaintiffs' court debt is "connected" to their underlying offenses and the initial imposition of fines and fees, their injuries occurred as a direct result of the unlawful debt-collection practices which comprise the RICO enterprise's predicate acts. Plaintiffs could not have been lawfully compelled to pay the money. The racketeering activity proximately caused Plaintiffs' injuries.

### B.    Plaintiffs Have Identified a RICO Enterprise.

Walton argues that no RICO enterprise has been identified. *See* Doc. 408 at 20-21. But the facts alleged belie that claim. To show the existence of an association-in-fact constituting a RICO enterprise, Plaintiffs need only establish that there was a "group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Kamahele*, 748 F.3d 984, 1003 (10th Cir. 2014) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)); *see also* 18 U.S.C. § 1961(4). This includes when two corporate entity defendants join together to engage in a course of conduct. *George v. Urb. Settlement Servs.*, 833 F.3d 1242, 1251 (10th Cir. 2016). Such enterprises "may be proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Hutchinson*, 573 F.3d 1011, 1020 (10th Cir. 2009) (Gorsuch, J.) (cleaned up). Here, the enterprise is straightforward: two separate corporate entity defendants (Aberdeen and OSA), along with their officers and members (the Shofners and Sheriff Defendants), have united by contract with the

BRIEF D

common purpose of engaging in a course of conduct to maximize the collection of money from indigent court debtors in Oklahoma counties. SAC ¶¶ 55 *et seq.* The allegations meet every requirement for an association-in-fact enterprise. Walton's further argument there was no enterprise due to the absence of a "decision-making framework," Doc. 408 at 20-21, relies on a test was expressly overruled by the Supreme Court in *Boyle v. United States*, 556 U.S. 938 (2009),[14] where the Court held that "an association-in-fact enterprise is simply a continuing unit that functions with a common purpose" and "need not have a hierarchical structure or a 'chain of command.'" *Id.* at 948. Under this test, the complaint properly pleads that the RICO enterprise here functioned as a continuing unit with a common purpose. Walton's additional argument that there was no enterprise independent from the racketeering activity itself, Doc. 408 at 20-21, is similarly mistaken. "Simply put, after *Boyle*, an association-in-fact enterprise need have . . . no purpose or economic significance beyond or independent of the group's pattern of racketeering activity." *Hutchinson*, 573 F.3d at 1021. In any event, here the enterprise has both lawfully collected money from those who are not indigent and can afford to pay, and extorted money from those who are and cannot. *See, e.g.*, SAC ¶ 8.

## C.     The RICO Enterprise Affects Interstate Commerce.

Plaintiffs have properly alleged that the activities of Defendants' debt-collection enterprise "affect[] interstate . . . commerce." 18 U.S.C. § 1962(c). To satisfy this requirement, the enterprise must have at least some "minimal effect" on interstate commerce. *United States v. Garcia*, 793 F.3d 1194, 1210 (10th Cir. 2015) (collecting cases). A plaintiff can make this showing in several ways, two of which are particularly relevant and easily met here. First, a plaintiff may establish

---

[14] Walton has continued to cite this bad precedent, even though Plaintiffs alerted him to it in the prior round of briefing. Doc. 270 at 18.

BRIEF D

that the enterprise uses "an instrumentality of commerce, such as telephone lines." *United States v. Mejia*, 545 F.3d 179, 203 (2d Cir. 2008). Second, the plaintiff may prove that the enterprise's conduct depletes the assets of victims who potentially would have used such assets to purchase goods in interstate commerce. *See United States v. Curtis*, 344 F.3d 1057, 1070 (10th Cir. 2003).

The Second Amended Complaint easily satisfies both theories under the lenient "minimal effect" standard. Plaintiffs have alleged that Defendants' enterprise uses interstate mail and wires (through telephone calls) to contact debtors across state lines and collect court debt from people out of state. SAC ¶ 279. Plaintiffs have also alleged facts that meet the depletion-of-assets theory; the complaint states that the enterprise has "collected millions of dollars in payments from thousands of debtors who would have used some of that money to purchase goods in interstate commerce." *Id.*; *see United States v. Boulahanis*, 677 F.2d 586, 589-90 (7th Cir. 1982) (effect on interstate commerce proved where extortionate activities prevented victim's out-of-state purchases amounting to only $68 a month). What's more, the enterprise "makes threats of arrest to, and collects money from, debtors and debtors' family members who live outside of Oklahoma.," including Plaintiff Melanie Holmes. SAC ¶¶ 76, 212. Interstate commerce has been affected by Defendants' actions.

### D.     Walton Has Participated in the Conduct of the RICO Enterprise.

Walton's various arguments regarding his participation in the conduct of the RICO enterprise make the same essential claim—that he only executed warrants, which cannot constitute participation in RICO conduct because it was a service performed in the regular course of business. *See* Doc. 408 at 21. These arguments do not support dismissal. Walton and the other Sheriff Defendants have participated in the RICO enterprise in multiple ways.

First, the Walton is a member of the OSA, which has acted as his "agent" with respect to the contract with Aberdeen. SAC ¶ 29. As a member, he "authorized [OSA] to enter into the

BRIEF D

Agreement for debt collection services on [his] behalf." *Id.*; *accord id.* ¶ 30. Walton is responsible for the activities of Aberdeen in his county with "full knowledge" of the misconduct. *Id.* ¶ 81.

Second, Walton was authorized by the contract to "select cases to refer to Aberdeen," and he also provided Aberdeen with "debtor information" it collects through OSA. *Id.* ¶¶ 57, 60; *see also* SAC Ex. A at 3. Enabling Aberdeen by assigning it the right to collect debt—and assisting a company that regularly extorts indigent debtors by threatening them with unlawful arrest—is a singular, discretionary act, and is not part of the "goods and services" he provided in the "regular course of business." *See Safe Sts. All. v. Hickenlooper*, 859 F.3d 865, 884 (10th Cir. 2017). Importantly, Walton was not an "outsider" merely providing services to the RICO enterprise; he has been an integral part of the enterprise, and decided individually to authorize Aberdeen's operation in Rogers County. *See George*, 833 F.3d at 1251-52.

Third, Walton "routinely arrest[s] and jail[s] individuals pursuant to . . . debt-collection arrest warrants that are based solely on nonpayment." SAC ¶ 10. Once a person is arrested for nonpayment, even if she is indigent and unable to pay, Walton, at his discretion, will hold her in jail unless she can pay a predetermined cash payment equivalent to the total debt she owes. *Id.* ¶ 32. There is nothing "legitimate" about this "law enforcement activity." Doc. 408 at 20. These illegal warrants are not part of Walton's legitimate activity for the same reason that their execution does not entitle the Sheriffs to absolute immunity: he participated in the scheme by knowingly participating in the procurement of the unlawful warrants, *see Malley v. Briggs*, 475 U.S. 335, 345 (1986), and, in fact, executes warrants he knows to be invalid, *see, e.g.*, *Juriss v. McGowan*, 957 F.2d 345, 352 (7th Cir. 1992). "[N]o reasonably well-trained officer should rely on [a] warrant" that is "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *United States v. Leon*, 468 U.S. 897, 923 (1984) (internal

BRIEF D

quotation marks omitted). Walton cannot reasonably claim that his "regular services" include executing and detaining people on warrants "not supported by oath or affirmation" or probable cause. SAC ¶ 336. The arrests contribute directly to the success of the RICO enterprise by making real Aberdeen's threats of unlawful arrest. The same is true of detention, as any cash paid by debtors to secure their release in Rogers County goes directly to paying those making threats.

Finally, Walton profits from the enterprise through the collection of Sheriff's Fees and through participation in the OSA. *See id.* ¶¶ 105-06, 149. Together, the allegations establish Walton's intimate and frequent participation in the RICO enterprise through a variety of means.

### E.   Plaintiffs Allege a Pattern of Racketeering Activity.

Finally, Walton argues that there is no "pattern" or racketeering activity, as required by the RICO Act, because this case "does not involve 'extortion.'" Doc. 408 at 22. His argument is mistaken for two reasons. First, the allegations adequately plead multiple predicate offenses of extortion, specifically, extortion under the Hobbs Act, the Travel Act, and Oklahoma law, and the extortionate extension of credit. Second, Walton's claim that there can be no extortion based on the collection of money intended solely for the government provides no defense here, as Aberdeen and OSA are both private beneficiaries of the money extorted by the RICO enterprise.[15]

#### 1.   Plaintiffs Adequately Plead Multiple Predicate Acts of Extortion.

***Hobbs Act.*** To establish extortion under 18 U.S.C. § 1951, Plaintiffs must only show that "(1) the defendant induced his victim to part consensually with property (2) either through the

---

[15] Walton also suggests that there has been no extortion because *he himself* did not obtain any property. Doc. 408 at 22. But this is a red herring, and merely a reiteration of his previous "participation" arguments. Walton benefits financially, and the fact that the Plaintiffs did not pay Walton directly does not absolve him of his participation in the larger RICO enterprise.

BRIEF D

wrongful use of actual or threatened force, violence or fear or under color of official right (3) in such a way as to adversely affect interstate commerce." *United States v. Smalley*, 754 F.2d 944, 947 (11th Cir. 1985). In this case, Walton has not contested that Plaintiffs "consensually" parted with property by paying Aberdeen, and the interstate commerce element is addressed above in Section IV.C. The only remaining issue is whether the RICO enterprise took payment (1) through "wrongful use of actual or threatened force, violence or fear" or (2) "under color of official right." 18 U.S.C. § 1951(b)(2).

Here, it is alleged that the RICO enterprise has engaged in Hobbs Act extortion through "threatened force" and "fear." Aberdeen "demands . . . payment under threat of unlawful arrest, intentionally conceals alternative options that would avoid issuance of an arrest warrant, and seeks warrants for the arrest of persons who it knows to be indigent without disclosing such information." SAC ¶ 281. It also "calls family members and threatens prolonged incarceration of the indigent person if the family does not pay money to Aberdeen." *Id.* As a result of these threats, Aberdeen has obtained payment from named Plaintiffs—payments Plaintiffs could make only after foregoing basic necessities. *Id.* ¶ 293. Moreover, Aberdeen has also collected money for the RICO enterprise "under color of official right," which requires a showing that "a public official has obtained payment to which he was not entitled, knowing that the payment was made in return for official acts." *United States v. Vigil*, 523 F.3d 1258, 1266 (10th Cir. 2008) (quoting *Evans v. United States*, 504 U.S. 255, 268 (1992)). Aberdeen and OSA act as public officials in their respective roles contracting for collection and collecting court debt on behalf of the RICO Enterprise, *see* Br. G, Section II.A; Br. E, Section I.A, and the RICO enterprise also comprises numerous sheriffs, including Walton, who are undeniably public officials. The complaint clearly alleges that both Aberdeen and OSA received payments to which they were not entitled (for example, payment from

22

BRIEF D

disability benefits, *see supra* Section IV.A) in return for official acts by Aberdeen seeking arrest warrants. *See, e.g.*, SAC ¶ 29.

**Travel Act and State Law.** The Travel Act prohibits "travel[] in interstate or foreign commerce or use[] [of] the mail or any facility in interstate or foreign commerce with intent to" commit unlawful activity, including extortion. 18 U.S.C. § 1952(a). The first prong is adequately pled here: as already established, Aberdeen sends threats by mail, SAC ¶ 72, and "makes threats of arrest to, and collects money from, debtors and debtors' family members who live outside of Oklahoma," *id*. ¶ 76; *see also supra* Section IV.C. The second prong requires a showing of extortion, which is defined in relation to state law. *United States v. Nardello*, 393 U.S. 286, 290 (1969). Under Oklahoma law, similar to the Hobbs Act, "[e]xtortion is the obtaining of property from another with his consent, induced by a wrongful use of force or fear, or under color of official right." Okla Stat. tit. 21, § 1481. "Fear" actionable under state law "may be induced by a threat," in relevant part, (1) "[t]o do an unlawful injury to the person or property of the individual threatened"; (2) "[t]o accuse him . . . of any crime"; or (3) "[t]o expose, or impute to him . . . any deformity or disgrace." *Id.* § 1482. As with the Hobbs Act, an attempt to obtain "satisfaction of a legitimate debt" is not considered a defense to extortion. *United States v. French*, 628 F.2d 1069, 1075 (8th Cir. 1980). "Likewise, it does not justify extortion of a wrongful payment under color of official right that the payment came from one who had a legitimate debt to the government." *Id.* The allegations in this case satisfy these broad categories for purposes of extortion under state law and the Travel Act.

**Extortionate Extension of Credit.** The RICO enterprise, through Aberdeen, also committed the predicate offense of extortionate credit transactions under 18 U.S.C. §§ 891–894, which does not require a connection to interstate commerce. These statutes prohibit the "use of

BRIEF D

any extortionate means (1) to collect or attempt to collect any extension of credit, or (2) to punish any person for the nonrepayment thereof." 18 U.S.C. § 894(a). "Collect[ing] an extension of credit" is defined as "induc[ing] in any way any person to make repayment thereof," *id.* § 891(5), and the extension of credit encompasses "any debt," *see id.* § 891(1). In this case, Plaintiffs allege that Aberdeen enters into repayment agreements with indigent debtors. *See, e.g.* SAC ¶¶ 77-79. Aberdeen undeniably profits from the collected money, *id.* ¶ 107, and the law extends to "the use of extortionate means to collect '*any* extension of credit,'" *United States v. Enriquez*, 106 F.3d 414, 1997 WL 31567, at *1 (10th Cir. 1997) (unpublished) (emphasis added) (quoting 18 U.S.C. § 894), including legitimate ones. *United States v. Goode*, 945 F.2d 1168, 1169 (10th Cir. 1991). An agreement to accept deferred payments to satisfy a civil judgment debt constitutes an extension of credit within the meaning of the statute. *Id.* at 1171. Here, Aberdeen negotiates with debtors about payment plans, uses extortionate means to extract payments pursuant to those plans, and profits from the money paid.

"Extortionate means" refers to "the use of force or threats for the purpose of extorting money." *United States v. Briola*, 465 F.2d 1018, 1022 (10th Cir. 1972). Threats "instill fear in the person to whom they are directed or are reasonably calculated to do so in light of the surrounding circumstances." *United States v. Natale*, 526 F.2d 1160, 1168 (2d Cir. 1975) (cleaned up). Even vague, implicit threats count. *See United States v. Analetto*, 807 F.3d 423, 428 (1st Cir. 2015) (voicemail stating "start doing the right thing or, you know, 2012 isn't going to be too good for you"); *United States v. Serrantonio*, 159 F.3d 1349, 1998 WL 611981, at *1 (2d Cir. 1998) (unpublished) ("I'm not somebody you want as your enemy" and "[if] you do the right thing, everything will be okay and nobody will do anything"). Here, the allegations amply demonstrate applicable threats. *See, e.g.*, SAC ¶ 75 (Aberdeen employee passed the phone to a person

24

BRIEF D

purporting to be law enforcement, who stated that he would immediately arrest the debtor if he did not pay enough money).

2.      The Extortion Benefitted Private Entities as Well as the Government.

Walton's second argument—that there can be no extortion where the "sole" intended beneficiary is a government entity, Doc. 408 at 23 (quoting *Wilkie v. Robbins*, 551 U.S. 537, 564-65 (2007))—fares no better. *Wilkie* expressly distinguished cases in which money was extorted to benefit *both* a private third party and a government actor. *See* 551 U.S. at 565 (distinguishing *People v. Whaley*, 6 Cow. 661, 1827 WL 2284 (N.Y. 1827)); *see also United States v. Renzi*, 861 F. Supp. 2d 1014, 1022 (D. Ariz. 2012), *aff'd* 769 F.3d 731 (9th Cir. 2014). In this case, the money is intended for both public *and* private benefit: the extortionate scheme has netted millions of dollars in profit for Aberdeen and the OSA, both private entities. *See, e.g.*, SAC ¶ 3. In instances such as this one, *Wilkie* does not bar relief.

## V.      Plaintiffs' Claims Against Walton Are Not Moot.

Walton incorporates Rogers County's argument that statutory amendments have mooted this case. Doc. 408 at 25 (citing Doc. 406 at 17-25). Thus, Plaintiffs incorporate their response to the same. *See* Br. B, Section III. In brief, this case is not moot because Plaintiffs do not challenge the constitutionality of a statute. They challenge *conduct* that, throughout the course of this case, has violated extant statutes and rules. Accordingly, and moreover, any changes would constitute voluntary cessation. At this stage, none of Plaintiffs' equitable claims are moot.

**CONCLUSION**

For the reasons stated above, the Court should deny Walton's motion to dismiss.


Dated: August 10, 2023                    Respectfully submitted,

                                          /s/ *Daniel E. Smolen*
                                          Daniel Smolen, OBA #19943

25

BRIEF D

Robert M. Blakemore, OBA #18656
Smolen & Roytman
701 South Cincinnati Avenue
Tulsa, OK 74119
Tel: 918-585-2667
Fax: 918-585-2669

/s/ *Ryan Downer*
Ryan Downer (admitted *pro hac vice*)
D.C. Bar No. 1013470
Katherine Hubbard (admitted *pro hac vice*)
D.C. Bar No. 1500503
Marco Lopez (admitted *pro hac vice*)
D.C. Bar No. 888324793
Leonard J. Laurenceau (admitted *pro hac vice*)
D.C. Bar No. 90007729
Ellora Thadaney Israni (admitted *pro hac vice*)
D.C. Bar No. 1740904
Civil Rights Corps
1601 Connecticut Ave. NW, Suite 800
Washington, D.C. 20009
Tel.: 202-844-4975
ryan@civilrightscorps.org
katherine@civilrightscorps.org
marco@civilrightscorps.org
leo@civilrightscorps.org
ellora@civilrightscorps.org

/s/ *Seth Wayne*
Seth Wayne (admitted *pro hac vice*)
D.C. Bar No. 888273445
Shelby Calambokidis (admitted *pro hac vice*)
D.C. Bar No. 1684804
Mary B. McCord (admitted *pro hac vice*)
D.C. Bar No. 427563
Institute for Constitutional Advocacy and Protection
Georgetown University Law Center
600 New Jersey Ave. NW
Washington, D.C. 20001
Tel: 202-662-9042
sw1098@georgetown.edu
sc2053@georgetown.edu
mbm7@georgetown.edu

*Attorneys for the Plaintiffs*

BRIEF D

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of August, 2023, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants who have appeared in this case.

/s/ *Seth Wayne*

BRIEF D