# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| **CARLY GRAFF, et al.,** | |
| *Plaintiffs*, | |
| v. | **Case No. 4:17-CV-606-TCK-JFJ** |
| **ABERDEEN ENTERPRIZES II, INC., et al.,** | |
| *Defendants*. | |

## PLAINTIFFS' OPPOSITION TO 51 COUNTY SHERIFF DEFENDANTS' RENEWED MOTION TO DISMISS (OFFICIAL CAPACITY)

### BRIEF I

Daniel Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Smolen & Roytman
701 South Cincinnati Avenue
Tulsa, OK 74119
Tel: 918-585-2667
Fax: 918-585-2669

Seth Wayne (admitted *pro hac vice*)
D.C. Bar No. 888273445
Shelby Calambokidis (admitted *pro hac vice*)
D.C. Bar No. 1684804
Mary B. McCord (admitted *pro hac vice*)
D.C. Bar No. 427563
Institute for Constitutional Advocacy
  and Protection
Georgetown University Law Center
600 New Jersey Ave. NW
Washington, D.C. 20001
Tel.: 202-662-9042
sw1098@georgetown.edu
sc2053@georgetown.edu
mbm7@georgetown.edu

Ryan Downer (admitted *pro hac vice*)
D.C. Bar No. 1013470
Katherine Hubbard (admitted *pro hac vice*)
D.C. Bar No. 1500503
Marco Lopez (admitted *pro hac vice*)
D.C. Bar No. 888324793
Leonard J. Laurenceau (admitted *pro hac vice*)
D.C. Bar No. 90007729
Ellora Thadaney Israni (admitted *pro hac vice*)
D.C. Bar No. 1740904
Civil Rights Corps
1601 Connecticut Ave. NW, Suite 800
Washington, D.C. 20009
Tel.: 202-844-4975
ryan@civilrightscorps.org
katherine@civilrightscorps.org
marco@civilrightscorps.org
leo@civilrightscorps.org
ellora@civilrightscorps.org

*Attorneys for the Plaintiffs*

## <u>Index of Plaintiffs' Opposition Briefs</u>

For ease of reference, each of Plaintiffs' opposition briefs has been labeled by letter according to the motion to dismiss to which it responds, listed below.

A.  51 County Sheriff Defendants, Individual Capacity (Doc. 407)

B.  Rogers County Defendants, Official Capacity (Doc. 406)

C.  Kim Henry, Former Court Clerk of Rogers County, Individual Capacity (Doc. 402)

D.  Scott Walton, Sheriff of Rogers County, Individual Capacity (Doc. 408)

E.  Aberdeen Enterprizes II, Inc. (Doc. 404)

F.  Jim and Rob Shofner (Doc. 403)

G.  Oklahoma Sheriffs' Association (Doc. 405)

H.  Defendant Judges (Doc. 412)

I.  51 County Sheriff Defendants, Official Capacity (Doc. 398)

J.  Vic Regalado, Sheriff of Tulsa County, Individual Capacity (Doc. 409)

K.  Don Newberry, Court Clerk of Tulsa County, Individual Capacity (Doc. 411)

L.  Darlene Bailey, Cost Administrator of Tulsa County, Individual Capacity (Doc. 410)

M.  Tulsa County Defendants, Official Capacity (Doc. 399)

BRIEF I

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION .............................................................................................. 1

RELEVANT BACKGROUND ........................................................................... 2

ARGUMENT ..................................................................................................... 4

I.     Plaintiffs Have Standing to Sue the County Sheriffs and Have Stated Claims Against Each of Them in Their Official Capacities. ................................. 4

      A.    The County Sheriffs Have Final Policymaking Authority with Respect to the Decision to Hire and Assist Aberdeen, as well as the Execution of Warrants, and Their Policies Were the Moving Force Behind Plaintiffs' Injuries. ........................................................................... 6

           1.    Contracting with and Assisting Aberdeen ....................................... 6

           2.    Arresting Indigent Debtors on Warrants Known to Be Unlawful .............................................................................................. 7

      B.    Plaintiffs' Claims Pose No "Prudential Standing Problem." ....................... 9

II.    Plaintiffs Have Stated a Valid Claim for a Due Process Violation Because of Aberdeen's Conflicting Loyalties to Money and Justice ................................. 12

III.   Plaintiffs Have Stated a Claim that the County Sheriffs Violate Plaintiffs' Equal Protection Rights. ..................................................................................... 20

IV.   Plaintiffs' Claims Are Not Moot ............................................................................. 23

CONCLUSION ...................................................................................................... 25

BRIEF I

## **TABLE OF AUTHORITIES**

**Cases**

*Bhd. of Locomotive Firemen & Enginemen v. United States*, 411 F.2d 312 (5th Cir. 1969) ....... 12

*Bishop v. United States ex rel. Holder*, 962 F. Supp. 2d 1252 (N.D. Okla. 2014) ...................... 23

*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175 (10th Cir. 2010)........................ 5

*Broussard v. Parish of Orleans*, 318 F.3d 644 (5th Cir. 2003) ................................................ 14, 15

*Brown v. Cameron-Brown Co.*, 30 Fed. R. Serv. 2d 1181, 1980 WL 1856 (E.D. Va. 1980)....... 10

*Burns v. State*, 220 P.2d 473 (Okla. Crim. App. 1950) ................................................................. 8

*Cain v. City of New Orleans*, 327 F.R.D. 111 (E.D. La. 2018) .................................................... 22

*Cantrell v. Commonwealth*, 329 S.E.2d 22 (Va. 1985) ................................................................ 13

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009).............................................................. 12

*Com. Standard Ins. Co. v. Liberty Plan Co.*, 283 F.2d 893 (10th Cir. 1960) .............................. 10

*Connally v. Georgia*, 429 U.S. 245 (1977) ................................................................................... 12

*Evers v. Custer County*, 745 F.2d 1196 (9th Cir. 1984) ............................................................... 21

*Fair Fight Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251 (N.D. Ga. 2019) ...................... 25

*Flora v. Sw. Iowa Narcotics Enf't Task Force*, 292 F. Supp. 3d 875 (S.D. Iowa 2018)... 13, 17, 19

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ................ 25

*Fuller v. Oregon*, 417 U.S. 40 (1974)........................................................................................... 20

*Ganger v. Peyton*, 379 F.2d 709 (4th Cir. 1967) ......................................................................... 12

*Garner v. Memphis Police Dep't*, 8 F.3d 358 (6th Cir. 1993)....................................................... 21

*Graff v. Aberdeen Enterprizes, II, Inc.*, 65 F.4th 500 (10th Cir. 2023) .................................. 2, 24

*Hamilton v. Am. Corrective Counseling Servs.*, No. 3:05-cv-434RM, 2006 WL 3332828
    (N.D. Ind. Nov. 14, 2006).......................................................................................................... 18

*Harjo v. City of Albuquerque*, 307 F. Supp. 3d 1163 (D.N.M. 2018) ......................................... 13

*Harper v. Prof'l Prob. Servs.*, 976 F.3d 1236 (11th Cir. 2020)............................................. 15, 19

*Hollingsworth v. Hill*, 110 F.3d 733 (10th Cir. 1997) ................................................................... 5

*Hunnicutt v. Zeneca, Inc.*, No. 10-cv-708, 2012 WL 4321392 (N.D. Okla. Sept. 19, 2012) ....... 11

*In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92 (D.N.J. 2012)............................................. 10

*James v. Strange*, 407 U.S. 128 (1972).................................................................................. 20, 23

*Malley v. Briggs*, 475 U.S. 335 (1986) .......................................................................................... 8

*Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980) ..................................................................... 12, 15

*Merck Sharp & Dohme Corp. v. Conway*, 861 F. Supp. 2d 802 (E.D. Ky. 2012)........................ 12

*Messerschmidt v. Millender*, 565 U.S. 535 (2012) ....................................................................... 8

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). .................................... 5

*Moore v. Comfed Sav. Bank*, 908 F.2d 834 (11th Cir. 1990)........................................................ 11

*Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313 (10th Cir. 1998) .............................. 6

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007)...................... 25

*Payton v. County of Kane*, 308 F.3d 673 (7th Cir. 2002) ............................................................. 11

*Pembaur v. City of Cincinatti*, 475 U.S. 469 (1986).............................................................. 5, 21

*People v. Zimmer*, 414 N.E.2d 705 (N.Y. 1980) .......................................................................... 13

*Reid v. Hamby*, 124 F.3d 217, 1997 WL 5379091 (10th Cir. 1997)............................................. 6

*Rembert v. Sheahan*, 62 F.3d 937 (7th Cir. 1995) ....................................................................... 25

*Rios v. Marshall*, 100 F.R.D. 395 (S.D.N.Y. 1983)....................................................................... 9

*Rodriguez v. Providence Cmty. Corr., Inc.*, 191 F. Supp. 3d 758 (M.D. Tenn. 2016)................ 23

*Rolf v. City of San Antonio*, 77 F.3d 823 (5th Cir. 1996)............................................................. 22

*Schwarm v. Craighead*, 552 F. Supp. 2d 1056 (E.D. Cal. 2008)........................................... 17, 18

BRIEF I

*State ex rel. Koppers Co. v. Int'l Union*, 298 S.E.2d 827 (W.Va. 1982) ..................................... 13

*State v. Culbreath*, 30 S.W.3d 309 (Tenn. 2000) .............................................................. 13

*State v. Eldridge*, 951 S.W.2d 775 (Tenn. Crim. App. 1997) ............................................. 13

*Tumey v. Ohio*, 273 U.S. 510 (1927) ........................................................................... 12

*United States v. Leon*, 468 U.S. 897 (1984) ..................................................................... 7

*Ward v. Village of Monroeville*, 409 U.S. 57 (1972) .......................................................... 12

*Warner v. Orange Cnty. Dep't of Prob.*, 115 F.3d 1068 (2d Cir. 1996) ............................... 16

*Wilson v. City of New Orleans*, 479 So.2d 891 (La. 1985) ................................................. 18

*Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987) ........................... 12, 16

**Constitutional Provisions**

Okla. Const. art. 7, § 7(a) .......................................................................................... 22

**Statutes**

18 U.S.C. §§ 1961–1968 ............................................................................................... 1

42 U.S.C. § 1983 ........................................................................................................... 5

La. R.S. § 13:1336 ....................................................................................................... 22

Okla. Stat. tit. 19, § 514.4 ............................................................................... 3, 6, 8, 21

Okla. Stat. tit. 19, § 514.5 ................................................................................... 3, 21

Okla. Stat. tit. 22, § 983 .............................................................................................. 24

Oklahoma Uniform Consumer Credit Code, Okla. Stat. tit. 14A, §§ 1-101 *et seq.* ................... 21

**Legislative Materials**

H.B. 3242, 52d Leg., 2d Reg. Sess. (Okla. 2010) .......................................................... 6

S.B. 689, 56th Leg., 2d Reg. Sess. (Okla. 2018) ......................................................... 24

**Other Authorities**

7AA Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1785.1 (3d ed.) ......... 11

Ex. 9 to Def. Linda Beaver Official-Capacity Mot. for Summ. J., *Jones v. Hacker*, No. 13-cv-
   444, 2015 WL 1279352 (E.D. Okla. Mar. 20, 2015) .................................................... 14

BRIEF I

## INTRODUCTION

This class action lawsuit challenges a systemic and extortionate scheme in Oklahoma, whereby local officials, in concert with Aberdeen Enterprizes II, Inc. ("Aberdeen"), use threats of arrest and actual imprisonment to extract money from indigent people who owe court debts for traffic and criminal offenses. Defendants employ these coercive tactics against members of the putative class without doing anything to assess their ability to pay the debts levied against them. Plaintiffs, all of whom owe or have owed fines, fees, and costs to the court system, are thus threatened, arrested, and imprisoned—not because of any willful refusal to pay, but solely due to their indigence. As a result of this scheme, tens of millions of dollars—squeezed from Oklahoma's poorest citizens, who sacrifice basic necessities of life in an attempt to avoid being thrown in jail— have flowed to Aberdeen, a private, for-profit debt-collection company; the Oklahoma Sheriffs' Association ("OSA"), a private lobbying organization; dozens of County Sheriffs' offices; and the Oklahoma court system. Plaintiffs' suit challenges the operation of this scheme, which violates the federal Constitution, Oklahoma law, and the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. §§ 1961–1968).

County Sheriffs of 51 Oklahoma counties ("County Sheriffs")[1] are sued here in both their individual and official capacities. This brief-in-opposition responds to their official capacity arguments. *See* Doc. 398. Plaintiffs assert two claims against the County Sheriffs in their official capacities. First, they allege that the County Sheriffs' use of Aberdeen, an enforcement actor with a direct financial stake in the cases under its authority, violates the Due Process Clause of the Fourteenth Amendment (Count 6). Second, Plaintiffs allege that the County Sheriffs' use of

---

[1] There are 54 Sheriffs named in the Second Amended Complaint. Plaintiffs voluntarily dismissed one of those sheriffs, *see* Doc. 280, and two others—the Sheriffs of Tulsa and Rogers Counties— have filed separate motions to dismiss.

BRIEF I

Aberdeen and assistance in the company's extortionate activities constitute impermissible onerous collection practices against indigent criminal court debtors, in violation of the Equal Protection Clause of the Fourteenth Amendment (Count 7).

The County Sheriffs raise various arguments in support of their motion to dismiss the official-capacity claims (Doc. 398), but none are availing. Many of these arguments resemble the ones made in support of the Sheriffs' individual-capacity motion to dismiss (Doc. 407), and fail for similar reasons: As explained below, Plaintiffs have standing to sue the County Sheriffs, their request for injunctive relief has not been mooted by recent changes to state law, and the policies and practices that Plaintiffs challenge are attributable to the Sheriffs as statutorily empowered decisionmakers and no one else. As Plaintiffs allege consistently, the County Sheriffs continue to work in partnership with Aberdeen, despite the Sheriffs' knowledge of the company's extortionate and extreme debt collection practices. Aberdeen's substantial financial incentive creating a conflict of interest and the onerous surcharge imposed upon transfer are clear from the face of the contract each Sheriff has authorized for his or her county. Moreover, Plaintiffs allege that the County Sheriffs' practices discriminate against indigent criminal court debtors when compared with other types of judgment debtors. These allegations are more than sufficient to find each County Sheriff Defendant liable for the challenged conduct. Defendants' motion should be denied.

## **RELEVANT BACKGROUND**[2]

Each County Sheriff's office authorized the OSA, on the Sheriff's behalf, to enter into a contract with Aberdeen for debt-collection services for people with outstanding warrants for nonpayment of court debt. Second Am. Compl. ("SAC"), Doc. 212, ¶ 30. This was a purely

---

[2] This section includes allegations relevant to Plaintiffs' claims against the County Sheriffs in their official capacities. For a summary of the allegations and claims against all Defendants, see *Graff v. Aberdeen Enterprizes, II, Inc.*, 65 F.4th 500, 509-14 (10th Cir. 2023).

BRIEF I

discretionary action by each County Sheriff: state law expressly provided them a choice of whether to do so. *See* Okla. Stat. tit. 19, § 514.4(A) (eff. Nov. 1, 2010).[3]

The County Sheriffs' contracts with Aberdeen have been consistently renewed, and permit the transfer of cases to Aberdeen when court debtors cannot pay, leading to the company to using threats of arrest and actual imprisonment to extort money from indigent debtors for their own financial benefit. SAC ¶ 55. Transfer to Aberdeen through the contract results in an automatic 30-percent increase in the total amount owed by the debtor. *Id.* The portion of this surcharge that Aberdeen retains is its sole source of income, *id.* ¶ 26, giving Aberdeen a direct financial stake in the cases under its authority and presenting a conflict of interest that violates the Due Process Clause (Count 6). The County Sheriffs are fully aware of Aberdeen's misaligned incentives: the contract itself reveals that the company's revenue directly depends on how much debt it collects, and the Sheriffs' own trade organization and agent has profited exponentially—a more than 60-fold increase in assets—as a result of Aberdeen's collections activity. *Id.* ¶¶ 56-59, 104-07. The County Sheriffs are obligated—by the contract into which they themselves have chosen to enter—to assist Aberdeen in its collection activities. *Id.* ¶ 283. Aberdeen, empowered by the County Sheriffs through the contract and their assistance, and motivated by its own financial ends, unlawfully threatens and coerces members of the putative class to make payments they cannot afford and seeks warrants when debtors, solely because of their poverty, are unable to pay. *Id.* ¶ 2.

---

[3] Attached as Exhibit 1 to Br. A are the versions of Okla. Stat. tit. 19, §§ 514.4 & 514.5 that were in place at the time Plaintiffs filed suit in 2017 (the 2010 laws) and that have been in place since an amendment took effect in 2018 (the 2018 laws). Both versions of § 514.4 authorize sheriffs to assign their contract rights to the OSA. The main difference is that while the 2010 laws allowed the sheriff to contract with debt collector directly, the 2018 laws require the OSA to serve as a go-between. The most recent amendments to these statutes (which are attached as exhibits to numerous Defendants' renewed motions to dismiss, *see, e.g.*, Doc. 405-1), will take effect on November 1, 2023 and do not alter this scheme.

BRIEF I

The County Sheriffs then make Aberdeen's threats reality by arresting and jailing individuals pursuant to Aberdeen's requested debt-collection arrest warrants, *id.* ¶ 10, actions not required by any law or court and fully within the County Sheriffs' discretion. When these coercive methods do extract money from people, the County Sheriffs financially benefit, relying on money collected from court debts to partially fund their operations, *id.* ¶ 30, while OSA as their agent splits with Aberdeen the 30-percent surcharge that is attached to every transfer to the company, *id.* ¶ 59. These arrests and subsequent detention subject those too poor to pay, including Plaintiffs and putative class members, to onerous debt-collection enforcement methods not experienced by other types of debtors, in violation of the Equal Protection Clause (Count 7).

These constitutional violations result from deliberate choices made by the County Sheriffs, each of whom is the final policymaker regarding contracting with Aberdeen and other law enforcement activity in his or her county. The County Sheriffs have authority under Oklahoma law to select a method of debt collection. They chose—and continue to choose—Aberdeen for this purpose and provide Aberdeen with debtor information to assist its efforts. The County Sheriffs then arrest and confine individuals on debt-collection arrest warrants issued based on unsworn statements, without inquiry into the individual's ability to pay or any other pre-deprivation process, and on warrant applications that no reasonable person could believe are sufficient to justify arrest. *Id.* ¶ 30. The County Sheriffs are liable for these actions in their official capacities.

## **ARGUMENT**

I.    **Plaintiffs Have Standing to Sue the County Sheriffs and Have Stated Claims Against Each of Them in Their Official Capacities.**

The County Sheriffs argue that Plaintiffs lack standing to sue "most" of them. Doc. 398 at 12. In particular, they maintain that Plaintiffs are attempting to hold them responsible for the actions of third parties and thus cannot satisfy the "fairly traceable" element of Article III standing

4

BRIEF I

analysis. *Id.* They also claim that Plaintiffs have not made "allegations regarding county practices" carried out by the County Sheriffs, *id.* at 13, and that for the same reason, Plaintiffs cannot establish *Monell* liability under § 1983, *id.* at 31-34. These arguments largely overlap, and are wrong for mostly the same reasons. Plaintiffs address them together.

Simply put, Defendants are incorrect that Plaintiffs "make no allegations regarding county practices" carried out by the County Sheriffs sufficient to establish Article III standing and municipal liability. *Id.* at 13. "Municipal liability under § 1983 attaches where . . . a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010) (alteration omitted) (quoting *Pembaur v. City of Cincinatti*, 475 U.S. 469, 483-84 (1986)); *see also Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978). Such liability "may be based on a formal regulation or policy statement, or it may be based on an informal 'custom' so long as this custom amounts to a widespread practice that . . . is so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Brammer-Hoelter*, 602 F.3d at 1189 (internal quotation marks omitted). Here, the County Sheriffs are final policymakers for their respective counties under *Monell*. Each Sheriff, as county policymaker, has made the decision to contract with Aberdeen, to assist its collection activities, and to arrest and detain people on unlawful warrants as a means of enforcing court debts as part of their participation in the contract. These official actions on behalf of Sheriffs' counties constitute a moving force behind the resulting violations, cementing Plaintiffs' standing to challenge them.

BRIEF I

**A.**   **The County Sheriffs Have Final Policymaking Authority with Respect to the Decision to Hire and Assist Aberdeen, as well as the Execution of Warrants, and Their Policies Were the Moving Force Behind Plaintiffs' Injuries.**

      1.   <u>Contracting with and Assisting Aberdeen</u>

Sheriffs are county actors with final policymaking authority over "law enforcement activities" in each of their counties. *Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1319 (10th Cir. 1998). Oklahoma law confirms that the decision to hire Aberdeen falls within the scope of that final policymaking authority. The law under which each County Sheriff contracted with Aberdeen provided that "County Sheriffs" "*may*" contract with a private debt collector "to attempt to *locate and notify persons* of their outstanding misdemeanor or failure-to-pay warrants." *See* Okla. Stat. tit. 19, § 514.4(A) (eff. Nov. 1, 2010) (emphases added). Indeed, the description of that legislation was "[a]n Act relating *to counties and county officers* . . . which relate to outstanding warrants . . . ." H.B. 3242, 52d Leg., 2d Reg. Sess. (Okla. 2010) (emphasis added). Each County Sheriff, moreover, had authority to decide whether to enter into a contract directly or to designate OSA as its agent to do so. Okla. Stat. tit. 19, § 514.4(E) (eff. Nov. 1, 2010). Tellingly, this provision that vests the sheriffs with authority to decide whether to contract with an entity such as Aberdeen is part of the same chapter of Oklahoma law as other provisions that courts have determined constitute county functions. *See Hollingsworth v. Hill*, 110 F.3d 733, 743 (10th Cir. 1997); *Reid v. Hamby*, 124 F.3d 217, 1997 WL 537909, at *5 & n.1 (10th Cir. 1997) (unpublished). Here, each County Sheriff designated OSA as their agent to contract with a private debt collector for their specific county; and some have since made the decision to stop doing so. *See, e.g.*, Doc. 342. Thus, when each County Sheriff exercised their discretion under state law to hire and then re-hire Aberdeen (through OSA), they did so as a county officer with final policymaking authority.

Moreover, under the terms of the contract that each Sheriff authorized as county policymaker, the County Sheriffs are required to assist Aberdeen in its collection activities. *See*

6

BRIEF I

SAC ¶ 283 (requiring sheriffs to "provide debtor information"); *id.* (sheriffs and court clerks have "sole discretion" to choose cases to transfer to Aberdeen). Any assistance provided to the company is attributable to the contract authorized by each Sheriff making the decision for his or her county. These facts alone are sufficient to establish county liability with respect to Counts 6 and 7, the only claims that Plaintiffs bring against the County Sheriffs in their official capacities.

2.  <u>Arresting Indigent Debtors on Warrants Known to Be Unlawful</u>

Although not necessary to establish liability for Counts 6 and 7, Plaintiffs have pled that in addition to contracting with and assisting Aberdeen, the County Sheriffs execute debt-collection arrest warrants they know to be unlawful. As alleged, "courts routinely issue" the nonpayment arrest warrants Aberdeen requests "without any inquiry into or knowledge of whether the person had the means to pay." SAC ¶ 92. The courts "issue the debt-collection arrest warrants Aberdeen, Inc. seeks, even though the warrants are predicated on nothing more than Aberdeen, Inc.'s unsworn factual allegation that a debtor has not made payments." *Id.* ¶ 64. The County Sheriffs thereafter "execute the illegal arrest warrants and detain debtors based solely on the unsworn allegations of nonpayment." *Id.* ¶ 65. Critically, Plaintiffs allege that the County Sheriffs do this *with full knowledge of Aberdeen's unlawful collection practices and the unconstitutionality of the warrants*. *Id.* ¶¶ 65, 81. The decision to execute such warrants falls within the County Sheriffs' policymaking authority.

To be clear, although the courts issue these warrants, the County Sheriffs make the deliberate choice to enforce them. Longstanding Supreme Court precedent establishes that officers may be held liable for enforcing warrants when they lack a reasonable belief that the warrants are lawful. *See generally United States v. Leon*, 468 U.S. 897, 923 (1984); *Malley v. Briggs*, 475 U.S.

7

BRIEF I

335, 344-45 (1986).[4] Here, it is alleged that the County Sheriffs not only lack a reasonable belief, but that they execute warrants with full knowledge of Aberdeen's unlawful practices and that the warrants are issued on nothing more than unsworn allegations of nonpayment. SAC ¶¶ 65, 81. This aligns with state law, which only requires Sheriffs to exercise warrants "according to law." Okla. Stat. tit. 19, § 514.

The County Sheriffs cannot hide behind the fiction that these are "facially valid judicial orders." Doc. 398 at 10. The debt-collection arrest warrants challenged here are not the type of judicial orders that Sheriffs are granted license (or obligated) to enforce. There is simply no duty for Sheriffs to enforce court orders they *know* to be deficient, even if issued by a lawful authority. For example, in *Burns v. State*, 220 P.2d 473 (Okla. Crim. App. 1950), the Criminal Court of Appeals of Oklahoma found that a warrant could not be lawfully executed even though it was issued by a judge, because the person who had obtained it was not employed by a sheriff and did not swear to the allegations in the request, creating a risk a false statements. *Id.* at 475-76; s*ee also, e.g.*, *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012) ("[T]he fact that a neutral magistrate has issued a warrant . . . does not end the inquiry into objective reasonableness.").

Here, Plaintiffs allege that magistrates have abandoned their judicial role by rubber-stamping warrants at Aberdeen's request, and that the warrants themselves lack any indicia of probable cause whatsoever. The County Sheriffs cannot claim that the mere existence of warrants they know to be unlawful rendered them powerless. The decision to enforce unconstitutional warrants accordingly fell within each County Sheriff's discretion, was not mandated by law, and

---

[4] Functionally, this is no different than a warrantless arrest, and a sheriff, of course, does not act as an arm of the state courts in carrying out such arrests.

BRIEF I

is the moving force behind the constitutional harms suffered by Plaintiffs.[5] The Sheriffs may each therefore be held liable under *Monell*.

### B. Plaintiffs' Claims Pose No "Prudential Standing Problem."

The County Sheriffs argue as well that the putative class's claims against them pose a "prudential standing problem." Doc. 398 at 13.[6] This argument fails. From the start, it omits that Plaintiffs Kendallia Killman, Ira Lee Wilkins, and Melanie Holmes have pled harms caused specifically by policies of the Cleveland County, Wagoner County, and Creek County Sheriffs, respectively. SAC ¶¶ 22, 24-25. At the very least, those Defendant Sheriffs must remain. But regardless, the County Sheriffs' argument as a whole lacks merit for two reasons.

First, when a plaintiff alleges harm at the hands of a conspiracy, as Plaintiffs do here, *see, e.g.*, SAC ¶ 292, she has standing to sue all participants in the conspiracy, regardless of whether she interacted directly with each individual participant. *See, e.g.*, *Rios v. Marshall*, 100 F.R.D. 395, 404 (S.D.N.Y. 1983) ("a plaintiff injured by one of the defendants as a result of the conspiracy has standing to sue the co-conspirator defendants even though that plaintiff had no direct dealings with

---

[5] In a footnote, the County Sheriffs attempt to evade responsibility by arguing that there is "no agency relationship between the County Sheriffs and Aberdeen," and by stating that they "are not liable . . . for Aberdeen's conduct." Doc. 398 at 29-30 n.11. This assertion misunderstands Plaintiffs' claims. As explained, Plaintiffs do not allege that the County Sheriffs—acting in their official capacity—are liable for Aberdeen's conduct; they allege that the Sheriffs themselves played an active role in inflicting Plaintiffs' injuries by entering into a contract with Aberdeen and enabling Aberdeen's extortion scheme. These allegations do not rely on vicarious liability.

[6] In the same vein, the County Sheriffs assert that the Second Amended Complaint makes only "collective allegations" that fail to satisfy *Iqbal*'s plausibility standard. Doc. 398 at 31-34. They are incorrect. Plaintiffs have pled that each official capacity County Sheriff has the same two unlawful policies: "[e]ach Defendant Sheriff's office authorized the [OSA] to enter into the contract for debt collection services with Aberdeen, Inc. on the Sheriff's behalf" and "each of County Sheriffs" uses the power of arrest to collect court debts. SAC ¶ 30. It is not improperly "collective" to plead that multiple defendants have engaged in the same type of unconstitutional conduct. Neither Rule 8 nor *Iqbal* demands that Plaintiffs list allegations against each Defendant in separate paragraphs.

9

BRIEF I

the co-conspirators" and "to represent a class of individuals injured by any of the defendants as part of the conspiracy"); *Brown v. Cameron-Brown Co.*, 30 Fed. R. Serv. 2d 1181, 1980 WL 1856, at *3 (E.D. Va. 1980) ("the requisite nexus between the defendants and the injured plaintiffs may be established" if all defendants "are linked together by virtue of participation in a conspiracy"), *aff'd in relevant part by* 652 F.2d 375 (4th Cir. 1981). This stems from the foundational tort law principle that each member of a conspiracy "is jointly and severally liable for the damages resulting from the conspiracy." *Com. Standard Ins. Co. v. Liberty Plan Co.*, 283 F.2d 893, 894 (10th Cir. 1960); *see also In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 113 (D.N.J. 2012).

In this case, Plaintiffs allege that *all* the County Sheriffs have entered into a conspiracy that has harmed the named Plaintiffs. SAC ¶ 292. This conspiracy underpins Plaintiffs' RICO claim (Count 1), and these allegations are incorporated into each of Plaintiffs' constitutional claims against the County Sheriffs in their official capacities. *Id.* ¶¶ 354, 360. The County Sheriffs have entered into an agreement by which they all knowingly participate in the same scheme, whereby they enable and endorse Aberdeen's profit-seeking conduct through "execut[ing] the arrest warrants threatened and obtained by Aberdeen," "provid[ing] debtor information to Aberdeen," "transfer[ring] cases to Aberdeen[] for collection," and "detain[ing] persons in jail pending payment to Aberdeen[.]" *Id.* ¶¶ 283-84; *see also id.* ¶¶ 29-30, 65, 284 (explaining how sheriffs benefit financially as members of the OSA, whom they authorized to contract with Aberdeen).

Second, Plaintiffs also have standing to bring their § 1983 claims against the County Sheriffs pursuant to the "juridical link" doctrine. Because class members have been injured by each County Sheriff through the same course of conduct, the named Plaintiffs have Article III standing to bring these claims on behalf of the class. That is, "if all the defendants took part in a similar scheme that was sustained either by a contract or conspiracy, or was mandated by a uniform

10

BRIEF I

state rule, it is appropriate to join as defendants even parties with whom the *named* class representative did not have direct contact." *Payton v. County of Kane*, 308 F.3d 673, 679 (7th Cir. 2002), *cert. denied*, 540 U.S. 812 (2003); *see also Moore v. Comfed Sav. Bank*, 908 F.2d 834, 838-39 (11th Cir. 1990). In such circumstances, standing exists "even though the representative was injured by the conduct of only one of the" defendants. 7AA Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1785.1 (3d ed.). Here, all of the County Sheriffs take part in a similar scheme sustained by a single contract that applies to "participating County Sheriffs of Oklahoma," i.e., the County Sheriffs in this action. SAC Ex. A, Doc. 212-1, at 1. The facts supporting Plaintiffs' claims against these Sheriffs and the ensuing injuries are materially identical for each Sheriff, as they have each authorized cases to be transferred to Aberdeen for debt collection. SAC ¶ 30. As a practical matter, the sheer number of defendants engaged in the same unlawful activity makes it infeasible to add individual named plaintiffs for each county or to bring separate lawsuits. *See Moore*, 908 F.2d at 838 ("The case is simpler and more economical with the class of plaintiffs and the named defendants. . . . No court would want to have 644 separate lawsuits." (internal quotation marks omitted)). Under the juridical link doctrine, therefore, the named Plaintiffs have standing to sue all of the County Sheriffs.[7]

---

[7] Plaintiffs recognize that this Court declined to apply the juridical link doctrine to find standing in *Hunnicutt v. Zeneca, Inc.*, No. 10-cv-708, 2012 WL 4321392, at *3 n.3 (N.D. Okla. Sept. 19, 2012). But *Hunnicutt* is factually distinct from the present case—so much so that the plaintiffs there explicitly disclaimed reliance on the doctrine. The juridical link doctrine supplies standing where, as in *Moore* and the present case, large numbers of defendants make the addition of class representatives or separate law suits unwieldy. *Hunnicutt*, by contrast, involved only two defendants, and this Court recognized that the juridical link doctrine does not apply in such circumstances. *Id.* at *3 n.5.

BRIEF I

## II.     Plaintiffs Have Stated a Valid Claim for a Due Process Violation Because of Aberdeen's Conflicting Loyalties to Money and Justice.

The Supreme Court has long held that judges and other neutral decisionmakers must be free from financial conflicts of interest. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876-78 (2009); *Connally v. Georgia*, 429 U.S. 245, 250 (1977) (per curiam); *Tumey v. Ohio*, 273 U.S. 510, 522 (1927). Although these protections are at their peak when an official performs judicial or quasi-judicial functions, they apply to *all* officials who perform law enforcement functions. *See Marshall v. Jerrico, Inc.*, 446 U.S. 238, 250 (1980) (noting that due process problems would be implicated if there were "a realistic possibility that the assistant regional administrator's judgment w[ould] be distorted by the prospect of institutional gain as a result of zealous enforcement efforts"); *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 805 (1987) (finding structural error due to mere "*potential* for private interest to influence the discharge of public duty" (emphasis original)). This principle does not require proof that any particular decision was rendered out of bias and does not require any *personal* financial conflict of interest. *See Ward v. Village of Monroeville*, 409 U.S. 57, 60 (1972). That is because "[a] scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the . . . decision" that "raise serious constitutional questions." *Jerrico*, 446 U.S. at 249-50. Yet this—a financial interest in the enforcement process—is the precise nature of Aberdeen's contract with the County Sheriffs.

To avoid just such a circumstance, courts all over the country have rejected policies that on their face create financial conflicts of interest for the decision-maker, regardless of how any individual might behave.[8] Especially relevant here, courts have specifically applied these

---

[8] *See Bhd. of Locomotive Firemen & Enginemen v. United States*, 411 F.2d 312, 319 (5th Cir. 1969); *Ganger v. Peyton*, 379 F.2d 709, 713-14 (4th Cir. 1967); *Merck Sharp & Dohme Corp. v. Conway*, 861 F. Supp. 2d 802, 812 (E.D. Ky. 2012); *State v. Culbreath*, 30 S.W.3d 309, 316, 318

BRIEF I

principles to law enforcement agents other than prosecutors. For example, in *Flora v. Southwest Iowa Narcotics Enforcement Task Force*, the court denied the defendant police officers' motion for summary judgment on the plaintiff's due process claim because the officers had failed to establish that they were "not financially dependent on maintaining a large and continuing stream of forfeiture penalties" and "did not stand to profit economically from vigorous enforcement of the law." 292 F. Supp. 3d 875, 904-05 (S.D. Iowa 2018); *see also Harjo v. City of Albuquerque*, 307 F. Supp. 3d 1163, 1208 (D.N.M. 2018) (noting that due process is violated where there are personal or institutional incentives to enforce a law aggressively).

When prosecutors, police officers, or other "executive" officials are personally compensated based on the law enforcement decisions they make, serious due process concerns arise. The County Sheriffs move to dismiss Count 6 by arguing that Aberdeen is a "purely executive actor" whose "only option is to seek a judicial determination of a rights-affecting decision" and is therefore not required to be financially disinterested from the collection process. Doc. 398 at 22. But Aberdeen's conflicting loyalties to money and justice plainly violate the prohibition on officials who enforce the law having a financial interest in the cases they pursue. Plaintiffs have alleged that Aberdeen, empowered and assisted by the County Sheriffs, undertakes numerous discretionary enforcement actions akin to those undertaken by prosecutors and other law enforcement officials that inflict serious harms on indigent debtors. *See* SAC ¶¶ 77-99.

The contract between the County Sheriffs (through OSA) and Aberdeen on its face violates due process because its participants' earnings depend directly on how vigorously they pursue court debtors. The County Sheriffs' "executive actor" argument attempts to downplay the centrality of

---

(Tenn. 2000); *State v. Eldridge*, 951 S.W.2d 775, 782 (Tenn. Crim. App. 1997); *Cantrell v. Commonwealth*, 329 S.E.2d 22, 26-27 (Va. 1985); *State ex rel. Koppers Co. v. Int'l Union*, 298 S.E.2d 827, 831-32 (W.Va. 1982); *People v. Zimmer*, 414 N.E.2d 705, 707-08 (N.Y. 1980).

BRIEF I

the company's role, but it ignores Plaintiffs' allegations about how the contract between Aberdeen and OSA actually functions. *See, e.g.*, Doc. 398 at 22 (asserting that the company "cannot—at any point—affect whether a debt is owed"). Specifically, the complaint alleges that Aberdeen decides what payment plans to accept, how much money to demand to recall an arrest warrant, when to choose to seek an arrest warrant for non-compliance with the company's payment policies, and when to recall a warrant. *See, e.g.*, SAC ¶¶ 26-28, 68, 78-80. Plaintiffs further allege that judges routinely issue warrants that Aberdeen requests without meaningfully reviewing the alleged basis for the warrant. *See id.* ¶ 9. The Sheriffs' factual description of Aberdeen's authority to affect Plaintiffs' legal rights cannot be squared with these allegations, which must be taken as true.[9]

The County Sheriffs ignore binding case law applying the due process constraint on pecuniary conflicts of interest to non-judicial actors and rely significantly on *Broussard v. Parish of Orleans*, 318 F.3d 644 (5th Cir. 2003), to argue that only judicial officers are subject to that due process constraint. The Sheriffs then use *Broussard* to support their contention that they cannot be held accountable for Aberdeen's conflict of interest because the company does not assume a judicial role when attempting to collect debts. Doc. 398 at 15-17. In *Broussard*, the plaintiffs challenged a state statute that required arrestees to pay a small fee to sheriffs on top of their bail for each charge, arguing that this created an incentive to "stack" charges and gave the sheriffs a judicial function. *Id.* at 648-49. Critically, the plaintiffs in *Broussard* conceded that neutrality rules

---

[9] No evidence beyond Plaintiffs' allegations are necessary at this stage, but the plausibility of Plaintiffs' claims is supported by the record in *Jones v. Hacker*, a case on which the Sheriffs' co-defendants rely. *See, e.g.*, Doc. 399 at 13. In *Jones*, an employee of the clerk's office of Okmulgee County (where Defendant Eddy Rice is Sheriff) submitted a list of her "daily duties" to the federal district court in that case, and those duties included the following: "1. Check email for recalls from Aberdeen Enterprizes[.] If there is a recall write down the name and case number on a recall sheet. Go to the case and recall warrant[.]" Ex. 9 to Def. Linda Beaver Official-Capacity Mot. for Summ. J. at 9, *Jones v. Hacker*, No. 13-cv-444, 2015 WL 1279352 (E.D. Okla. Mar. 20, 2015).

BRIEF I

applied only to judges, and focused on that requirement, arguing that the statutory fees constituted a "punishment" and that the sheriffs acted in a judicial role in imposing them. *Id.* at 661. Because the Fifth Circuit concluded that the fees were administrative, not punitive, and that the sheriffs did not exercise a "judicial function," it rejected the plaintiffs' claims. *Id.* at 662.

That holding has no application here. Plaintiffs do not claim that Aberdeen or the County Sheriffs perform a judicial function.[10] Indeed, *if* Aberdeen or the County Sheriffs were acting as judicial entities, they would be subjected to the strictest neutrality requirements applicable to judges. *See Harper v. Prof'l Prob. Servs.*, 976 F.3d 1236, 1243 (11th Cir. 2020) (private probation company subject to "strict" neutrality requirement when making unilateral decision to extend probation terms of supervisees).[11] But regardless, the Fifth Circuit in *Broussard* could arrive at its conclusion only by ignoring *Jerrico*, likely as a result of the *Broussard* plaintiffs' flawed concession and decision to rely solely on cases concerning judicial actors. As noted, *Jerrico* states that due process protections against actual or perceived conflicts of interest apply to *all* officials who enforce the law, including entities like the County Sheriffs and Aberdeen. 446 U.S. at 249 (noting that "traditions of prosecutorial discretion do not immunize from judicial scrutiny cases in which the enforcement decisions of an administrator were motivated by improper factors"). Thus,

---

[10] Aberdeen itself argues that it functions as a "quasi-judicial" actor entitled to absolute immunity even though it is a for-profit company making a business decision to engage in the conduct challenged in this case. Doc. 404 at 15. The County Sheriffs in their individual capacities make a similar argument. Doc. 407 at 14-15. These arguments fail. *See* Brs. E & F, Section I.D; Br. A at Section II. But regardless, it certainly cannot be both that these Defendants are executive actors entirely exempt from due process neutrality requirements and at the same time so connected to the judicial process as to enjoy absolute judicial immunity.

[11] *See id.* ("[defendant]'s theory implies that when a court delegates (abdicates?) its judicial function to an entity with a personal financial stake in how that function is performed, neither actor violates the Due Process Clause—the court skates because it's not partial, and the delegate gets off because it's not judicial. That can't be the law.").

BRIEF I

to the extent *Broussard* can be read to confine due process principles to judicial actors, that reading conflicts with binding Supreme Court precedent and myriad lower court holdings.

The County Sheriffs additionally argue that even if enforcement actors must be neutral, that rule does not apply here because Aberdeen is different from prosecutors and "other government actors tasked with enforcing the law," because those actors are empowered to make decisions that affect substantive legal rights that are not easily, or typically, reviewed by courts. *See* Doc. 398 at 17-20. Debt collectors, they propose, are different, because they do nothing but collect debts that are owed regardless of what the debt collector does.

But Plaintiffs allege that in Oklahoma, these debt collectors *are* directly comparable to government actors. The allegations state that Aberdeen decides how much money to demand of debtors, and by what deadline they must pay. *See* SAC ¶¶ 77-80. If a debtor does not pay what Aberdeen has demanded on Aberdeen's schedule, the company chooses to submit an arrest warrant request to the court, which is rubber-stamped by judges without any scrutiny or investigation. *See id.* ¶¶ 90-91. That is, just like the case cited by the County Sheriffs, courts "adopt [Aberdeen's] recommendations . . . without conducting an independent investigation" of their merits. *See* Doc. 398 at 20 (citing *Warner v. Orange Cnty. Dep't of Prob.*, 115 F.3d 1068, 1072 (2d Cir. 1996)). Because of Aberdeen's submissions, indigent debtors are arrested and jailed by the County Sheriffs. Aberdeen thus "shapes" the debt-collection enforcement process in a way that harms Plaintiffs and infringes on their substantive legal rights. *See* Doc. 398 at 18 (citing *Young*, 481 U.S. at 807-08). In these circumstances, due process requires financial neutrality.

Indeed, several of the cases discussed *supra*—including *Jerrico*, *Young*, and *Flora*—all concern decisions to initiate judicial proceedings, just as Aberdeen does here. Whatever gloss the County Sheriffs put on the fact that Aberdeen's titular role is that of a debt collector, in practice,

16

BRIEF I

as alleged, Aberdeen makes direct enforcement requests to the state courts, who sign off as a matter of course. SAC ¶¶ 88-99. To fulfill that role, due process requires neutrality. *Flora*, 292 F. Supp. 3d at 904 ("Although state courts have the final say on whether forfeiture is proper in a given case . . . there remains an issue as to whether Task Force officers . . . and PCAO prosecutors . . . are so incentivized to enforce Iowa's civil forfeiture law as to distort their judgment.").

Indeed, as these cases highlight, although it is true that Aberdeen does not "put the debtors in jail themselves," Doc. 398 at 22, the antecedent decision to begin judicial proceedings by seeking an automatically approved arrest warrant itself causes serious harm. The presence of pecuniary interests infects decision-making in ways that poison the operation of the legal system. Plaintiffs allege that Aberdeen has a financial incentive to obtain new warrants because Aberdeen leverages warrants—and the attendant threat of arrest—to extract payments from indigent debtors. Aberdeen thus has a clear financial incentive to make its path to obtaining a warrant as straightforward as possible. To do so, Plaintiffs allege, Aberdeen either declines to inquire into a debtor's ability to pay or, when it has information because the debtor volunteered it, withholds that information from the state court that formally issues the warrant. SAC ¶¶ 63-64, 82-85. If Aberdeen properly informed the court (and the court properly performed its oversight role), the vast majority of the warrants Aberdeen seeks—including those against Plaintiffs—would not issue. Aberdeen's financial incentive results in the opposite result and lies at the core of the unconstitutional conduct by the County Sheriffs challenged in this lawsuit.

The County Sheriffs' reliance on *Schwarm v. Craighead*, 552 F. Supp. 2d 1056, 1086 (E.D. Cal. 2008), for the proposition that a third-party debt collector that administered a "bad check diversion program" was not bound by the requirements of the Due Process Clause, is also misplaced. Doc. 398 at 20-22. Although the Sheriffs argue that "recounting" the key facts of that

17

case "is not necessary," *id.* at 21, it is precisely those facts that demonstrate its irrelevance here. The critical fact in *Craighead* was that the defendant in that case, the CEO of a private entity that collected debts from participants in a bad check diversion program, "[u]nder no circumstance" had any "authority to deprive [anyone] of their property" or liberty. 522 F. Supp. 3d at 1087 (internal quotation mark omitted). The arrangement between Craighead and district attorneys did not permit Craighead such discretion. After a merchant referred a bad check to Craighead, he sent three boilerplate notices offering entry into a bad check diversion program. *Id.* at 1064-65. If the bad check writer declined, Craighead applied the "county's guidelines" to determine whether to notify a prosecutor or to send the check back to the merchant—either way, Craighead's collection efforts ceased. *Id.* at 1066. This yes-or-no determination involved application of county guidelines and did not include seeking arrest warrants; all Craighead did was notify the prosecutor when a person had elected not to participate in the diversion program. Craighead played no role in any subsequent actions by prosecutors, who themselves had no financial interest in the outcome. This was the critical fact the court relied on to hold that the *Tumey-Ward-Jerrico* line of cases was "inapplicable to Craighead." *Id*. at 1086-87.

 *Craighead* is inapposite. Aberdeen is not a middleman transmitting objective facts under specific guidelines. Rather, the company *itself* exercises discretion to determine what payments are owed, whether to seek arrest when its payment policies have not been complied with, and under what conditions to recall a warrant.[12] A warrant on a case referred to Aberdeen only issues if and

---

[12] Nor does the only other case relied on (without explanation) by the Sheriffs help. In that case, *Hamilton v. Am. Corrective Counseling Servs.*, No. 3:05-cv-434RM, 2006 WL 3332828 (N.D. Ind. Nov. 14, 2006), the court concluded that "American Corrective's role in the collection scheme was to provide seminars and notice of the procedures under which a check-writer could contest the deprivation before a neutral decision maker," but the contract did not authorize the company "to deprive check writers of their property." *Id.* at *6. Thus, the court expressly distinguished another case, *Wilson v. City of New Orleans*, 479 So.2d 891 (La. 1985), in which the court found a due

BRIEF I

when *Aberdeen* decides to seek one. *See, e.g.*, SAC ¶ 62 (describing court docket stating "DO NOT ISSUE WARRANT UNLESS CONTACTED BY ABERDEEN"). And even to the extent *Craighead* could be read to apply to these facts, it is in open conflict with established precedent holding that law enforcement entities are bound by the neutrality principles inherent in the Due Process Clause. *See Harper*, 976 F.3d at 1243; *Flora*, 292 F. Supp. 3d 875, 904-05.

For principally these same reasons, it is of no relevance that "state governments and the federal government use third party debt collectors to collect debts on a routine basis." Doc. 398 at 22; *see id.* at 22-23 (citing I.R.S. and student loan debt collectors as examples). It is not debt collection generally that Plaintiffs challenge—it is the specific role of *these* debt collectors, Aberdeen and its principals, who have been empowered to usurp law enforcement functions that have long been required to be strictly neutral. The County Sheriffs note that a federal statute that allows the I.R.S. to contract with debt collectors has not been challenged on due process grounds. *Id.* at 23. That is likely because there are not allegations that *those* debt collectors make threats that they will obtain arrest warrants if payment is not made, SAC ¶ 35; affirmatively prevent debtors from learning of their legal rights to avoid imprisonment for nonpayment, *id.* ¶ 95; and then have the "power to control whether a person is imprisoned" if that person does not pay what the collector demands, *id.* ¶ 96. These allegations render Aberdeen an enforcement actor different from other government debt collectors. And because it lacks the neutrality required of such actors, people are harmed. Plaintiffs have stated a claim under Count 6.

---

process violation because a private company with a financial interest played a role in determining which cars the city government would boot for unpaid tickets. *Id.* at 901-02.

BRIEF I

III.    **Plaintiffs Have Stated a Claim that the County Sheriffs Violate Plaintiffs' Equal Protection Rights.**

Under Count 7, Plaintiffs allege that the use of especially "onerous" debt-collection methods—including "arrest warrants," "an additional 30-percent penalty surcharge," possible "suspension of a driver's license," and "repeated threats of arrest[]"—denies them equal protection as compared to other judgment debtors. SAC ¶ 361. Under well-established Supreme Court precedent, the government may not use "unduly harsh or discriminatory terms" to collect court costs owed from a criminal case, "merely because the obligation is to the public treasury rather than to a private creditor." *James v. Strange*, 407 U.S. 128, 138 (1972).

In *Strange*, the Court struck down a Kansas recoupment statute that expressly denied former criminal defendants who owed money to the State for indigent defense costs the basic wage garnishment exemptions available to other civil judgment debtors under state law. *Id.* at 135-36, 141-42. The Court recognized that state recoupment statutes generally embody "legitimate state interests" but reasoned that those interests "are not thwarted by requiring more even treatment of indigent criminal defendants with other classes of debtors." *Id.* at 141. "For Kansas to deny" the basic wage exemptions at issue was "to risk denying" a debtor "the means needed to keep himself and his family afloat," *id.* at 136, a denial that "embodie[d] elements of punitiveness and discrimination which violate the rights of citizens to equal treatment under the law," *id.* at 142. The result was to "blight" in "discriminatory fashion the hopes of indigents for self-sufficiency and self-respect." *Id.* at 141-42. For these reasons, the Court struck down Kansas's "unduly harsh" debt-collection scheme. *Id.* at 138; *see also Fuller v. Oregon*, 417 U.S. 40, 47 (1974) (affirming that the Fourteenth Amendment protects government debtors from unduly harsh treatment as compared to people indebted to private creditors).

BRIEF I

Here, the County Sheriffs' use of Aberdeen exposes Plaintiffs to surcharges,[13] threats, arrest warrants, and jailing in the pursuit of their county debts. Plaintiffs are thereby singled out by the government for extreme collection methods not available against other Oklahoma judgment debtors.[14] *See generally* Oklahoma Uniform Consumer Credit Code, Okla. Stat. tit. 14A, §§ 1-101 *et seq.* The Equal Protection Clause does not permit such discrimination.

The County Sheriffs argue that Plaintiffs' claim fails because Plaintiffs are not similarly situated compared to debtors unburdened by Defendants' harsh collection methods. Doc. 398 at 27. The Sheriffs contend that for two groups to be similarly situated, "[t]he 'challenged state action' must be able to apply to all members of [both] the groups, yet in its enforcement discriminate[] between those groups because of a protected class[ification]." *Id.* But if this

---

[13] The 30-percent surcharge is required by state statute *only if* a debtor's warrant has been referred to a third-party contractor such as Aberdeen. Okla. Stat. tit. 19, § 514.5. Because state law merely authorizes but does not require the County Sheriffs to engage such a contractor, *see id.* § 514.4(A), the Sheriffs are responsible for the state-law consequences of their decision to do so. *See, e.g.*, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (municipal liability attaches where policymakers make a "deliberate choice . . . from among various alternatives"); *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (holding municipality liable for its policy of allowing deadly force in certain situations even though a state statute authorized those uses of force, because the latter did not require them); *Evers v. Custer County*, 745 F.2d 1196, 1201 (9th Cir. 1984) (holding that County Board's issuance of a declaration that plaintiff's road was public sufficed to impose liability although state law allowed such a declaration). The Sheriffs are also responsible for the manner in which they comply with § 514.5 after they choose to trigger it. Nothing in state law prohibits them from conducting ability-to-pay inquiries and referring only willful non-payers (if any) to a third party. That the contract with Aberdeen was "statutorily allowable," as the Sheriffs note, Doc. 398 at 29 n.11, does not change the fact that the Sheriffs' deliberate choice to contract with and transfer cases to Aberdeen caused Plaintiffs injuries.

[14] The County Sheriffs concede that plaintiffs could, consistent with *James*, "draw[] a distinction between indigent defendants who owed money to the state or the state's private debt collectors versus those who owed money to private parties." Doc. 398 at 31 n. 12. Plaintiffs' claim in Count 7 implicates exactly this distinction, albeit with reference to additional distinctions between wealthy and indigent debtors. Given the important constitutional rights at stake, this Court should construe Plaintiffs' complaint as making the same comparison as the Supreme Court did in *Strange*, which forms the basis for this type of "onerous collection" claim.

21

BRIEF I

understanding were correct, then a state law directing the arrest of all members of a particular race would not violate equal protection, because it would not apply to similarly situated members of other races. For good reason, that is not the standard. It is enough that the challenged action "classifies or distinguishes between two or more relevant groups." *Rolf v. City of San Antonio*, 77 F.3d 823, 826 (5th Cir. 1996). And, as the example above illustrates, an action targeting just one of two similarly situated groups can effect just such a distinction.

Building upon their misunderstanding of the doctrine, the County Sheriffs invite this Court to follow the district court in *Cain v. City of New Orleans*, 327 F.R.D. 111 (E.D. La. 2018), which dismissed a claim brought under *Strange* on the ground that the defendant municipal judges overseeing the challenged debt collection on behalf of a government creditor did not have jurisdiction over private civil judgment debtors. Doc. 398 at 28. In reaching that decision, the court in *Cain* relied on two principal factors which do not apply here. First, it found that plaintiffs there did not "point to any state law that facially discriminates against criminal judgment debtors like the Kansas recoupment statute in *James*." *Cain*, 327 F.R.D. at 120. Here, Plaintiffs have specifically identified the 30-percent surcharge, which only applies to criminal judgment debtors whose cases are transferred for private collection. SAC ¶ 55; *see supra* note 13. Second, the court in *Cain* found that because the plaintiffs there were challenging the policy of judges in a specific court that, per state law, only had jurisdiction over criminal cases, it did not align with *Strange*. 327 F.R.D. at 120 (citing La. R.S. § 13:1336). But here, the courts out of which Plaintiffs' cases arise (and over which Defendant Judges preside) have "unlimited original jurisdiction of *all justiciable matters*," civil and criminal. Okla. Const. art. 7, § 7(a) (emphasis added). Unlike in *Cain*, the groups here are directly comparable, and the criminal debtors are discriminated against by rules and practices that do not apply to civil debtors with cases in the same courts.

BRIEF I

In any event, the Supreme Court in *Strange* did not require that the defendant judicial administrator have "jurisdiction" or other power over private debtors (nor is there any indication that he did). Nor could the Kansas recoupment scheme invalidated in *Strange* have been rendered constitutional simply by setting up a separate court with jurisdiction limited to indigent criminal defendants who owed money for the costs of their state-afforded defense. What mattered in *Strange* was that the government helped itself to unduly harsh collection methods that were not available to private judgment creditors (regardless of whether the same officials who employed those methods would have been involved in a private creditor's collection efforts). *See* 407 U.S. at 138-39.

The County Sheriffs offer no reason why Plaintiffs' debts could not "be collected in the same manner as a judgment in a civil action," rather than in Defendants' abusive manner. *Rodriguez v. Providence Cmty. Corr., Inc.*, 191 F. Supp. 3d 758, 775 (M.D. Tenn. 2016) (internal quotation mark omitted) (denying a motion to dismiss an equal protection claim similar to Plaintiffs' that challenged a private probation scheme). But for the County Sheriffs' choice to subject them to uniquely extreme collection methods, Plaintiffs would be in the same situation as any other Oklahoma judgment debtor. In treating Plaintiffs more harshly simply because their debts are owed to the government, the County Sheriffs violate Plaintiffs' right to equal protection.

## IV.   Plaintiffs' Claims Are Not Moot.

The County Sheriffs note that in addition to damages, Plaintiffs seek equitable relief.[15] They assert that "most, if not all" of this relief is mooted by forthcoming modifications to the Oklahoma statutory regime, which "appear to have been enacted almost directly in response to the

---

[15] "[U]nlike claims for declaratory or injunctive relief, claims for damages are not mooted by subsequent events." *Bishop v. United States ex rel. Holder*, 962 F. Supp. 2d 1252, 1271 (N.D. Okla. 2014) (Kern, J.).

BRIEF I

claims Plaintiffs make in this lawsuit." Doc. 398 at 34. Accordingly, the Sheriffs argue, this Court should dismiss the relief Plaintiffs seek that would amount to a statutory violation under the new regime. The County Sheriffs do not specify which claims they believe are mooted or cite any law in support of their argument.

Plaintiffs laud the Oklahoma legislature for taking measures to address the deficiencies challenged in this lawsuit. But any modifications have yet to go into effect. Regardless, even if and when they do, this case will not become moot because Plaintiffs challenge *practices*, not any statute or rule. *See*, *e.g.*, SAC pp. 98-100; *Graff v. Aberdeen Enterprizes, II, Inc.*, 65 F.4th 500, 517 (10th Cir. 2023) (noting that "every one of the ten claims set out in the [SAC] challenges debt-collection practices commenced after Plaintiffs are convicted and sentenced"). This is because Defendants' actions have *never* complied with state law. Plaintiffs have consistently alleged that the County Sheriffs' practices did not comply with the statute that was in place at the time this lawsuit was filed. Before the recent amendments, state law was clear: a court debtor could only be imprisoned for nonpayment if "the trial court finds after notice and hearing that the defendant is financially able but refuses or neglects to pay." Okla. Stat. tit. 22, § 983(A) (eff. Nov. 1, 2018);[16] *see also* SAC ¶¶ 43-46 (noting that "Oklahoma's statutory scheme provides protections" intended to ensure constitutional requirements are followed, but alleging that "the collapse of these protections" has led to the challenged practices).

Pursuant to the allegations, the County Sheriffs as well as other Defendants "routinely ignore constitutional *and statutory* requirements in a concerted effort to extract as much money as

---

[16] A copy of Section 983 as it exists today, before the amendments take effect on November 1, 2023, is attached as an exhibit to Plaintiffs' opposition to the Sheriffs' individual-capacity motion to dismiss. *See* Br. A, Ex. 2. Although this version of the law went into effect after Plaintiffs filed this lawsuit, the prior version was identical in all relevant respects. *See* S.B. 689, 56th Leg., 2d Reg. Sess. (Okla. 2018).

BRIEF I

possible from indigent people." SAC ¶ 49 (emphasis added). For example, the County Sheriffs are alleged to execute arrest warrants procured by Aberdeen, which they knew were a result of Aberdeen's actions, including "intentionally conceal[ing] alternative options that would avoid issuance of an arrest warrant, and seek[ing] warrants for the arrest of persons who it knows to be indigent without disclosing such information." *Id.* ¶¶ 281, 283. This activity, among others practiced by the County Sheriffs, has never been authorized by any version of Section 983. Other sources of liability, including the County Sheriffs' transfer of cases to Aberdeen (the subject of Count 6), remain authorized by the amended statutes. The County Sheriffs, in other words, cannot point to a change in *statutes or rules* when the relevant inquiry is whether they have changed their *practices. See, e.g.*, *Fair Fight Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251, 1272-76 (N.D. Ga. 2019) (claim not moot from change in state law where defendants had not shown compliance with amended law); *Rembert v. Sheahan*, 62 F.3d 937, 942 (7th Cir. 1995) (following change of law, the "district court must determine what the Sheriff's actual . . . practices are in order to assess whether [plaintiffs'] case is moot")

In any event, even if evidence showed the County Sheriffs had changed their practices in response to the law, under the voluntary-cessation doctrine a defendant "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). Defendants cannot meet that burden because they continue to "vigorously defend[] the constitutionality" of the challenged practices, *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007). None of Plaintiffs' claims are moot.

## **CONCLUSION**

The Court should deny the County Sheriffs' official-capacity motion to dismiss.

BRIEF I

Dated: August 10, 2023

Respectfully submitted,

/s/ *Daniel E. Smolen*
Daniel Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Smolen & Roytman
701 South Cincinnati Avenue
Tulsa, OK 74119
Tel: 918-585-2667
Fax: 918-585-2669

/s/ *Ryan Downer*
Ryan Downer (admitted *pro hac vice*)
D.C. Bar No. 1013470
Katherine Hubbard (admitted *pro hac vice*)
D.C. Bar No. 1500503
Marco Lopez (admitted *pro hac vice*)
D.C. Bar No. 888324793
Leonard J. Laurenceau (admitted *pro hac vice*)
D.C. Bar No. 90007729
Ellora Thadaney Israni (admitted *pro hac vice*)
D.C. Bar No. 1740904
Civil Rights Corps
1601 Connecticut Ave. NW, Suite 800
Washington, D.C. 20009
Tel.: 202-844-4975
ryan@civilrightscorps.org
katherine@civilrightscorps.org
marco@civilrightscorps.org
leo@civilrightscorps.org
ellora@civilrightscorps.org

/s/ *Seth Wayne*
Seth Wayne (admitted *pro hac vice*)
D.C. Bar No. 888273445
Shelby Calambokidis (admitted *pro hac vice*)
D.C. Bar No. 1684804
Mary B. McCord (admitted *pro hac vice*)
D.C. Bar No. 427563
Institute for Constitutional Advocacy and Protection
Georgetown University Law Center
600 New Jersey Ave. NW
Washington, D.C. 20001
Tel: 202-662-9042
sw1098@georgetown.edu
sc2053@georgetown.edu

26

BRIEF I

mbm7@georgetown.edu

*Attorneys for the Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of August, 2023, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants who have appeared in this case.


/s/ *Seth Wayne*

BRIEF I