**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| CARLY GRAFF, et al., on behalf of themselves and all others similarly situated,<br><br>  Plaintiffs,<br><br>v.<br><br>ABERDEEN ENTERPRIZES II, INC., *et al.*,<br><br>  Defendants. | 4:17-CV-606-TCK-JFJ<br>*Hon. Terence C. Kern* |

### **COUNTY SHERIFF DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE TO THE OFFICIAL-CAPACITY MOTION TO DISMISS**

Robert S. Lafferrandre, OBA #11897
Randall J. Wood, OBA #10531
Jeffrey C. Hendrickson, OBA #32798
**PIERCE COUCH HENDRICKSON
BAYSINGER & GREEN, L.L.P.**
1109 North Francis Avenue
Oklahoma City, Oklahoma 73106
Telephone: (405) 235-1611
Facsimile: (405) 235-2904
jhendrickson@piercecouch.com

*Attorneys for County Sheriff Defendants*

– August 31, 2023 –

**COUNTY SHERIFF DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE TO THE OFFICIAL-CAPACITY MOTION TO DISMISS**

The Plaintiffs' Response to the County Sheriff Defendants' official-capacity Motion to Dismiss is, once more, an exercise in re-framing. Like an ever-changing chameleon, Plaintiffs again tell the Court that certain allegations, previously little advertised, are the most important allegations, while other allegations are less important if extant at all. Too the Plaintiffs continue to mischaracterize the CSDs' arguments to gin up the appearance of a one-sided debate. It is not. The CSDs' original arguments, plus the replies herein, demonstrate why the Court should dismiss them from the case with prejudice.

**I.   PLAINTIFFS CONTINUE TO MISUNDERSTAND THE PLEADING STANDARDS ARTICULATED IN *TWOMBLY* AND *IQBAL*.**

As with the previous round of briefing, the Plaintiffs' entire response is afflicted with their failure to understand the ins and outs of plausibility pleading as set out *Bell Atlantic Corp. v. Twombly* and refined in *Ashcroft v. Iqbal*. At repeated points, Plaintiffs baldly claim to have complied with the applicable pleading standards despite having changed no single part of their Second Amended Complaint—and even though the SAC is replete with generalities about what the entire set of County Sheriff Defendants did, not what specific County Sheriffs did. *See* ECF 415, pg. 6 (with no authority: "It is not improperly 'collective' to plead that multiple defendants have engaged in the same type of unconstitutional conduct[.]"). The CSDs, in their individual-capacity reply brief filed contemporaneously, expound on why Rule 8 and *Twombly/Iqbal* require dismissal of the Plaintiffs' claims. The CSDs incorporate by reference that discussion here. *See* Individual-Capacity Reply, pgs. 1-3.

## II. PLAINTIFFS FAIL TO SHOW WHY THEY HAVE PRUDENTIAL STANDING TO SUE THE COUNTY SHERIFF DEFENDANTS.

Turning to the substantive arguments, Plaintiffs respond first to the CSDs' contention that they lack Article III and prudential standing. *See* ECF 423, pgs. 4-11. Though for the reasons set out in the CSDs' motion, see ECF 398, pgs. 12-14, Plaintiffs cannot show a case or controversy to satisfy Article III as to an overwhelming number of the CSDs,[1] the CSDs' focus in reply is on the Plaintiffs' flat inability to articulate how their class-action complaint establishes prudential standing against all but one of the CSDs.[2] Recall that prudential standing requires of class-action plaintiffs in a multi-defendant suit that they show that each defendant has harmed at least one named plaintiff. *See*, *e.g.*, *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 188 (4th Cir. 1993); *see also Hunnicutt v. Zeneca, Inc.*, No. 10-CV-708-TCK-TLW, 2013 WL 4321392, at *3 (N.D. Okla. Sept. 19, 2012) (citing *Cent. Wesleyan Coll.*). This is an off-shoot of the concept that "named plaintiffs who represent a class must allege and show that they have been personally injured, not that the injury has been suffered by other, unidentified members of the class to which they belong and purport to represent." *Lewis v. Casey*, 518 U.S. 343, 357 (1996); *see also Thomas*

---

[1] This is because the CSDs do not contract with Aberdeen; they assign their right to contract to the Oklahoma Sheriffs' Association, who in turn contracts with Aberdeen to collect debts owed to the State of Oklahoma, not to any one county or CSD. *See* Okla. Stat. tit. 19, § 514.4(E); *see also* ECF 430, Reply Br. of Tulsa County, at pgs. 3-5. If any injury stems from the collection of state-court debt, it would flow only to the collector of the debt and to the party for whom the debt is collected. That is not the CSDs, who are removed by at least one, if not two, degrees of separation from the process. *See* ECF 407, pgs. 11-13.

[2] Appearing here to realize their prudential-standing problem, the Plaintiffs tacitly concede that "at the very least," only the CSDs of Cleveland, Wagoner, and Creek County must remain in the case. *See* ECF 415, pgs. 6-7. But that is itself not accurate, as the cited portions of the SAC which reference those counties mention only the acts of those counties' district courts and underlying county personnel who function as arms of the state, not the CSDs in those counties. Moreover, the Plaintiffs flatly get the law wrong—the cost-and-fee program is not county policy, as Plaintiffs retroactively label it, but state policy. *See* Okla. Stat. tit. 28, § 151(D); *see also* Okla. Stat. tit. 19, §§ 514.4-514.5. The Plaintiffs' prudential standing problem as to those CSDs remains.

*v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1159 (10th Cir. 2011) ("Prior to class certification, the named plaintiffs' failure to maintain a live case or controversy is fatal to the case as a whole—that unnamed plaintiffs might have a case or controversy is irrelevant"). Plaintiffs make two arguments as to why prudential standing exists as to the CSDs. Both fail.

*Conspiracy Standing.* First, Plaintiffs tell the Court—with citations only to forty-plus-year-old, non-binding opinions from the 1980s—that when alleging a conspiracy, they can "sue all participants in the conspiracy, regardless of whether [they] interacted with each individual participant." *See* ECF 415, pgs. 7-8 (citing *Rios v. Marshall*, 100 F.R.D. 395 (S.D.N.Y. 1984) and *Brown v. Cameron-Brown Co.*, Civil Action No. 78-0836-A, 1980 WL 1856 (E.D. Va. June 13, 1980)). Assuming for the reply this is true—it does not appear the Tenth Circuit has ever taken up the question—*Rios* and *Brown* stand only for the proposition that a plaintiff can sue defendants with whom the plaintiff has not dealt if those non-dealing defendants participated with the harm-dealing defendants in a conspiracy that itself harmed the plaintiff.

In *Rios*, for example, the Southern District of New York found certain plaintiff farmhands in a proposed class action had standing to sue their employers, as well as other employers that did not employ them but employed probable non-named farmhand class members, on a theory that the entire lot of employers participated in an alleged conspiracy among the employers to replace the resident farmhands with temporary foreign workers, and thereby harm the named plaintiffs. *See* 100 F.R.D. at 404. The court concluded that the named farmhands had sufficiently alleged a conspiracy *among* (or *between*) the similarly-situated defendants such that standing was conferred on the named farmhands to bring class claims against apple growers that did not employ them but who engaged in the conspiracy with the apple growers that did employ them. *Id.* at 405.

In *Brown*, an antitrust suit, the Eastern District of Virginia concluded that certain plaintiff

mortgagors in a proposed class action had standing to sue their mortgage lenders, as well as lenders who did not hold their mortgages but held mortgages of probable non-named mortgagors, on a theory that the entire lot of lenders participated in an alleged conspiracy to eliminate one method of accounting for mortgage escrow payments, which in turn reduced competition in the mortgage loan market. 1980 WL 1856, at *1. The court concluded that the named mortgagors had sufficiently alleged a conspiracy *among* (or *between*) the similarly-situated lenders such that standing was conferred on the named mortgagors to bring class claims against lenders that did not hold their mortgages but who engaged in the conspiracy with the lenders that did. *Id.* at 405. The principle is thus clear: in each case, standing was conferred over the non-dealing defendants because those defendants still participated in a conspiracy between the primary defendants which operated to harm the named plaintiffs.

That principle is not applicable here because Plaintiffs do not allege a broad, horizontal conspiracy between or among the CSDs; to the extent ascertainable, they allege individual, vertical conspiracies between each CSD, the OSA, and Aberdeen. In other words, Plaintiffs do not sufficiently allege that the CSDs themselves conspired between the CSDs to violate Plaintiffs' rights, unlike the apple growers in *Rios* or the mortgage lenders in *Brown*. As such, Plaintiffs do not conceivably allege they suffered harm from any CSD with whom they also did not interact. Sheriff Rick Wallace in Alfalfa County did not conspire with Sheriff Bryan Jump in Coal County to violate the rights of any named Plaintiff—none of whom, by the way, alleged they've ever set foot in Alfalfa or Coal Counties to begin with.

This concept, as it were, is illustrated neatly by a case cited directly in *Rios* as an example of how the conspiracy-defendant standing exception does not operate. In *Vulcan Soc. of Westchester v. Fire Dep't of City of White Plains*, while discussing class certification, the Southern

District of New York observed that a set of named race-discrimination plaintiffs only had standing to sue the municipality "from which he has…allegedly been the subject of discriminatory practices and policies" because there was no "proper allegation of conspiracy or other joint liability sufficient to confer on a plaintiff from one municipality standing to sue another municipality." *See Vulcan*, 82 F.R.D. 379, 398 (S.D.N.Y. 1979). The court determined that there was no identity of interests among plaintiffs from separate municipalities, and each municipality, "a separate legal entity, [was] individually responsible for any practices or policies of discrimination within its jurisdiction." *Id.* at 399.³ So it is here. Plaintiffs simply do not plead facts sufficient to show a conspiracy between the CSDs, as opposed to multiple individual conspiracies between each CSD, OSA, and Aberdeen, such that they could rely on the conspiracy-defendant standing exception—to the extent the same even exists in the Tenth Circuit.

***Juridical Link.*** As a secondary position on standing, Plaintiffs pivot to cite the "juridical link" doctrine to establish standing against CSDs with whom none of them have personally dealt. *See* ECF 415, pg. 8. Plaintiffs acknowledge this Court's past refusal to apply the juridical link doctrine, *see Hunnicutt*, 2012 WL 4321392, at *3, n. 3, and it remains the case that there appears to be no Tenth Circuit authority even citing the doctrine (even now, fifty years since the Ninth Circuit created it), much less finding it applicable to a particular set of facts. Contra the Plaintiffs' claim that *Hunnicutt* was so "factually distinct" from this case that the plaintiffs "explicitly disclaimed reliance on the doctrine," the *Hunnicutt* plaintiffs abandoned the argument because the juridical link doctrine does not apply to standing. *See* 2012 WL 4321392, at *3, n. 3 ("Plaintiff

---

³ Though the court made these statements in the context of class certification, it was careful to note that the absence of any named plaintiff for any named defendant municipality would mean there was no "cause of action" against that municipality due to lack of standing. *Id.* at 399, n. 31.

conceded that the juridical link doctrine does not apply to standing[.]").

This Court was correct to discard the juridical-link doctrine as a creature of standing in *Hunnicutt*. The far-and-away majority view is that the juridical-link doctrine simply does not apply to standing—a conclusion impliedly reached even by the Ninth Circuit itself, which created it.[4] Given these persuasive authorities, and the frank lack of direction from the Tenth Circuit on the topic, this Court should decline Plaintiffs' invitation to adopt the juridical-link doctrine as a matter of standing and dismiss the CSDs on prudential-standing grounds.

### III. PLAINTIFFS' INTERPRETATION OF CONSTITUTIONAL FINANCIAL-NEUTRALITY OBLIGATIONS IS FLAWED.

Turning to the CSDs' substantive argument that Plaintiffs cannot, as a matter of law, state a Due Process Clause violation because of Aberdeen's position in the cost-and-fee system, *see* ECF 398, pgs. 11-23, Plaintiffs again shift the emphasis of their claims to avoid the clear implication of the CSDs' argument. The CSDs argue that Aberdeen has no requirement to remain financially independent because they do not make discretionary calls akin to a probation officer or prosecutor. *Id.* Plaintiffs rejoin that they have alleged Aberdeen does make such calls, bringing it in the realm of Supreme Court cases that require financial neutrality, if not of the strictest kind. *See* ECF 415, pg. 13. This argument relies wholly on a manipulation of the CSDs' point, however. The CSDs' fundamental position is that Aberdeen cannot affect whether a criminal defendant owes a debt, and if so, how much debt is owed. Had Plaintiffs alleged that Aberdeen can, as a matter of law, decide whether a debt exists or not, or to set the amount of debt owed as a matter of law, this would be a different story. But that is simply *not* what Plaintiffs alleged—and it is not how the

---

[4] *See, e.g., Bahamas Surgery Center, LLC v. Kimberly-Clark Corporation*, 820 F. App'x. 563, 565–66, n.4 (9th Cir. 2020) (finding juridical link doctrine "irrelevant" and rejecting standing as to defendant that did not manufacture gowns purchased by named plaintiff in disputed transaction); *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 64 (2d Cir. 2012) (rejecting juridical link doctrine).

system functions. Plaintiffs tacitly acknowledge this when referencing the "typical" initial debts after a guilty plea for a misdemeanor DUI charge as being about $1,300. *See* ECF 212, ¶ 78, at 32. Aberdeen has no role in determining that ~$1,300 number.

State law dictates the amount owed. That is the discretionary calls that fall within the Due Process Clause's ambit, and, conspicuously, Aberdeen is not involved in it. The fact is, every item Plaintiffs cites as purportedly showing how Aberdeen make rights-affecting discretionary calls does no such thing. Plaintiffs say Aberdeen "decides what payment plans to accept," *see* ECF 423, at 16, that does not affect the of-law existence of the criminal defendant's debt. Plaintiffs say Aberdeen decides "how much money to demand to recall an arrest warrant," *id.*, but that does not affect the of-law existence of the criminal defendant's debt. Plaintiffs say Aberdeen decides "when to choose to seek an arrest warrant for non-compliance with the company's payment policies," *id.*, but that *still* does not affect the of-law existence of the criminal defendant's debt. Plaintiffs say Aberdeen decides "when to recall a warrant," *id.*, but *that still does not affect the existence of the debt*.

Faced with the reality, however, that functionally Aberdeen is no different than any other private debt-collector hired by the government to collect debts, Plaintiffs pivot to describing the threatening conduct Aberdeen allegedly employs to achieve compliance. *See* ECF 423, pg. 19. Whatever constitutional provisions are implicated by that alleged conduct—and Plaintiffs have contemplated other provisions aside from the Fourteenth Amendment's Due Process Clause—it is not the financial-neutrality requirements of the Due Process Clause. At bottom, Plaintiffs cannot plausibly claim Aberdeen makes *more* money by its alleged enforcement tactics—it simply makes what it makes under its contractual agreement with the OSA when it collects the debt, a debt that is owed regardless of whether Aberdeen is involved. This is the same as the I.R.S.'s private debt-

collectors, who almost assuredly are paid a percentage of what they collect. That Aberdeen is incentivized to collect debts a criminal defendant owes to the state, debts they will owe regarding of whether Aberdeen attempts to collect it, does not make Aberdeen inappropriately financially interested. *The debt, which Aberdeen did not set, remains owed.* Because of this, Aberdeen and the CSDs do not violate the Due Process Clause.

Plaintiffs also, once more, respond to the CSDs' argument that Aberdeen need not be financially disinterested by saying the "Defendant Sheriffs ignore binding case law applying the due process constraint on pecuniary conflicts of interest to non-judicial actors." *Id*. at 14. But the CSDs do no such thing. To the contrary, the CSDs explicitly acknowledge the Due Process Clause applies to entities like prosecutors or probation officers. *See* ECF 398 at 17-18. The Plaintiffs cite no authority that a purely executive actor, like Aberdeen, must remain financially disinterested. Instead, they mix executive actors like Aberdeen with quasi-judicial actors like prosecutors or probation officers. The difference is that Aberdeen, again, can do nothing to affect legal rights themselves—unlike prosecutors or probation officers or other actors with quasi-judicial powers. Plaintiffs' attempt to re-imagine their allegations does not suffice, as discussed above.

The Plaintiffs also misstate what *Marshall v. Jerrico* says about zealous enforcement efforts. See ECF 423, at 12 ("noting that due process problems would be implicated where there was 'a realistic possibility that the assistant regional administrator's judgment will be distorted by the prospect of institutional gain as a result of zealous enforcement efforts,'" quoting *Jerrico*, 446 U.S. at 251). What *Jerrico* says is: "Nor is there a realistic possibility that the assistant regional administrator's judgment will be distorted by the prospect of institutional gain as a result of zealous enforcement efforts." 446 U.S. at 250 (emphasis added). Similarly, Aberdeen's "judgment" will not be "distorted by the prospect of institutional gain" either, because Aberdeen doesn't set the

amount of debt owed.[5] Their sole purpose is to collect outstanding debt. They do not make law enforcement decisions. They do not impose the debt they collect. They simply collect. And debt collection is not "law enforcement." *See, e.g., Pub. Emps. for Envt'l. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 203 (D.C. Cir. 2014) ("the term 'law enforcement' in Exemption 7 refers to the act of enforcing the law, both civil and criminal") (citing Black's Law Dictionary, 964 (9th ed. 2009) as "defining 'law enforcement' as the 'detection and punishment of violations of the law'"); see also *Am. Civil Liberties Union Found., Inc. v. United States Dep't of Educ.*, 320 F. Supp. 3d 270, 277 (D. Mass. 2018).

## IV. PLAINTIFFS' INTERPRETATION OF THE EQUAL PROTECTION CLAUSE IS FLAWED.

In response to the CSDs' Equal Protection argument—that the challenged state action by definition only applies to indigent debtors, and thus Plaintiffs have not shown a disparity in treatment between similarly situated groups—Plaintiffs dispute the CSDs' conception of how the Equal Protection Clause applies. Plaintiffs claim that if the CSDs' concept of Equal Protection were true (that a challenged state action must be able to apply to all members of similarly situated groups and in its enforcement discriminate between those groups because of a protected class, *see* ECF 398, at 27) then a law directing the arrest of all members of a particular race would not violate equal protection because it would not apply to similarly situated members of other races. *See* ECF 423, at 21-22.

This hyperbolic analogy misses the mark. The problem with Plaintiffs' Equal Protection claim is that the challenged state action—debt collection—can only apply to those who owe debts

---

[5] Obviously, if Aberdeen played a role in setting debt owed as a matter of law, or had the judicial authority to increase, decrease, or relieve debts as a matter of law, then the percentage they collect would portend a possible unconstitutional conflict of interest. But Plaintiffs do not allege that Aberdeen does this.

and don't pay. *See* ECF 398, at 27. There is no debt collection to be had from those who pay their debts, so the challenged state action can apply only to one group of people. On the other hand, the challenged state action in Plaintiffs' expansive (and patently unlawful for many other reasons) hypothetical—an unlawful arrest—could theoretically apply to *anyone*. That Plaintiffs' hypothetical legislature specifically ordered the arrests to apply only to one particular race would pose a classic Equal Protection (and Fourth Amendment, etc.) problem. The CSDs' concept of Equal Protection is accurate.

Plaintiffs otherwise return to the dispute over how *James v. Strange* applies. In this briefing cycle, likely recognizing the problem with attempting to distinguish between debtors who pay the government and those who do not (the central feature of Plaintiffs' Equal Protection claim, *see* ECF 212, ¶¶ 360-362), Plaintiffs now pivot to alleging that their real argument is that indigent debtors who owe money to the government are treated worse than indigent debtors who owe money to private creditors. *See* ECF 423, at 23. While such a claim does sound more like the acts barred by *James v. Strange*, Plaintiffs do not allege in the SAC facts sufficient to state such a claim. The SAC refers to "private creditors" a total of three times, and all in discussing class certification. *See* ECF 212, ¶¶ 224, 230, and 238. In this six-year-old lawsuit, the Court should not permit the Plaintiffs to make such an about-face, without having pled facts remotely sufficient to support it.

V. **THE COUNTY SHERIFF DEFENDANTS DEFER TO THEIR ORIGINAL BRIEFING ON ALL REMAINING ISSUES.**

The CSDs otherwise refer this Court to their original briefing on all remaining issues, including the Plaintiffs' failure to plead facts demonstrating municipal liability, the decision of any final decision-maker, and mootness under revisions to Okla. Stat. tit. 22, § 983.

<table>
<tr><td>Date: August 31, 2023</td><td>Respectfully submitted,<br><br>s/ Jeffrey C. Hendrickson<br>Robert S. Lafferrandre, OBA #11897<br>Randall J. Wood, OBA #10531<br>Jeffrey C. Hendrickson, OBA #32798<br>**PIERCE COUCH HENDRICKSON**<br>**BAYSINGER & GREEN, L.L.P.**<br>1109 North Francis Avenue<br>Oklahoma City, Oklahoma 73106<br>Telephone: (405) 235-1611<br>Facsimile: (405) 235-2904<br>jhendrickson@piercecouch.com<br><br>***Attorneys for County Sheriff Defendants***</td></tr>
</table>

**CERTIFICATE OF SERVICE**

I certify that on **August 31, 2023** I electronically transmitted the attached document to the Clerk of this Court using the ECF System for filing. Based on the records currently on file, the Clerk will transmit a Notice of Electronic Filing all ECF registrants who have appeared in this case.

s/ Jeffrey C. Hendrickson
Jeffrey C. Hendrickson
