**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **IRA LEE WILKINS, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**ABERDEEN ENTERPRISES II, Inc. et al.,**<br><br>**Defendants.** | **Case No. 17-CV-00606-SEH-JFJ** |

**OPINION AND ORDER**

## I. Introduction

Someone who owes a debt to society usually pays that debt by serving a term of imprisonment. But there is a more literal aspect to paying societal debts that comes in the form of fines and fees imposed on top of (or in lieu of) incarceration. This case is about what legal limits exist on imposing and collecting such fines and fees.

Plaintiffs are individuals who owe debts related to criminal convictions in Oklahoma state courts. According to Plaintiffs, they and many other Oklahomans suffer severe consequences for failing to pay court debts not because they are unwilling to pay, but because they are simply too poor to do so. They generally allege that because of these debts, warrants are issued for their arrest that are not supported by sworn statements or otherwise reliable

information, and the warrants are issued as a matter of course by state court judges. Because of these warrants, Plaintiffs allege they are detained for significant periods to coerce payment, and their families are regularly harassed and threatened in an effort to collect payment. All of this, they say, is done without a meaningful or timely investigation into their ability to pay.

Plaintiffs allege that this system is the result of a scheme set up by dozens of individual county sheriffs and their independent lobbying entity, court clerks and cost administrators, boards of county commissioners, judges, and a private debt collection entity and its owners. The purported purpose of the scheme is to extract money from indigent criminal defendants without regard to their constitutional rights. The money collected from the impoverished court debtors is not only used to pay off outstanding fines and fees, but it is also used to personally financially benefit many of those involved.

Now before the Court are thirteen motions to dismiss. [ECF Nos. 398, 399, 402, 403, 404, 405, 406, 407, 408, 409, 410, 411, & 412]. The motions are granted in part and denied in part for the reasons set forth below. Several additional motions, [ECF Nos. 77–79], will also be addressed below.

## II. Background[1]

Plaintiffs assert claims against the defendants for violations of their constitutional rights under 42 U.S.C. § 1983, the Racketeer Influenced and Corrupt Organizations ("RICO") Act, and various state laws. With respect to Plaintiffs' allegations regarding the violations of their constitutional rights, those allegations fall into two main categories: (1) the process that they are subjected to; and (2) the personal interests that some defendants have in the debt collection scheme. These allegations also help frame the issues as to Plaintiffs' other claims.

Process

Plaintiffs are each "impoverished individuals who have been saddled with court debts" in several Oklahoma counties. [ECF No. 212 at 5]. The scheme alleged by Plaintiffs starts with the county judges, court clerks, and cost administrators who first impose fines and fees on individual defendants in criminal cases. [*Id*. at 4–5]. When a person fails to pay his or her court debt, the court clerk or cost administrator "seeks a warrant for that person's arrest, based solely on the nonpayment." [*Id*. at 6]. The clerks and cost

[1] The Court does not make any factual determinations at this stage. Rather, the Court recounts and summarizes Plaintiffs' allegations for purposes of framing the issues raised in the defendants' motions to dismiss.

administrators seek warrants based on unsworn statements without any inquiry into an individual's ability to pay. [*Id.* at 8–9].

The assigned judges then sign arrest warrants as a matter of course, again without any inquiry into an individual's ability to pay the court debt. [ECF No. 212 at 37]. Once the arrest warrant is signed, the court clerk or cost administrator uses his or her discretion to transfer the case to a private debt collection agency, Defendant Aberdeen Enterprizes II, Inc. ("Aberdeen"). [*Id.* at 6]. Plaintiffs also allege that some court clerks, such as the court clerk in Tulsa County, "delegate[s] the function of determining when to seek a new arrest warrant for nonpayment to Aberdeen, Inc. after a case has been transferred to the company for collection." [*Id.* at 28]. This means Aberdeen "has discretion to determine the amount of money a debtor must pay, the deadline for making the payment, and when to seek a warrant for nonpayment." [*Id.*].

Aberdeen appears to exist because an Oklahoma statute allows individual county sheriffs "to enter into, and the [Oklahoma] Sheriffs' Association to administer, contracts with private entities who will 'attempt to locate and notify persons of their outstanding misdemeanor or failure-to-pay warrants.'" [*Id.* at 26] (quoting 19 O.S. § 514.4(A) (2010)). The Oklahoma Sheriffs' Association, Inc. ("OSA") "represents the Sheriffs of all 77 counties in Oklahoma as a lobbying organization." [*Id.* at 16]. All 54 named sheriff

defendants in this case have authorized the OSA to enter into an agreement with Aberdeen. [*Id.*]. Plaintiffs attached the agreement between the OSA and Aberdeen as an exhibit to the operative pleading, the Second Amended Class Action Complaint ("SACAC"). [ECF No. 212-1].

After a case is transferred to Aberdeen, "a 30-percent penalty surcharge is added to the amount owed" without any inquiry into an individual's ability to pay. This penalty is the result of lobbying done by the OSA, which Aberdeen splits the proceeds from the 30-percent penalty with Aberdeen. [ECF No. 212 at 6]. To assist with Aberdeen's collection efforts, the agreement between it and the OSA "guarantees" that Aberdeen will have access to court files, and that "[e]ach county sheriff's office and court clerk's office [will] make 'collective efforts' to obtain debtor information…." [*Id.* at 27–28]. But counties give Aberdeen even more authority than the contract allows. Plaintiffs allege that "[i]n at least one county, Aberdeen, Inc. not only has the ability to access and view the records in … the district court's internal record management system, but it also has authority to *edit* individual case files…." [*Id.* at 28] (emphasis in original).

Plaintiffs further allege that Aberdeen "engages in threats and extortion to extract as much money as possible from the debtor, without regard to the debtor's ability to pay or the person's need to obtain the basic necessities of life." [ECF No. 212 at 25]. To do this, Aberdeen and its employees tell debtors

and their family members that it will recall warrants if some amount—determined by Aberdeen—is paid, and that it will seek new arrest warrants for people who stop making payments after an arrest warrant is recalled. [*Id.* at 30–32]. As an example of the pressure exerted by Aberdeen, Plaintiffs allege that an Aberdeen script has its employees tell debtors: "Like I said I want to help you get this resolved. I would not want you to get picked up on this warrant and not be there for your kids." [*Id.* at 31].

Defendants Jim and Rob Shofner are "supervising officers" with Aberdeen who "establish company policy and direct collection activities." [ECF No. 212 at 39]. Plaintiffs allege that the Shofners do not just oversee Aberdeen's operations at a high level. Rather, they "routinely" listen in on phone calls with debtors and discipline or terminate employees who are "insufficiently aggressive in seeking payment." [*Id.*]. The Shofners have also set up Aberdeen employees' compensation to be "affected by the amount of money they are able to collect." [*Id.* at 40].

Once the decision is made to arrest a person for failure to pay and a court clerk assists Aberdeen with acquiring an arrest warrant, state court judges issue the warrants even though they are based on unsworn statements. [ECF No. 212 at 29]. The warrants are issued by the judges even though "[t]here is no pre-deprivation notice or other formal process, no opportunity to be heard, and no hearing of any kind before a neutral arbiter before" the judges sign off

on the warrants. [*Id.* at 29]. At this stage, the sheriffs not only authorize the OSA to contract with Aberdeen, they "execute the illegal arrest warrants and detain debtors based solely on the unsworn allegations of nonpayment, even though they have knowledge of the company's policies and practices alleged in the" SACAC. [*Id.* at 29].

After an individual is arrested, the sheriffs keep them detained "if they are too poor to pay a fixed sum required for their release." [ECF No. 212 at 29]. If a debtor cannot immediately pay to get out, what happens next depends on the county. In Tulsa County, for example, debtors stay in jail until the sheriff takes them to the next cost docket, which could be up to four days or more. [*Id.* at 47]. Debtors are not provided counsel during the cost hearing, and the judge who presides over the cost docket "will, as a matter of course, release indigent debtors without further payment (unless they have other unrelated warrants) and set a review date for them to return to court." [*Id.* at 47]. Debtors then start the process all over again after they are released. [*Id.* at 48]. As alleged by Plaintiffs, this is all done without giving a meaningful opportunity to have their ability to pay evaluated, and Defendants are aware of the deficiencies Plaintiffs identify. [*Id.* at 8–9, 47].

For people who owe court debt in Rogers County, a similar story plays out. Fines and fees are imposed at the time of plea and sentencing, but additional costs are imposed when the individual reports to the Rogers County Court

Clerk after sentencing. [ECF No. 212 at 48]. Debtors are put on a payment plan without any inquiry about their ability to pay, and arrest warrants are issued and cases are referred to Aberdeen for those who do not satisfactorily comply with the payment program. [*Id*. at 48–49]. On top of that, an automatic $80 fee is added in each case when a warrant is issued, along with the 30% penalty added to cases referred to Aberdeen. [*Id*. at 49]. Rogers County debtors are also held in jail after arrest unless they pay the court debt to get out, or until they are brought before a judge during an "arraignment." [*Id*. at 50]. During the hearing, the judge will ask a debtor if he or she can pay $100. [*Id*.]. If not, the judge will order the debtor to "'sit it out' in jail at a rate of $25 per day." [*Id*.].

Motives

In addition to constitutional violations, Plaintiffs also allege that some of the defendants have personal or other improper interests in collecting court debts.

Plaintiffs allege that defendants use fines and fees to pay for operations such as court security, drug court, mailing materials, court reporters, transcripts, courthouse maintenance, furniture, supplies, and technology. [ECF No. 212 at 51]. The collections are also used to pay for salaries and retirement benefits for judges, court clerks, and other court employees, and directly fund both sheriffs and prosecutors. [*Id*. at 51–52]. The collections also

fund the OSA, the entity that lobbies on behalf of the sheriffs. [*Id*. at 5–6]. And Aberdeen, as a third party debt collector, financially benefits from collecting court debts. [*Id*. at 6]. Plaintiffs note Aberdeen benefits not only financially by receiving a percentage of collections, but Aberdeen also determines how much each individual must pay and sets the individual's payment schedule. [*Id*. at 32].

There are eight individual plaintiffs named in the SACAC:

- <u>Carly Graff:</u> Graff resides in Rogers County, Oklahoma. [*Id*. at 54]. She was issued a $250 ticket for failing to properly use a car seat, but was unable to pay due to her poverty. [ECF No. 212 at 55]. Because she did not pay the ticket, the Rogers County clerk and judge issued a warrant for her arrest, which resulted in another $80 fee. [*Id*.]. Another $100.58 penalty was added to her Rogers County court debt because the clerk referred her case to Aberdeen. [*Id*.]. The application for her arrest warrant was not based on sworn statements. [*Id*.]. Aberdeen has sent multiple letters to Graff that notify her she may be arrested if she does not pay them. [*Id*.].

- <u>Randy Frazier:</u> Frazier is an indigent, disabled veteran who resides in Tulsa, Oklahoma. [*Id*. at 55]. He has multiple cases for which he cannot pay outstanding court debts. [*Id*. at 56]. As a result, the Tulsa County Clerk sought and a Tulsa County Special Judge issued arrest warrants in his cases and imposed $80 warrant fees in each case. [*Id*.]. The cases were transferred to Aberdeen, the 30% penalty was imposed, and he now owes more than $10,000. [*Id*.]. Aberdeen has demanded payments from Frazier and has contacted his family to threaten arrest. [*Id*.].

- <u>David Smith:</u> Smith is an indigent resident of Tulsa, Oklahoma. [*Id*. at 56]. He has debt in two cases. [*Id*. at 57]. He made monthly payments for a while, but stopped when he lost his job. [*Id*.]. Aberdeen threatened arrest when he stopped paying, so he paid some amount at the expense of paying other necessities such as child support, which led to the denial of visitation with his child. [*Id*.].

- Linda Meachum: Meachum is an indigent resident of Tulsa, Oklahoma. [*Id*. at 57]. The Tulsa County Clerk transferred her 2007 case to Aberdeen, and they, along with the Cost Administrator, sought an arrest warrant when Meachum was unable to pay her debt. [*Id*. at 58]. A judge signed an arrest warrant without inquiring into the reason she failed to pay. [*Id*.]. Meachum had another case brought against her in 2014, and she "was forced to pay an additional $200 to be released because of the debt-collection arrest warrant from her previous case." [*Id*.].

- Kendallia Killman: Killman is an indigent resident of Norman, Oklahoma. [*Id*. at 58]. She owes fines and fees in Cleveland County, and her case was transferred to Aberdeen. [*Id*.]. She is unable to pay her court debt, and she has been arrested twice because of it. [*Id*.]. Aberdeen employees have continued to threaten her with jailing if she does not pay. [*Id*. at 58–59].

- Christopher Choate: Choate is an indigent resident of Tulsa, Oklahoma. [*Id*. at 59]. He has made payments toward his Tulsa County court debt "since he was released from prison in 2009" but he has struggled to pay because of his limited income. [*Id*.]. Multiple arrest warrants have been issued for Choate, and he has been arrested once and he spent a night in jail. [*Id*.].

- Ira Lee Wilkins: Wilkins is an indigent "resident of Tulsa, Oklahoma, who is currently incarcerated in the Oklahoma State Reformatory Work Center in Granite, Oklahoma." [*Id*. at 60]. A warrant for Wilkins' arrest was issued by the Wagoner County District Court, and Aberdeen demanded payment to recall the warrant. [*Id*. at 60]. Wilkins' fiancée contacted Aberdeen to notify them that he was incarcerated, but Aberdeen still demanded payment even though he had no income. [*Id*. at 60]. Although his fiancée paid a lump sum to have the warrant recalled, Wilkins still owes thousands in court debt. [*Id*. at 60].

- Melanie Holmes: Holmes owes court debt in multiple cases. [*Id*. at 60]. She had sporadic employment following her release from prison in 2011 until 2015. [*Id*. at 61]. She made some payments to Aberdeen during that time because it threatened her with arrest if she did not pay, even "at the expense of obtaining groceries for herself and her family." [*Id*.]. Holmes told Aberdeen about her inability to pay, and on one occasion an Aberdeen employee told her "that she should go directly to court to see a judge instead of dealing with the company, but before doing so, the

employee told [her] that, under company policy, he was not supposed to share that information." [*Id.*]. Holmes lost her job in 2015, and she and her husband became homeless. [*Id.*].

In August 2016, the Rogers Court Clerk sought, and a Rogers County Judge issued a warrant for Holmes' arrest without any inquiry into her ability to pay her court debt. [*Id.* at 62]. The application for her arrest warrant did not contain a sworn statement, and did not include "any information whatsoever other than the letters 'FTP BW' (which, presumably, stands for 'failure to pay bench warrant')." [*Id.*]. A couple months later, Aberdeen and the Tulsa Court Clerk sought, and a Tulsa County Judge issued a warrant for Ms. Holmes' arrest. [*Id.*]. The docket for this warrant states "DID NOT PAY ABERDEEN, 2ND BENCH WARRANT ISUED, DO NOT RELEASE." [*Id.*].

Holmes was arrested on the Tulsa County warrant in December 2016, and "[a]n Order of Commitment signed by an employee of the Tulsa Clerk on December 2, 2016, directed the Tulsa Sheriff that Holmes would have to pay $500 to be released." [*Id.* at 62]. This document was not signed by a judicial officer, "and in the line for the signature of 'COURT/JUDGE,' all that is written is 'Cost.'" [*Id.*]. Because she did not have the $500 to get out, Ms. Holmes was in jail until December 8th, when she was finally taken to see a judge. [*Id.*]. The judge released her, made no inquiry into her ability to pay her court debt, and directed her to contact Aberdeen to set up a payment plan. [*Id.* at 63]. Holmes then contacted Aberdeen again, but it refused to set up a payment plan because of her outstanding warrant in Rogers County. [*Id.*]. Holmes and her husband fled Oklahoma for Oregon, and she "is afraid to return [to Oklahoma] because of her debt-collection arrest warrants." [*Id.*].

## III. Discussion

### A. Standards

Defendants bring their various motions to dismiss under Fed. R. Civ. P. 12(b)(1) and (6). The standards under these provisions are:

**i. <u>Rule 12(b)(1)</u>**

Motions brought under Fed. R. Civ. P. 12(b)(1) challenge a court's subject-matter jurisdiction. "Federal courts are courts of limited jurisdiction" and may exercise jurisdiction only when specifically "authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction takes one of two forms: a facial or a factual attack. *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1148 n.4 (10th Cir. 2015). A facial attack questions the sufficiency of the complaint's allegations. *Id.* In reviewing a facial challenge, a district court must accept the allegations in the complaint as true. *Id.* However, in a factual attack, the moving party may go beyond the allegations contained in the complaint and challenge the facts upon which subject-matter jurisdiction depends. *Id.* A district court may not presume the truthfulness of the complaint's factual allegations when reviewing a factual attack on subject-matter jurisdiction. *Id.* Rather, a court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts. *Id.*

Once challenged, the burden of proving subject-matter jurisdiction is on the plaintiff. *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 797–98 (10th Cir. 2002) (explaining that "conclusory allegations of jurisdiction are not enough;" plaintiff must "show, by a preponderance of the

evidence, that jurisdiction exists") (quotation marks and citations omitted)); *see also Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1189 (10th Cir. 2008) ("The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction.").

**ii. <u>Rule 12(b)(6)</u>**

A defendant may move to dismiss under Fed. R. Civ. P. 12(b)(6) based on a plaintiff's failure to state a claim upon which relief can be granted. To survive such a motion, "a plaintiff must plead sufficient factual allegations 'to state a claim to relief that is plausible on its face.'" *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1104 (10th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "There is a low bar for surviving a Rule 12(b)(6) motion to dismiss," and a case "may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Griffith v. El Paso Cnty., Colo.*, 129 F.4th 790, 815 (10th Cir. 2025) (cleaned up).

Although the facts alleged in the operative pleading are viewed in the light most favorable to the non-moving party, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "In other words, dismissal under Rule 12(b)(6) is appropriate if the complaint alone is legally insufficient to state a claim." *Brokers' Choice*, 861 F.3d at 1104–05.

Additionally, conclusory allegations need not be accepted. *Erikson v. Pawnee Cnty. Bd. of Cnty. Comm'rs*, 263 F.3d 1151, 1154–55 (10th Cir. 2001). "[C]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

**B. <u>Preliminary Issues</u>**

Before focusing on individual motions, there are a few issues raised in the briefing that can be collectively addressed: (1) qualified immunity; (2) mootness; (3) Plaintiffs' alleged constitutional violations; and (4) Plaintiffs' RICO claims.

**i. <u>Qualified Immunity</u>**

Many of the defendants raise the defense of qualified immunity as to Plaintiffs' claims against them under 42 U.S.C. § 1983. Qualified immunity protects public officials "from liability for violating a constitutional right that wasn't clearly established when the violation occurred." *Armendariz v. City of Colo. Springs*, 169 F.4th 1036, 1051 (10th Cir. 2026). The procedural posture of this case is relevant because "defendants asserting qualified immunity through motions to dismiss face 'a more challenging standard of review than would apply on summary judgment.'" *Id*. at 1052 (quoting *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014)).

To overcome a qualified immunity defense at this stage, a plaintiff must plausibly allege that: (1) the defendant violated their constitutional rights; and (2) the rights were clearly established at the time. *Armendariz*, 169 F.4th at 1052 (quoting *Brown v. City of Tulsa*, 124 F.4th 1251, 1265 (10th Cir. 2025)). At the motion to dismiss stage, and unlike at summary judgment, "it is the defendant's conduct *as alleged in the complaint* that is scrutinized for [constitutionality]." *Thompson v. Ragland*, 23 F.4th 1252, 1256 (10th Cir. 2022) (emphasis and brackets in original) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996)).

Although Courts may grant a motion to dismiss based on qualified immunity, it is also appropriate for a court to defer the issue until a later stage in litigation if additional facts are needed "to definitively determine whether defendants are entitled to qualified immunity." *Buck v. Rhoades*, 598 F.Supp.3d 1181, 1196 (N.D. Okla. 2022); *see also Wilson v. Long*, No. 21-cv-03207-CMA-NRN, 2022 WL 2981834, at *7 n.10 (D. Colo. July 28, 2022) ("It is not uncommon for courts to defer ruling on qualified immunity until the summary judgment stage."). The Court has fully considered the parties' filings, the arguments made therein, and the applicable authority, and this is such a case where it is premature to definitively determine whether the defendants are entitled to qualified immunity. To be clear, the Court *does not* make a ruling on qualified immunity at this stage. Defendants are neither

granted nor denied qualified immunity. Rather, it is more appropriate for the parties to engage in discovery and for defendants to reassert the issue at a later stage if they choose to do so.

**ii. <u>Mootness</u>**

Several defendants argue that Plaintiffs' claims are moot, primarily because of the revisions to 19 O.S. §§ 514.4–514.5 and 22 O.S. § 983. Plaintiffs respond that their claims are not moot because their allegations focus on Defendants' ongoing conduct and practices rather than the relevant statutes or rules. *E.g.,* [ECF No. 423 at 28–30].

Again, "[f]ederal courts are courts of limited jurisdiction" and may exercise jurisdiction only when specifically "authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "One fundamental principle of [federal court] subject-matter jurisdiction is the 'constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" *Shields Law Group, LLC v. Stueve Siegel Hanson LLP*, 95 F.4th 1251, 1279 (10th Cir. 2024) (quoting *Brown v. Buhman*, 822 F.3d 1151, 1163 (10th Cir. 2016)). Mootness is based on the case-and-controversy requirement, and it "is essentially 'standing set in a time frame' and ensures that '[t]he requisite personal interest that must exist at the commencement of the litigation ... continue[s] throughout its existence.'" *Id.* at 1280 (quoting

*Prison Legal News v. Fed. Bureau of Prisons*, 944 F.3d 868, 879 (10th Cir. 2019)).

Claims become moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *Shields Law Group, LLC*, 95 F.4th at 1280 (quoting *Brown v. Buhman*, 822 F.3d 1151, 1165 (10th Cir. 2016)). An issue is no longer live if a change in circumstances "deprives the plaintiff of a personal stake in the outcome." *Id.* (internal quotation marks and citation omitted). In other words, a claim is moot when a court decision can no longer redress a plaintiff's injury. *Id.* Mootness is a threshold, jurisdictional issue. *Id.* If a claim becomes moot at any time in the litigation, including upon appellate review, the court lacks jurisdiction to consider a claim. *See id.* at 1280–81.

The Court agrees with Plaintiffs that the change in applicable state law does not moot their claims. As repeatedly noted by Plaintiffs, their claims focus on Defendants' practices, not the state laws on the same subject matter. Stated otherwise, a statute's requirements are irrelevant if Defendants' conduct does not match the statutory requirement or the conduct still violates Plaintiffs' constitutional rights. In the parlance of mootness, the Court can still redress Plaintiffs injuries if the Defendants violated and/or continue to violate their constitutional rights regardless of what state law says. Although the Court agrees with Plaintiffs on this broad point, it may be discovered that

some of the plaintiffs' claims are moot. But that is a question for later in the litigation.

**iii. <u>Plaintiffs' Alleged Constitutional Violations</u>**

The defendants all, in one way or another, contend that Plaintiffs fail to state a claim against them under 42 U.S.C. § 1983 for alleged violations of Plaintiffs' equal protection and due process rights under the Fourteenth Amendment and their rights under the Fourth Amendment. Many defendants also argue that Plaintiffs have not adequately alleged a policy or custom, that they were a final decisionmaker, or that they otherwise caused or can be held liable for Plaintiffs' injuries. The Court has reviewed and considered Plaintiffs allegations, the parties' briefing, and the applicable authority, and finds that Plaintiffs have plausibly alleged violations of their Fourth and Fourteenth Amendment rights for the reasons set forth in their briefing. The Court further determines that Plaintiffs have adequately alleged and identified sufficient policies and/or customs, status as a final decisionmaker, and other conduct adequate for the Court to determine that each Defendant has caused and can be held liable for the Plaintiffs' injuries as alleged in the SACAC, except as otherwise noted in this order. In other words, Plaintiffs have plausibly alleged a comprehensive scheme of policies, procedures, customs, and individual conduct that results in the violation of each Plaintiff's constitutional rights, and each Defendant plays an integral

and causal role in that scheme. Although the Court will not specifically opine on each and every argument raised by each and every Defendant on this front, a few guiding principles are worth noting.

### a. The Fourth Amendment

Count three of the SACAC sets out Plaintiffs' Fourth Amendment claim against Tulsa County, certain Tulsa County judges, a Rogers County judge, the Tulsa Court Clerk and Cost Administrator, the Tulsa County Sheriff, the Rogers County Court Clerk, and the Rogers County Sheriff in their individual and official capacities. [ECF No. 212 at 90–92]. Plaintiffs also assert this claim against Aberdeen, the Shofners, and the OSA. [*Id.*]. Plaintiffs allege that Defendants seek, issue and execute arrest warrants based on applications that are knowingly false or misleading in that the applications lack information about an individual's ability to pay their court fines and fees. [*Id.* at 91]. Plaintiffs also allege that the warrants sought, issued, and executed are based on applications with unsworn statements and lack any oath or affirmation. [*Id.*]. Plaintiffs further allege that the Tulsa and Rogers County judges issue the warrants "[a]t the request of the Defendants" who seek them. [*Id.*]. As for the Tulsa and Rogers County Sheriffs, Plaintiffs allege that they execute the warrants "and detain persons in jail with knowledge that the warrants lacked sworn statements supporting the factual basis, lacked probable cause, and omitted relevant information as a matter of

policy and practice, or with reckless disregard for the same." [*Id*. at 92]. And although Plaintiffs do not specifically include this allegation within count three, they allege that judges issue arrest warrants "as a matter of course" when requested by Aberdeen, the Tulsa Court Clerk/Cost Administrator, and the Rogers Court Clerk [*Id*. at 37, 45–46, and 49].

Plaintiffs' allegations about judges issuing warrants upon application "as a matter of course" are reason enough to deny Defendants' motions to dismiss. It is fundamental that a judge reviewing a warrant application must serve as a neutral and detached decisionmaker. *Aguilar v. State of Tex.*, 378 U.S. 108, 111 (1964), *abrogated on other grounds by, Illinois v. Gates*, 462 U.S. 213 (1983). The Fourth Amendment requires a reviewing judge to serve as more than "a rubber stamp for the police" or "as 'an adjunct law enforcement officer.'" *United States v. Leon*, 468 U.S. 897, 914 (1984) (quoting *Aguilar*, 378 U.S. at 111; *Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319, 326–327 (1979)); *see also Armendariz v. City of Colo. Springs*, 169 F.4th 1036, 1052–53 (10th Cir. 2026) (stating that an "officer may still violate clearly established law" when "the issuing magistrate wholly abandoned his judicial role") (quoting *Leon*, 468 U.S. at 923)). When Plaintiffs allege that judges issue warrants upon application "as a matter of course," they are alleging that the judges act as no more than a rubber stamp. The Fourth Amendment requires more.

**b. <u>The Fourteenth Amendment – Equal Protection and Due Process</u>**

Like with Plaintiffs' Fourth Amendment Claims, the Court determines that Plaintiffs have plausibly alleged each category of due process and equal protection violation under the Fourteenth Amendment as to each Defendant against whom they assert their claims against. Plaintiffs also sufficiently allege enough factual allegations in the SACAC to plausibly allege that each Defendant caused the constitutional violation either through their own individual involvement in the conduct alleged, conduct by a final decisionmaker, adoption of a policy or custom, or otherwise. And although the Court agrees with Plaintiffs response arguments, several guiding principles are worth highlighting.

First, several of Plaintiffs' claims are based on the overarching allegation that Defendants do not sufficiently inquire into or evaluate Plaintiffs ability to pay fines (*i.e.* willfulness) before taking action against them. The Court generally agrees that the SACAC plausibly alleges that Defendants violated their Fourteenth Amendment rights on this basis, and that Plaintiffs' theory is generally supported by the Supreme Court's holdings in *Bearden v. Georgia*, 461 U.S. 660 (1983) and its progeny. But the Court also highlights that Plaintiffs' claims present not *just* equal protection issues, and not *just* due process issues. Rather, "[d]ue process and equal protection principles

converge in the Court's analysis in these cases." *Id.* at 665. And beyond the broad underlying issue of willful nonpayment versus non-willful inability to pay, Plaintiffs also plausibly allege that Defendants have not adhered to appropriate due process procedural safeguards in their application of the debt collection scheme.

Second, Plaintiffs' claim that Defendants have improper financial incentives in the way they operate the debt collection scheme. The Court does not question that it could be proper, for example, for a governmental entity to outsource certain criminal justice functions to third parties that are compensated for their work. Plaintiffs plausibly allege that it becomes constitutionally problematic when there is a financial incentive for selective enforcement and improper decision-making in how to carry out criminal justice functions. *E.g. Marshall v. Jerrico, Inc.*, 446 U.S. 238, 249–50 (1980) (collecting cases).

Third, Plaintiffs plausibly allege that Defendants engage in onerous debt collection practices that are not imposed on other types of debtors, and this violates Plaintiffs' equal protection rights. *See James v. Strange*, 407 U.S. 128, 138 (1972).

In addition to the above, several issues remain, such as whether certain defendants acted under color of law. These remaining issues about whether

Plaintiffs have plausibly alleged a claim under § 1983 will be addressed in more detail below, as necessary.

**iv. Plaintiffs' RICO Claims**

**a. RICO Framework**

Plaintiffs assert RICO claims against several defendants under 18 U.S.C. §§ 1962(c)–(d). Those provisions provide:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
>
> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

*Id*. Although the RICO statute includes criminal penalties, it also provides for a civil cause of action. *Id*. § 1964(c). "To state a civil RICO claim, a plaintiff must adequately plead that (1) the defendant violated the RICO statute and (2) the plaintiff was injured 'by reason of' that violation.'" *Gaddy v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 148 F.4th 1202, 1210 (10th Cir. 2025). "A defendant violates the RICO statute when the defendant (1) invests in, controls, or participates in the conduct of (2) an enterprise (3) through a pattern (4) of racketeering activity." *Id*. (citations omitted). In addition to these elements, a plaintiff must show that the enterprise is either engaged in interstate or foreign commerce, or

that its activities affect interstate commerce. 18 U.S.C. § 1962(c). Several of the elements are defined by statute and further clarified by relevant cases.

Under the first element, "RICO requires a showing that the defendant '***conduct[ed] or participate[d]***, directly or indirectly, in the conduct of [the] enterprise's affairs.'" *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1251 (10th Cir. 2016) (emphasis added). The Tenth Circuit has explained:

> This, in turn, requires a showing that the defendant "participate[d] in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). Under *Reves'* operation or management test, the defendant must have "some part in directing" the enterprise's affairs. But importantly, the defendant need not have "primary responsibility for the enterprise's affairs," "a formal position in the enterprise," or "significant control over or within an enterprise." Instead, even "lower rung participants in the enterprise who are under the direction of upper management" may be liable under RICO if they have "some part" in operating or managing the enterprise's affairs. Nevertheless, a defendant must do more than simply provide, through its regular course of business, goods and services that ultimately benefit the enterprise.

*Id*. (some internal citations omitted).

"'***Racketeering activity***' consists of the criminal offenses listed in 18 U.S.C. § 1961(1), and a '***pattern***' requires at least two racketeering acts committed within ten years of each other." *Johnson v. Heath*, 56 F.4th 851, 858 (10th Cir. 2023) (emphasis added) (citing 18 U.S.C. § 1961(1), 1961(5)). The underlying acts identified in § 1961 are referred to as "predicate acts." *Gaddy*, 148 F.4th 1202, 1210 (citation omitted).

As noted by the Tenth Circuit in *Johnson v. Heath*, "[d]etermining what constitutes a RICO pattern is no easy task." 56 F.4th 851, 858 (10th Cir. 2022). "According to the Supreme Court, a RICO pattern requires that the racketeering predicates relate to each other and amount to a threat of continued racketeering activity." *Id.* (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). "No pattern exists without this 'continuity plus relationship.'" *Id.* at 859. Under the first part of this test, the relationship prong, "racketeering predicates relate to each other if they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Id.* This is not a cumbersome standard, and "[p]redicate acts satisfy the relationship requirement when they make up one common scheme." *Id.*

The second part of this test, the continuity prong, is more stringent and "[n]o universal standard precisely defining continuity exists because it ultimately 'depends on the specific facts of each case.'" *Johnson*, 56 F.4th at 859. Continuity is analyzed as either closed-ended continuity or open-ended continuity:

> Closed-ended continuity is a closed period of repeated racketeering conduct, while open-ended continuity consists of racketeering conduct that threatens future repetition. Plaintiffs can establish open-ended continuity by showing that the racketeering acts involved implicit or explicit threats of

> repetition, that they formed the operations of an association that exists for criminal purposes, or that they were the defendants' regular way of conducting a legitimate enterprise.
>
> …
>
> [C]losed-ended continuity consists of a closed period of repeated, related racketeering acts that do not necessarily threaten future repetition.

*Id*. at 859–60 (citation modified).

***Enterprise*** "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). In *Boyle v. United States*, 556 U.S. 938, 948 (2009), the Supreme Court held that "an association-in-fact enterprise is simply a continuing unit that functions with a common purpose." The Court further held:

> Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach.

*Id*. As referenced in later cases from the Tenth Circuit, the focus is whether there is a sufficient showing of a "shared … purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Harris*, 695 F.3d at 1136.

In addition to the main elements of civil RICO claim, a plaintiff must also demonstrate that the enterprise affects ***interstate commerce***. *Johnson*, 56 F.4th at 858; 18 U.S.C. 1962(c) (making it unlawful to be "employed by or associated with any enterprise *engaged in, or the activities of which affect, interstate or foreign commerce*, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." (emphasis added)). The enterprise's impact on interstate commerce does not need to be direct or significant. Rather, in at least the criminal context, "[i]t is not necessary to prove that the acts of any particular defendant affected interstate commerce as long as the acts of the enterprise had such effect. … [T]he government is not required to prove that any defendant knew he was affecting interstate commerce." 10th Cir. Criminal Pattern Jury Instr. No. 2.74.4. Additionally, the alleged conduct need only have "a minimal effect on interstate commerce." 10th Cir. Criminal Pattern Jury Instr., Cmt. to No. 2.74.4.; *Cf also United States v. Garcia*, 793 F.3d 1194, 1209–11 (10th Cir. 2015) (not outright adopting the

minimal effect test, but not overturning a jury instruction containing minimal effect language).

Several defendants move to dismiss the RICO claims alleged against them. The Court will address each set of defendants in turn.

**b. The Oklahoma Sheriffs' Association**

The OSA argues that Plaintiffs have not alleged it participated in a RICO enterprise, or engaged in any predicate acts (a.k.a. racketeering activity). [ECF No. 405 at 13–17].

**1. Plaintiffs Plausibly Allege that the OSA Participated in a RICO Enterprise**

Viewing Plaintiffs' allegations through the lens set out in *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1251 (10th Cir. 2016), the Court determines that Plaintiffs have plausibly alleged that the OSA participated in a RICO enterprise. Plaintiffs allege that the OSA did more than simply sign a contract. For example, Plaintiffs allege that the OSA continues to contract with Aberdeen with full knowledge of their unlawful activities, administers the contract, and procures information about court debtors for Aberdeen so it can continue its unlawful activities. [ECF No. 212 at 16, 82]. This is sufficient to allege the OSA participated in the operation of the larger unlawful scheme alleged by Plaintiffs. In other words, Plaintiffs do not just allege that

the OSA passively benefitted from or minimally participated in the alleged RICO enterprise. Rather, Plaintiffs allege that the OSA is an active participant in the enterprise's operations, and it continues to knowingly serve as one of the integral parts of the enterprise that allows Aberdeen to engage in unlawful conduct.

**2. <u>Plaintiffs Plausibly Allege that the OSA Engaged in Predicate Acts</u>**

The OSA contends that Plaintiffs have not alleged a predicate act because "Plaintiffs do not allege that the OSA has used the threat of force or other criminal means to obtain property or has engaged in any other conduct required to constitute extortion." [ECF No. 405 at 17]. The Court liberally construes Plaintiffs' response as saying that they assert the OSA is liable for extortion on an aiding or abetting theory. [ECF No. 421 at 13–14] (citing *Indep. Drug Wholesalers Grp., Inc. v. Denton*, No. 92–2164–JWL, 1993 WL 191393, at *4 (D. Kan. May 13, 1993), for the proposition that RICO "requires only that the OSA be 'associated with the primary violation, participated in it as something that [it] wished to bring about, and sought by [its] actions to make it succeed.'"). The first part of the sentence quoted by Plaintiffs refers to establishing a claim against a defendant "as an aider and abettor." *Denton*, 1993 WL 191393, at *2. For substantially the same reasons that the Court determined that the OSA participated in the RICO enterprise, it determines

that Plaintiffs have plausibly alleged that the OSA aided or abetted extorting Plaintiffs under the federal and state laws identified in the SACAC. *See* 18 U.S.C. § 2 (federal statute authorizing criminal liability for those who aid or abet); 21 O.S. § 172 (Oklahoma State statute authorizing criminal liability for those who aid or abet).

For the reasons stated above, Plaintiffs have plausibly stated a claim against the OSA under 18 U.S.C. § 1962(c). The OSA's motion to dismiss is denied on this basis.

**3. Plaintiffs' Conspiracy Claim under § 1962(d)**

The OSA's arguments on this front rest on its argument that Plaintiffs fail to state a claim against it under 18 U.S.C. § 1962(c). Because the Court denies the OSA's motion on this basis, the motion to dismiss Plaintiffs' claim under § 1962(d) is also denied.

**c. Aberdeen and the Shofners**

Aberdeen Enterprizes II, Inc. ("Aberdeen") and Jim and Rob Shofner (the "Shofners") (collectively, the "Aberdeen Defendants") raise three primary arguments as to why they believe that Plaintiffs have not stated a RICO claim against them: (1) that Plaintiffs have not sufficiently alleged the interstate commerce element; (2) that Plaintiffs have not alleged a necessary injury to business or property; and (3) that Plaintiffs do not adequately allege

an enterprise, or that Defendants have engaged in a pattern of racketeering activity.[2]

### 1. Interstate Commerce

As noted above, Plaintiffs must adequately allege that the enterprise affected interstate commerce to survive a motion to dismiss. The Aberdeen Defendants argue that Plaintiffs have not sufficiently alleged the interstate commerce element of the RICO claims against them. [ECF No. 403 at 9]; [404 at 12–13].But Plaintiffs identify several ways that the RICO enterprise engaged in interstate commerce:

- The enterprise's "activities and transactions relating to the collection of money, and the movement of the profit received by the Defendants through the enterprise, frequently require movement and communications across state lines;"
- "Aberdeen, Inc.'s case managers use electronic and telephone communications and United States mail to communicate with plaintiffs and members of the proposed class, including those who live outside of Oklahoma, including using those means to transmit threats of incarceration for nonpayment;"
- "Aberdeen, Inc. also collects payments from people who live outside of Oklahoma using interstate mail and/or wires;"
- "The RICO Enterprise has collected millions of dollars in payments from thousands of debtors who would have used some of that money to purchase goods in interstate commerce;" and
- "Aberdeen, Inc.'s policies also direct employees to collect money from people who receive federal disability payments."

[2] The Aberdeen Defendants do not organize their arguments in exactly this way, but the Court reads their arguments as falling into these main categories.

[ECF No. 212 at 81]. The Court determines Plaintiffs have plausibly alleged that the affairs of the enterprise at least minimally impacted interstate commerce. The allegations demonstrating the transfer of funds across state lines and interaction with people across state lines for the same purposes meet this standard. And because Plaintiffs allege that the enterprise collected "millions of dollars in payments from thousands of debtors," [*id.*], they also allege more than a minimal impact on interstate commerce. Therefore, the Aberdeen Defendants' motions to dismiss are denied on this basis.

**2. <u>Injury in Business or Property</u>**

To prevail on their RICO claim against Aberdeen and the Shofners, Plaintiffs must also show: "that the plaintiff's business or property was injured." *Safe Sts. All. v. Hickenlooper*, 859 F.3d 865, 881 (10th Cir. 2017) (citations omitted). This requirement comes from 18 U.S.C. § 1964(c), the statute that authorizes civil RICO actions. In relevant part, the statute provides: Any person *injured in his business or property by reason of a violation of section 1962* of this chapter may sue therefor in any appropriate United States district court…." *Id.* (emphasis added). "Section 1964(c)'s 'reference to injury to "business or property" ... cabin[s] RICO's private cause of action to particular kinds of injury—excluding, for example, personal

injuries—[by which] Congress signaled that the civil remedy is not coextensive with § 1962's substantive [criminal] prohibitions,' which do not require proof of such injuries." *Hickenlooper*, 859 F.3d at 885 (quoting *RJR Nabisco v. European Community*, 579 U.S. 325, 350 (2016)).

The Supreme Court has also recently addressed the question of "whether [§ 1964(c)], by implicitly denying a remedy for *personal* injuries, also denies a remedy for business and property loss that derives from a personal injury." *Medical Marijuana, Inc. v. Horn*, 604 U.S. 593, 596 (2025) (emphasis in original). And while the Court explicitly declined to "opine on what it means for a plaintiff to be 'injured in his ... property' under § 1964(c)," the Court held that § 1964(c) *does not* deny a remedy for business and property loss that *derives from* a personal injury. *Id.* at 601, 614. Plaintiffs' claims are certainly focused on personal constitutional and statutory injuries as well as tort claims for personal injuries based on Oklahoma state law. At a minimum, therefore, Plaintiffs' RICO claim does not fail simply because their business or property loss *derives from* a personal injury. The question is whether Plaintiffs' have been "injured in [their] … property." 18 U.S.C. § 1964(c).

Money is personal property under Oklahoma law. 25 O.S. § 26(3); *see also* 60 O.S. § 9; *First Pryority Bank v. Moon*, 326 P.3d 528, 539–40 (2013) (citing *Sw. Bell Tel. Co. v. Okla. State Bd. of Equalization*, 231 P.3d 638, 643, *abrogation on other grounds as recognized in Kingfisher*

*Wind, LLC v. Wehmuller*, 2022 OK 83, ¶¶ 17–18, 521 P.3d 786, 790–91)). The thrust of Plaintiffs' RICO claim against the Aberdeen Defendants is that they were injured in their property because the defendants extorted money from them, and Plaintiffs paid money to Aberdeen and the OSA even though they could not "afford to do so without sacrificing the basic necessities of life, resulting in economic harm to themselves and their families." [ECF No. 212 at 88]. Discovery may reveal a more nuanced landscape, but taking Plaintiffs' allegations as true for present purposes, Plaintiffs plausibly allege that they were injured in their property. And perhaps the result would be different if 18 U.S.C. § 1964(c) required showing an injury *to* property, rather than *in* property. In that case, Plaintiffs would likely need to allege that the property itself was injured (*e.g.* that the money or other property was physically damaged). But that is not what the statute says. The Aberdeen Defendants' motions are, therefore, denied on this basis.

### 3. <u>**Enterprise Engaged in a Pattern of Racketeering Activity**</u>

<u>Enterprise</u>

Plaintiffs plausibly allege a RICO enterprise. As noted above, the Supreme Court found "an association-in-fact enterprise is simply a continuing unit that functions with a common purpose." *Boyle*, 556 U.S. at 938, 948 (2009).

And the focus is whether there is a sufficient showing of a "shared … purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *United States v. Harris*, 695 F.3d 1125, 1136 (10th Cir. 2012). Plaintiffs allege that the OSA and Aberdeen each play a part in collecting money from court debtors, that individual county sheriffs repeatedly authorize the OSA to enter into contracts with Aberdeen, and that the Sheriffs execute the debt collection scheme. [ECF No. 212 at 17, 29]. Plaintiffs also allege that the Shofners are intimately involved in Aberdeen's daily activities and establishing Aberdeen's collection practices. [*Id.* at 15–16]. The Court finds that these allegations are enough to plausibly allege an enterprise that operates to collect court debts in a way that profits the private entities.

<u>Pattern</u>

With respect to the "pattern" element, the Aberdeen defendants argue that Plaintiffs have only alleged one activity as a part of a single scheme rather than a pattern of activity. [ECF No. 403 at 11]; [ECF No. 404 at 16]. Although the parties do not explicitly address this issue under the "continuity plus" framework identified above, Plaintiffs generally respond that they have adequately alleged a pattern of racketeering activity because they allege "multiple incidents of extortion over the course of years, comprising a pattern

… [which] have the same or similar purposes, results, participants, victims, and methods of commission and are in no way isolated events." [ECF No. 419 at 27]; *see also* [ECF No. 420 at 24]. The Court agrees that Plaintiffs have sufficiently alleged a pattern of activity.

Under the continuity plus relationship test, the first prong asks whether predicate acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Johnson*, 56 F.4th at 859. Plaintiffs satisfy this prong because they allege the defendants have a shared purpose in their conduct by collecting court debt. Of course, the continuity prong is a more difficult question, and there is no universal standard. *Id*. In the Court's view, Plaintiffs have sufficiently alleged open-ended continuity because they generally allege that the defendants' scheme was their "regular way of conducting a legitimate enterprise." *Id*. at 860. There is nothing inherently unconstitutional or otherwise unlawful about efforts to collect court fines and fees, but Plaintiffs allege that the manner in which the defendants did this was unlawful. For these reasons, the Aberdeen Defendants' motions are denied on this basis.

<u>Racketeering Activity – Hobbs/Travel Act Extortion – 18 U.S.C. §§ 1951–52</u>

The Shofners contend that Plaintiffs have not sufficiently alleged any conduct on their behalf, and that they, "as officers of Aberdeen[,] were not

robbing or extorting money from Plaintiffs wrongfully but performing obligations pursuant to [their contractual obligations] in order to assist county officials with the recovery of money owed to the county." [ECF No. 403 at 11]. In a similar vein, Aberdeen argues that it was not extorting plaintiffs, but rather performing contractual and statutorily authorized duties. [ECF No 404 at 16–17]. The Court first rejects the Shofners' argument about their level of involvement. Plaintiffs allege that the Shofners have detailed involvement in Aberdeen's debt collection policies and the daily activities of its employees. [ECF No. 212 at 15–16]. The Court also rejects the Aberdeen Defendants' argument about simply complying with its lawful obligations. Plaintiffs do not allege that the defendants were merely acting within their contractual or statutory authority. Rather, they allege the defendants' *conduct* violated their constitutional rights.

Aberdeen further argues that Plaintiffs have not sufficiently alleged the travel element under the Travel Act, and appears to argue that Plaintiffs fail to allege this predicate act because no person physically traveled in interstate commerce. [ECF No. 404 at 17]. Aberdeen misunderstands Plaintiffs' claim. Rather than personal travel, Plaintiffs allege the defendants used the mail or facilities in interstate commerce under 18 U.S.C. § 1952(a)(1). Aberdeen's argument is, therefore, rejected.

Racketeering Activity – Extortion – Okla. Stat. tit. 21, §§ 1481 and 1482

The Shofners argue that Plaintiffs have not sufficiently alleged a predicate act under Oklahoma state law. They primarily assert that Plaintiffs allegations about "threats" do not qualify as "wrongful" under 21 O.S. § 1481 because Plaintiffs' criminal fines are allowed under statute. [ECF No. 403 at 12]. Aberdeen advances substantially the same argument. [ECF No. 404 at 17]. Again, the defendants miss the mark. Plaintiffs allege that the Aberdeen Defendants engaged in conduct beyond what is allowed under Oklahoma law, and that their conduct violates their constitutional rights by threatening arrest for failure to pay fines that Plaintiffs cannot afford to pay. Therefore, Plaintiffs have plausibly alleged "wrongful use of force or fear" under 21 O.S. § 1481.

Racketeering Activity – Extortionate Credit – 18 U.S.C. § 894

In relevant part, 18 U.S.C. § 894(a)(1) provides: "Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means … to collect or attempt to collect any extension of credit" shall be subject to criminal penalties. The Shofners and Aberdeen attack this predicate act on two main bases. First, the Aberdeen Defendants argue that neither of them are a "creditor," nor did they extend credit under 18 U.S.C. § 894. [ECF No. 403 at 13]; [ECF No. 404 at 17–18]. Second, they argue that

their alleged conduct does not qualify as "extortionate means." [ECF No. 403 at 13]; [ECF No. 404 at 18].

The statute defines the term "extend credit" as: "[T]o make or renew any loan, or to enter into *any agreement*, tacit or express, whereby the repayment or satisfaction of *any debt* or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred." 18 U.S.C. § 891(1) (emphasis added). Plaintiffs allege that they enter into payment plans with Aberdeen for their court debts plus the 30 percent penalty. [ECF No. 212 at 32]. And as noted above, Plaintiffs allege that the Shofners are intimately involved in setting Aberdeen's policies and the debt collection process. The Court views this allegation as at least a tacit agreement for repayment of "*any* debt," § 891(1) (emphasis added), that may be deferred because it appears to be an agreement to repay a debt on a later or different schedule than originally intended.

In turn, "[t]he term 'creditor,' with reference to any given extension of credit, refers to any person making that extension of credit, or to any person claiming by, under, or through any person making that extension of credit." *Id.* § 891(2). Plaintiffs allege that Aberdeen is the party that puts them on a payment plan. [ECF No. 212 at 32]. Therefore, they have plausibly alleged that Aberdeen provides them with an extension of credit. Section 894(a) creates liability for all those who "knowingly participate[] in any way … in

the use of any extortionate means," not just those with direct, firsthand involvement. Therefore, while the Shofners might not be a "creditor" in the traditional sense of being directly owed money by a debtor, Plaintiffs allege that they "establish company policy and direct collection activities" for Aberdeen, and they are directly involved in the daily collection activities of Aberdeen's individual debt collectors. [ECF No. 212 at 39]. This is a sufficient use of 18 U.S.C. § 894 as a predicate act for Plaintiffs' RICO claim against the Shofners.

Section 891(6) provides: "An extortionate extension of credit is any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failure to make repayment *could result* in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person." (emphasis added). Plaintiffs allege that the Aberdeen Defendants threaten them with arrest if they do not pay sufficient payments under the payment plan, and do not inform Plaintiffs there are procedures by which Plaintiffs ability to pay can be assessed. [ECF No. 212 at 31]. It is plausible that an arrest could result in the use of violence. Therefore, the Aberdeen Defendants' motion is denied on this basis.

**d. The Sheriffs**

The Grouped Sheriffs,[3] the Rogers County Sheriff, and the Tulsa County Sheriff make several arguments that were also raised by the OSA and the Aberdeen Defendants. For example, the sheriffs challenge Plaintiffs RICO claims against them on the basis that they have failed to allege an injury in their business or property, that there is a sufficient allegation as to interstate commerce, and that they have identified a RICO enterprise. The Court rejects these arguments for the same reasons explained elsewhere in Section III(B)(iv). However, the sheriffs raise a few additional points that must be addressed.

Additionally, and as explained in more detail below, the Court determines that Plaintiffs do not have standing against many of the Grouped Sheriffs. Therefore, the below determinations apply only to those Grouped Sheriffs that Plaintiffs have standing to bring claims against.

**1. The Grouped Sheriffs**

First, the Grouped Sheriffs argue that Plaintiffs have not sufficiently alleged their involvement in the RICO enterprise. [ECF No. 407 at 32–33]. Specifically, the Grouped Sheriffs contend that "Plaintiffs limit the [Grouped Sheriffs'] involvement in the pled 'enterprise' to the performance of services

[3] By referencing the "Grouped Sheriffs," the Court specifically references each county sheriff for which a motion to dismiss was filed at [ECF Nos. 398 & 407].

in their regular course of business" by executing bench warrants. [*Id.*]. But as noted by Plaintiffs, their claims against the Grouped Sheriffs focus on more than just the execution of warrants; they allege that the Sheriffs authorize the OSA to enter into an agreement with Aberdeen with full knowledge of Aberdeen's practices, and they continue to authorize the OSA to enter into the agreement. [ECF No. 212 at 16–17, 29, 33–34]. Plaintiffs also allege that the Grouped Sheriffs provide Aberdeen with debtor information to the OSA, which is then shared with Aberdeen. [*Id*. at 27–28]. Plaintiffs further allege that the Grouped Sheriffs execute warrants based solely on nonpayment, [ECF No. 212 at 9], which they argue is not part of a regular function of the Sheriff, [ECF No. 415 at 25–26], and that they profit as a part of their participation in the scheme. [*Id*. at 26] (citing [ECF No. 212 at 52]).

The Court determines that the Grouped Sheriffs' conduct, including repeatedly authorizing the OSA to enter into agreements with Aberdeen with full knowledge of their practices and providing debtor information to the OSA, are sufficient allegations as to the Grouped Sheriff's participation in the alleged RICO enterprise. The Grouped Sheriffs exercise their discretion to allow the OSA to enter into agreements with Aberdeen on their behalf, and they provide debtor information as a part of that scheme. As alleged by Plaintiffs, these are crucial aspects of the alleged RICO enterprise and overall scheme, and not a part of any individual sheriff's regular course of

business. Because these are sufficient bases to allege the Grouped Sheriffs' involvement in the RICO enterprise, the Court does not express an opinion regarding Plaintiffs' remaining arguments on this point.

Second, the Grouped Sheriffs challenge Plaintiff's reliance on extortion theories as a basis for the alleged predicate acts. On this point, the Grouped Sheriffs primarily rely on the Supreme Court's decision in *Wilkie v. Robbins*, 551 U.S. 537 (2007). The *Wilkie* case involved a yearslong and multifaceted dispute between a landowner and employees of the federal Bureau of Land Management ("BLM"). As the plaintiff-respondent landowner in *Wilkie* alleged it, the BLM waged a targeted campaign against him because he refused to grant the government an easement for public use of his land. *Id.* at 541–49. After protracted administrative proceedings and other interactions with the BLM, the landowner filed suit against several individual BLM employees under RICO, and he alleged violations of the Hobbs Act and Wyoming's blackmail statute. *Id.* at 563–67.

In finding against the landowner's extortion RICO theory, the Supreme Court focused on the scope of common law extortion, which it "presume[d] Congress meant to incorporate when it passed the Hobbs Act in 1946." *Id.* at 563. The Court noted that common law extortion "focused on the harm of public corruption, by the sale of public favors for private gain, not on the harm caused by overzealous efforts to obtain property on behalf of the

Government." *Id.* at 564. In other words, the crucial inquiry is whether the beneficiary of the extortion is for the public or private gain. *Id.* The Grouped Sheriffs argue that because they are just collecting property for the government, their conduct is not extortionate. [ECF No. 407 at 33–34]. But as Plaintiffs point out, the money collected is not just for public debts, it also benefits private third parties; namely, the Aberdeen Defendants and the OSA. [ECF No. 415 at 26–27]. The Court agrees with Plaintiffs on this point.

As the Supreme Court observed in *Wilkie*, the landowner in that case "cited no decision by any court, much less this one, from the entire 60–year period of the Hobbs Act that found extortion in efforts of Government employees to get property for the exclusive benefit of the Government." 551 U.S. at 565. Indeed, one of the two cases cited by the plaintiff in *Wilkie* "involved illegally obtaining property for the benefit of a private third party," and the Court noted that because of this fact, the case did "not stand for the proposition that an act for the benefit of the Government alone can be extortion." *Id.* (citing *People v. Whaley,* 6 Cow. 661, 1827 WL 2284 (N.Y. 1827)). That is what Plaintiffs allege here—the Sheriffs participated in conduct that extorted money from Plaintiffs for the benefit of private parties; namely, the Aberdeen Defendants and the OSA. Therefore, the Grouped Sheriffs' motion is denied on this basis.

### 2. The Rogers and Tulsa County Sheriffs

The Rogers and Tulsa County Sheriffs make, essentially, the same arguments as those made by the Grouped Sheriffs. Therefore, the Court rejects the Rogers and Tulsa County Sheriffs' motions to dismiss Plaintiffs' RICO claims against them for substantially the same reasons as explained above.

### C. The Grouped Sheriffs' Motions [ECF Nos. 398, 407]

The Grouped Sheriffs move to dismiss the claims brought against them in their individual and official capacities. The Court will address their arguments as set forth below.

#### i. Plaintiffs Do not have Standing Against Most of The Grouped Sheriffs Except for those Identified Below.

Standing is a threshold jurisdictional issue based on Article III's cases and controversies requirement. *Shields Law Grp., LLC v. Stueve Siegel Hanson LLP*, 95 F.4th 1251, 1279 (10th Cir. 2024). To establish standing, a party must show three things: "(1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 1280 (internal quotation marks omitted) (quoting *Defenders of Wildlife v. Everson*, 984 F.3d

918, 945 (10th Cir. 2020)). It is up to the party invoking federal jurisdiction to establish standing. *Id.*

The Grouped Sheriffs argue that Plaintiffs' claims improperly focus on the actions of third parties, and that Plaintiffs' face a prudential standing problem. [ECF No. 398 at 20–22]; [ECF No. 407 at 22–24]. Plaintiffs generally respond that they have standing because there are sufficient allegations regarding the Grouped Sheriffs' involvement in the scheme with Aberdeen and their knowledge about the unlawful nature of their conduct. [ECF No. 423 at 9–14]; [ECF No. 415 at 11–13]. Plaintiffs argue they have standing against all members of the alleged RICO conspiracy, and that they have standing to pursue their § 1983 claims under the juridical link doctrine. [ECF No. 423 at 14–16]; [ECF No. 415 at 13].

First, the Court rejects Plaintiffs' arguments regarding the juridical link doctrine. This doctrine potentially allows a court to find standing in class actions "in which the defendant class was composed of public officials" and the class representative "was injured by the conduct of only one of the officials because the court determined that the defendants were so closely related that they should be treated substantially as a single unit." 7AA Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1785.1 (3d ed.) (Apr. 2026 update). Plaintiffs assert that the juridical link doctrine applies "[b]ecause class members have been injured by each County Sheriff

through the same course of conduct." [ECF No. 423 at 15]. Despite Plaintiffs' arguments, the Tenth Circuit has not adopted the juridical link doctrine, and the Court is not convinced it should because it undermines the fundamental principle that a plaintiff must establish standing against each defendant. *See Rolaff v. Farmers Ins. Co., Inc.*, No. CIV-19-0689-J, 2020 WL 4939172, at *3 (W.D. Okla. Mar. 19, 2020); *see also* 1 Newberg and Rubenstein on Class Actions § 2.5 (6th Ed.).

Second, the Court is likewise unconvinced that Plaintiffs have established standing for alleged "harm at the hands of a conspiracy." [ECF No. 423 at 14]. The Court rejects Plaintiffs' argument for the same reason it rejects application of the juridical link doctrine. Specifically, the Court is not convinced by Plaintiffs' out-of-circuit, non-binding authorities that would require the Court to abandon the fundamental principle that a plaintiff must establish standing against each defendant.

Because the Court rejects Plaintiffs' standing arguments as to the juridical link doctrine and as to the Grouped Sheriff defendants' participation in a conspiracy, Plaintiffs lack standing against most of the Grouped Sheriffs. However, the Court does find that Plaintiffs have established standing as to several of the Grouped Sheriffs. Specifically, the Court agrees that Plaintiffs Kendallia Killman, Ira Lee Wilkins, and Melanie Holmes have alleged actual or imminent, specific injuries caused by the Cleveland, Wagoner, and Creek

County Sheriffs, all of which could be redressed. However, the Court finds that the Plaintiffs have failed to allege specific injuries as to the remaining Grouped Sheriffs. The Grouped Sheriffs' motion, therefore, is granted as to those individual Grouped Sheriffs for which a motion was filed at [ECF Nos. 398 and 407], and they are dismissed without prejudice, with the exception that the sheriffs of Cleveland, Wagoner, and Creek counties are not dismissed. The motions with respect to the Tulsa and Rogers County Sheriffs will be addressed below.

#### ii. <u>The Grouped Sheriffs are Not Entitled to Quasi-Judicial Immunity</u>

Judges are, as a general matter, absolutely immune from liability for damages "for acts committed within their judicial jurisdiction." *Pierson v. Ray*, 386 U.S. 547, 554 (1967). Judicial immunity is a broad protection. "A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the 'clear absence of all jurisdiction.'" *Stump v. Sparkman*, 435 U.S. 349, 356–57 (1978) (citation omitted); *see also Ward v. Fisher*, No. 24-5083, 2025 WL 1012868, at *3 (10th Cir. Apr. 1, 2025) (unpublished). The question of whether a judge is immune largely depends on whether their conduct is judicial in nature. Judges are not protected by immunity for "administrative, legislative, or executive functions

that judges may on occasion be assigned by law to perform." *Forrester v. White*, 484 U.S. 219, 227 (1988). To determine whether acts are judicial or administrative, the Court will consider "the nature of the act itself," "whether it is a function normally performed by a judge, and to the expectations of the parties," and "whether they dealt with the judge in his judicial capacity." *Stump*, 435 U.S. at 362 ; *see also Hill v. Town of Valley Brook*, 595 F.Supp.3d 1030, 1040 (W.D. Okla. 2022).

But immunity does not just protect judges. "Immunity which derives from judicial immunity may extend to persons other than a judge where performance of judicial acts or activity as an official aide of the judge is involved." *Henriksen v. Bentley*, 644 F.2d 852, 855 (10th Cir. 1981). Immunity extended to non-judges is often referred to as quasi-judicial immunity.

This protection "has been extended to non-judicial officers where 'their duties had an integral relationship with the judicial process.'" *Whitesel v. Sengenberger*, 222 F.3d 861, 867 (10th Cir. 2000)). Quasi-judicial immunity is also broad. For example, law enforcement officials "acting within the scope of a facially valid court order" enjoy quasi-judicial immunity. *Henshaw v. Bliss*, 421 F. App'x 870, 872 (10th Cir. 2011). But quasi-judicial immunity has limits. "Because quasi-judicial immunity derives from judicial immunity, the order must be one for which the issuing judge is immune from liability." *Turney v. O'Toole*, 898 F.2d 1470, 1474 (10th Cir. 1990). Additionally, a

government official's "immunity depends upon the likely effect their exposure to liability will have on the operation of effective government in a particular context, balanced against the potential for a deprivation of individual rights in that context." *Valdez v. City and Cnty. of Denver*, 878 F.2d 1285, 1287 (10th Cir. 1989).

The Grouped Sheriffs assert that the claims brought against them in their individual capacity[4] should be dismissed because they are protected by quasi-judicial immunity. [ECF No. 407 at 24–28]. Plaintiffs primarily respond that the conduct they allege against the Grouped Sheriffs involves more than the mere execution of a warrant. [ECF No. 415 at 13–14]. Rather, Plaintiffs argue, their claims against the Grouped Sheriffs "pertain primarily to their decision to contract with Aberdeen and assist in its debt-collection activities, with full knowledge of its extortionate conduct." [*Id*. at 14]. The Court agrees that the Grouped Sheriffs' authorization of the Oklahoma Sheriffs' Association to contract with Aberdeen is not the kind of judicial conduct that would entitle the Grouped Sheriffs to quasi-judicial immunity. Therefore, the Grouped Sheriffs' motion is denied on this ground.

[4] Judicial immunity only applies to claims brought against an individual in his or her individual capacity. The Court also notes that judicial immunity does not apply to claims for prospective injunctive relief or declaratory relief, so long as the relief sought is "to define the legal rights and obligations of the parties in anticipation of some future conduct, not simply to proclaim liability for a past act." *Lawrence v. Kuenhold*, 271 F. App'x 763, 766 (10th Cir. 2008).

And as Plaintiffs further highlight, their allegations focus on the Grouped Sheriffs purported knowledge that the warrants they execute are contrary to law. [*Id*. at 14–16]. Plaintiffs specifically allege that the Grouped Sheriffs "execute the arrest warrants threatened and obtained by Aberdeen, Inc., which they know were procured as a result of Aberdeen, Inc.'s policies and practices, in order to provide a credible threat of incarceration to maximize the coercive effect of the company's threats." [ECF No. 212 at 82]. The Court agrees that the Grouped Sheriffs do not enjoy immunity from actions related to conduct they know to be contrary to law. *See Welch v. Saunders*, 720 F. App'x 476, 481 (10th Cir. 2017). The Grouped Sheriffs' motions are denied on this ground.

**D. <u>The Oklahoma Sheriffs' Association (the "OSA") [ECF No. 405]</u>**

Plaintiffs assert claims against the OSA under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 42 U.S.C. § 1983, Oklahoma state law liberty interests, and additional state law causes of action. The OSA argues that Plaintiffs' claims for injunctive and declaratory relief are moot. It further moves to dismiss Plaintiffs' RICO, § 1983, and state law claims for failure to state a claim, and argues that the Court should decline to exercise supplemental jurisdiction over the state law claims. The OSA's motion to dismiss Plaintiffs' RICO claims is denied for the reasons explained above in Section III(B)(iv), *supra*. The Court also rejects the OSA's arguments about

whether Plaintiffs have plausibly alleged a Section 1983 claim violation for the reasons explained above in Section III(B)(iii), *supra*.

**i. <u>Plaintiffs' Claims are Not Moot</u>**

For substantially the same reasons explained in Section III(B)(ii), *supra*, Plaintiffs' claims are not moot.

**ii. <u>Plaintiffs State Plausible Claims Under § 1983</u>**

**a. <u>Plaintiffs Plausibly Allege that the OSA Acted Under Color of State Law.</u>**

Title 42 U.S.C. § 1983 allows recovery against persons "who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." "The Supreme Court has delineated various tests for analyzing the state actor requirement," and one such test is the joint action test. *Janny v. Gamez*, 8 F.4th 883, 919 (10th Cir. 2021). "Under the joint action test, 'courts examine whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights.' This test is satisfied by establishing that a private party 'is a willful participant in joint action with the State or its agents.'" *Id.* (citation omitted).

The Court finds that the OSA acted under color of state law under the joint action test. As alleged by Plaintiffs, the Grouped Sheriffs "authorized

the [OSA] to enter into [agreements with Aberdeen] for debt collection services *on their behalf*." [ECF No. 212 at 16] (emphasis added). Plaintiffs also allege that the OSA is more than a passive intermediary; it affirmatively assists with procuring court debtor information to give to Aberdeen to facilitate the alleged scheme. [ECF No. 212 at 82]. For these and the additional reasons stated by Plaintiffs in their response to the OSA's motion to dismiss, [ECF No. 421 at 15–18], the Court determines that Plaintiffs plausibly allege the OSA acted under color of State law, and the OSA's motion is denied on this basis. Because Plaintiffs have established state action under the joint action test, the Court need not address the other tests discussed by the parties.

**b. <u>Direct Claims</u>**

The OSA also argues that Plaintiffs have failed to state a "direct claim" against it, and that it cannot be held liable on a *respondeat superior* theory. [ECF No. 405 at 20]. The OSA primarily relies on the case of *Dubbs v. Head Start, Inc.*, 336 F.3d 1194 (10th Cir. 2003) to support its argument. But *Dubbs* is materially distinguishable. The *Dubbs* court found that the relevant defendant "had no role" in the challenged conduct, and that was why summary judgment was proper. *Id.* at 1217. But here, and as highlighted above, Plaintiffs allege that the OSA continually renews the contract with Aberdeen despite its knowledge about unlawful activity, and it procures

debtor information to give to Aberdeen to facilitate its efforts. The Court finds this sufficient for Plaintiffs to state a plausible claim against the OSA, and the motion is denied on this basis.

### iii. Plaintiffs Fail to State a Plausible Claim for Abuse of Process or Duress, but Plaintiffs State a Plausible Claim for Unjust Enrichment

Plaintiffs assert three state law claims against the OSA: abuse of process, duress, and unjust enrichment.

#### a. Plaintiffs Fail to State a Claim for Abuse of Process

The elements of an abuse of process claim under Oklahoma law are: "(1) the improper use of the court's process (2) primarily for an ulterior or improper purpose (3) with resulting damage to the plaintiff asserting the misuse." *McGinnity v. Kirk*, 362 P.3d 186, 203–04 (Okla. 2015). The OSA argues that this claim should be dismissed because Plaintiffs fail to allege "that the OSA has used any court process at all, let alone for any improper purpose." [ECF No. 405 at 24].

The Court agrees that Plaintiffs have not sufficiently alleged that the OSA improperly used a court's process. Under Oklahoma law, a plaintiff must show that a "definite act or threat occurred showing an improper use of the process." *Meyers v. Ideal Basic Indus., Inc.*, 940 F.2d 1379, 1383 (10th Cir. 1991) (citing *Gore v. Taylor*, 792 P.2d 432, 435–36 (Okla. Civ. App. 1990)); *see also Tawose v. Winton*, No. CIV-25-1421-R, 2026 WL 360044, at *9 (W.D.

Okla. Feb. 9, 2026) (quoting *Gore* for the same proposition). This is in contrast to § 1983 abuse of process claims where a plaintiff would only need to show that a defendant "set in motion a series of events that defendant knew or reasonably should have known would cause others to deprive plaintiff of his constitutional rights." *German v. Rhoades*, No. CIV-19-0751-F, 2021 WL 619764, at *12 (W.D. Okla. Feb. 17, 2021).

Plaintiffs do not allege that the OSA engaged in a "definite act or threat." They focus on the allegation that the OSA took part in the scheme by providing Aberdeen with debtor information with full knowledge of the constitutional violations. [ECF No. 425 at 23–24]. Although enough to plausibly incur liability for other claims, it is not enough to plausibly allege that the OSA used a court's process. Therefore, Plaintiffs' claim for abuse of process against the OSA is dismissed without prejudice.

**b. <u>Plaintiffs Fail to State a Claim for Duress</u>**

The OSA argues that this claim should be dismissed because there is no such cause of action under Oklahoma law, Plaintiffs' allegations about the OSA's conduct are insufficient as to this claim, and "Plaintiffs have not claimed that the OSA has obtained anything from any of the Plaintiffs through any threats or through any other means." [ECF No. 405 at 24–25]. Although the Court is not aware of a standalone tort action for "duress" under Oklahoma law, it is clear enough that a plaintiff may, as a matter of

equity, bring a claim for relief that would allow recovery of money paid and relieve them from their obligations under a contract that was obtained as a result of duress. *Cimarron Pipeline Const., Inc. v. U.S. Fidelity & Guar. Ins. Co.*, 848 P.2d 1161, 1162–66 (Okla. 1993). Importantly, however, this equitable doctrine is focused on providing a remedy to a party to a contract. *See id*; *see also* 15 O.S. § 52 (allowing a party to seek recission of a contract when consent is not freely given). Because Plaintiffs do not plausibly allege that they entered into an agreement with the OSA, the motion is granted on this basis. Plaintiffs' claim for duress against the OSA is dismissed without prejudice.

#### c. **Plaintiffs Plausibly Allege a Claim for Unjust Enrichment**

The elements for an unjust enrichment claim under Oklahoma law are: "(1) the unjust (2) retention of (3) a benefit received (4) at the expense of another." *Orthman v. Premiere Pediatrics, PLLC*, 545 P.3d 124, 136 (Okla. Civ. App. 2024) (quoting *Dept. of Securities ex rel. Faught v. Blair*, 231 P.3d 645, 658–59 (Okla. 2010)). The OSA offers two main arguments in response to Plaintiffs' motion to dismiss: (1) that the money the OSA receives is statutorily authorized and is, in fact, owed by Plaintiffs; (2) that Plaintiffs "do not allege that the OSA has collected any monies directly from Plaintiffs." [ECF No. 405 at 25].

With respect to the first argument, the OSA misses the mark. Regardless of whether Oklahoma law allows courts to impose fines or whether the OSA may receive a portion of collections, Plaintiffs challenge the manner in which those fines are imposed and collected. Because Plaintiffs plausibly allege that the defendants' practices violate their constitutional rights and other laws for the reasons explained above, the OSA's collection of funds may still be unjust even in the face of state statues that cover a similar subject matter. The OSA's motion is denied on this basis.

With respect to the OSA's second argument, Plaintiffs respond by citing to cases from several out-of-state jurisdictions that have rejected such a requirement. Oklahoma law is not as strict or straightforward as requiring a payment from a plaintiff to a defendant. Rather, the law requires a plaintiff to show either "a contractual or quasi-contractual relationship with [a defendant] or that [a defendant] perpetrated fraud, abuse of confidence, or acted unconscionably." *Randle v. City of Tulsa*, 556 P.3d 612, 622 (Okla. 2024). At this stage, the Court finds that Plaintiffs have plausibly alleged that the OSA benefits from a scheme it actively participates in, that the scheme is to Plaintiffs' detriment, and that the scheme could be considered unconscionable. The OSA's motion to dismiss is denied on this basis.

**iv. The Court Will Exercise Supplemental Jurisdiction**

The Court will exercise supplemental jurisdiction over Plaintiffs' state law claims against the OSA because the federal claims remain, and the state law claims form part of the same case or controversy as the federal claims.

**v. Plaintiffs Claims are not Moot**

The OSA argues that Plaintiffs' claims are moot because of an intervening change in state law. [ECF No. 405 at 26–30]. The Court disagrees and finds that Plaintiffs' claims are not moot for substantially the same reasons explained in Section III(B)(ii), *supra*.

**E. The Judicial Defendants [ECF No. 412]**

Tulsa County Judges Douglas Drummond, Dawn Moody, and William Musseman, and Rogers County Judge Terrell Crosson (the "Judicial Defendants") move to dismiss Plaintiffs claims against them on two grounds: standing and mootness.

**i. Plaintiffs Have Standing Against the Judicial Defendants**

As noted above, to establish standing, a plaintiff must show three things: "(1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Shields Law Grp., LLC v. Stueve Siegel Hanson LLP*, 95

F.4th 1251, 1280 (10th Cir. 2024) (internal quotation marks omitted) (quoting *Defenders of Wildlife v. Everson*, 984 F.3d 918, 945 (10th Cir. 2020)). The Judicial Defendants attack Plaintiffs' standing on all three fronts.

**a. <u>Injury in Fact</u>**

Plaintiffs Randy Frazier and Melanie Holmes contend they have standing against the Judicial Defendants due to their alleged jailing practices. [ECF No. 422 at 14–15]. Frazier alleges that a Tulsa County judge issued a warrant for his arrest. [ECF No. 212 at 12]. Holmes alleges that Judges Moody and Crosson issued warrants for her that are still active. [*Id*. at 15]. Because these warrants are active, they can be acted upon at any time. These plaintiffs further allege that when they are arrested, they are required to wait in jail for up to several days before a hearing, and that they are too poor to pay the amounts the judges require for release. [*Id*. at 12, 15, 39, 47–48]. Rogers County court debtors are also required by the judge "to 'sit it out' in jail at a rate of $25 per day." [*Id*. at 50]. These are concrete, imminent harms. The Court finds that Plaintiffs Frazier and Holmes have sufficiently alleged an injury in fact against these Judicial Defendants.

Plaintiffs Linda Meachum, Christopher Choate, and David Smith allege they have standing against the Tulsa County judges because of the judges' alleged warrant practices. [ECF No. 422 at 16–19]. As noted by Plaintiffs Meachum, Choate, and Smith, they either have not paid or struggle to pay

their court debts due to their poverty. [ECF No. 212 at 12–14]. And, as alleged by Plaintiffs, if they are unable to pay court debts, the county's court clerk will either immediately seek a warrant or refer the case to Aberdeen for collection. [*Id*. at 8]. If Aberdeen cannot get the Plaintiffs to pay, active arrest warrants are signed by Tulsa County Judge Moody based on a policy allowed by Judge Musseman and Judge Drummond. [*Id*. at 19]. Again, the Court finds that these are concrete, imminent harms such that Plaintiffs Meachum, Choate, and Smith have alleged an injury in fact against Judge Musseman, Judge Drummond, and Judge Moody.

The Judicial Defendants' motion to dismiss is denied with respect to their arguments on the issue of whether Plaintiffs have alleged an injury in fact.

**b. Traceability**

The Court finds that, for substantially the same reasons identified above regarding Plaintiffs' allegations of an injury in fact, most Plaintiffs have alleged that their injuries are fairly traceable to the Judicial Defendants. Mr. Frazier has sufficiently alleged that his injuries are fairly traceable to Judges Moody, Drummond, and Musseman. Ms. Holmes has sufficiently alleged that her injuries are also fairly traceable to Judge Crosson. And Ms. Meachum, Mr. Choate, and Mr. Smith have sufficiently alleged that their injuries are fairly traceable to Judge Moody, Judge Musseman, and Judge Drummond. The Judicial Defendants' motion is denied on this basis.

**c. <u>Redressability</u>**

The Judicial Defendants make a few broad arguments as to why Plaintiffs' request for declaratory relief against the Judicial Defendants are not redressable injuries. First, the Judicial Defendants argue that Plaintiffs do not challenge the constitutionality of the underlying state statutes; thus meaning declaratory relief will not cure injuries because the Judicial Defendants are bound to follow those statutes, Plaintiffs will still owe court debts, and declaratory judgments are not meant to address past conduct. [ECF No. 412 at 24–26]. But the relief Plaintiffs seek is forward-looking, based on prohibiting future violations of their constitutional rights as it relates to the Judicial Defendants' *actual practices*, not just what an applicable statute or rule says. The Court has no reason to believe that if the Judicial Defendants' conduct is ultimately found to violate Plaintiffs' rights, the Judicial Defendants would not change their practices to comply with the Court's order. The Judicial Defendants' motion is denied on this basis.

**d. <u>Propriety of Declaratory Relief</u>**

The Judicial Defendants also make several arguments as to why declaratory judgment is improper. First, the Judicial Defendants argue that Plaintiffs have not been put in a position where they must choose "between potential prosecutions or abandoning rights." [ECF No. 412 at 28]. To this point, the Judicial Defendants contend that "Plaintiffs are simply failing to

exercise or ignoring those rights, which does not give them the right to challenge the state court's mechanisms for enforcement of its judgments." [*Id.*]. As noted by Plaintiffs, the Judicial Defendants do not sufficiently support this argument with any applicable authority. [ECF No. 422 at 21]. But what is more, Plaintiffs' allegations are not just about what happened in the past. Rather, they allege that the Judicial Defendants' conduct is ongoing and actively violates their rights, and that they will continue to do so. A declaration as to Plaintiffs' rights can redress future conduct by the Judicial Defendants, so their motion to dismiss is denied on this point.

The Judicial Defendants also invoke the five factors identified in *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994), to argue that the Court should exercise its discretion to deny declaratory relief. [ECF No. 412 at 28–30]. Those factors are:

> [1] whether a declaratory action would settle the controversy; [2] whether it would serve a useful purpose in clarifying the legal relations at issue; [3] whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race to *res judicata* "; [4] whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and [5] whether there is an alternative remedy which is better or more effective.

*Mhoon*, 31 F.3d at 983 (quoting *Allstate Ins. Co. v. Green*, 825 F.2d 1061, 1063 (6th Cir.1987)). With respect to the first three factors, and for the reasons explained in more detail above, the Court determines that Plaintiffs

sufficiently allege that there is a concrete and imminent harm caused by the Judicial Defendants. That means a declaration of rights would be helpful to resolve the issue, and this does not appear to be a situation where Plaintiffs are engaging in "procedural fencing" or are in a race for *res judicata*. As to the fourth factor of friction between federal and state courts, the Tenth Circuit has already addressed this issue to the extent that the Court should abstain from exercising jurisdiction. *Graff v. Aberdeen Enterprises, II, Inc.*, 65 F.4th 500 (10th Cir. 2023). For substantially the same reasons that the Tenth Circuit rejected application of the abstention doctrines in *Graff*, the Court will likewise reject abstention. Finally, for the fifth factor, the Court finds that there is no alternate remedy because the injuries Plaintiffs allege are forward-looking. If Plaintiffs interact with the Judicial Defendants and either a warrant is issued for their arrest or they are arrested because of an outstanding warrant, the harm Plaintiffs seek to redress will have already occurred. That renders appellate review ineffective.

For the reasons set out above, Plaintiffs Randy Frazier, Melanie Holmes, Linda Meachum, Christopher Choate, and David Smith have adequately shown that they have standing against the Judicial Defendants. The Judicial Defendants' motion to dismiss is denied on this basis as to these Plaintiffs. However, Plaintiffs have not pointed to any support for Plaintiff Ira Wilkins' or Carly Graff's standing against the Judicial Defendants, so the motion is

granted as to these Plaintiffs, and their claims against the Judicial Defendants are dismissed without prejudice.

**ii. Mootness**

The Judicial Defendants argue that Plaintiffs' claims are moot because of an intervening change in state law. [ECF No. 412 at 30–40]. The Court disagrees, and finds that Plaintiffs' claims are not moot for substantially the same reasons explained in Section III(B)(ii), *supra*.

**iii. Remaining Issues**

The Judicial Defendants also raise an argument in their reply brief that Judge Kern's previous order in this case remains "intact" as to his "determination of the statutory and constitutional foundation for issuing bench warrants for failure to appear or failure to pay." [ECF No. 436 at 1 n.2]. This argument was raised for the first time in the reply brief, so the Court will not rule on it. *Pamela D.T. v. O'Malley*, No. 4:23-cv-62-CDL, 2024 WL 1381779, at *6 (N.D. Okla. Mar. 31, 2024) (collecting cases). But even if the Court were to decide this issue, the law of the case argument would be rejected because trial courts may reconsider earlier interlocutory orders. *Been v. OK. Indus., Inc.* 495 F.3d 1217, 1225 (10th Cir. 2007).

**F. The Rogers County Defendants [ECF Nos. 402, 406, and 408]**

Several Rogers County Defendants move to dismiss the claims brought against them in their official and individual capacities.

**i. <u>The Rogers County Defendants – Official Capacity</u>**

In their official capacities, The Rogers County Board of County Commissioners (the "Rogers County Board"); the Rogers County Sheriff, Scott Walton (the "Rogers County Sheriff"); and the former Court Clerk of Rogers County, Kim Henry (the "Rogers County Court Clerk"), (together, the "Rogers County Defendants"), raise these issues: (1) whether Plaintiffs have standing against them; (2) whether Plaintiffs have stated a claim for relief against them; and (3) whether Plaintiffs' claims are moot and/or Plaintiffs lack standing to assert claims for relief.

**a. <u>Standing</u>**

To establish standing, and as noted above, a party must show three things: "(1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Shields Law Grp., LLC v. Stueve Siegel Hanson LLP*, 95 F.4th 1251, 1280 (10th Cir. 2024). (internal quotation marks omitted) (quoting *Defenders of Wildlife v. Everson*, 984 F.3d 918, 945 (10th Cir. 2020)). The Rogers County Defendants argue that Plaintiffs cannot trace their injuries to any conduct by the Rogers County Sheriff or Rogers County Court Clerk because "county officers lack authority to act" with respect to the

"assessment and collection of fines, fees, and costs." [ECF No. 406 at 17]. The Rogers County Defendants do not cite any authority for this proposition.

Plaintiffs respond by pointing to their specific allegations against the Rogers County Sheriff and Rogers County Court Clerk. [ECF No. 416 at 13]. The Court agrees with Plaintiffs. The standing question is answered by whether an injury is "fairly traceable" to a defendant's *conduct*, not whether they acted under proper legal authority. *Shields Law Grp., LLC*, 95 F.4th at 1280. Because Plaintiffs identify specific conduct that they allege caused their injuries, they have sufficiently established standing. The Rogers County Defendants' motion is denied on this basis.

**b. <u>Failure to State a Claim</u>**

The Rogers County Defendants raise several arguments on this front that have been addressed elsewhere in this order. The one remaining issue for the Court to decide is whether the Rogers County Board is a properly named defendant. With respect to claims asserted against municipalities and officials in their official capacity, official capacity suits are just "another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dept. of Social Servs. of City of New York*, 436 U.S. 658, 690 n.55 (1978). And as noted by another judge in this district, "[i]n cases where both the governmental entity and official are sued, any official capacity claims are redundant with those against the entity and therefore subject to dismissal."

*Williams v. City of Tulsa*, 11–CV–469–TCK–FHM, 2013 WL 244049, at *11 (N.D. Okla. Jan 22, 2013); *see also Brashear v. Tulsa County Board of Cnty. Commr's*, No. 15-CV-473-GKF-PJC, 2016 WL 633374, at *4 (N.D. Okla. Feb. 17, 2016). Because Plaintiffs name the Rogers County Board, the Court finds the official capacity claims asserted against the Rogers County Sheriff and Rogers County Court Clerk to be superfluous. Therefore, the Rogers County Defendants' official capacity claims against the Rogers County Sheriff and Rogers County Court Clerk are dismissed without prejudice.

**ii. Kim Henry – Rogers County Court Clerk – Individual Capacity [ECF No. 402]**

Defendant Kim Henry ("Henry") moves to dismiss the claims Plaintiffs assert against her in her individual capacity. She makes four main arguments: (1) that she had no personal involvement in the arrest, detention, or confinement of Plaintiffs Graff and Holmes, (2) that she is entitled to absolute quasi-judicial immunity; (3) that she is entitled to qualified immunity; and (4) that Plaintiffs' claims against her are moot. The Court has already addressed the issues of personal involvement (*i.e.* causation), qualified immunity, and mootness in Section III(B), *supra*. Therefore, the only remaining issue to address is whether Henry is entitled to absolute quasi-judicial immunity.

Plaintiffs' allegations focus on Henry's "practices of referring indigent debtors' cases to Aberdeen and seeking failure to pay warrants without regard for ability to pay, without sworn allegations or probable cause that nonpayment was willful (and, in fact, with personal knowledge that it was not), and without submitting information that would preclude a finding of willfulness if presented to the judge." [ECF No. 417 at 10]. Plaintiffs are correct that absolute quasi-judicial immunity does not protect a defendant who obtained an order "in bad faith," as "[s]uch an order does not provide the same quasi-judicial immunity as an order which the defendant played no part in procuring." *Turney v. O'Toole*, 898 F.2d 1470, 1473 n.3 (10th Cir. 1990). Because Plaintiffs allege that Henry referred cases to Aberdeen and sought warrants that either contained misleading information or omitted material information, they sufficiently allege bad faith and knowing participation in a process known to be unlawful. Henry is, for that independent reason, not entitled to absolute quasi-judicial immunity. Henry's motion to dismiss is denied on this basis.

**iii. <u>Scott Walton – Rogers County Sheriff – Individual Capacity [ECF No. 408]</u>**

Defendant Scott Walton ("Walton") moves to dismiss the claims Plaintiffs bring against him in his official capacity for six main reasons: (1) that Plaintiffs lack standing against him; (2) that he had no personal involvement

in any arrest, detention, or confinement of Plaintiffs Graff and Holmes (i.e. causation); (3) that he is entitled to absolute quasi-judicial immunity; (4) that he is entitled to qualified immunity; (5) that Plaintiffs have failed to state a RICO claim against him; and (6) that Plaintiffs' claims for injunctive and declaratory relief are either moot or Plaintiffs lack standing. Again, the Court has already addressed the issues of personal involvement (*i.e.* causation), qualified immunity, mootness, and Plaintiffs' RICO claims in Section III(B), *supra*. Therefore, the only remaining issues are standing and quasi-judicial immunity.

**a. <u>Standing</u>**

Walton argues that Plaintiffs have not sufficiently alleged the causation and traceability elements of standing. [ECF No. 418 at 9–10]. Walton appears to use the terms "causation" and "traceability" interchangeably, keeping the focus on whether Plaintiffs have sufficiently shown that their "injury is fairly traceable to the challenged action of the defendant," rather than using the term "causation." *Shields Law Grp., LLC v. Stueve Siegel Hanson LLP*, 95 F.4th 1251, 1280 (10th Cir. 2024) (internal quotation marks omitted) (quoting *Defenders of Wildlife v. Everson*, 984 F.3d 918, 945 (10th Cir. 2020)).

The Court disagrees with Walton on this issue. As alleged by Plaintiffs, Walton repeatedly authorized the OSA to contract with Aberdeen to collect court debt in Rogers County. And as a part of that process, Plaintiffs allege

that Aberdeen's debt collection and other practices related to securing warrants are conducted in a way that violates Plaintiffs' rights. In other words, Aberdeen and other actors in Rogers County would not be able to violate Plaintiffs' constitutional rights without Walton authorizing the OSA to engage Aberdeen for its services. Additionally, Plaintiffs allege that Walton executes warrants that he knows to be unlawful. What is more, Plaintiffs allege that Walton engages in this conduct with the knowledge of "Aberdeen's impermissible financial bias, their unlawful debt-collection practices, and the illegality of the arrest warrants." [ECF No. 418 at 10]. Walton's motion is denied on this basis.

**b. <u>Quasi-Judicial Immunity</u>**

The Court finds that Walton is not entitled to absolute quasi-judicial immunity for two reasons. First, the Court agrees with Plaintiffs that Walton is not immune from the claims that stem from his decision to repeatedly authorize the OSA to engage Aberdeen for its services, exercising his discretion to transfer cases to Aberdeen, and providing debtor information to Aberdeen. These are administrative functions that are not protected by absolute quasi-judicial immunity. *See Wittenberg v. Oklahoma Health Care Authority*, 781 F.Supp.2d 1221, 1229 (N.D. Okla. 2011) (citing *Stein v. Disciplinary Bd. of Supreme Ct. of NM*, 520 F.3d 1183, 1190, 1193 (10th Cir. 2008); *Becker v. Kroll*, 494 F.3d 904, 925 (10th Cir.2007)).

Second, Walton is not entitled to absolute quasi-judicial immunity for substantially the same reasons that Defendant Kim Henry is not. Plaintiffs allege that Walton seeks and executes warrants known to be unlawful. Absolute quasi-judicial immunity does not protect Walton under these circumstances. *Turney*, 898 F.2d at 1473 n.3 (10th Cir. 1990). Sheriff Walton's motion to dismiss is denied on this basis.

#### c. Mootness/Standing

For substantially the same reasons explained in Section III(B), *supra*, the Court determines that Plaintiffs claims against the Rogers County Defendants in their official capacities are not moot.

### G. The Tulsa County Defendants' Motions [ECF Nos. 399, 409, 410, and 411]

Defendants Tulsa County Court Clerk Don Newberry (the "Tulsa County Clerk"), Tulsa County Sheriff Vic Regalado (the "Tulsa County Sheriff"), the Tulsa County Cost Administrator Darlene Bailey (the "Tulsa County Cost Administrator"), and the Board of County Commissioners of Tulsa County (the "Tulsa County Board") (collectively, the "Tulsa County Defendants") move to dismiss the claims that Plaintiffs allege against them in their official capacities. [ECF No. 399]. The Tulsa County Defendants raise these primary issues as to the claims asserted against them in their official capacities: (1) whether Plaintiffs have sufficiently identified a county custom or policy that

is the moving force behind the deprivation of Plaintiffs' rights; (2) Eleventh Amendment immunity; (3) whether the Tulsa County Cost Administrator has policymaking authority; (4) whether Plaintiffs have stated a claim against the Tulsa County Board; and (5) whether Plaintiffs' claims are moot.

The Tulsa County Sheriff, Vic Regalado, moves to dismiss the claims Plaintiffs assert against him in his individual capacity. [ECF No. 409]. The Tulsa County Sheriff raises these primary issues: (1) whether he is entitled to quasi-judicial immunity; (2) whether he is entitled to qualified immunity; (3) whether Plaintiffs have stated a RICO claim against him; and (4) whether Plaintiffs may seek injunctive relief against him.

The Tulsa County Cost Administrator, Darlene Bailey, moves to dismiss the claims Plaintiffs assert against her in her individual capacity. [ECF No. 410]. The Tulsa County Cost administrator raises these primary issues: (1) whether she is entitled to quasi-judicial immunity; (2) whether she is entitled to qualified immunity; (3) whether Plaintiffs may seek injunctive relief against her; and (4) whether Plaintiffs claims are barred by the statute of limitations.

The Tulsa County Clerk, Don Newberry, moves to dismiss the claims Plaintiffs assert against him in his individual capacity. [ECF No. 411]. The Tulsa County Clerk raises these primary issues: (1) whether he is entitled to quasi-judicial immunity; (2) whether he is entitled to qualified immunity; (3)

whether Plaintiffs may seek injunctive relief against him; and (4) whether Plaintiffs claims are barred by the statute of limitations.

The Court will address the official capacity claims first, and then the individual capacity claims.

**i. Official Capacity**

**a. Eleventh Amendment Immunity**

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Courts recognize that Eleventh Amendment immunity is not just for suits brought by citizens of one state against another state, "the amendment has long been understood to have a broader reach: 'The Eleventh Amendment generally bars suits against a state in federal court commenced by citizens of that state *or* citizens of another state.'" *Good v. Dep't of Ed.*, 121 F.4th 772, 788 (10th Cir. 2024) (emphasis added), *cert. denied*, __ U.S. __, No. 24-992 (2026) (mem.), (quoting *Elephant Butte Irr. Dist. of New Mexico v. Dep't of Interior*, 160 F.3d 602, 607 (10th Cir. 1998)).

States are not just immune when they are sued in their own name. Eleventh Amendment immunity also applies to "arms of the state." *Id.* at 789 (quoting *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 574 (10th Cir.

1996)). "Put differently, '[t]he arm-of-the-state doctrine bestows immunity on entities created by state governments that operate as alter egos or instrumentalities of the states.'" *Id.* (quoting *Watson*, 75 F.3d at 574) (alteration in original). But not all entities affiliated with state government enjoy Eleventh Amendment immunity. For example, counties, municipalities, and local governments generally do not enjoy Eleventh Amendment immunity. *Id.* (quoting *Hennessey v. Univ. of Kan. Hosp. Auth.*, 53 F.4th 516, 527 (10th Cir. 2022)). The arm-of-the-state inquiry is ultimately a matter of federal law. "But 'arm-of-the-state status must be determined in each case by reference to the particular state laws characterizing the entity.'" *Id.* at 790 (citations omitted). The burden for establishing Eleventh Amendment Immunity falls on the party asserting it is an arm of the state. *Id.*

At least in the context of entities created by the state, the Tenth Circuit adheres to the two-step test set out in *Hennessey v. Univ. of Kan. Hosp. Aut.*, 53 F.4th 516 (10th Cir. 2022). Under the first step, which may be dispositive, courts "evaluate the four "primary" *Steadfast* factors." *Id.* at 792.

> ***First***, we assess the character ascribed to the entity under state law. Simply stated, we conduct a formalistic survey of state law to ascertain whether the entity is identified as an agency of the state. ***Second***, we consider the autonomy accorded the entity under state law. This determination hinges upon the degree of control the state exercises over the entity. ***Third***, we study the entity's finances. Here, we look to the amount of state funding the entity receives and consider whether the entity has the ability to issue bonds or levy taxes on its own behalf. ***Fourth***, we

> ask whether the entity in question is concerned primarily with local or state affairs. In answering this question, we examine the agency's function, composition, and purpose.

*Good*, 121 F.4th at 792. Certainly, some of these factors overlap, but if "all of these factors point in the same direction, that is the end of the analysis." *Id.*

If the result under the factors are mixed, "a court should proceed to the second step and consider the 'twin reasons' underlying the Eleventh Amendment—avoiding an afront to the dignity of the state and the impact of a judgment on the state treasury." *Hennessey*, 53 F.4th at 528. "Of these twin reasons, the 'foremost' reason for sovereign immunity is avoiding state liability for any judgment against the entity." *Id.* "The focus of this judgment liability issue is on direct legal liability and not on any indirect or practical loss of funds to the state." *Id.* at 529. "While focusing on legal liability rather than practical effect may 'ignore[ ] economic reality,' it 'provides a clear and workable test in this very confused area of the law. It directs courts away from having to make case-by-case fact-specific determinations of the practical impact on state treasuries.'" *Id.* (citation omitted). An entity is not entitled to Eleventh Amendment immunity "[w]here it is clear that the state treasury is not at risk." *Id.* (quoting *Fresenius Med. Care Cardiovascular Res., Inc. v. Puerto Rico and the Caribbean Cardiovascular Center Corp.*, 322 F.3d 56, 65 (1st Cir. 2003)). With respect to the dignity of the state, courts

> must remember that where "the state has not clearly demarcated the entity as sharing its sovereignty, there is great reason for caution" because "[i]t would be every bit as much an affront to the state's dignity and fiscal interests were a federal court to find erroneously that an entity was an arm of the state, when the state did not structure the entity to share its sovereignty."

*Id*.

But even beyond the *Hennessey* test, courts regularly consider whether county officers are entitled to Eleventh Amendment immunity under two prominent frameworks: the *Mt. Healthy/Steadfast* factors and the *McMillian* factors. *See Couser v. Gay*, 959 F.3d 1018, 1023 (10th Cir. 2020). Notably, in *Couser*, the court highlighted that "[t]he Supreme Court 'has repeatedly refused to extend [Eleventh Amendment] sovereign immunity to counties'" and "[i]t follows that county officers sued for damages in their official capacity are generally not entitled to Eleventh Amendment immunity." *Id*. (citations omitted).

Different courts of appeal have set forth various tests based on the Supreme Court's decision in *Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274 (1977). The Tenth Circuit did so in *Steadfast Ins. Co. v. Ag. Ins. Co.*, 507 F.3d 1250 (10th Cir. 2007). In *Steadfast*, the Tenth Circuit identified four factors that are used to determine whether a defendant is an arm of the state:

> (1) "the character ascribed to the [defendant] under state law";
> (2) "the autonomy accorded the [defendant] under state law;

> (3) "the [defendant's] finances"; and
>
> (4) "whether the [defendant] in question is concerned primarily with local or state affairs."

*Id*. at 1024 (citations omitted).

In *McMillian v. Monroe Cnty.*, 520 U.S. 781 (1997), the Supreme Court focused on two principles to determine whether an Alabama county sheriff was an arm of the state. "First, the sheriff's state or municipal status depends on his specific function 'in a particular area, or on a particular issue.'" *Couser*, 959 F.3d at 1025 (quoting *McMillan*, 520 U.S. at 785). Notably, the court in *Couser* held that "an official may be considered a state official for the purpose of one function and a municipal official for another." *Id*. And the second principle that the Court focused on in *McMillan*, "like the *Mt. Healthy/Steadfast* arm-of-the-state inquiry, the *McMillian* Court's inquiry is 'dependent on an analysis of state law.'" *Couser*, 959 F.3d at 1025 (citation omitted). Under this second principle, a court's "understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law." *McMillian*, 520 U.S. at 786.

The Tulsa County Defendants do not rely on or point to any of this authority to support their arguments. Rather, they rely on a Seventh Circuit case decided more than thirty years ago that is not binding on this Court. [ECF No. 399 at 29–31] (relying on *Scott v. O'Grady*, 975 F.2d 366, 367–69

(7th Cir. 1992)). The Tulsa County Defendants ask the Court to focus on the assertion that they play a part in "enforcing court orders or otherwise act[] as auxiliaries to the Oklahoma state courts." [*Id.* at 29]. They also point to Oklahoma statutes that require county sheriffs to execute lawful orders under threat of criminal penalties. [*Id.* at 30]. What is more, they ask the Court to essentially ignore their finances or whether a judgment would have an impact on the state treasury because the Seventh Circuit found it non-dispositive in *Scott*. [ECF No. 399 at 30–31].

It is unclear how the Tulsa County Defendants expect the Court to find that they are entitled to Eleventh Amendment immunity when they completely ignore—and, apparently, outright reject—one of the factors specifically identified by the Tenth Circuit in *Steadfast*. Indeed, the Tenth Circuit recently highlighted the importance of an entity's financial relationship with the state when deciding whether it is an arm of the state. *Good v. Dep't of Ed.*, 121 F.4th 772, 795 (10th Cir. 2024). And as noted above, it is the Tulsa County Defendants' burden to show they are entitled to protection. *Id.* at 790. The Court recognizes that one factor alone might not be dispositive. But the Tulsa County Defendants have failed to even address the financial factor, which is particularly telling in the context of county government officials who are regularly denied Eleventh Amendment immunity.

But even assuming the financial *Steadfast* factor weighed in the Tulsa County Defendants' favor, Plaintiffs allege that "these officials do not simply 'execute' judges' orders." [ECF No. 427 at 22]. Rather, Plaintiffs allege that the Tulsa County Officials use their discretion to decide the manner in which fees are collected, who to partner with in those pursuits, and how warrants are sought and executed, all while knowing the result of their conduct will violate Plaintiffs' constitutional rights.

For the reasons stated above, the Court finds that the Tulsa County Defendants have failed at this stage to show that they are entitled to Eleventh Amendment immunity, and their motion is denied on this basis. Of course, this issue may be revisited later in the proceedings upon further showings from these defendants.

**b. Whether the Tulsa County Cost Administrator and Tulsa County Board are Properly Named Parties**

For the reasons explained above in Section III(F)(i)(b), *supra*, when county officials *and* the relevant board of county commissioners are named with respect to § 1983 claims brought in an official capacity against officers, the board of county commissioners is the properly named party. Therefore, the Tulsa County Defendants' motion is granted as to the claims brought against the Tulsa County Cost Administrator in her official capacity, but the motion is denied as to the claims against the Tulsa County Board.

**c. <u>Mootness</u>**

For substantially the same reasons explained above in Section III(B)(ii), *supra*, the Court finds that Plaintiffs' official capacity claims against these Defendants are not moot.

**ii. <u>Individual Capacity – Tulsa County Cost Administrator [ECF No. 410]</u>**

The Tulsa County Cost Administrator, Darlene Bailey ("Bailey"), argues that Plaintiffs' claims against her in her individual capacity should be dismissed for several reasons: (1) she is entitled to quasi-judicial immunity; (2) she is entitled to qualified immunity; (3) that Plaintiffs cannot obtain injunctive relief against her; and (4) most of plaintiffs' claims are barred by the statute of limitations. The Court already addressed the qualified immunity issue above, so it will address the remaining issues here.

**a. <u>Quasi-Judicial Immunity</u>**

As Plaintiffs note, they allege two general categories of conduct against Bailey: (1) seeking warrants; and (2) working with Aberdeen to collect court debt. Because the quasi-judicial immunity issue is answered by analyzing a defendant's *conduct*, *Whitesel v. Sengenberger*, 222 F.3d 861, 867 (10th Cir. 2000), the Court will analyze each category of conduct in turn.

### 1. Seeking Warrants

Plaintiffs allege that after a criminal defendant enters a guilty plea, they are instructed to go to the Tulsa County Cost Administrator who tells criminal defendants they can "either pay the full amount by the end of the probation period (if a probationary term is imposed), or make minimum payments to the court every month." [ECF No. 212 at 44]. Then, "[i]f a debtor does not make a payment during the first six months of the payment period, the Tulsa Cost Administrator's office, pursuant to policy established by the Tulsa Clerk, seeks a debt-collection arrest warrant based solely on the nonpayment, which as a matter of course is signed by Defendant Judge Moody." [*Id*. at 45]. On the other hand, if a debtor does make a payment during the initial six month period, the Tulsa County Cost Administrator's office will conduct annual reviews of the case. [*Id*.]. However, "the Tulsa Cost Administrator's office will seek an arrest warrant if the debtor makes no payment for twelve months." [*Id*.]. After an arrest warrant is issued, a $250 payment is typically required to recall the warrant, but that can be negotiated. [*Id*.].

Bailey points to the case of *Cain v. City of New Orleans*, No. 15-4479, 2017 WL 467685 (E.D. La. Feb. 3, 2017), to argue that Plaintiffs' allegations, taken as a whole, indicate that Bailey does not just seek warrants, she engages in judicial activity entitled to quasi-judicial immunity. [ECF No. 410 at 19–20].

Plaintiffs attempt to distinguish this case from *Cain* by noting that the defendant judges in *Cain* were alleged to have outsourced their job to a court administrator, but Bailey merely investigates and "seeks" warrants. [ECF No. 426 at 13]. The Court agrees with the Bailey on this point. Plaintiffs do not just allege that Bailey investigated and sought warrants. They allege that the judges issue warrants as a matter of course and that she recalls warrants upon satisfactory payments. That is substantially closer to the situation presented in *Cain* than a traditional law enforcement officer who conducts an independent investigation and then seeks an arrest warrant. For these reasons, Bailey is entitled to absolute quasi-judicial immunity with respect to her involvement in seeking warrants.

**2. <u>Working With Aberdeen to Collect Court Debt</u>**

Plaintiffs also allege that Bailey "'chooses which individual cases to transfer to Aberdeen'; 'transfer[s] such cases without conducting an inquiry into the debtor's ability to pay,' knowing this will automatically trigger a 30-percent surcharge; and 'assists Aberdeen, Inc. with seeking arrest warrants at [its] request.'" [ECF No. 426 at 15] (citing [ECF No. 212 at 20]). Bailey argues that when she transfers cases to Aberdeen, that is done "in direct response to an order given by the Chief Justice of the Supreme Court" pursuant to a Supreme Court Administrative Directive. [ECF No. 410 at 20–21] (citing *In Re: Participation in Misdemeanor or Failure-to-Pay Warrants*

*Program*, No. S.C.A.D. 2011-08 (Okla. 2011)). Bailey also relies on several Oklahoma statutes involving court debt. [ECF No. 410 at 18–19].

Given the broad nature of the Oklahoma Supreme Court Administrative Directive and the discretion involved in how to implement the program, the Court is skeptical that any conduct taken under that order is *ipso facto* judicial in nature and, thus entitling an actor to absolute quasi-judicial immunity. The Court does not, however, rest its decision on the impact of S.C.A.D. 2011-08. Rather, the Court looks to the *conduct* alleged by Plaintiffs. For the reasons explained above, Bailey is entitled to absolute quasi-judicial immunity for her efforts to seek warrants. However, the additional conduct alleged by Plaintiffs (*i.e.* choosing which cases to transfer to Aberdeen), is administrative in nature. Therefore, Bailey is not entitled to absolute quasi-judicial immunity for this conduct. *See Forrester v. White*, 484 U.S. 219, 227 (1988). Bailey's motion is denied on this basis.

**b. Injunctive Relief**

The Court agrees that Plaintiffs cannot be granted injunctive relief against Bailey in her individual capacity. Plaintiffs raise an interesting point about a potential loophole in simultaneously allowing a defendant to claim he or she is not acting pursuant to a final municipal policy (thus meaning no liability attaches for an official capacity claim) while also prohibiting injunctive relief for individual capacity claims. [ECF No. 426 at 21–25].

Nevertheless, the Tenth Circuit has been clear enough that injunctive relief is not available against officials sued in their individual capacity. *E.g. Springer v. Seventh Judicial District Court*, No. 24-2174, 2025 WL 3121605, at *2 (10th Cir. Nov. 7, 2025) (quoting *Chilcoat v. San Juan County*, 41 F.4th 1196, 1214 (10th Cir. 2022)). Therefore, while the Court does not dismiss any particular claims, Bailey's motion is granted on this basis, and the Court finds that Plaintiffs cannot obtain injunctive relief against Bailey in her individual capacity.

**c. <u>Statute of Limitations</u>**

Before addressing the substantive question raised by the Bailey about whether Plaintiffs' claims against her under § 1983 are barred by the statute of limitations, the Court must address whether it may even consider such arguments. Plaintiffs assert that the Court should not reach the statute of limitations issue because Fed. R. Civ. P. 12(g)(2) states that a party "must not make another motion under [Rule 12] raising a defense or objection that was available to the party but omitted from its earlier motion." [ECF No. 426 at 25]. As noted by Plaintiffs, Bailey did not raise the statute of limitations issue in its previous motion to dismiss. [*Id.*]; *see also* [ECF No. 237]. But there are exceptions provided in Rule 12(h)(2). [ECF No. 426 at 25].[5] Rule

[5] There is also an exception for motions challenging a court's subject matter jurisdiction, but that is not relevant here.

12(h)(2) allows a party to raise a defense of failure to state a claim under three circumstances: "(A) in any pleading allowed or ordered under Rule 7(a); (B) by a motion under Rule 12(c); or (C) at trial."

Plaintiffs point this Court to the Tenth Circuit's decision in *Albers v. Bd. of Cnty. Commr's of Jefferson Cnty.*, 771 F.3d 697 (10th Cir. 2014). [ECF No. 426 at 26–27]. The Court generally agrees that *Albers* counsels against considering Bailey's statute of limitations argument. In *Albers*, the Tenth Circuit was presented with an appeal of a district court order that considered a defendant's arguments raised under Fed. R. Civ. P. 12(b)(6) that were not raised in a previous motion to dismiss. *Albers* at 699–700. On appeal, the plaintiff argued that the district court should not have considered the arguments raised in the defendant's second motion to dismiss because of the prohibition set forth in Fed. R. Civ. P. 12(g)(2). *Id.* at 700.

The Tenth Circuit did not squarely decide whether it was error for the district court to consider the new arguments, but it evaluated the Seventh Circuit's approach to this problem as stated in *Ennenga v. Starns*, 677 F.3d 766 (7th Cir. 2012). *Albers*, 771 F.3d at 702–03. In *Ennenga*, the Seventh Circuit found it proper for a district court to consider new arguments not raised in a prior motion to dismiss because "Rule 12(h)(2) specifically excepts failure-to-state-a-claim defenses from the Rule 12(g) consolidation requirement." 677 F.3d at 773. In *Albers*, however, the Tenth Circuit

criticized the Seventh Circuit's approach because it "fails to address the language from Rule 12(h)(2) that arguably limits a party to presenting those arguments in a pleading, a motion for judgment on the pleadings, or at trial." 771 F.3d at 703. The Tenth Circuit also described the *Ennenga* decision as "problematic." *Id.* While the Tenth Circuit addressed the merits of the district court's decision (which it ultimately affirmed), it did so for reasons that are not yet present in this case. In *Albers*, the Tenth Circuit found that, presuming an error occurred, it was harmless because the defendant could have properly asserted the same arguments under Fed. R. Civ. P. 12(c). *Id.* at 701–02.

The Court is left in a perplexing position. On the one hand, the Tenth Circuit acknowledged some courts' view that it is improper to apply Rule 12(g)(2) in a "hyper-technical" way that undermines the goals set forth in Fed. R. Civ. P. 1. *Albers*, 771 F.3d at 702. The Court sympathizes with this view, especially considering that motions brought under Fed. R. Civ. P. 12(c) are evaluated in the same way as motions brought under Fed. R. Civ. P. 12(b)(6). *Dyno Nobel v. Steadfast Ins. Co.*, 85 F.4th 1018, 1025 (10th Cir. 2023); *Sheridan v. Unifi Aviation, LLC*, No. 23-cv-00444-SH, 2024 WL 2864032, at *3 (N.D. Okla. June 6, 2024). On the other hand, the Tenth Circuit clearly indicated its view that the Seventh Circuit's approach in *Ennenga* was "problematic." *Albers*, 771 F.3d at 703. The Court also cannot

ignore plain language in Fed. R. Civ. P. 12(h)(2) limiting its exceptions to circumstances not present in this case.

Given the above, the Court agrees with Plaintiffs that it cannot consider Bailey's statute of limitations argument pursuant to Fed. R. Civ. P. 12(g)(2). Although considering the merits of the statute of limitations argument at this stage would be an efficient use of judicial resources, the Court will not knowingly commit error, harmless or otherwise. Bailey's motion is denied on this basis.

**iii. Individual Capacity – Tulsa County Sheriff [ECF No. 409]**

The two remaining arguments raised by the Tulsa County Sheriff, Vic Regalado ("Regalado"), that have not already been addressed elsewhere in overarching sections this order are: (1) that Plaintiffs cannot seek injunctive relief for the claims asserted against him in his individual capacity; and (2) that he is entitled to quasi-judicial immunity. For the same reasons explained above in Section III(G)(ii)(b), *supra*, the Court finds that Plaintiffs cannot obtain injunctive relief against Regalado in his individual capacity, so the motion is granted on this basis.

With respect to absolute quasi-judicial immunity, the Court agrees that Regalado's arguments suffer from a fatal flaw. Plaintiffs do not just allege that Regalado's conduct violated their constitutional rights, they allege that he actively participated in the scheme and execution of warrants that he

knew to be unlawful. [ECF No. 424 at 23–24]. Therefore, Regalado is not entitled to absolute quasi-judicial immunity. *Turney v. O'Toole*, 898 F.2d 1470, 1473 n.3 (10th Cir. 1990).

**iv. <u>Individual Capacity – The Tulsa County Clerk [ECF No. 411]</u>**

The three remaining arguments raised by the Tulsa County Clerk, Don Newberry ("Newberry"), that have not already been addressed elsewhere in this order are: (1) that Plaintiffs cannot obtain injunctive relief against him; (2) that Plaintiffs' claims are barred by the statute of limitations; and (3) that he is entitled to absolute quasi-judicial immunity.

On the injunctive relief issue, the Court agrees with Newberry that Plaintiffs cannot obtain injunctive relief against him in his individual capacity for the same reasons explained in section III(G)(ii)(b), *supra.* With respect to the statute of limitations issue, the Court agrees with Plaintiffs that the Court cannot consider such arguments at this stage for substantially the same reasons explained in section III(G)(ii)(c), *supra*.

The arguments raised by Newberry and Plaintiffs regarding absolute quasi-judicial immunity are essentially the same as those raised as Bailey. Therefore, for substantially the same reasons explained in section III(G)(ii)(a), *supra*, the Court determines that Newberry is entitled to absolute quasi-judicial immunity for his conduct related to seeking warrants,

but he is not entitled to immunity for his conduct related to working with Aberdeen.

**H. Aberdeen and the Shofners [ECF Nos. 403 and 404]**

The Aberdeen Defendants move to dismiss Plaintiffs' claims against them. Some of the issues raised by the Aberdeen Defendants, such as whether Plaintiffs have stated a RICO claim against them, have already been addressed elsewhere in this order. With respect to the remaining issues that have not been addressed, Defendants' motions are granted in part and denied in part for the reasons set forth below.

**i. Section 1983 Claims**

Two issues remain with respect to Plaintiffs' § 1983 claims against the Aberdeen Defendants: (1) whether these defendants acted under color of state law; and (2) whether these defendants are entitled to quasi-judicial immunity.

**a. Under Color of State Law**

As noted above, "The Supreme Court has delineated various tests for analyzing the state actor requirement." *Janny v. Gamez*, 8 F.4th 883, 919 (10th Cir. 2021). Plaintiffs assert that they can establish Aberdeen and the Shofners acted under color of state law under several of these tests. [ECF No 419 at 11–13]; [ECF No. 420 at 8–11]. The Court determines that Plaintiffs have sufficiently alleged that Aberdeen and the Shofners have engaged in

conduct that satisfies the joint action test. Under that test, it is sufficient to show "that a private party 'is a willful participant in joint action with the State or its agents.'" *Janny* 8 F.4th at 919 (quoting *Anderson v. Suiters*, 499 F.3d 1228, 1233 (10th Cir. 2007)). Here, Plaintiffs allege that Aberdeen, with direct and detailed involvement by the Shofners in Aberdeen's daily activities, play a cooperative and integral part of the larger court debt collection scheme alleged by Plaintiffs. Plaintiffs also allege that Aberdeen, for example, works directly with the county court clerks and cost administrators to achieve its goals. This scheme, as explained in more detail above, is part of the effort to collect debt that Plaintiffs purportedly owe. That is sufficient to plausibly allege that Aberdeen and the Shofners acted under color of sstate law. The motion to dismiss is, therefore, denied on this basis.

**b. <u>Quasi-Judicial Immunity</u>**

Both the Shofners and Aberdeen very briefly argue that they are entitled to quasi-judicial immunity. They assert that they were "at best, only performing a purely ministerial act of locating and attempting to collect orders issued from a court." [ECF No. 403 at 19–20]; [ECF No. 404 at 23]. Aberdeen quotes *Valdez v. City and Cnty. Of Denver*, 878 F.2d 1285, 1289 (10th Cir. 1980) to argue that they should not be subjected to liability "for the legality of decisions which they are powerless to control." [ECF No. 404 at 23]. Aberdeen is correct that courts generally extend immunity for "acts

prescribed by [a] judge's order." *Moss v. Kopp*, 559 F.3d 1155, 1167 (10th Cir. 2009). "Although quasi-judicial or prosecutorial functions are protected by absolute immunity, investigative or administrative functions receive only qualified immunity." *Wittenberg v. Okla. Health Care Auth*, 781 F.Supp.2d 1221, 1229 (N.D. Okla. 2011) (citing *Stein v. Disciplinary Bd. of Supreme Ct. of NM*, 520 F.3d 1183, 1190, 1193 (10th Cir. 2008); *Becker v. Kroll*, 494 F.3d 904, 925 (10th Cir.2007)).

Plaintiffs primarily argue that Aberdeen and the Shofners are not entitled to absolute quasi-judicial immunity because "[n]othing [they] do bears any resemblance to a judicial process or has any of the indicia of a court proceeding." [ECF No. 420 at 21]. The Court agrees. The Aberdeen Defendants focus their arguments in support of quasi-judicial immunity on their efforts to locate and collect from debtors. [ECF No. 403 at 19–20]; [ECF No. 404 at 23]. These are administrative functions not entitled to quasi-judicial immunity, and the Aberdeen Defendants' motions are denied on this basis.

Plaintiffs also argue that Aberdeen is not entitled to absolute immunity because "a corporate entity cannot claim quasi-judicial immunity." [ECF No. 419 at 22]. The Court does not address this argument because the Court's determination above sets forth an independent basis to deny the Shofners and Aberdeen absolute quasi-judicial immunity.

**ii. State Law Claims**

At the outset, the Court will not decline to exercise supplemental jurisdiction over Plaintiffs' state law claims against the Aberdeen Defendants because some federal claims remain, and the state law claims form part of the same case or controversy.

**a. Plaintiffs State a Claim for Abuse of Process**

As noted above, one of the elements for an abuse of process claim under Oklahoma law is "improper use of the court's process." *McGinnity v. Kirk*, 362 P.3d 186, 203–04 (Okla. 2015). Among other arguments, the Aberdeen Defendants contend that Plaintiffs have not sufficiently alleged that these defendants have misused a warrant. [ECF No. 403 at 26–27]; [ECF No. 404 at 31]. The Court interprets this argument as one attacking the "use" element of this claim. The Court agrees that Plaintiffs have sufficiently alleged that the Aberdeen Defendants improperly used a court's process.

For an abuse of process claim under Oklahoma law, a plaintiff must show that a "definite act or threat occurred showing an improper use of the process." *Meyers v. Ideal Basic Indus., Inc.*, 940 F.2d 1379, 1383 (10th Cir. 1991) (citing *Gore v. Taylor*, 792 P.2d 432, 435–36 (Okla. Civ. App. 1990)); *see also Tawose v. Winton*, No. 25-CV-1421-R, 2026 WL 360044, at *9 (W.D. Okla. Feb. 9, 2026) (quoting *Gore* for the same proposition). This is in contrast to § 1983 abuse of process claims where a plaintiff would only need

to show that a defendant "set in motion a series of events that defendant knew or reasonably should have known would cause others to deprive plaintiff of his constitutional rights." *German v. Rhoades*, No. 19-CV-751-F, 2021 WL 619764, at *12 (W.D. Okla. Feb. 17, 2021). Plaintiffs respond that they have adequately alleged improper use of the court's process because the Aberdeen Defendants use warrants "as a tool of extortion to extract unlawful payments from indigent debtors." [ECF No. 419 at 30]; *see also* [ECF No. 420 at 25–26]. Unlike the OSA, which is a step removed from using a court's process, Plaintiffs allege the Aberdeen Defendants use the threat of actual court process—a warrant, or the legitimate threat of a warrant—for purposes of collecting debts in a way that violates the law. Therefore, the Aberdeen Defendants' motions are denied on this basis.

**b. <u>Plaintiffs State a Claim for Duress</u>**

The Shofners allege that this claim should be dismissed because "duress" based in contract law "is not an independent tort under Oklahoma law." [ECF No. 403 at 27]. While the Court agrees that "duress" is not an individual tort claim under Oklahoma law, it is clear enough that a plaintiff may, as a matter of equity, bring a claim for relief that would allow recovery of money paid and relieve them from their obligations under a contract that was obtained as a result of duress. *Cimarron Pipeline Const., Inc. v. U.S. Fidelity*

*& Guar. Ins. Co.*, 1993 OK 22, ¶¶ 3, 6, 848 P.2d 1161, 1162–66 (Okla. 1993). Therefore, the Shofners' motion to dismiss is denied.

Although the Shofners' motion is denied, one issue was not addressed in their briefing. It is unclear to the Court how Plaintiffs could recover against the Shofners if there is no contract between these two parties. If this claim is the subject of any future motions, the Court expects the parties to address this issue.

Similarly, Aberdeen argues that Count nine for "civil extortion" should be dismissed because there is no such cause of action under Oklahoma law. [ECF No. 404. at 32]. Count nine of the SACAC is for duress, not civil extortion. [ECF No. 212 at 97–98]. This appears to be a vestige of Aberdeen's argument in one of its' previous motions to dismiss filed at [ECF No. 175 at 30]. Plaintiffs' operative complaint does not allege "civil extortion" against Aberdeen, so this argument is moot.

**c. <u>Plaintiffs State a Claim for Unjust Enrichment</u>**

The Aberdeen Defendants move to dismiss Plaintiffs' unjust enrichment claims against them for two primary reasons: (1) the administrative fees they receive are statutorily authorized; and (2) the underlying court debt is actually owed by Plaintiffs, and not due to any conduct by the Aberdeen Defendants. [ECF No. 403 at 28]; [ECF No. 404 at 32]. Regardless of whether Oklahoma law allows courts to impose fines, and whether the Aberdeen

Defendants may receive a portion of collections, Plaintiffs challenge the manner in which those fines are imposed and collected. Because Plaintiffs plausibly allege that the Aberdeen Defendants' practices violate their constitutional rights and other laws for the reasons explained above, the Aberdeen Defendants' collection of funds may still be unjust, even in the face of otherwise enforceable state statutes. The Aberdeen Defendants' motion is denied on this basis.

## IV. <u>Conclusion</u>

The Court leaves the parties with some closing thoughts as they move forward in this case. First, there are two additional pending motions not yet addressed in this order: Plaintiffs' motion for temporary restraining order and preliminary injunction [ECF Nos. 77 and 79];[6] and Plaintiffs' motion to certify class [ECF No. 78]. The motion for temporary restraining order was converted into a motion for preliminary injunction, [ECF No. 149], and the matter was referred to United States Magistrate Judge Jodi F. Jayne, [ECF No. 325]. Judge Jayne set the motion for temporary restraining order and preliminary injunction for telephone hearing, [ECF No. 334], and the matter was taken under advisement following a hearing. [ECF No. 344]. Before a

[6] This matter was docketed as [ECF Nos. 77 and 79], but there is only one filing at [ECF No. 77]. Therefore, when the Court refers to the motion for preliminary injunction, it is referring to both [ECF Nos. 77 and 79].

report and recommendation was entered on the motion for temporary restraining order and preliminary injunction, this action was dismissed by Judge Terence Kern, [ECF No. 352], and appealed to the Tenth Circuit. [ECF No. 356]. The Tenth Circuit reversed and remanded that decision back to this Court. [ECF No. 366]. Upon remand, the motion for preliminary injunction and temporary restraining order were reinstated. Because these motions were already heard by Judge Jayne, the Court again REFERS those motions [ECF Nos. 77 and 79] to United States Magistrate Judge Jodi F. Jayne for findings and recommendation pursuant to 28 U.S.C. § 636(b).

With respect to the pending motion for class action certification, [ECF No. 78], the defendants' deadline to respond to that motion was delayed until after the Court resolved the previous round of motions to dismiss. [ECF No. 148]. But because Judge Kern dismissed this action, no response brief was ever filed. Significant time has passed since the motion for class certification was filed, and some of the Court's rulings in this order may have an impact on the nature of class allegations. Therefore, the Court will exercise its discretion to STRIKE Plaintiffs' motion for class certification, [ECF No. 78], without prejudice to refiling. The Court will set a scheduling conference following entry of this order, and a new scheduling order will be entered that sets relevant deadlines for class certification issues.

Second, the Court implores the parties to proceed with an eye toward speedy and just results. The Federal Rules of Civil Procedure counsel courts *and parties* to construe the rules in such a way that they "secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. The Court's Civil Chambers Rules begin with a similar admonition in that parties must make a meaningful effort to confer with opposing parties before filing *any* motion. The courthouse doors are always open for litigants to resolve their disputes. But please at least give the other side a call before rushing to file a motion on an issue that reasonable minds can resolve without judicial intervention.

Third, the Court laments the glacial pace with which this case has proceeded. Much time has passed since this case was first filed, and the landscape of the court debt collection process may have substantially changed. The Court expects the parties to seriously and diligently evaluate and investigate their claims and defenses upon entry of this order. This is the time to do so. To that end, the Court sets this case for a scheduling conference on October 30th, 2026, at 9:30 a.m. Counsel for the parties are further ordered to confer before the scheduling conference to discuss scheduling matters. Counsel must come prepared with full authority to make all necessary scheduling decisions. The Court further advises that it intends to set this case for an early judicial settlement conference.

DATED this 30th day of September, 2026.

Sara Hill

Sara E. Hill
UNITED STATES DISTRICT JUDGE